ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
Matthew L. Venezia (State Bar No. 313812)
  mvenezia@egcfirm.com
George B. A. Laiolo (State Bar No. 329850)
  glaiolo@egcfirm.com
2121 Avenue of the Stars, 30th Floor
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697

Attorneys for Plaintiff Anthony Randall

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ANTHONY RANDALL,<br><br>              Plaintiff,<br><br>       vs.<br><br>UNITED NETWORK FOR ORGAN SHARING; CEDARS-SINAI MEDICAL CENTER,<br><br>              Defendants. | Case No. 2:23-cv-02576-MEMF (MAAx)<br>The Hon. Maame Ewusi-Mensah Frimpong<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT CEDARS-SINAI MEDICAL CENTER'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Date:    September 14, 2023<br>Time:   10:00 a.m.<br>Crtrm.: 8B<br><br>Trial Date: None Set |

2253774.1

Case No. 2:23-cv-02576-MEMF (MAAx)

PLAINTIFF'S OPPOSITION TO DEFENDANT CEDARS-SINAI'S MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES .............................................. 1

I. PRELIMINARY STATEMENT ........................................................................ 1

II. SUMMARY OF FACTUAL ALLEGATIONS .................................................. 3

    A. Cedars-Sinai provides data considered by UNOS when determining who will be awarded donor kidneys. ................................. 3

    B. Cedars-Sinai's use of the race-based coefficient discriminates against its Black patients seeking donor kidneys. ................................. 4

    C. Even after UNOS outlawed the race-based coefficient, Cedars-Sinai failed to timely update its patients' wait time calculations. .......... 5

    D. Mr. Randall suffered discrimination via the race-based coefficient for years, and UNOS never awarded Mr. Randall a kidney. ........................................................................................................ 6

    E. By virtue of the delay to his kidney transplant, Mr. Randall suffered significant economic harm. ......................................................... 6

III. CEDARS-SINAI'S MOTION SHOULD BE DENIED .................................... 7

    A. Legal Standard ................................................................................................ 7

    B. Mr. Randall's claims are timely. .............................................................. 7

        1. Pursuant to the discovery rule, Mr. Randall's claims did not accrue until shortly before this case was filed. ........................ 7

        2. Alternatively, the continuing violations doctrine applies to render Mr. Randall's claims timely. ............................................ 10

    C. Mr. Randall has statutory standing to bring a UCL claim against Cedars-Sinai. ................................................................................... 12

    D. Cedars-Sinai breached its fiduciary duty to Mr. Randall. ..................... 13

IV. CONCLUSION ..................................................................................................... 14

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................ 7

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................ 7

*Caltex Plastics, Inc. v. Lockheed Martin Corp.*,
    824 F.3d 1156 (9th Cir. 2016) ............................................................................ 7

*Lopez v. Smith*,
    203 F.3d 1122 (9th Cir. 2000) ............................................................................ 7

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
    519 F.3d 1025 (9th Cir. 2008) ............................................................................ 7

*Olsen v. Idaho State Bd. of Med.*,
    363 F.3d 916 (9th Cir. 2004) .............................................................................. 8

**STATE CASES**

*Aryeh v. Canon Bus. Solutions, Inc.*,
    55 Cal. 4th 1185 (2013) ........................................................................ 2, 8, 10, 11

*Fox v. Ethicon Endo-Surgery, Inc.*,
    35 Cal. 4th 797 (2005) ........................................................................................ 8

*Hongsathavij v. Queen of Angels etc. Med. Ctr.*,
    62 Cal. App. 4th 1123 (1998) ............................................................................ 13

*Jones v. Tracy School Dist.*,
    27 Cal. 3d 99 (1980) .......................................................................................... 11

*Kwikset Corp. v. Superior Court*,
    51 Cal. 4th 310 (2011) ...................................................................................... 12

*Moore v. Regents of University of California*,
    51 Cal. 3d 120 (1990) .............................................................................. 3, 13, 14

*O'Byrne v. Santa Monica-UCLA Med. Ctr.*,
    94 Cal. App. 4th 797 (2001) .............................................................................. 13

# TABLE OF AUTHORITIES
## (Continued)

**Page**

*Shevtsov v. The Cheesecake Factory*,
   No. B300116, 2021 WL 1997144 (Cal. Ct. App. May 19, 2021)
   (unpublished) .................................................................................................. 8, 10

