1   ELLIS GEORGE CIPOLLONE
    O'BRIEN ANNAGUEY LLP
2   Matthew L. Venezia (State Bar No. 313812)
       mvenezia@egcfirm.com
3   George B. A. Laiolo (State Bar No. 329850)
       glaiolo@egcfirm.com
4   2121 Avenue of the Stars, 30th Floor
    Los Angeles, California 90067
5   Telephone: (310) 274-7100
    Facsimile: (310) 275-5697
6
    Attorneys for Plaintiff Anthony Randall
7

8                   UNITED STATES DISTRICT COURT

9          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

10

11  ANTHONY RANDALL,                    Case No. 2:23-cv-02576-MEMF (MAAx)
                                         The Hon. Maame Ewusi-Mensah
12                Plaintiff,             Frimpong

13       vs.                            **PLAINTIFF'S OPPOSITION TO
                                         DEFENDANT UNITED NETWORK
14  UNITED NETWORK FOR ORGAN            FOR ORGAN SHARING'S MOTION
    SHARING; CEDARS-SINAI               TO DISMISS FIRST AMENDED
15  MEDICAL CENTER,                     COMPLAINT**

16                Defendants.
                                         Date:     September 14, 2023
17                                       Time:     10:00 a.m.
                                         Ctrm.:    8B
18
                                         Trial Date:  None Set
19

20

21

22

23

24

25

26

27

28

2253762.3

1

# **TABLE OF CONTENTS**

2

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ............................................... 1

I.    PRELIMINARY STATEMENT ....................................................... 1

II.   SUMMARY OF FACTUAL ALLEGATIONS ................................................. 5

    A.    UNOS controls the national kidney transplant waitlist and determines who will be awarded donor kidneys. .................................. 5

    B.    UNOS's use of the race-based coefficient discriminates against Black candidates for donor kidneys. ........................................ 5

    C.    After admitting the race-based coefficient discriminates against Black candidates for donor kidneys, UNOS failed to timely fix the problem. ......................................................... 7

    D.    Mr. Randall suffered discrimination via the race-based coefficient for years, and UNOS never awarded Mr. Randall a kidney. ......................................................... 7

    E.    By virtue of the delay to his kidney transplant, Mr. Randall suffered significant economic harm. .................................. 8

III.  UNOS'S MOTION SHOULD BE DENIED ....................................... 8

    A.    Legal standard. ................................................... 8

    B.    Mr. Randall has standing to seek injunctive relief. ................................ 9

    C.    Mr. Randall's claims are timely. ........................................ 10

        1.    Even if the Court accepts UNOS's characterization of Mr. Randall's injury, his claims are timely pursuant to the discovery rule. ................................................... 11

        2.    UNOS's discrimination against Mr. Randall was continuing, and part of a systematic policy. ................................. 14

    D.    UNOS engages in actionable discrimination. ........................................ 16

        1.    Title VI ................................................... 16

        2.    Unruh Civil Rights Act ............................................ 20

    E.    UNOS engages in "business activities" such that it is not immune from liability under the Unruh Civil Rights Act or the UCL. ............. 21

    F.    Plaintiff can seek restitution under the UCL. ...................................... 24

IV.   CONCLUSION ................................................................ 24

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544, 570 (2007) ...................................................................... 8

*Bird v. Dep't of Human Servs.*,
 935 F.3d 738, 746 (9th Cir. 2019) ...................................................... 15

*Bonelli v. Grand Canyon Univ.*,
 28 F.4th 948, 952-53 (9th Cir. 2022) .................................................. 11

*Bonner v. Med. Board of Cal.*,
 No. 2:17-cv-00445-KJM-DB, 2018 WL 4699996, at *6 (E.D. Cal. Sep.
 30, 2018) ............................................................................................... 12

*Brandon v. Nat'l R.R. Passenger Corp. Amtrak*,
 No. CV 12-5796 PSG (VBKx), 2013 WL 800265, at *4 (C.D. Cal. Mar.
 1, 2013) ................................................................................................. 10

*Briggs v. Montgomery*,
 No. CV-18-02684-PHX-EJM, 2019 WL 2515950, at *1, 22 (D. Ariz.
 June 18, 2019) ...................................................................................... 16

*Brown v. Reese*,
 No. CV12–02003–PHX–DGC, 2013 WL 5929903 (D. Ariz. Aug. 5,
 2013) ..................................................................................................... 11

*Caltex Plastics, Inc. v. Lockheed Martin Corp.*,
 824 F.3d 1156 (9th Cir. 2016) .......................................................... 2, 9

*Carpinteria Valley Farms, Ltd. v. County of Santa Barbara*,
 344 F.3d 822 (9th Cir. 2003) .............................................................. 14

*Carroll v. Nakatani*,
 188 F. Supp. 2d 1219 (D. Haw. 2001) ................................................... 9

*Community House, Inc. v. City of Boise*,
 490 F.3d 1041 (9th Cir. 2007) ............................................................ 20

*Fathers & Daughters Nevada, LLC v. Lingfu Zhang*,
 284 F. Supp. 3d 1160 (D. Ore. 2018) ................................................ 2, 9

1
2

**TABLE OF AUTHORITIES**
(Continued)

<u>Page</u>

3

*Fobbs v. Holy Cross Health Sys. Corp.*,
4
   29 F.3d 1439 (9th Cir. 1994) ......................................................................... 17, 20

5

*Friends of the Earth, Inc. v. Laidlaw Envtl. Serv.*,
6
   528 U.S. 167 (2000) ............................................................................................. 9

7

*GCB Commc'ns, Inc. v. U.S. S. Commc'ns, Inc.*,
8
   650 F.3d 1257 (9th Cir. 2011) ........................................................................... 10

9

*Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*,
   742 F.3d 414 (9th Cir. 2014) ........................................................................ 20, 21

10

*Gutowsky v. County of Placer*,
11
   108 F.3d 256 (9th Cir. 1997) ............................................................................. 15

12

*Hassan v. City of New York*,
13
   804 F.3d. 277 (3d Cir. 2015) ............................................................................. 19

14

*Ice Cream Distribs. of Evansville, LLC v. Dreyer's Grand Ice Cream, Inc.*,
15
   487 F. App'x 362 (9th Cir. 2012) ...................................................................... 24

16

*Jones v. Beverly Hills Unified School Dist.*,
17
   No. WD CV 08-7201-JFW (PJW), 2010 WL 1222016, at *1, 5 (C.D.
   Cal. Mar. 24, 2010) ........................................................................................... 17

18

*Lane v. Kitzhaber*,
19
   283 F.R.D. 587 (D. Ore. 2012) ............................................................................ 9

20

*Lopez v. Smith*,
21
   203 F.3d 1122 (9th Cir. 2000) ............................................................................. 9

22

*Lujan v. Defenders of Wildlife*,
23
   504 U.S. 555 (1992) .......................................................................................... 3, 9

24

*Lukovsky v. City & County of San Francisco*,
25
   535 F.3d 1044 (9th Cir. 2008) ....................................................................... 11, 12

26

*Lyons v. England*,
27
   307 F.3d 1092 (9th Cir. 2002) ........................................................................... 15

28

*Mandel v. Bd. of Trustees of Cal. State Univ.*,
   No. 17-cv-03511-WHO, 2018 WL 1242067 (N.D. Cal. Mar. 9, 2018) .............. 19

## TABLE OF AUTHORITIES
### (Continued)

**Page**

*Mansourian v. Regents of Univ. of California*,
  602 F.3d 957 (9th Cir. 2010) .................................................................... 3, 15