*Weinberg v. Cedars-Sinai Med. Ctr.*,
   119 Cal. App. 4th 1098 (2004) ........................................................................ 3, 13

*Yanowitz v. L'Oreal USA, Inc.*,
   36 Cal. 4th 1028 (2005) . Application of the ....................................................... 11

**STATE STATUTES**

Cal. Bus. & Prof. Code § 17204 ............................................................................. 12

**RULES**

Rule 12(b)(6) ............................................................................................................ 7

Plaintiff Anthony Randall hereby opposes defendant Cedars-Sinai Medical Center's ("Cedars-Sinai") Motion to Dismiss the First Amended Complaint [ECF No. 23] (the "Motion" or "MTD") as follows.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.  PRELIMINARY STATEMENT

Cedars-Sinai operates a large transplant hospital in Los Angeles, California. Approximately 205 Black patients have entrusted this hospital with overseeing their candidacy for a donor kidney, and for those patients fortunate enough to be awarded a donor kidney, performing a kidney transplant. While Cedars-Sinai's reputation likely drew many of these patients to choose the hospital, unfortunately, for many years Cedars-Sinai has engaged in intentional, race-based discrimination against its Black patients, disadvantaging those patients' pursuit of a kidney transplant when compared with members of other races.

Specifically, Cedars-Sinai used and failed to timely remedy the ongoing effects of the "race-based coefficient"—an artificial increase to only Black patients' observed kidney function scores, indicating their kidneys function better than they function in reality. This adjustment was made based solely on the defunct racial stereotype that Black people have greater muscle mass than other races, and delayed Cedars-Sinai's Black patients from accruing qualifying wait time on the national kidney waitlist maintained by co-defendant UNOS. This prejudices Cedars-Sinai's Black patients' chances to be awarded a donor kidney.

Indeed, even after UNOS outlawed use of the race-based coefficient and admitted it "may have negatively affected the timing of transplant listing or the date at which candidates qualify to begin waiting time for a transplant[,]" Cedars-Sinai took no steps for at least nine months to update its Black patients' wait times such that they could receive equal consideration for donor kidneys. Evidencing similar flippancy to the racial discrimination suffered by their Black patients, Cedars-Sinai now defends the race-based coefficient as the "medically accepted standard of care[.]"

That Cedars-Sinai would argue express racial discrimination against its own patients was ever an accepted standard of care, and take no steps to remedy the ongoing discrimination against their patients for nine months, even after UNOS banned the practice, demonstrates Cedars-Sinai's abject failure to provide appropriate medical care to its Black kidney transfer patients.

Cedars-Sinai cannot seriously defend the racially discriminatory nature of the race-based coefficient, and instead seeks to avoid liability by raising a number of unfounded technical legal arguments, such as statute of limitations, standing, and existence of a fiduciary duty. Each of these arguments fails.

***First***, Cedars-Sinai's statute of limitations argument is without merit. Mr. Randall did not learn that his accrual of wait time was delayed until shortly before filing this case, never receiving any notice that the race-based coefficient was being applied to his observed eGFR scores, or that his accrual of qualifying wait time was delayed. *Aryeh v. Canon Bus. Solutions, Inc.*, 55 Cal. 4th 1185, 1192 (2013) (cause of action does not accrue under California law until "plaintiff discovers, or has reason to discover, the cause of action"). Moreover, Mr. Randall's injury is not limited to his original delay in accruing wait time. Mr. Randall was victimized by Cedars-Sinai's pattern of continued use of the race-based coefficient and failure to update its Black patients' race-based coefficient tainted wait time calculations. *Aryeh*, 55 Cal. 4th at 1198 (pursuant to the continuing violations doctrine, "pattern of reasonably frequent and similar acts" can be "actionable in its entirety" even where "conduct occurred partially outside and partially inside the limitations period").

***Second***, Cedars-Sinai's argument that Mr. Randall does not have standing because Cedars-Sinai did not cause his injuries simply ignores the allegations made in the First Amended Complaint. It need not be the case that Cedars-Sinai caused Mr. Randall's original contraction of kidney disease for Cedars-Sinai to have caused Mr. Randall harm. Mr. Randall alleges that but for delay caused by Cedars-Sinai, he would have received a transplant earlier, incurred fewer medical expenses, like ongoing

dialysis costs, and been able to return to work earlier. *See* First Amended Complaint [ECF No. 12] ("FAC"), ¶¶ 29, 30, 56–62.