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
  519 F.3d 1025 (9th Cir. 2008) ...................................................................... 9

*Massarsky v. Gen. Motors Corp.*,
  706 F.2d 111 (3d Cir. 1983) (Sloviter, J., dissenting) ............................... 19

*Massey v. Biola Univ., Inc.*,
  No. 2:19-cv-09626-CJC-JDE, 2020 WL 5898804 (C.D. Cal. Aug. 21,
  2020) ........................................................................................................... 19

*Miller v. Johnson*,
  515 U.S. 900 (1995) .................................................................................... 19

*Monteiro v. Tempe Union High School Dist.*,
  158 F.3d 1022 (9th Cir. 1998) .................................................................... 17

*Nat'l R.R. Passenger Corp. v. Morgan*,
  536 U.S. 101 (2002) ............................................................................. 14, 15

*Olsen v. Idaho State Bd. of Med.*,
  363 F.3d 916 (9th Cir. 2004) ................................................................. 3, 12

*Reed v. Lockheed Aircraft Corp.*,
  613 F.2d 757 (9th Cir. 1980) ...................................................................... 15

*Ricci v. DeStefano*,
  557 U.S. 557 (2009) ............................................................................. 16, 17

*Rodriguez v. City of Los Angeles*,
  No. CV 11-01135 DMG, 2015 WL 13260395 (C.D. Cal. May 8, 2015) ........... 16

*Rodriguez v. Ralphs Grocery Co.*,
  No. 20-cv-150-JAH2021 WL 4295292, at *10 (S.D. Cal. Sept. 21,
  2021) ........................................................................................................... 10

*Stevens v. Optimum Health Institute*,
  No. 09cv2565 WQH (RBB), 2010 WL 1838252 (S.D. Cal. May 5,
  2010) ........................................................................................................... 23

# TABLE OF AUTHORITIES
### (Continued)

**Page**

*United States v. County of Maricopa, Arizona*,
  889 F.3d 648 (9th Cir. 2018) ............................................................... 19

*Watson v. Fort Worth Bank & Trust*,
  487 U.S. 977 (1988) .......................................................................... 17

*Wittmer v. Peters*,
  904 F. Supp. 845 (C.D. Ill. 1995), *aff'd*, 87 F.3d 916 (7th Cir. 1996) ............... 19

*Zamorano v. City of San Jacinto*,
  No. CV 12-0965 GAF, 2012 WL 12886821 (C.D. Cal. Oct. 22, 2012) .............. 11

## STATE CASES

*Aryeh v. Canon Bus. Solutions, Inc.*,
  55 Cal. 4th 1185 (2013) ........................................................ 3, 12, 14, 16

*Brennon B. v. Super. Ct.*,
  13 Cal. 5th, 662, 679 (2022) ................................................................ 22

*Burks v. Poppy Constr. Co.*,
  57 Cal. 2d 463 (1962) ........................................................................ 22

*People ex rel. City of Santa Monica v. Gabriel*,
  186 Cal. App. 4th 882 (2010) ............................................................... 22

*Fox v. Ethicon Endo-Surgery, Inc.*,
  35 Cal.4th 797 (2005) ........................................................................ 13

*Ibister v. Boys' Club of Santa Cruz, Inc.*,
  40 Cal. 3d 72 (1985) ......................................................................... 22

*Kasky v. Nike, Inc.*,
  27 Cal. 4th 939 (2002) ....................................................................... 21

*Koebke v. Bernardo Heights Country Club*,
  36 Cal. 4th 824 (2005) ....................................................................... 20

*Massachusetts Mutual Life Ins. Co. v. Super. Ct.*,
  97 Cal. App. 4th 1282 (2002) ............................................................... 22

PLAINTIFF'S OPPOSITION TO DEFENDANT UNOS'S MOTION TO DISMISS

# TABLE OF AUTHORITIES
### (Continued)

**Page**

*O'Connor v. Village Green Owners Ass'n*,
   33 Cal. 3d 790 (1983) ................................................................. 4, 22

*People v. E.W.A.P., Inc.*,
   106 Cal. App. 3d 315 (1980) ............................................................ 22

*Pines v. Tomson*,
   160 Cal. App. 3d 370 (1984) ......................................................... 4, 22

*Shevtsov v. The Cheesecake Factory*,
   No. B300116, 2021 WL 1997144 (Cal. Ct. App. May 19, 2021)
   (unpublished) .................................................................................. 13

*Yanowitz v. L'Oreal USA, Inc.*,
   36 Cal. 4th 1028 (2005) ..................................................................... 16

## STATE STATUTES

Cal. Civ. Code § 51(b) .......................................................................... 22

Unfair Competition Law ("UCL") ......................................................... 22

Unruh Civil Rights Act ..................................................................*passim*

## RULES

Rule 12(b)(6) ........................................................................................... 8

## REGULATIONS

28 C.F.R. § 41.3(e) .............................................................................. 20

Plaintiff Anthony Randall hereby opposes United Network for Organ Sharing's ("UNOS") Motion to Dismiss the First Amended Complaint [ECF No. 25] (the "Motion" or "MTD") as follows.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   PRELIMINARY STATEMENT

Since 1984, this country has entrusted UNOS to fairly determine who receives organ transplants, and given the scarcity of donor organs, conversely, who will not. Despite its claimed goal to "[p]rovide equity in access to transplants[,]" UNOS has failed Black patients for decades. That is, while Black Americans are three times more likely than White Americans to suffer from kidney disease, and overrepresented on the national kidney waitlist maintained by UNOS, Black Americans are nonetheless significantly less likely than their White counterparts to actually receive a kidney transplant. Societal factors outside of UNOS's control cannot explain this. To the contrary, Plaintiff alleges facts, and intends to prove, that UNOS engages in intentional, racial discrimination against Black Americans when awarding donor kidneys.

In a shocking breach of the public's trust, it has recently been established that UNOS discriminates against Black candidates for donor kidneys by use of the "race-based coefficient"—an artificial increase to only Black patients' observed kidney function scores, indicating their kidneys function better than they function in reality. This adjustment is made based solely on the defunct racial stereotype that Black people have greater muscle mass than other races. Shortly after this case was filed, UNOS's own Vice Chair of its Patient Affairs Committee commented on the policy in the ROANOKE TIMES and RICHMOND TIMES-DISPATCH: "***It's racially biased and means people of color are deprioritized in terms of access to the list[.] That's terrible.***"[1]

---

[1] Eric Kolenich, *Richmond's Organ Transplantation Network Hit with Class-Action Lawsuit*, ROANOKE TIMES, Apr. 12, 2023, https://roanoke.com/news/state-and-

Specifically, kidney function is measured by a calculation known as an eGFR score. When a patient's eGFR score falls below 20 ml/min, they become eligible to accrue wait time on the national kidney waitlist, maintained by UNOS. But, for Black patients, even when their true eGFR score falls below 20 ml/min, the race-based coefficient is applied to artificially increase their eGFR score by 16–18%, meaning that Black patients' unmodified eGFR scores have to fall well below 20 ml/min to accrue wait time, and Black patients' qualification for wait time is thus delayed. UNOS then knowingly uses the manipulated wait time calculations in its algorithm as the primary factor determining which candidate is awarded a donor kidney, to the significant disadvantage of Black candidates. *See* First Amended Complaint [ECF No. 12] ("FAC"), ¶¶ 3–9, 28, 30–37, 40–44. This Court is bound to accept these well-pleaded facts as true on this Motion. *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159 (9th Cir. 2016).