***Third***, while Cedars-Sinai points to *Moore v. Regents of University of California*, 51 Cal. 3d 120, 133 (1990), to argue that hospitals cannot owe a fiduciary duty to their patients, the California Court of Appeal has repeatedly commented to the contrary, even following *Moore*. *See, e.g., Weinberg v. Cedars-Sinai Med. Ctr.*, 119 Cal. App. 4th 1098, 1109 (2004) (Cedars-Sinai "owes a duty of a fiduciary nature to its patients and the public to deliver safe and competent medical services"). This strongly suggests that Cedars-Sinai makes too much of *Moore*. Indeed, this case is quite different than *Moore* in that Mr. Randall challenges a hospital-level policy of racial discrimination, whereas *Moore* concerns only a hospital's potential liability for the rogue acts of a few employees.

For these reasons, and as explained in more detail below, Cedars-Sinai's Motion should be denied.

## II.  SUMMARY OF FACTUAL ALLEGATIONS

### A.  Cedars-Sinai provides data considered by UNOS when determining who will be awarded donor kidneys.

In 1984, Congress passed the National Organ Transplant Act, which called for a national registry for organ matching to be operated by a private, non-profit organization under federal contract. FAC, ¶ 27. Since that time, UNOS has served as that private, non-profit organization, and per its website, UNOS "[m]anag[es] the national transplant waiting list, matching donors to recipients 24 hours a day, 365 days a year." *Id.* at ¶ 28. UNOS is further empowered to establish and implement policy concerning how donor organs will be awarded to patients in need, including kidneys. *Id.* at ¶¶ 28, 34.

UNOS manages the national kidney waitlist using its UNet software, which maintains candidates' medical information, including eGFR scores, and tracks wait times. *Id.* at ¶ 28. Each time a donor kidney becomes available, UNet runs an

algorithm that considers the information maintained in UNet and generates a ranked list of potential matches, with qualifying wait time being the primary factory considered by the UNet algorithm. *Id.* at ¶¶ 31, 32. In other words, UNet will identify patients that are a medical match for a particular available kidney, and then rank those patients according to qualifying wait time. *Id.* at ¶ 32.

Cedars-Sinai, like other transplant hospitals, plays an integral role in this process, because transplant hospitals must refer patients to the national kidney waitlist and enter the medical information considered by UNOS's algorithm into UNet, including eGFR scores. *Id.* at ¶¶ 29, 30. Notably, referral to the waitlist by a transplant hospital does not necessarily start the clock on qualifying wait time. To accrue qualifying wait time, a patient's eGFR score must either fall below 20 ml/min, or the patient must begin dialysis. *Id.* at ¶ 33.

### B. Cedars-Sinai's use of the race-based coefficient discriminates against its Black patients seeking donor kidneys.

When current tests for the eGFR were developed, a few flawed studies indicated Black Americans had higher creatinine extraction rates, and instead of considering whether this difference could be caused by non-racial societal factors, it was postulated by the developers of the eGFR that Black Americans' scores could be explained because Black Americans have more muscle mass and thus more creatinine in their systems than White Americans. *Id.* at ¶¶ 4, 35. Based on this postulation, the creators of the eGFR added a race-based modifier to eGFR scores, known as the "race-based coefficient," which artificially inflates the scores of Black Americans by 16–18%. *Id.* at ¶¶ 5, 35. That is, eGFR is calculated irrespective of race, and then only for Black patients, the score is increased by 16–18%, based upon the flawed premise that Black Americans have greater muscle mass and thus naturally have more creatinine in their bodies. *Id.*

This was and continues to be junk science supported only by the defunct racial stereotype that Black people have larger muscles than other races, not any valid

scientific studies or rigorous scientific evidence. *Id.* at ¶¶ 6, 38. Prior to this lawsuit, UNOS admitted that the race-based coefficient is problematic:

> **UNOS**   Organ donors   Patients
>
> **What are other issues with the race variable in eGFR?**
>
> EGFR calculations rely on a binary approach to race. When the race variable is used in formulas, eGFR calculators only offer two response options: "Black" or "Not Black."
>
> These options do not include a designation for mixed race or multi-racial individuals, and do not account for the existing genetic diversity within the Black population. The concept of race is a social construct and an unreliable proxy for genetic difference, therefore not a biological marker or clinical measure.