Unwilling to take any accountability for its actions, UNOS seeks to evade liability in the present case by raising a number of misguided technical legal arguments like standing and the statute of limitations. Each of these arguments fails, and UNOS must take responsibility for its intentional racial discrimination against Black Americans in need of donor kidneys.

***First***, contrary to UNOS's argument, Mr. Randall has standing to seek injunctive relief despite his recent receipt of a kidney from a living, private donor (i.e., not a kidney awarded by UNOS). It is well-settled that standing is determined at the time of filing, and when Mr. Randall filed this case, he had not received a transplant, and was a member of the national kidney waitlist maintained by UNOS. *Fathers & Daughters Nevada, LLC v. Lingfu Zhang*, 284 F. Supp. 3d 1160, 1171 (D. Ore. 2018)

---

regional/richmonds-organ-transplantation-network-hit-with-class-action-lawsuit/article_cd4536e0-d8b8-11ed-9e22-4fa6e3df100e.html (last accessed June 23, 2023). This is the same article as run in the RICHMOND-TIMES DISPATCH, and because the article requires a subscription to view multiple times per month, a courtesy copy is attached hereto as Exhibit 1.

1   (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 569 n.4 (1992)).

2       ***Second***, UNOS's statute of limitations argument is without merit. Mr. Randall

3   did not learn that his accrual of wait time was delayed until shortly before filing this

4   case, never receiving any notice that the race-based coefficient was being applied to

5   his observed eGFR scores, or that his addition to UNOS's national kidney waitlist

6   was delayed. *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 926–27 (9th Cir. 2004)

7   (holding notice required to trigger statute of limitations); *Aryeh v. Canon Bus.*

8   *Solutions, Inc.*, 55 Cal. 4th 1185, 1192 (2013) (internal quotation omitted) (California

9   law "postpones accrual of a cause of action until the plaintiff discovers, or has reason

10  to discover, the cause of action."). Moreover, Mr. Randall's injury is not limited to

11  his original delay in accruing wait time. Mr. Randall was victimized by a continuing

12  policy of racial discrimination endorsed and enacted by UNOS, in place through the

13  filing of this case, the entirety of which is actionable under the continuing violations

14  doctrine. *Mansourian v. Regents of Univ. of California*, 602 F.3d 957, 974 (9th Cir.

15  2010) (holding failure to provide equal athletic opportunities to female students was

16  actionable as a systematic violation under continuing violations doctrine); *Aryeh*, 55

17  Cal. 4th at 1198–99 (same is true under California law).

18      ***Third***, UNOS's attempt to distance itself from the race-based coefficient and

19  argue that UNOS itself did not discriminate defies credulity. UNOS is responsible for

20  developing the country's policy concerning organ donations, and encouraged use of

21  the race-based coefficient until June of 2022. And even then, after admitting the race-

22  based coefficient discriminates against Black patients, UNOS did nothing to update

23  wait times for six months, and then gave transfer hospitals until January of 2024 to

24  update wait times. Black patients thus continue to be discriminated against by UNOS

25  in their candidacy for donor kidneys *right now*. In this regard, UNOS operates the

26  algorithm that determines who will receive donor kidneys, which to this day makes

27  the race-based coefficient-manipulated wait time data the primary factor determining

28  which candidate will receive a donor kidney. FAC, ¶¶ 3–9, 28, 30–37, 40–49, 51–61.

*Fourth*, UNOS cannot escape the reach of the Unruh Civil Rights Act and UCL based on its specious argument that UNOS does not engage in "business." UNOS has for decades enjoyed a contract with the federal government in which UNOS is provided with millions of dollars in funding to maintain the national kidney waitlist. UNOS provides healthcare services to patients analogous to a hospital, i.e., UNOS maintains patients' medical information and determines who will be awarded donor kidneys when they become available. In exchange, patients like Mr. Randall incur medical expenses such as the fee required by UNOS to be placed on its waitlist. To make these business-like activities occur, UNOS is guided by a CEO and CFO like any other large business, operates from a permanent headquarters, has 450 employees, and enjoys a $64 million/year budget. *Cf. O'Connor v. Village Green Owners Ass'n*, 33 Cal. 3d 790, 796 (1983) (non-profit homeowners association subject to Unruh Act); *Pines v. Tomson*, 160 Cal. App. 3d 370, 386 (1984) (religious non-profit organization operating a Christian Yellow Pages subject to Unruh Act and UCL).

*Fifth*, UNOS's argument that Mr. Randall has no available remedy on his UCL claim fails. As discussed above, Mr. Randall has standing to seek injunctive relief. Mr. Randall can also seek restitution of the required fees he paid to UNOS to be placed on the national kidney waitlist. *See* MTD, 24 (admitting that restitution is available under the UCL where defendant "took money or property directly from [the plaintiff]") (internal quotation omitted).

For these reasons, and as explained in more detail below, UNOS's Motion should be denied.[2]

---

[2] Mr. Randall does not currently intend to pursue a breach of fiduciary duty claim against UNOS, only Cedars-Sinai. Thus, Mr. Randall does not oppose the Motion as to that one cause of action, insofar as it relates to UNOS.

## II.   SUMMARY OF FACTUAL ALLEGATIONS

### A.   UNOS controls the national kidney transplant waitlist and determines who will be awarded donor kidneys.

In 1984, Congress passed the National Organ Transplant Act, which called for a national registry for organ matching to be operated by a private, non-profit organization under federal contract. FAC, ¶ 27. Since that time, UNOS has served as that private, non-profit organization, and per its website, UNOS "[m]anag[es] the national transplant waiting list, matching donors to recipients 24 hours a day, 365 days a year." *Id.* at ¶ 28. UNOS is further empowered to establish and implement policy concerning how donor organs will be awarded to patients in need, including kidneys. *Id.* at ¶¶ 28, 34.

UNOS manages the national kidney waitlist using its UNet software, which maintains candidates' medical information, including eGFR scores, and tracks wait time. *Id.* at ¶ 28. Each time a donor kidney becomes available, UNet runs an algorithm that considers the information maintained in UNet and generates a ranked list of potential matches, with qualifying wait time being the primary factory considered by the UNet algorithm. *Id.* at ¶¶ 31, 32. In other words, UNet will identify patients that are a medical match for a particular available kidney, and then rank those patients according to qualifying wait time. *Id.* at ¶ 32.

Notably, referral to the waitlist by a transplant hospital does not necessarily start the clock on qualifying wait time. To accrue qualifying wait time, a patient's eGFR score must either fall below 20 ml/min, or the patient must begin dialysis. *Id.* at ¶ 33.

### B.   UNOS's use of the race-based coefficient discriminates against Black candidates for donor kidneys.

When current tests for the eGFR were developed, a few flawed studies indicated Black Americans had higher creatinine extraction rates, and instead of considering whether this difference could be caused by non-racial societal factors, it

was postulated by the developers of the eGFR that Black Americans' scores could be explained because Black Americans have more muscle mass and thus more creatinine in their systems than White Americans. *Id.* at ¶¶ 4, 35. Based on this postulation, the creators of the eGFR added a race-based modifier to eGFR scores, known as the "race-based coefficient," which artificially inflates the scores of Black Americans by 16–18%. *Id.* at ¶¶ 5, 35. That is, eGFR is calculated irrespective of race, and then only for Black patients, the score is increased by 16–18%, based upon the flawed premise that Black Americans have greater muscle mass and thus naturally have more creatinine in their bodies. *Id.*

This was and continues to be junk science supported only by the defunct racial stereotype that Black people have larger muscles than other races, not any valid scientific studies or rigorous scientific evidence. *Id.* at ¶¶ 6, 38. At least prior to this lawsuit, UNOS admitted that the race-based coefficient is problematic:



**UNOS™**                                          Organ donors        Patients

**What are other issues with the race variable in eGFR?**

EGFR calculations rely on a binary approach to race. When the race variable is used in formulas, eGFR calculators only offer two response options: "Black" or "Not Black."