*Id.* at ¶ 7; *see also* ¶ 44 (UNOS's press release explained that the race-based coefficient "has led to a systemic underestimation of kidney disease severity for many Black patients. Specifically in organ transplantation, it may have negatively affected the timing of transplant listing or the date at which candidates qualify to begin waiting time for a transplant."). Simply put, the race-based coefficient unfairly prejudiced Black patients' chances of receiving a donor kidney when compared to members of other races, increasing wait times even for those lucky enough to ultimately receive a kidney. *Id.* at ¶¶ 40–43.

### C. Even after UNOS outlawed the race-based coefficient, Cedars-Sinai failed to timely update its patients' wait time calculations.

In June of 2022, after many years of knowingly allowing for and encouraging use of the race-based coefficient, UNOS rightfully pivoted, and announced that transfer hospitals were no longer allowed to use the race-based coefficient. *Id.* at ¶¶ 37, 44, 45. UNOS sat on its hands until January of 2023 before it instructed donor hospitals to notify Black candidates for kidneys of the new policy. *Id.* at ¶ 47. With no sense of urgency, UNOS then provided transfer hospitals with another year, until January of 2024, 18 months after UNOS's original policy change, to determine

whether any of their patients were entitled to a wait time adjustment. *Id.* at ¶¶ 47, 48.

Similar to UNOS, Cedars-Sinai exhibited no sense of urgency to update its Black patients' wait times such that they could receive fair consideration for donor kidneys. That is, even where UNOS outlawed the race-based coefficient and admitted its discriminatory nature in June of 2022, Cedars-Sinai took no steps whatsoever to update its Black patients' wait times until March of 2023, "when Cedars-Sinai sent notice that it would begin reviewing members of its kidney waitlist to determine whether wait time adjustments were required '[o]ver the next several months[.]'" *Id.* at ¶¶ 14, 59, 60.

### D. Mr. Randall suffered discrimination via the race-based coefficient for years, and UNOS never awarded Mr. Randall a kidney.

Consistent with UNOS policy, the race-based coefficient was applied to Mr. Randall's eGFR scores, delaying his referral to UNOS's national kidney waitlist and accrual of qualifying wait time. *Id.* at ¶¶ 51–53. Absent this adjustment, Mr. Randall would have held an earlier spot in line and enjoyed a greater chance to receive a donor kidney, and upon information and belief, Mr. Randall would have received a donor kidney from the national kidney waitlist. *Id.* at ¶¶ 54, 55.

In this regard, in December of 2022, Mr. Randall was informed that he finished second for a matching donor kidney; UNOS's algorithm considering discriminatorily-calculated wait time data for Mr. Randall when awarding the kidney to another patient. *Id.* at ¶¶ 56–58. What happened to Mr. Randall illustrates the harm caused to Black patients by virtue of Cedars-Sinai's failure to timely recalculate wait times, even after UNOS admitted the racially discriminatory effect of the race-based coefficient. *Id.* at ¶¶ 7, 44–49, 61.

### E. By virtue of the delay to his kidney transplant, Mr. Randall suffered significant economic harm.

While Mr. Randall's kidney transplant was delayed by virtue of the race-based coefficient, Mr. Randall's kidney disease worsened significantly, and in January of

2022, Mr. Randall became unable to work, causing him harm in the form of lost wages. *Id.* at ¶ 62. Mr. Randall also incurred increased medical expenses, for instance, ongoing dialysis costs. *Id.* These harms were of course exacerbated by the delay of Mr. Randall's kidney transplant because, following a transplant, Mr. Randall would no longer need dialysis (or other related treatments), and could potentially return to work.

### III. CEDARS-SINAI'S MOTION SHOULD BE DENIED

#### A. Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, a complaint need only "contain sufficient factual matter . . . to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court is bound to "accept all well-pleaded material facts as true and draw all reasonable inferences in favor of the plaintiff." *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159 (9th Cir. 2016); *see also Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) ("We accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party."). Finally, should the Court deem any portion of the complaint to be deficient, the Court should grant leave to amend unless "the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000).

#### B. Mr. Randall's claims are timely.

Mr. Randall's claims are timely because they did not accrue until shortly before this lawsuit was filed pursuant to the discovery rule, and, alternatively, the continuing violations doctrine applies.