These options do not include a designation for mixed race or multi-racial individuals, and do not account for the existing genetic diversity within the Black population.  The concept of race is a social construct and an unreliable proxy for genetic difference, therefore not a biological marker or clinical measure.

*Id.* at ¶ 7; *see also* ¶ 44 (UNOS's press release explained that the race-based coefficient "has led to a systemic underestimation of kidney disease severity for many Black patients. Specifically in organ transplantation, it may have negatively affected the timing of transplant listing or the date at which candidates qualify to begin waiting time for a transplant."). Simply put, the race-based coefficient unfairly prejudices

Black patients' chances of receiving a donor kidney when compared to members of other races, increasing wait times even for those lucky enough to ultimately receive a kidney. *Id.* at ¶¶ 40–43.

## C. After admitting the race-based coefficient discriminates against Black candidates for donor kidneys, UNOS failed to timely fix the problem.

In June of 2022, after many years of knowingly allowing for and encouraging use of the race-based coefficient, UNOS rightfully pivoted, and announced that transfer hospitals were no longer allowed to use the race-based coefficient. *Id.* at ¶¶ 37, 44, 45. But, UNOS itself continued using the race-based coefficient—i.e., no changes were made to adjust the race-based coefficient impacted wait times in UNet, and UNOS thus continued to racially discriminate against Black candidates for kidneys every time UNOS ran the UNet algorithm. *Id.* at ¶¶ 46, 49.

Indeed, UNOS sat on its hands until January of 2023 before it instructed transplant hospitals to notify Black candidates for kidneys of the new policy. *Id.* at ¶ 47. With no sense of urgency, UNOS then provided transfer hospitals with another year, until January of 2024, 18 months after UNOS's original policy change, to determine whether any of their patients were entitled to a wait time adjustment. *Id.* at ¶¶ 47, 48. In the interim, UNOS continues to intentionally discriminate against Black candidates for donor kidneys.

## D. Mr. Randall suffered discrimination via the race-based coefficient for years, and UNOS never awarded Mr. Randall a kidney.

Consistent with UNOS's policy, the race-based coefficient was applied to Mr. Randall's eGFR scores, delaying his referral to UNOS's national kidney waitlist and accrual of qualifying wait time. *Id.* at ¶¶ 51–53. Absent this adjustment, Mr. Randall would have held an earlier spot in line and enjoyed a greater chance to receive a donor kidney, and upon information and belief, Mr. Randall would have received a donor kidney from the national kidney waitlist. *Id.* at ¶¶ 54, 55.

In this regard, in December of 2022, Mr. Randall was informed that he finished second for a matching donor kidney; UNOS's algorithm considering discriminatorily-calculated wait time data for Mr. Randall when awarding the kidney to another patient. *Id.* at ¶¶ 56–58. What happened to Mr. Randall illustrates the harm caused to Black patients by virtue of UNOS's failure to timely recalculate wait times, even after admitting the racially discriminatory effect of the race-based coefficient. *Id.* at ¶¶ 7, 44–49, 61. While Mr. Randall did recently receive a transplant, to be clear, UNOS never awarded Mr. Randall a donor kidney. Instead, Mr. Randall's friend stepped up to offer Mr. Randall a kidney and save his life, where UNOS's discriminatory policy failed to ever provide such an opportunity.

### E. By virtue of the delay to his kidney transplant, Mr. Randall suffered significant economic harm.

While Mr. Randall's kidney transplant was delayed by virtue of the race-based coefficient, Mr. Randall's kidney disease worsened significantly, and in January of 2022, Mr. Randall became unable to work, causing him harm in the form of lost wages. *Id.* at ¶ 62. Mr. Randall also incurred increased medical expenses, for instance, ongoing dialysis costs. *Id.* These harms were of course exacerbated by the delay of Mr. Randall's kidney transplant because, following a transplant, Mr. Randall would no longer need dialysis (or other related treatments), and could potentially return to work. While not expressly broken out from "medical expenses" in the First Amended Complaint, Mr. Randall was required to pay a fee directly to UNOS to be included on the waitlist, for which Mr. Randall seeks restitution.

### III. UNOS'S MOTION SHOULD BE DENIED

#### A. Legal standard.

To survive a Rule 12(b)(6) motion to dismiss, a complaint need only "contain sufficient factual matter . . . to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court is bound to "accept all well-pleaded material facts

as true and draw all reasonable inferences in favor of the plaintiff." *Caltex Plastics*, 824 F.3d at 1159; *see also Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) ("We accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party."). Finally, should the Court deem any portion of the complaint to be deficient, the Court should grant leave to amend unless "the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000).

## B.   Mr. Randall has standing to seek injunctive relief.

UNOS begins by arguing that because Mr. Randall received a kidney transplant in May of 2023, he does not have standing to seek injunctive relief against use of the race-based coefficient. MTD, 15. But, even if the Court could consider Mr. Randall's recent transplant being outside the pleadings, the matter is irrelevant to standing, which is "considered at the time a lawsuit is filed." *Fathers & Daughters Nevada*, 284 F. Supp. 3d at 1171 (citing *Lujan*, 504 U.S. at 569 n.4 (1992)); *Carroll v. Nakatani*, 188 F. Supp. 2d 1219, 1224 (D. Haw. 2001) (same). For this reason, "[a] plaintiff does not lose standing to seek injunctive relief when the unlawful conduct ceases after a lawsuit is filed." *Lane v. Kitzhaber*, 283 F.R.D. 587, 599 (D. Ore. 2012) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv.*, 528 U.S. 167, 185 (2000)). Thus, even if UNOS can no longer engage in unlawful conduct by applying the race-based coefficient specifically to Mr. Randall, the proper inquiry is whether Mr. Randall had standing when this case was filed.

In this regard, UNOS argues that prior to Mr. Randall filing this lawsuit, it had already amended its policy to forbid use of the race-based coefficient, and instructed hospitals to adjust their wait time calculation by January of 2024, mooting Mr. Randall's claim for injunctive relief. MTD, 16. Mr. Randall takes no issue with the proposition that tendering the requested relief and/or the cessation of a challenged policy could moot a claim for injunctive relief in certain instances, so far as it goes, but that is not consistent with the allegations here. Mr. Randall did not ask UNOS to

require hospitals to update wait times by January of 2024, to the contrary, Mr. Randall argues it is inappropriate to allow hospitals so much time to update their records while Black patients continue to suffer harm. *See* FAC, ¶¶ 48, 49 ("During this period, Black Americans continue to suffer a race-based disadvantage in their candidacy for a donor kidney—UNet continuing to utilize the old, improperly calculated wait times when awarding kidneys"). Indeed, the challenged discrimination continues because UNOS is allowing it to continue until at least January of 2024, and thus, Mr. Randall's injunctive relief claim is not moot. *See GCB Commc'ns, Inc. v. U.S. S. Commc'ns, Inc.*, 650 F.3d 1257, 1267 (9th Cir. 2011) (holding claim was not moot where parties did not agree on settlement terms).