##### 1. Pursuant to the discovery rule, Mr. Randall's claims did not accrue until shortly before this case was filed.

Cedars-Sinai argues that "because [Mr. Randall] alleges his harm occurred years earlier than five years ago when he should have been placed on the waitlist but

was not, he has pled himself out of the statute of limitations for each of his claims against Cedars-Sinai." MTD, 11. Mischaracterization of Mr. Randall's injury aside, Cedars-Sinai is wrong on the law. Mr. Randall's claims do not accrue when he is injured—the claims accrue when Mr. Randall discovers his causes of action against Cedars-Sinai.

Under California law, the discovery rule "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." *Aryeh*, 55 Cal. 4th at 1192 (internal quotation omitted); *see also Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 926–27 (9th Cir. 2004) (under similar federal rule, discrimination claim does not accrue until such time as the claimant receives notice of an adverse action). "In other words, plaintiffs are required to conduct a reasonable investigation after becoming aware of an injury, and are charged with knowledge of the information that would have been revealed by such an investigation." *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 808 (2005). For claims requiring intentional discrimination, it is thus not sufficient that a plaintiff know he has been injured, he must know or have reason to know the injury was the result of racial discrimination. *Shevtsov v. The Cheesecake Factory*, No. B300116, 2021 WL 1997144, at *4 (Cal. Ct. App. May 19, 2021) (unpublished) ("[T]hey assert that they did not know—and had no way to learn—that their ill-treatment was caused by discrimination rather than just bad service . . . This distinction matters because . . . the Unruh Act requires plaintiffs to prove intentional discrimination.").

Mr. Randall did not learn of his injury as characterized by Cedars-Sinai—the delay in accrual of wait time—until shortly before filing this case. In this regard, Mr. Randall never received any contemporaneous notice explaining that he did not qualify to join the national kidney waitlist or accrue wait time.[1] The only notice of any arguably adverse action Mr. Randall received came in December of 2022, when Mr.

---

[1] This discussion does not consider the March 27, 2023 letter from Cedars-Sinai because that letter was received shortly before filing this case. FAC, ¶ 59.

Randall was informed by Cedars-Sinai that he finished in second place for a kidney transplant. FAC, ¶ 18; *see also* ¶ 29 (patients do not apply directly to UNOS such that they would receive an objection, instead, "[t]o be placed on the national kidney transplant waitlist, a patient must first visit one of 200+ transplant hospitals, and receive a referral from their physician). Mr. Randall simply underwent regular check-ups until such time as he was referred to a transfer hospital. *Id.* at ¶¶ 29, 51, 52. The lack of notice is dispositive of the discovery rule analysis, and Mr. Randall's claims against Cedars-Sinai are timely.

Cedars-Sinai attempts to avoid this conclusion by suggesting that the race-based coefficient was explained to Mr. Randall, or that Mr. Randall was aware of literature questioning the practice:

> Plaintiff alleges since at least 2011, members of the medical community specializing in kidney disease were publicly questioning and criticizing the standard of care used in calculating eGFR test scores. Plaintiff alleges the use of the race-coefficient in eGFR test scores was explained to patients with kidney disease who were waiting to be placed on the organ donor transplant waitlist. FAC ¶ 39.

MTD, 10. In reality, in paragraph 39 of the First Amended Complaint, Mr. Randall simply references an article published in the *American Journal of Kidney Diseases*, in which the author recounts her experience in explaining the race-based coefficient to patients. But the author of that article is not Mr. Randall's doctor and it does not follow that Mr. Randall's doctor must have also explained the practice—no such disclosure is alleged, and it never happened. Nor does it follow that because the First Amended Complaint references an article in a medical journal, Mr. Randall read the article 12 years earlier. That is simply not what is alleged.