None of UNOS's cases support a contrary holding because, in each case, the requested relief had been tendered or the challenged policy halted, except for *GCB Commc'ns*, discussed above, which cuts in Mr. Randall's favor. *See Brandon v. Nat'l R.R. Passenger Corp. Amtrak*, No. CV 12–5796 PSG (VBKx), 2013 WL 800265, at *4 (C.D. Cal. Mar. 1, 2013) (plaintiff was tendered check for requested restitution); *Acad. of Motion Picture Arts & Scis. v. GoDaddy.com, Inc.*, No. CV 10-03738-AB (CWx), 2015 WL 12684340, at *11 (C.D. Cal. Apr. 10, 2015) ("evidence is undisputed that GoDaddy has ceased its practice . . . "); *Rodriguez v. Ralphs Grocery Co.*, No. 20-cv-150-JAH2021 WL 4295292, at *10 (S.D. Cal. Sept. 21, 2021) ("Defendant already had in place a policy for removing shopping carts from paths of travel that predates Plaintiff filing his complaint").

## C. <u>Mr. Randall's claims are timely.</u>

UNOS's statute of limitations argument fails because (1) accepting the well-pleaded allegations as true, the first time Mr. Randall even arguably received notice of any adverse action taken against him was December of 2022, and (2) UNOS committed multiple instances of actionable discrimination against Mr. Randall through the time this lawsuit was filed, consistent with UNOS's systematic policy of race-based discrimination.

1

2

3

    **1.**    <u>Even if the Court accepts UNOS's characterization of Mr.</u>

             <u>Randall's injury, his claims are timely pursuant to the</u>

             <u>discovery rule.</u>

       **Title VI claim.** Setting aside for now the continuing violations doctrine, Mr. Randall does not dispute that generally a federal discrimination claim accrues "when the plaintiff knows or has reason to know of the injury which is the basis of the action." *Bonelli v. Grand Canyon Univ.*, 28 F.4th 948, 952–53 (9th Cir. 2022) (quoting *Lukovsky v. City & County of San Francisco*, 535 F.3d 1044, 1048 (9th Cir. 2008). This rule proceeds in a straightforward manner where there is one instance of actionable conduct, and a plaintiff receives express notice that an adverse action has been taken against them. For example, in *Bonelli*, the university issued an Official Disciplinary Warning to the plaintiff, and in *Lukovsky*, the plaintiffs received notice that they would not be hired. *Bonelli*, 28 F.4th at 952–53; *Lukovsky*, 535 F.3d at 1047.[3]

       Here, UNOS argues that, "[t]he delay in his accruing wait time on the national kidney waitlist—of which Plaintiff was aware—constituted Plaintiff's alleged actual injury." MTD, 17–18. This arguments is noticeably made without citation, because there is no allegation in the First Amended Complaint that would indicate Mr. Randall was aware of any delay. Unlike *Bonnelli* and *Lukovsky*, Mr. Randall never received any contemporaneous notice that the race-based coefficient was applied to his eGFR scores or that he failed to qualify to accrue wait time—Mr. Randall simply attended

---

[3] In the other cases cited by UNOS, the plaintiffs similarly received express notice of their injury. *See Brown v. Reese*, No. CV12–02003–PHX–DGC, 2013 WL 5929903, at *1 (D. Ariz. Aug. 5, 2013) ("Through 2004, Arizona DES repeatedly refused to aid Plaintiff in modifying his support order and informed Plaintiff that he needed to seek the modification through Georgia DHS."); *Zamorano v. City of San Jacinto*, No. CV 12-0965 GAF (DTBx), 2012 WL 12886821, at *5 (C.D. Cal. Oct. 22, 2012) (plaintiffs "were being given the runaround as their application was repeatedly denied").

regular check-ups until such time as he was referred to Cedars-Sinai, his transplant hospital. FAC, ¶¶ 29 (patients do not apply directly to UNOS such that they would receive an objection, instead, "[t]o be placed on the national kidney transplant waitlist, a patient must first visit one of 200+ transplant hospitals, and receive a referral from their physician), 51, 52. Accepting the First Amended Complaint's allegations as true, the first time Mr. Randall received notice of an adverse action of any type was December of 2022, when Mr. Randall was informed he finished in second place for a donor kidney, *id.* at ¶ 56, less than five months before the lawsuit was filed.[4]

*Olsen*, 363 F.3d 916, is instructive on the facts of this case. In *Olsen*, the Ninth Circuit emphasized the importance of *receiving notice* of an adverse action to trigger the statute of limitations, holding inappropriate questions during an interview insufficient to put plaintiff on notice of her claims, with the statute of limitations only beginning to run when plaintiff received notice her license would not be reinstated. 363 F.3d at 926–27. Here, again, Mr. Randall did not receive any notice that he was ineligible to accrue wait time from UNOS that could provide notice of his injury. *See also Bonner v. Med. Board of Cal.*, No. 2:17-cv-00445-KJM-DB, 2018 WL 4699996, at *6 (E.D. Cal. Sep. 30, 2018) (claim accrued when Medical Board reached its final determination to revoke medical license, not when several related actions occurred during the course of proceeding).

Mr. Randall's referral was simply delayed by the policy encouraged by UNOS, unbeknownst to Mr. Randall. Thus, the earliest Mr. Randall could be deemed to have discovered any injury was December of 2022.

**California law claims**. More liberal than the federal discovery rule under *Lukovsky*, in California, the discovery rule "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." *Aryeh*, 55 Cal. 4th at 1192 (internal quotation omitted). "In other words, plaintiffs are required

---

[4] This discussion does not consider the March 27, 2023 letter from Cedars-Sinai because that letter was received shortly before filing this case. FAC, ¶ 59.

to conduct a reasonable investigation after becoming aware of an injury, and are charged with knowledge of the information that would have been revealed by such an investigation." *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal.4th 797, 808 (2005). Differing from federal law, for claims requiring intentional discrimination, it is thus not sufficient that a plaintiff know he has been injured, he must know or have reason to know the injury was the result of racial discrimination. *Shevtsov v. The Cheesecake Factory*, No. B300116, 2021 WL 1997144, at *4 (Cal. Ct. App. May 19, 2021) (unpublished) ("[T]hey assert that they did not know—and had no way to learn—that their ill-treatment was caused by discrimination rather than just bad service . . . This distinction matters because . . . the Unruh Act requires plaintiffs to prove intentional discrimination.").

This difference is academic here though. UNOS characterizes Mr. Randall's injury to be the delay in accruing qualifying wait time. MTD, 17–18. But, again, Mr. Randall was not informed that he did not qualify to join the national kidney waitlist or accrue wait time—he simply underwent regular check-ups until such time as he was referred to a transfer hospital. FAC, ¶¶ 29, 51, 52. Consistent with the analysis of federal law above, the lack of such notice is dispositive of the discovery rule analysis under California law, and Mr. Randall's claims against UNOS are timely.

Nonetheless, even if the Court were to find Mr. Randall had knowledge of the delay, that is not dispositive of the inquiry. For Mr. Randall's claims to have accrued at that time, it must also be the case that a reasonable investigation conducted by Mr. Randall would have discovered use of the race-based coefficient and its discriminatory nature. *See Shevtsov*, 2021 WL 1997144, at *4. Here, it is too high of a burden to place on a non-doctor such as Mr. Randall to conduct independent medical research and come to the conclusion that the race-based coefficient is discriminatory, in 2019, when the organization which is paid millions of dollars in federal funding to understand such issues would not reach that conclusion itself until 2022. FAC, ¶¶ 27,

28, 34, 44.[5]

## 2.   UNOS's discrimination against Mr. Randall was continuing, and part of a systematic policy.

In an attempt to manufacture a statute of limitations defense, UNOS mischaracterizes Mr. Randall's injury. UNOS argues that Mr. Randall's injury occurred solely when his accrual of wait time was delayed, and thus Mr. Randall's injury occurred no later than when Mr. Randall began to accrue wait time. MTD, 17–18. In reality, as explored below, UNOS's actionable discrimination was ongoing, and thus actionable in its entirety under the federal and California continuing violation doctrines.