Nonetheless, even if the Court were to somehow find Mr. Randall had contemporaneous knowledge of the delay in his accrual of wait time, that is not dispositive of the inquiry. For Mr. Randall's claims to have accrued at that time, it must also be the case that a reasonable investigation conducted by Mr. Randall would have discovered use of the race-based coefficient and its discriminatory nature. *See*

*Shevtsov*, 2021 WL 1997144, at *4. Here, Cedars-Sinai defends the race-based coefficient by referring to it as the "standard of care." Query then how Mr. Randall, a non-doctor, could be required to research the policy, and reach an opposite conclusion from what Cedars-Sinai represents was widely accepted in the medical community? Cedars-Sinai itself did not acknowledge that wait times should be recalculated until March 27, 2023. FAC, ¶ 59. Cedars-Sinai does reference an article published in a medical journal in 2011 questioning use of the race-based coefficient, *id.* at ¶ 39, but Mr. Randall is not a doctor such that he could reasonably be imputed with knowledge of every medical journal article concerning kidney disease.[2]

### 2. **Alternatively, the continuing violations doctrine applies to render Mr. Randall's claims timely.**

In an attempt to manufacture a statute of limitations defense, Cedars-Sinai mischaracterizes Mr. Randall's injury. Cedars-Sinai argues that Mr. Randall's injury occurred solely when his accrual of wait time was delayed, and thus Mr. Randall's injury occurred no later than when Mr. Randall began to accrue wait time. MTD, § IV. In reality, as explored below, Cedars-Sinai's actionable discrimination was ongoing through the filing of this lawsuit, and thus actionable in its entirety under the California continuing violation doctrine.

As a threshold matter, even were Cedars-Sinai correct that Mr. Randall's original delay in accruing wait time was time barred, pursuant to the continuous accrual doctrine, it is "long settled that separate, recurring invasions of the same right can each trigger their own statute of limitations." *Aryeh*, 55 Cal. 4th at 1199–2000 (finding claims concerning excess printing charges incurred within the statute of

---

[2] Because no allegations suggest Mr. Randall received notice of an adverse action prior to December of 2022, Mr. Randall believes the First Amended Complaint is timely on its face. Nonetheless, to the extent the Court believes further factual allegations are required to warrant application of the discovery rule, Mr. Randall expressly requests leave to amend to explain the circumstances in which he came to be a member of the national kidney waitlist, and specifically how he never received any notice of an adverse action.

limitations timely, despite failure to timely file suit on earlier excess charges); *Jones v. Tracy School Dist.*, 27 Cal. 3d 99, 103–07 (1980) (finding plaintiff could recover for sex discrimination in her wages within the statute of limitations, despite failure to timely file suit on earlier discrimination).

Here, Mr. Randall alleges that Cedars-Sinai provided UNOS with race-based coefficient-tainted data both when Mr. Randall was originally added to the waitlist, but also that Cedars-Sinai failed to correct that data through the filing of this lawsuit. Pursuant to continuing accrual, at minimum, claims concerning Cedars-Sinai's failure to update records post-UNOS policy change in June of 2022, and Mr. Randall's resulting prejudice in consideration for a particular kidney in December of 2022, must be held timely. *See* FAC, ¶¶ 14, 19, 56–61.

Nonetheless, Mr. Randall's claims are all timely when considered together under the continuing violations doctrine. Pursuant to the continuing violations doctrine, "[a]llegations of a pattern of reasonably frequent and similar acts may, in a given case, justify treating the acts as an indivisible course of conduct actionable in its entirety, notwithstanding that the conduct occurred partially outside and partially inside the limitations period." *Aryeh*, 55 Cal. 4th at 1198; *see also Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1059–60 (2005) (holding doctrine potentially applied to retaliation claims where alleged retaliatory acts occurred over the course of several months). Application of the continuing violations doctrine is particularly apt where "a wrongful course of conduct became apparent only through the accumulation of a series of harms[.]" *Aryeh*, 55 Cal. 4th at 1198; *Yanowitz*, 36 Cal. 4th at 1058.

Here, Mr. Randall alleges that Cedars-Sinai engaged in a course of conduct where it supplied UNOS with race-based-coefficient-tainted data, and failed to correct the data even after UNOS outlawed use of the race-based coefficient. FAC, ¶¶ 14, 19, 29, 30, 56–61, 95. Moreover, there is a particularly strong showing that Cedars-Sinai's ongoing violations would not be apparent to Mr. Randall, indeed, the showing is so strong as to also trigger application of the discovery rule, as discussed above. *See,*

*supra*, § III.B.1. But, as considered here, that Mr. Randall did not appreciate Cedars-Sinai was submitting race-based coefficient impacted data to UNOS also counsels in favor of applying the continuing violations doctrine, and Mr. Randall's claims are thus timely pursuant to the doctrine.