As a threshold matter, even if UNOS were correct that Mr. Randall's original delay in accruing wait time was time barred, "existence of past acts and . . . prior knowledge of their occurrence . . . does not bar" claims "about related discrete acts so long as the acts are independently discriminatory and . . . timely filed." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002*); see also Carpinteria Valley Farms, Ltd. v. County of Santa Barbara*, 344 F.3d 822, 829 (9th Cir. 2003) (holding that all but one of the related discrete acts were time barred, but the latest claim was timely, and plaintiff can use "time barred acts . . . as evidence to establish motive and to put his timely-filed claims in context"); *Aryeh*, 55 Cal. 4th at 1198–99 (same is true under California law). Mr. Randall alleges several other actionable occurrences of discrimination beyond the original application of the race-based coefficient to delay accrual of wait time:

- Maintaining a policy that encouraged used of the race-based coefficient through June of 2022. FAC, ¶¶ 37, 44.

---

[5] Because no allegations suggest Mr. Randall received notice of an adverse action prior to December of 2022, Mr. Randall believes the First amended Complaint is timely on its face. Nonetheless, to the extent the Court believes further factual allegations are required to warrant application of the discovery rule, Mr. Randall expressly requests leave to amend to explain the circumstances in which he came to be a member of the national kidney waitlist, and specifically how he never received any notice of an adverse action.

-14-
PLAINTIFF'S OPPOSITION TO DEFENDANT UNOS'S MOTION TO DISMISS

- Failing to timely update wait times even after UNOS publicly admitted the racially discriminatory nature of the race-based coefficient, and prohibited its use. *Id.* at ¶¶ 12, 13, 15, 44–49.

- Programming its UNet software to consider knowingly manipulated wait time data as the number one factor when awarding donor kidneys, through January of 2024. *Id.* at ¶¶ 13, 15, 32, 37, 47.

- Specifically as to Mr. Randall, Mr. Randall was identified by UNet's algorithm as a medical match for a donor kidney in December of 2022, but because UNOS failed to timely update his wait time, Mr. Randall was disadvantaged by use of the race-based coefficient in his candidacy for this donor kidney, which UNOS ultimately awarded to another patient. *Id.* at ¶¶ 56–58.

Nonetheless, Mr. Randall's claims are all timely when considered together under the continuing violations doctrine. Pursuant to the continuing violations doctrine, where "a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period[.]" *Bird v. Dep't of Human Servs.*, 935 F.3d 738, 746 (9th Cir. 2019). While *Bird* explains that the continuing violations doctrine has been curtailed by the Supreme Court in some other respects, 935 F.3d at 746–48, the doctrine remains available where Mr. Randall alleges a "systematic policy or practice that operated, in part, within the limitations period—a systematic violation." *Mansourian*, 602 F.3d at 974 (internal quotations omitted) (applying continuing violations doctrine because "university's ongoing and intentional failure to provide equal athletic opportunities for women is a systemic violation"); *Gutowsky v. County of Placer*, 108 F.3d 256, 260 (9th Cir. 1997) (applying continuing violations doctrine where "widespread policy and practices of discrimination of which [plaintiff] complains continued every day of her employment, including days that fall within the limitation period"); *Reed v. Lockheed Aircraft Corp.*, 613 F.2d 757, 760 (9th Cir. 1980) ("The fact that [plaintiff] sought to establish her case by listing specific incidents antedating the limitations periods is irrelevant . . . They are but evidence that a Policy of discrimination . . . "); *Lyons v. England*, 307 F.3d 1092, 1107 n.8 (9th Cir. 2002) ("We do not mean to suggest that after *Morgan* the same plaintiff would be precluded from

bringing a class-wide pattern-or-practice claim . . . . "); *Briggs v. Montgomery*, No. CV-18-02684-PHX-EJM, 2019 WL 2515950, at \*1, 22 (D. Ariz. June 18, 2019) (applying continuing violations doctrine where Maricopa County's policy extended marijuana diversion program by six additional months for persons who could not afford to pay "program fee," where additional required drug tests occurred within statute of limitations); *Rodriguez v. City of Los Angeles*, No. CV 11-01135 DMG (JEMx), 2015 WL 13260395, at \*19 (C.D. Cal. May 8, 2015) (applying continuing violations doctrine where plaintiff challenged City of Los Angeles's policy of serving unconstitutional gang injunctions); *see also Aryeh*, 55 Cal. 4th at 1199 (explaining that under California state law, the continuing violations doctrine may apply where there exists "a pattern of reasonably frequent and similar acts"); *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1059–60 (2005) (holding doctrine potentially applied to retaliation claims where alleged retaliatory acts occurred over the course of several months).

This is exactly what Mr. Randall alleges—a uniform, systematic policy of race-based discrimination against Black candidates for donor kidneys by virtue UNOS's policy encouraging use of the race-based coefficient, incorporation of manipulated wait time data as the determining factor who will receive a kidney in the UNet algorithm, and failure to promptly recalculate wait times even after UNOS admitted the discriminatory nature of race based coefficient. FAC, ¶¶ 31, 32, 37, 45–47, 55–58. Mr. Randall's claims are thus timely pursuant to the continuing violations doctrine.

### D.   **UNOS engages in actionable discrimination.**

#### 1.   **Title VI**

Intentional racial discrimination, often referred to as "disparate treatment," is "the most easily understood type of discrimination[.]" *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) (internal quotation omitted). Disparate treatment occurs where a defendant treats a "particular person less favorably than others because of a protected

1    trait." *Id.* (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 985–986

2    (1988). Stating a prima facie case under Title VI is thus straightforward—the plaintiff

3    need only allege that the defendant is engaging in racial discrimination. *See Monteiro*

4    *v. Tempe Union High School Dist.*, 158 F.3d 1022, 1026 (9th Cir. 1998) ("Under Title

5    VI . . . we have required only that the complaint allege that the defendant is engaging

6    in discrimination"). Though the plaintiff must prove intent at trial, the factual basis

7    establishing discriminatory intent "need not be pled in the complaint." *Fobbs v. Holy*

8    *Cross Health Sys. Corp.*, 29 F.3d 1439, 1447 (9th Cir. 1994), *overruled on other*

9    *grounds*, *Davison v. Columbia/HCA Healthcare Corp.*, 241 F.3d 1131 (9th Cir.

10   2001); *see also Monteiro*, 158 F.3d at 1026.