### C. Mr. Randall has statutory standing to bring a UCL claim against Cedars-Sinai.

Mr. Randall agrees that to have statutory standing to bring a UCL claim against Cedars-Sinai, Mr. Randall must plead that he "has lost money or property" as a result of Cedar-Sinai's alleged unfair competition. *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 320–21 (2011); Cal. Bus. & Prof. Code § 17204. Mr. Randall has clearly met his burden to plead the same.

Mr. Randall alleges that Cedars-Sinai acts as the gatekeeper between Mr. Randall and UNOS, entering Mr. Randall's medical information, including eGFR scores, into UNet. FAC, ¶ 29, 30. Mr. Randall further alleges that, even after UNOS reversed its policy and acknowledged that the race-based coefficient is racially discriminatory against Black patients, Cedars-Sinai failed to take any action whatsoever to adjust its patients' wait times for nine months, including Mr. Randall. *Id.* at ¶¶ 59–61. Cedars-Sinai thus entered the racially discriminatory data into UNet that UNOS relied upon when considering Mr. Randall for donor kidneys, and failed to timely remedy the problem even after UNOS outlawed use of the race-based coefficient, causing further prejudice to Mr. Randall's candidacy for a donor kidney. *Id.* at ¶¶ 56–61. Indeed, when Mr. Randall finished second for a donor kidney in December of 2022, because of Cedars-Sinai's failure to update Mr. Randall's wait time, Mr. Randall was disadvantaged, and upon information and belief, lost out on a kidney he would have otherwise been awarded. *Id.* at ¶¶ 56–58.

This delay in receiving a donor kidney caused Mr. Randall to incur economic damages. For example, Mr. Randall continued to incur charges for dialysis treatments that would have been unnecessary had Mr. Randall received a transplant earlier, and

could not return to work pending his receipt of a transplant. *Id.* at ¶ 62. These significant harms plainly provide Mr. Randall with statutory standing.

### D. Cedars-Sinai breached its fiduciary duty to Mr. Randall.

Cedars-Sinai argues that "non-physicians do not stand in a fiduciary relation to patients[,]" relying on *Moore*. MTD, 12–13. Such a position overstates the holding of *Moore*, and in the context of this case, Cedars-Sinai owed its patients a duty, and breached that duty.

The California Court of Appeal has on multiple occasions stated that hospitals owe their patients and/or the public a fiduciary duty, including in a case involving Cedars-Sinai. *Weinberg*, 119 Cal. App. 4th at 1109 (Cedars-Sinai "owes a duty of a fiduciary nature to its patients and the public to deliver safe and competent medical services"); *O'Byrne v. Santa Monica-UCLA Med. Ctr.*, 94 Cal. App. 4th 797, 811 (2001) (noting that hospital's "fiduciary responsibility is to the *public*") (emphasis in original); *Hongsathavij v. Queen of Angels etc. Med. Ctr.*, 62 Cal. App. 4th 1123 (1998) ("A hospital itself may be responsible for negligently failing to ensure the competency of its medical staff and the adequacy of medical care rendered to patients at its facility. A hospital has a duty to ensure the competence of the medical staff . . . ") (internal citations omitted).

The hospital-wide policy endorsing racial discrimination at issue in this case directly implicates the reasoning underpinning these cases. Hospitals welcome members of the public and have a fiduciary duty to ensure the hospital is providing some level of baseline care to the public—intentional racial discrimination against Black patients is antithetical to that notion and an obvious example of a breach of the type of duty owed by hospitals to the public, as referenced in *Weinberg*, *O'Byrne*, and *Hongsathavij*.

Nor is *Moore* controlling to the contrary. *Moore* discusses the actions of one doctor and one researcher working together, and whether the hospital had a fiduciary duty to prevent malfeasance by two individual employees. 51 Cal. 3d at 125–26. This

case is different where Mr. Randall does not challenge the actions of two rogue actors, but instead a public-facing hospital policy of racial discrimination impacting every Black patient seeking a kidney transplant.

## IV. CONCLUSION

For the reasons set forth above, the Motion should be denied. However, should the Court be inclined to grant any portion of the Motion, Mr. Randall requests leave to file an amended complaint.

Dated:  June 23, 2023

ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
  Matthew L. Venezia
  George B. A. Laiolo

By: */s/ Matthew L. Venezia*
  Matthew L. Venezia
Attorneys for Plaintiff Anthony Randall