11        The First Amended Complaint easily satisfies this standard. Mr. Randall alleges

12   that use of the race-based coefficient harmed his candidacy for a donor kidney, thus

13   delaying his kidney transplant. FAC, ¶¶ 7, 17–19, 51–58. And there is no dispute as

14   to why the race-based coefficient was applied to Mr. Randall's eGFR scores (and

15   other similarly-situated Black Americans)—it was solely because he is Black. FAC,

16   ¶¶ 4–7, 31, 32, 35, 38, 40–44. In other words, the race-based coefficient is not facially

17   neutral; by definition, it only applies to Black candidates for donor kidneys. And, even

18   UNOS admits that application of the race-based coefficient is discriminatory against

19   Black candidates for donor kidneys, reducing their chances to receive a kidney. *Id.* at

20   ¶ 44 ("This practice has led to a systemic underestimation of kidney disease severity

21   for many Black patients. Specifically in organ transplantation, it may have negatively

22   affected the timing of transplant listing or the date at which candidates qualify to begin

23   waiting time for a transplant.").[6]

24        Unable to defend the race-based coefficient on the merits, UNOS attempts to

25

---

26   [6] Courts routinely permit Title VI claims with far less specific allegations than Mr.
     Randall's to proceed to discovery, e.g., in *Jones v. Beverly Hills Unified School Dist.*,
27   the plaintiff alleged merely that her high school's varsity basketball team denied her
     a spot, despite bringing on "less qualified girls . . . some from different racial and
28   religious backgrounds." No. WD CV 08-7201-JFW (PJW), 2010 WL 1222016, at *1,
     5 (C.D. Cal. Mar. 24, 2010) (denying motion to dismiss as to Title VI claim).

distance itself from the policy, arguing, "Plaintiff's entire case rests on the idea that transplant hospitals—like Cedars-Sinai—improperly used a race-conscious eGFR . . . Noticeably absent from the FAC, however, are any allegations that UNOS developed or even encouraged use of a race-conscious eGFR." MTD, 20:6–10. UNOS further claims, "the FAC contains no facts addressing whether UNOS even knew whether Cedars-Sinai was or was not using a race-conscious eGFR to determine Plaintiff's kidney function[,]" and "Plaintiff does not, and cannot, allege that UNOS encouraged—much less required—transplant hospitals to use the allegedly discriminatory race-conscious eGFR." MTD, 20:6–18, 21:4–7.

These arguments simply fail to acknowledge the First Amended Complaint's allegations. Mr. Randall alleges that "UNOS establishes and implements policy concerning how donor kidneys will be awarded to patients with kidney disease." FAC, ¶ 28. Mr. Randall further alleges, "UNOS policy encouraged and allowed for use of the race-based coefficient, and UNOS knowingly used modified eGFR scores and manipulated wait times when ranking patients for kidney transplants." *Id.* at ¶ 37; *see also id.* at ¶ 45 ("UNOS policy officially changed on July 27, 2022, with UNOS policy prior to that time expressly allowing for use of the race-based coefficient . . . "). UNOS's attempt to distance itself from its policymaking role and authority is particularly incongruous given that no party disputes that UNOS recently changed its policy to forbid transplant hospitals from using the race-based coefficient in the future. *Id.* at ¶ 44.

But UNOS's racial discrimination goes beyond just implementing the original policy. Again, Mr. Randall alleges that UNOS operates UNet, which runs an algorithm each time a donor kidney becomes available to determine who will be awarded the kidney, considering the race-based coefficient impacted wait time data as the primary determining factor. *Id.* at ¶¶ 28, 31, 32. Mr. Randall further alleges that even after UNOS admitted to the discriminatory nature of the race-based coefficient, UNOS failed to adjust race-impacted wait times, and, only after another six months,

instructed transplant hospitals (including Cedars-Sinai) to investigate and implement wait-time adjustments free of racial bias, giving them *a full year* to do so, while racist, junk science continues to infect medical determinations. *Id.* at ¶¶ 44–47.[7]

Lastly, while Mr. Randall need not plead facts showing discriminatory intent, he certainly has. Primarily, UNOS uses an express classification, i.e., "the clearest form of direct evidence of discriminatory intent." Dept. of Justice, TITLE VI LEGAL MANUAL, Section VI: Proving Discrimination—Intentional Discrimination, Subheading B, "Proving Intentional Discrimination" ("If a [defendant] explicitly . . . directs adverse action to be taken based on race, color, or national origin, such a policy or practice constitutes an express classification.").[8] The Department of Justice further explains:

> A recipient's express or admitted use of a classification based on race, color, or national origin establishes intent without regard to the decision-makers' animus or ultimate objective. Such classifications demonstrate a discriminatory purpose as a matter of law. *See Miller v. Johnson*, 515 U.S. 900, 904–05 (1995); *see also Wittmer v. Peters*, 904 F. Supp. 845, 849–50 (C.D. Ill. 1995), *aff'd*, 87 F.3d 916 (7th Cir. 1996). "Put another way, direct evidence of intent is 'supplied by the policy itself.'" *Hassan v. City of New York*, 804 F.3d 277, 295 (3d Cir. 2015) (quoting *Massarsky v. Gen. Motors Corp.*, 706 F.2d 111, 128 (3d Cir. 1983) (Sloviter, J., dissenting)).

*Id.* (citation forms fixed from original). In sum, the race-based coefficient's express terms establish an intent to discriminate.

---

[7] UNOS's cases are not contradictory, and do not merit serious discussion. They each involve the question of whether an institution should be held liable for the acts of its officials. *See United States v. County of Maricopa, Arizona*, 889 F.3d 648, 650 (9th Cir. 2018) (considering whether County is liable for policymaking acts of its Sheriff); *Massey v. Biola Univ., Inc.*, No. 2:19-cv-09626-CJC-JDE, 2020 WL 5898804, at *8 (C.D. Cal. Aug. 21, 2020) (considering university's liability for actions of professors); *Mandel v. Bd. of Trustees of Cal. State Univ.*, No. 17-cv-03511-WHO, 2018 WL 1242067, at *10, 17 (N.D. Cal. Mar. 9, 2018) (considering alleged constitutional violations by university based on actions of university administrators or third parties).

[8] CIVIL RIGHTS DIV., U.S. DEP'T OF JUSTICE, "Section VI—Proving Discrimination—Intentional Discrimination", https://www.justice.gov/crt/fcs/T6Manual6#:~:text=A%20Title%20VI%20discriminatory%20intent,%2C%20color%2C%20or%20national%20origin (last accessed June 23, 2023).

Moreover, Mr. Randall alleges that under UNOS's oversight of the kidney transplant system, Black patients are less likely than their White counterparts to receive a kidney transplant, UNOS failed to timely correct wait time scores for Black patients even after admitting the discriminatory nature of the race-based coefficient, and UNOS ignored warning signs that the race-based coefficient was discriminatory, being premised on outdated stereotypes that Black Americans have bigger muscles than members of other races. FAC, ¶¶ 2, 4–6, 38, 39. *Cf. Community House, Inc. v. City of Boise*, 490 F.3d 1041, 1050 (9th Cir. 2007) (holding that facially discriminatory policy disallowing women in shelter must "respond[] to legitimate safety concerns raised by the individuals affected, rather than being based on stereotypes").

The above-discussed allegations far exceed what is required to plead a Title VI claim.[9]

### 2.    <u>Unruh Civil Rights Act</u>

UNOS is correct that, to state a claim under the Unruh Act, Mr. Randall must plead intentional discrimination. MTD, 19:12–20 (citing *Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 425 (9th Cir. 2014) (quoting *Koebke v. Bernardo Heights Country Club*, 36 Cal. 4th 824, 853 (2005))). It is almost fully correct in noting that the Unruh Act "contemplates '*willful, affirmative misconduct* on the part of those who violate the act.'" *Greater L.A.*, 742 F.3d at 425. UNOS just leaves out something important. The full quote reads: "[T]he Unruh Act 'contemplates willful, affirmative misconduct on the part of those who violate the

---

[9] Mr. Randall must also plead that the entity engaging in discrimination receives federal financial assistance. *See Fobbs*, 29 F.3d at 1447. UNOS does not challenge the FAC on these grounds, and could not, because the FAC pleads UNOS is under federal contract to maintain the national transplant waiting list. *See* 28 C.F.R. § 41.3(e) (defining federal financial assistance to include any grant, loan, contract (other than a procurement contract or a contract of insurance or guaranty), or any other arrangement by which the agency provides or otherwise makes available assistance in the form of, *inter alia*, funds); *see also* FAC, ¶ 86 (contract is "intended by the Federal government to act as a subsidy to UNOS, not as compensation for any goods or services provided by UNOS to the Federal government, for which there are none").

Act' *and that a plaintiff must therefore allege, and show, more than the disparate impact of a facially neutral policy*." *Id.* (emphasis added).

This is not a disparate impact case—UNOS's policy of factoring race into kidney health evaluations negatively impacted *only* Black Americans. UNOS's policy is far from facially neutral. As the First Amended Complaint alleges, "for decades, the race-based coefficient was applied to artificially inflate the eGFR scores for Black Americans, overstating their kidney function by 16–18%, based upon the underlying assumption that Black Americans have greater muscle mass and thus naturally have more creatinine in their system" (FAC ¶ 35); "to be clear, this modification was made to Black patients' eGFR scores entirely because of their race, and was not applied to other racial groups." *Id.* ¶ 37.

Rather, this is a case about a policy that by definition treats Black Americans differently than everyone else, to their detriment. The FAC pleads sufficient facts to allege that this race-based policy was created and enforced with the requisite racially discriminatory intent under California law and the Unruh Civil Rights Act, as outlined above when discussing Title VI.

### E.   UNOS engages in "business activities" such that it is not immune from liability under the Unruh Civil Rights Act or the UCL.

UNOS argues that it cannot be held liable for racially discriminatory conduct under either the Unruh Civil Rights Act or the UCL because it does not operate as a private business or engage in commercial or business-like activities, as UNOS argues is required by the Unruh Civil Rights Act and the UCL. UNOS is wrong.

The Supreme Court of California has explained, "[t]he UCL's scope is broad. By defining unfair competition to include any '*unlawful* ... business act or practice,' the UCL permits violations of other laws to be treated as unfair competition that is independently actionable." *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 949 (2002) (emphasis in original) (citation omitted). The proscription of "'unfair competition' is not confined to anticompetitive business practice but extends to 'any unlawful business

practice,'" *Pines*, 160 Cal. App. 3d at 380, "in whatever context such activity might occur." *Massachusetts Mutual Life Ins. Co. v. Super. Ct.*, 97 Cal. App. 4th 1282, 1288 (2002). Ultimately, whether a particular act is business-related "is a question of fact dependent on the circumstances of each case." *People ex rel. City of Santa Monica v. Gabriel*, 186 Cal. App. 4th 882, 888 (2010) (citing *People v. E.W.A.P., Inc.*, 106 Cal. App. 3d 315, 320–321 (1980)).

The Unruh Civil Rights Act enjoys even broader reach. The Act applies to "all business establishments of every kind whatsoever." Cal. Civ. Code § 51(b). The phrase "business establishments" should be understood "in the broadest sense reasonably possible." *Burks v. Poppy Constr. Co.*, 57 Cal. 2d 463, 468 (1962). The word "business" embraces everything about which one can be employed, and it is often synonymous with "calling, occupation, or trade, engaged in for the purpose of making a livelihood or gain," and the word "establishment" "includes not only a fixed location, such as the place where one is permanently fixed for residence or business, but also a permanent commercial force or organization." *Brennon B. v. Super. Ct.*, 13 Cal. 5th, 662, 679 (2022) (citing *Burks*, 57 Cal. 2d at 468) (cleaned up).

It is well-established the UCL and Unruh Act reach non-profit entities like UNOS. *See, e.g.*, *O'Connor*, 33 Cal. 3d at 796 (non-profit homeowners association subject to Unruh Act); *Ibister v. Boys' Club of Santa Cruz, Inc.*, 40 Cal. 3d 72, 78 and 82 (1985) (applying Unruh Act to non-profit recreational club because, if Unruh Act did not so apply, "thousands of facilities in private ownership, but otherwise open to the public, would be free under state law to exclude people for invidious reasons like sex, religion, age, and even race," and that, despite its non-profit status, the club was "functionally similar to a commercial business"); *Pines v. Tomson*, 160 Cal. App. 3d 370, 386 (1984) (Unruh and UCL applied to religious non-profit organization because of its "businesslike attributes"). *O'Connor*, *Ibister*, and *Pines* provide instructive examples of the types of organizations reachable by the UCL and Unruh Act—a homeowners association for a condominium development, a private recreational club

for boys, and a religious non-profit operating the Christian Yellow Pages.

UNOS is plainly engaging in "business" activities when compared to these entities. UNOS holds a federal contract in which UNOS is paid millions of dollars to fund its services in administering the country's organ transplant systems. FAC, ¶ 27, 85. UNOS is thus an integral part of the nation's healthcare system, working with 200+ transfer hospitals to meet the transplant needs of patients. *Id.* at ¶ 29. And, far from being a private club or religious organization, UNOS is open to all persons in need of an organ transplant. *Id.* at ¶¶ 27, 28. Similar to any conventional business, UNOS maintains its principal place of business (i.e., an office) in Richmond, Virginia. *Id.* at ¶ 21.

Mr. Randall respectfully submits that this is not a close call—UNOS is the type of business establishment that is within the ambit of the Unruh Act and UCL. But even if the Court believes it to be a close call, the matter cannot be resolved at the pleadings stage. *Stevens v. Optimum Health Institute*, No. 09cv2565 WQH (RBB), 2010 WL 1838252, at *5 (S.D. Cal. May 5, 2010) (fact-intensive evidentiary analysis required to determine whether entity engages in business activity "is not appropriate at the motion to dismiss stage").

Mr. Randall should thus at minimum be allowed to conduct discovery as to the nature of UNOS's business operations, but even at the pleadings stage, Mr. Randall can already allege several additional facts available in the public record in an amended complaint, should the Court believe it necessary:

- UNOS maintains a physical office.
- UNOS reports employing 450 staff.
- UNOS collects fees from patients and transfer hospitals to fund its operating budget of approximately $64 million/year.
- UNOS holds in excess of $94 million in assets, including cash, investments, and accounts receivable.
- The federal government has announced it will open the government contract held by UNOS for bidding, meaning that UNOS can face competition from other organizations.

Thus, while Mr. Randall does not believe it necessary, should the Court believe additional facts are required to demonstrate UNOS falls within the purview of the Unruh Act and UCL, Mr. Randall requests leave to amend and plead the above facts.

### F.   Plaintiff can seek restitution under the UCL.

UNOS argues that Mr. Randall's UCL claim fails for want of a remedy. As discussed above, this argument is a non-starter because Mr. Randall can seek injunctive relief.

Moreover, Mr. Randall can seek restitution for fees paid to UNOS. UNOS is correct that restitution is available under the UCL where the plaintiff "took money or property directly from [the plaintiff][.]" MTD, 24 (citing *Ice Cream Distribs. of Evansville, LLC v. Dreyer's Grand Ice Cream, Inc.*, 487 F. App'x 362, 363 (9th Cir. 2012)). Mr. Randall pleaded that he seeks to recover his medical expenses. FAC, ¶¶ 43, 62. While not specifically set out therein, Mr. Randall incurred medical expenses in the form of fees paid to UNOS to join the national kidney waitlist, for which Mr. Randall intends to seek restitution. Should the Court believe this theory is not adequately plead within "medical expenses[,]" Mr. Randall requests leave to make this intention clear.

## IV.   CONCLUSION

For the reasons set forth above, the Motion should be denied. However, should the Court be inclined to grant any portion of the Motion, Mr. Randall requests leave to file an amended complaint.

Dated:  June 23, 2023

ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
Matthew L. Venezia
George B. A. Laiolo


By:   /s/ Matthew L. Venezia
Matthew L. Venezia
Attorneys for Plaintiff Anthony Randall