UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ANTHONY RANDALL,

                    Plaintiff,

      v.

UNITED NETWORK FOR ORGAN
SHARING and CEDARS-SINAI MEDICAL
CENTER,

                Defendants.

Case No.:  2:23-CV-02576-MEMF-MAA

**ORDER GRANTING IN PART MOTIONS
TO DISMISS [ECF NOS. 23, 25]**

      Before the Court are Motions to Dismiss filed by Defendants United Network for Organ Sharing (ECF No. 25) and Cedars-Sinai Medical Center (ECF No. 23). For the reasons stated herein, the Court GRANTS IN PART both Motions to Dismiss.

/ / /

/ / /

/ / /

**BACKGROUND**

I.   **Factual Background[1]**

Plaintiff Anthony Randall ("Randall") is an individual residing in Los Angeles, California. FAC ¶ 20. Randall is Black. *Id.* ¶ 17. As of the time of the filing of his complaint, he was on the waiting list for a kidney transplant.[2] *Id.*

Defendant United Network for Organ Sharing ("UNOS") is a private, non-profit organization that manages the national organ transplant waiting list, pursuant to a federal contract. *Id.* ¶¶ 27, 28. UNOS manages a kidney transplant waiting list, and establishes and implements policy concerning how donor kidneys will be awarded to patients with kidney disease. *Id.* ¶ 28. To be placed on the waiting list, a patient must first visit a transplant hospital and receive a referral by a physician. *Id.* ¶ 29. UNOS maintains the waiting list with software called UNet. *Id.* ¶ 30. Referring hospitals enter patient information into UNet. *Id.* When a kidney becomes available, UNet's algorithm considers the information maintained in UNet, generates potential matches, and then ranks potential matches. *Id.* ¶ 31. Patients are then offered the available kidney based on this ranking. *Id.*

Kidney function is measured by an estimated glomerular filtration rate test ("eGFR"). *Id.* ¶ 3. A lower eGFR indicates lesser kidney function and more need for a kidney transplant. *See id.* Patients on the waiting list for a kidney begin to accrue "wait time" either when their eGFR score drops below 20 ml/min or when other, more severe symptoms present themselves. *See id.*; *see also id.* ¶ 10. Even if a patient is on the waitlist, they will not accrue wait time unless their eGFR score is sufficiently low, or unless some other factor shows their condition is sufficiently critical. *Id.* ¶¶ 33, 10. The amount of wait time that a patient has accrued is the primary factor that the UNet algorithm considers when ranking potential matches to determine which patient will receive a kidney. *Id.* ¶ 32.

---

[1] Unless otherwise indicated, the following factual background is derived from Plaintiff Anthony Randall's First Amended Complaint. ECF No. 12 ("FAC"). For the purposes of the Motions to Dismiss, the Court treats these factual allegations as true, but at this stage of the litigation, the Court makes no finding on the truth of these allegations and is therefore not—at this stage—finding that they are true.

[2] Defendant United Network for Organ Sharing submitted evidence that Randall has now received a kidney. *See* ECF No. 25-1 ¶ 3. The Court will not consider this evidence outside the complaint for the purposes of determining whether Randall stated a claim and deciding the Rule 12(b)(6) Motions. However, as described in more detail below, the Court will consider this evidence in determining whether Randall has standing.

For years, UNOS's policies allowed and encouraged hospitals to measure eGFR differently for Black Americans. *See id.* ¶¶ 9–13, 37. Based on now-debunked science, the creators of eGFR concluded that Black Americans had more muscle mass and creatine than all other patients, and that eGFR scores for Black Americans needed to be adjusted for this reason. *See id.* ¶¶ 4–6. Black patients' eGFR was therefore calculated using a coefficient, whereby Black Americans' eGFR scores were artificially inflated by 16–18%. *See id.* ¶ 5. No other racial group was subject to such a coefficient or adjustment of eGFR scores—eGFR was calculated the same for all Americans, and then Black Americans alone were singled out to have their scores adjusted. *See id.*

The race-based adjustment of eGFR scores affected Black Americans' access to kidney transplants. *See id.* ¶ 8. Black Americans were unable to begin accruing wait time when their unadjusted eGFR dropped below 20 ml/min and had to instead wait until the unadjusted score dropped well lower, or until they presented other, more severe symptoms. *See id.* ¶ 10. Some Black patients never accrued any wait time at all as a result, while others accrued less than they would have but for the racial adjustment. *See id.* This problem persisted for decades. *See id.* ¶ 35. It resulted in non-Black patients receiving kidneys that would have gone to Black patients but for the race-based adjustment to eGFR scores. *See id.* ¶ 41. These patients suffered harms as a result, including not only the failure to receive a kidney transplant, but also worsened kidney disease, undergoing dialysis, and economic damages in the form of medical expenses and lost wages. *See id.* ¶¶ 42, 43.

In 2011, evidence began emerging that this race-based adjustment to Black Americans' eGFR scores was not based in scientific fact. *See id.* ¶ 39. In November 2011, Dr. Toni Martin published an article in the *American Journal of Kidney Diseases* that questioned the practice, and that explained the history of purported genetic differences being used against Black Americans. *See id.* The policy of using a race-based coefficient to adjust the eGFR scores for Black patients persisted despite this evidence. *See id.* ¶ 44.

In June 2022, UNOS admitted that eGFR calculations had used the race-based coefficient, and that this had "led to a systemic underestimation of kidney disease severity for many Black patients" and "negatively affected the timing of transplant listing or the date at which candidates qualify to begin waiting time for a transplant." *See id.* ¶ 44. On June 27, 2022, UNOS officially

changed the policy and ceased allowing the race-based coefficient to calculate eGFR scores. *See id.* ¶ 45. However, despite the fact that previous eGFR calculations based on the coefficient had affected wait time accrual calculations for patients still awaiting transplants, UNOS did not immediately take action to correct the calculation of wait time accrual. *See id.* ¶ 46. On January 5, 2023, UNOS announced a new policy that required (1) a notification to patients on the wait list that Black Americans would be considered for an adjustment of their wait time accrual calculation to account for the fact that previous race-adjusted eGFR scores had impacted the amount of wait time accrued, and (2) a second notification to patients once the adjustment process was completed that would confirm completion and inform patients of their updated status. *See id.* ¶ 47. UNOS directed donor hospitals to investigate which patients were eligible for such adjustments and request adjustments on those patients' behalf within a year, by January 2024. *See id.* Black Americans needing kidney transplants continue to be affected by the race-based adjustment to their past eGFR scores while hospitals do this. *See id.* ¶ 49.

Randall first discovered he had kidney disease in approximately 1999. *See id.* ¶ 50. Thereafter, Randall underwent monthly eGFR testing. *See id.* ¶ 51. These monthly tests were all subjected to the race-based adjustment encouraged by UNOS's policies, and so Randall's eGFR scores were artificially inflated. *See id.* Randall was finally able to begin accruing wait time on the kidney waitlist in January 2018. *See id.* ¶ 52. Randall's actual, unadjusted eGFR scores would have allowed him to begin accruing wait time prior to January 2018. *See id.* ¶ 53.

Defendant Cedar-Sinai Medical Center ("Cedars-Sinai") is a California non-profit corporation with its principal place of business in Los Angeles, California. *See id.* ¶ 22. Cedars-Sinai is one of the donor hospitals that refers patients to UNOS for kidney transplants. *See id.* ¶ 14.

In December 2022, Cedars-Sinai called Randall and told him a kidney was available. *See id.* ¶ 56. Randall rushed to the hospital, prepared for surgery, and then waited 17 hours (including not eating or drinking), only to be told that the kidney was given to another patient. *See id.* Cedars-Sinai explained after the other transplant was completed that Randall had been brought to the hospital as an alternate, and that the other patient was the first choice. *See id.* At that time, in December 2022, Randall's waiting time calculation had not been corrected to account for the time in which he should

1    have accrued wait time but had not because of the race-based adjustment to his eGFR scores. *See id.*

2    ¶ 57. If Randall's wait time had been corrected, or if UNOS had never allowed the use of race-based

3    adjustment to eGFR scores, Randall would have received a kidney in December 2022 or earlier. *See*

4    *id.*

5         When UNOS announced that race-based adjustments could no longer be used in June 2022,

6    Cedars-Sinai took no action to correct wait time calculations. *See id.* ¶ 60. When UNOS announced

7    its new policies in March 2023, which required notifying patients that wait time needed correcting

8    and of whether their times had been corrected, Cedars-Sinai did not immediately correct the wait

9    times. *See id.* ¶ 59. Cedars Sinai informed patients that it would determine whether corrections were

10   necessary over the "next several months." *See id.*

11        As of the filing of this lawsuit (in April 2023), Randall's wait time had not been adjusted by

12   Cedars-Sinai. *See id.* ¶ 61. There are approximately 205 other Black patients at Cedars-Sinai

13   awaiting kidneys, and approximately 27,500 other Black patients on the national kidney waiting list.

14   **II.    Procedural History**

15        Randall filed suit in this Court on April 5, 2023. ECF No. 1. He filed a First Amended

16   Complaint on April 21, 2023. *See* FAC Randall brings this action as a class action. *See* FAC. There

17   are three purported classes: (1) a Nationwide Waitlist Class, seeking damages and injunctive relief;

18   (2) a California Waitlist Class, seeking damages and injunctive relief; and (3) a Cedars-Sinai

19   Waitlist Class, seeking damages and injunctive relief. *See* FAC ¶¶ 63–68.

20        The FAC asserts four causes of action: (1) violation of Title VI of the Civil Rights Act of

21   1964, brought by all three classes, against UNOS only (*see id.* ¶¶ 83–89); (2) Violation of the Unruh

22   Civil Rights Act (California Civil Code § 51), brought by the California Waitlist Class and the

23   Cedars-Sinai Waitlist Class, against UNOS and Cedars-Sinai (*see id.* ¶¶ 90–97); (3) breach of

24   fiduciary duty, brought by all three classes, against UNOS and Cedars-Sinai (*see id.* ¶¶ 98–105); and

25   (4) violation of California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 *et seq.*),

26   brought by the California Waitlist Class and the Cedars-Sinai Waitlist Class, against UNOS and

27   Cedars-Sinai (*see id.* ¶¶ 98–97).

28

Cedars-Sinai filed its Motion to Dismiss on May 26, 2023, along with a Memorandum of Points and Authorities. ECF No. 23 ("CS Motion" or "CS Mot."); ECF No. 23-1 ("CS MPA"). UNOS also filed its Motion to Dismiss on May 26, 2023, along with a declaration asserting certain additional facts. ECF No. 25 ("UNOS Motion" or "UNOS Mot."); ECF No. 25-1 ("Blouin Declaration" or "Blouin Decl."). Randall filed Oppositions to both Motions on June 23, 2023. ECF No. 29 ("Opposition to CS Motion" or "Opp'n to CS"); ECF No. 30 ("Opposition to UNOS Motion" or "Opp'n to UNOS"). Cedars-Sinai and UNOS each filed Replies in support of their respective Motions on June 30, 2023. ECF No. 31 ("UNOS Reply"); ECF No. 32 ("CS Reply").

The Court held a hearing on the CS Motion and UNOS Motion on October 26, 2023.

## UNOS'S MOTION TO DISMISS (ECF NO. 25)

### I.   Applicable Law

UNOS brings its Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)") and Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"). *See* UNOS Mot. The standards for each are discussed below.

#### A.   Rule 12(b)(1): motion to dismiss for lack of subject matter jurisdiction

Federal Rule of Civil Procedure 12(b)(1) authorizes a party to seek dismissal of an action for lack of subject-matter jurisdiction. "Because standing and ripeness pertain to federal courts' subject matter jurisdiction, they are properly raised in a Rule 12(b)(1) motion to dismiss." *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010). In the context of a 12(b)(1) motion, the plaintiff bears the burden of establishing Article III standing to assert the claims. *Id.*

Rule 12(b)(1) jurisdictional challenges can be either facial or factual. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In a factual challenge, the moving party "disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id.* "When the defendant raises a factual attack, the plaintiff must support her jurisdictional allegations with competent proof under the same evidentiary standard that governs in the summary judgment context." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (citation and quotation marks omitted). The court need not accept the allegations in the complaint as true. *Safe Air for Everyone*,

373 F.3d at 1039. The plaintiff bears the burden of proving subject-matter jurisdiction by a preponderance of the evidence. *Leite*, 749 F.3d at 1121.

**B. Rule 12(b)(6): motion to dismiss for failure to state a claim**

Federal Rule of Civil Procedure 12(b)(6) allows an attack on the pleadings for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The determination of whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Generally, a court must accept the factual allegations in the pleadings as true and view them in the light most favorable to the plaintiff. *Park v. Thompson*, 851 F.3d 910, 918 (9th Cir. 2017); *Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir. 2001). But a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

As a general rule, leave to amend a dismissed complaint should be freely granted unless it is clear the complaint could not be saved by any amendment. Fed. R. Civ. P. 15(a); *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

**II.   Discussion**

For the reasons discussed below, the Court finds that Randall has stated a claim against UNOS for violations of Title VI of the Civil Rights Act of 1964 (first cause of action) and violations of the Unruh Act (second cause of action), but not for breach of fiduciary duty (third cause of action) or UCL violations (fourth cause of action).

/ / /

/ / /

**A. Randall's claims as to injunctive relief are moot, and therefore both individual and class claims for injunctive relief may not proceed.**

UNOS argues that Randall lacks standing to seek injunctive relief. *See* UNOS Mot. at 7–8. UNOS brings two arguments on this issue: (1) the fact that Randall received a kidney after filing suit moots his claims for injunctive relief, and (2) even before Randall received a kidney, UNOS had already implemented policies that granted the relief Randall sought. *See id.* Randall responds that standing is evaluated at the time the lawsuit is filed, and thus that the later kidney transplant is irrelevant, and further argues that UNOS's change of policy is not actually the relief Randall seeks. *See* Opp'n to UNOS at 9–10.

Randall's FAC seeks "preliminary and permanent injunctions enjoining and restraining UNOS and Cedars-Sinai," as well as others acting on their behalf, from "from engaging in the above-described racial discrimination and breaches of fiduciary duty." *See* FAC at Prayer for Relief.

"Although rulings on standing often turn on a plaintiff's stake in initially filing suit, Article III demands that an 'actual controversy' persist throughout all stages of litigation." *Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1950–51 (2019). If the action is moot, it is "no longer a 'Case' or 'Controversy' for purposes of Article III" and the Court would lack jurisdiction. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). "If an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit, at any point during litigation, the action can no longer proceed and must be dismissed as moot." *Genesis Healthcare Corp. v. Symczy*k, 569 U.S. 66, 72 (2013). Accordingly, Randall's argument that the Court should only consider standing at the time the suit was filed has no merit in this context. The Court must consider whether mootness deprives the Court of jurisdiction, regardless of whether Randall had standing at the time he filed suit.

A "plaintiff must demonstrate standing separately for each form of relief sought*." Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000). An issue is moot if "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already*, 568 U.S. at 91.

Randall has received a kidney transplant. *See* Blouin Decl. ¶ 3. Randall does not dispute this assertion of fact by UNOS, and so the Court will accept it as true.[3] *See* Opp'n to UNOS. Randall does not allege that he is likely to require an additional kidney transplant at any point in the future, or that UNOS's policies regarding how kidney transplant recipients are chosen will otherwise affect Randall in any way now that he has received a kidney. *See* FAC. Accordingly, Randall no longer has any interest in an injunction that would prevent UNOS or Cedars-Sinai from engaging in the alleged conduct. *See Already*, 568 U.S. at 91. Such an injunction would not impact Randall in any way. The intervening circumstance has deprived Randall of any standing he once had to seek such an injunction, and so his request for an injunction is moot and may not proceed. *See Genesis Healthcare*, 569 U.S. at 72. The request for an injunctive relief is moot as to Randall.

The request for injunctive relief is also moot as to other class members. Although the Court is not aware of precedent directly holding as such, two Supreme Court cases compel this conclusion. First, in *O'Shea v. Littleton*, the Court held that, prior to class certification, where a named plaintiff seeking an injunction failed to allege a likelihood of future harm sufficient for standing, the named plaintiff could not bring suit for a class. *See O'Shea v. Littleton*, 414 U.S. 488, at 493–495 (1974). Although the Court was not considering mootness, it was addressing a similar threshold requirement for an Article III case or controversy. *See id.* The Court explained that "if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself *or any other member of the class*." *See id.* at 495 (emphasis added). The Court noted that no class determination had yet been made. *See id.* at 495 n.3. Second, in *Sosna v. Iowa*, the Court held that, after class certification, the named plaintiff's claim becoming moot does not also moot class claims. *See Sosna v. Iowa*, 419 U.S. 393, 397–403 (1975). The Court explained that, upon class certification, "the class of unnamed persons described in the certification acquired a legal status separate from the interest asserted by appellant." *See id.* at 399. Accordingly, although the named plaintiff's claims were moot, the class claims were not. *See*

---

[3] As described in the Applicable Law section above, on a 12(b)(1) Motion that makes a factual attack on the Court's jurisdiction, the Court may consider summary judgment type evidence beyond the Complaint itself. *See Leite*, 749 F.3d at 1121.

*id.* at 401. In making this ruling, the Court stressed that the legal status of the certified class "significantly affects the mootness determination." *See id.* at 399.[4]

Combining the reasoning and rulings of *O'Shea* and *Sosna*, the Court holds that where a named plaintiff's claims become moot prior to class certification, the named plaintiff may no longer "seek relief on behalf of himself or any other member of the class." *See O'Shea*, 414 U.S. at 495. The conclusion would be different if the class had been certified and acquired its own legal status. *See Sosna*, 419 U.S. at 399. But no class has been certified in this action. When the named plaintiff's claims are mooted prior to certification, *Sosna* does not apply. *See id.* Accordingly, the mootness of Randall's individual claim for an injunction makes the class claims for an injunction moot.

The Court need not reach UNOS's second argument as to whether UNOS's policy change already granted Randall the relief he sought via injunction.

The prayer for injunctive relief will be dismissed.[5] This dismissal will be without prejudice, as it is possible that further allegations could establish that Randall or another plaintiff has some stake in an injunction.

**B. The statutes of limitations do not bar Randall's claims.**

UNOS argues that all of Randall's claims are barred by the applicable statutes of limitations. *See* UNOS Mot. at 5. As described below, the Court finds that none of Randall's claims are time-barred.

---

[4] The Supreme Court has also held that where a named plaintiff's claim becomes moot after the denial of class certification, this does not preclude the named plaintiff from appealing the denial of the class certification motion. *See U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 404–05 (1980). In that specific context, the "action brought on behalf of a class does not become moot upon expiration of the named plaintiff's substantive claim." *Id.* at 404. The Court emphasized that its holding was "limited to the appeal of the denial of the class certification motion." *Id.* Citing *Sosna*, the Court explained that if the appeal as to the class certification motion prevailed, and the class was therefore certified, the plaintiff could litigate on behalf of the class pursuant to *Sosna* despite the mootness of his individual claim. *See id.* The Court finds that *Geraghty* has no application here, as it, per its text, "limited to the appeal of the denial of the class certification motion." *Id.* Nothing in *Geraghty* suggests that a plaintiff whose claims become moot prior to moving for class certification may continue pursuing claims on behalf of the class.

[5] This dismissal will be as to both UNOS and Cedars-Sinai. Although Cedars-Sinai did not raise this issue, the Court has an "independent obligation to determine whether subject-matter jurisdiction exists." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006). Having found that Randall lacks standing to seek injunctive relief, the Court must dismiss his prayer for injunctive relief against all parties he brought it against.

i.   The Title VI claim (first cause of action) is not barred.

The statute of limitations for Randall's claim under Title VI of the Civil Rights Act of 1964

is two years.[6] This time begins accruing "when the plaintiff knows or has reason to know of the

injury which is the basis of the action." *Bonelli v. Grand Canyon Univ.*, 28 F.4th 948, 952 (9th Cir.

2022). Plaintiffs and Defendants agree that the key injury (from which other injuries flowed) was the

*delay* in accruing wait time on the wait list for a kidney. *See* Opp'n to UNOS at 11, UNOS Reply at

5. But the parties dispute when Randall knew or had reason to know that this injury occurred.

Randall alleges that he knew or had reason to know of his injury when he learned that the race-based

coefficient was applied to his eGFR score. UNOS alleges that he knew or had reason to know of his

injury "when [he] began accruing wait time on the national kidney waitlist." UNOS Mot. at 9.

As an initial matter, UNOS's argument is unavailing, particularly in the context of a "wait"

list, which necessarily involves *waiting* and delay. In January 2019, Randall knew that he was

accruing wait time on the national kidney waitlist, but he did not know that he had been *delayed* in

accruing such wait time, and certainly did not know the allegedly discriminatory reason for the

delay.[7]

---

[6] The statute of limitations for a Title VI action is the same as the statute of limitations for an action under 42 U.S.C. § 1983. *See Taylor v. Regents of Univ. of California*, 993 F.2d 710, 712 (9th Cir. 1993). The statute of limitations for a Section 1983 claim is "is the personal injury statute of limitations of the state in which the cause of action arose." *Alameda Books, Inc. v. City of Los Angeles*, 631 F.3d 1031, 1041 (9th Cir. 2011). The statute of limitations for personal injury actions in California is two years. See Cal. Civ. Proc. Code § 335.1.

[7] This distinguishes Randall's case from the *Zamorano* case, concerning delay in approval of an application, and cited by UNOS. *See* UNOS Mot. at 10; *Zamorano v. City of San Jacinto*, No. CV120965GAFDTBX, 2012 WL 12886821 (C.D. Cal. Oct. 22, 2012), aff'd, 585 F. App'x 397 (9th Cir. 2014).  In *Zamorano*, the court noted as follows:

> When Plaintiffs were being given the runaround as their application was repeatedly denied and demands for further information were made, *Plaintiffs clearly knew that actions adverse to their interests had been taken* even if they did not yet know or suspect the refusal to grant their PUD application was based upon discrimination. In short, they believed that they had complied with every demand of the City on more than one occasion but clearly knew on each of these occasions that they had not been approved*, which surely must have raised questions regarding the City's intentions.*

*Zamorano*, 2012 WL 12886821, at *5 (emphasis added) (quotations omitted). There are no such allegations that Randall knew anything adverse had happened to him; rather, drawing all inferences in his favor, all along

1     In the context of hiring discrimination, the Ninth Circuit has held that an injury occurs and

2     time begins accruing when the plaintiff is informed he will be not hired, "even if at that point in time

3     the plaintiffs did not know of the legal injury, *i.e.*, that there was an allegedly discriminatory motive

4     underlying the failure to hire." *Lukovsky v. City & Cnty. of San Francisco*, 535 F.3d 1044, 1051 (9th

5     Cir. 2008). In making this holding, the *Lukovsky* court cited the Supreme Court's decision in *Nat'l*

6     *R.R. Passenger Corp. v. Morgan*, which explained that "Discrete acts such as . . . refusal to hire are

7     easy to identify." *See id.* (*citing Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002)).

8     UNOS cites *Lukovsky* to argue that even if Randall did not know of the discrimination, he knew of

9     the injury years ago. The Court disagrees and finds this case distinguishable from *Lukovsky*. Here,

10    there was no "easy to identify" discrete event where it was clear to Randall that he had not been

11    given what he sought. *See Morgan*, 536 U.S. at 114. A candidate who applies for a job knows when

12    he or she was rejected, and even if he or she does not know the reasons for the rejection, he or she at

13    least understands that he or she has suffered a less-than-ideal outcome. *See Lukovsky*, 535 F.3d at

14    1051.

15        Here, there was no moment when Randall experienced an event like that in *Lukovsky*.

16    Drawing all inferences in favor of Randall, Randall likely believed that he was supposed to take

17    eGFR tests and that he would begin to accrue wait time as soon as he as eligible to. *See* FAC ¶¶ 50–

18    52. Eventually, Randall was told he finally had a profile sufficient to begin accruing wait time. *See*

19    *id.* ¶ 52. At no point does Randall allege that during his years of waiting prior to March 2023 he was

20    ever informed of the impact of the application of the race-based coefficient to his own eGFR testing.

21    There was therefore no discrete event where he knew of the injury like that in *Lukovsky. See*

22    *Lukovsky*, 535 F.3d at 1051.

23        Accordingly, the Court holds that Randall learned of his injury when he learned that his

24    eGFR score had been adjusted based on his race for years. The complaint does not make explicit

25

26    ————————————

27    he believed that he was being fairly considered for a kidney and was merely waiting the length of time any
      other person in his situation was waiting.

28

when Randall learned of this, but drawing all inferences in Randall's favor, the Court finds that he plausibly learned of it when Cedars-Sinai sent a notice (acting per UNOS's new policy) to patients in March 2023 informing patients that it would determine in the next few months whether wait time adjustments were required. *See* FAC ¶ 58. Nothing in the FAC suggests Randall had any awareness of the race-based adjustment to his eGFR scores and their impacts on wait time calculations prior to that notice. Thus, the statute of limitations began accruing in March 2023, and Randall's suit was clearly timely when timed in April 2023. The federal civil rights claim will not be dismissed due to the statute of limitations. The Court need not reach other arguments as to whether there was a continuing violation.

    ii. <u>The state law claims are not barred (second, third, and fourth causes of action).</u>

    For similar reasons, Randall's state law claims are also not time-barred. Although the test under California law is slightly different from federal law, the result is ultimately the same here.

    Under California law, the time for statutes of limitations typically begins to accrue when a cause of action is "is complete with all of its elements." *Willis v. City of Carlsbad*, 48 Cal. App. 5th 1104, 1124 (2020). However, there is an exception for the "discovery rule," which "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." *Aryeh v. Canon Bus. Sols., Inc.*, 292 P.3d 871, 875 (Cal. 2013). "A plaintiff has reason to discover a cause of action when he or she has reason at least to suspect a factual basis for its elements." *Fox v. Ethicon Endo-Surgery, Inc.*, 110 P.3d 914, 920 (Cal. 2005).

    "The discovery rule only delays accrual until the plaintiff has, or should have, inquiry notice of the cause of action." *Id.* At the hearing, Cedars-Sinai[8] noted that *Fox* held that "plaintiffs are charged with presumptive knowledge of an injury if they have information of circumstances to put them on inquiry or if they have the opportunity to obtain knowledge from sources open to their investigation. *Id.* (internal alterations omitted). Cedars-Sinai argued that this is a significant distinction from the federal standard, which focuses on knowledge of the injury. Cedars-Sinai then

---

[8] Although this section of the Order relates to UNOS, the Court must analyze the same issue in the Cedar-Sinai portion, and the Court's analysis in the Cedar-Sinai portion will reference the reasoning here rather than restating it. Thus, the Court will consider Cedar-Sinai's arguments in this section.

suggested that Randall could have discovered the use of race-adjusted eGFR scores years ago. But the quotation from *Fox* above is misleading without its full context. In the next sentence, the *Fox* court explained that "In other words, plaintiffs are required to conduct a reasonable investigation *after becoming aware of an injury*, and are charged with knowledge of the information that would have been revealed by such an investigation." *Id.* (emphasis added). The Court went on to explain that "Simply put, in order to employ the discovery rule to delay accrual of a cause of action, a potential plaintiff *who suspects that an injury has been wrongfully caused* must conduct a reasonable investigation of all potential causes of that injury." *Id.* at 921 (emphasis added). This language makes clear that a plaintiff can only have inquiry notice of the cause of action *when the plaintiff is aware of or suspects an injury*. Here, drawing all inferences in Randall's favor, he had no reason to suspect and no actual knowledge that he was being discriminated against.

With the California rules described above in mind, for similar reasons to those described above with respect to the federal statute of limitations, the Court holds that, drawing all inferences in Randall's favor, Randall did not discover his causes of action until March of 2023. The Court need not detail the different statutes of limitation for each cause of action—it is clear that Randall's claims were not time-barred when filed in April 2023. The state law claims will not be dismissed due to the statute of limitations. The Court again need not reach arguments as to whether there were continuing violations.

### C. Randall has adequately pleaded discriminatory acts.

UNOS next argues that it did not engage in actionable discrimination. For the reasons described below, the Court holds that Randall has adequately pleaded that UNOS did indeed engage in such conduct.

UNOS argues that there are no allegations that "UNOS developed or even encouraged use of a race-conscious eGFR." UNOS Mot. at 12. This is squarely false. Randall alleged that "UNOS establishes and implements policy concerning how donor kidneys will be awarded to patients with kidney disease." FAC ¶ 28. He further alleged that "UNOS policy encouraged and allowed for use of the race-based coefficient, and UNOS knowingly used modified eGFR scores and manipulated wait times when ranking patients for kidney transplants." FAC ¶ 37. At the hearing, UNOS argued that

the allegation the UNOS "encouraged" the use of the race-based eGFR coefficient was conclusory. The Court finds that other facts alleged in the pleading making this allegation plausible. In particular, Randall's allegation that UNOS changed its policies to prohibit the use of the race-based eGFR coefficient in July of 2022 makes it plausible that prior to this change, UNOS's policies "encouraged and allowed" the use of the race-based eGFR coefficient. *See* FAC ¶ 45. Randall further alleges that UNOS acknowledged in a press release that "For a number of years, some eGFR calculations have included a modifier for patients identified as Black," and that UNOS's new policies require donor hospitals to notify patients and investigate ways to rectify the past use of race-based eGFR coefficient. *See id.* ¶ 44. Finally, Randall also includes allegations as to the history of the race-based eGFR coefficient and why it was initially created. *See id.* ¶¶ 4–6. Taken together, these specific factual allegations make the allegation that UNOS's policies at one point "encouraged and allowed" use of the race-based eGFR coefficient plausible.

At the hearing, UNOS also attempted to factually distinguish a lack of policy on the issue from a policy encouraging the use of the race-based eGFR coefficient. UNOS essentially argued that although previous policies did not *prohibit* the use of the coefficient, the previous policies did not encourage it, and the Court should not assume based on a change prohibiting the use that use was previously encouraged. While this may be the case, at this stage, the Court must accept plausible allegations in the pleadings as true. Randall alleges that UNOS's policies prior to June 2022 "encouraged and allowed" use of the race-based eGFR coefficient. *See id.* ¶ 37. The Court finds this allegation plausible as described above. The Court will thus accept the allegation as true and cannot consider factual arguments to the contrary at this stage.

To the extent that UNOS may be arguing that these allegations are conclusory or not plausible, the other facts pleaded in the complaint (including the history of why eGFR scores were subject to race-based adjustment and UNOS's announcement of new policies prohibiting the practice) make the previous allegations plausible and not conclusory. Randall also alleged that as

early as 2011, a peer-reviewed article was published questioning the practice, and UNOS did not change the practice for over a decade after that.[9] *See id.* ¶ 39.

The Unruh Act claim requires "willful, affirmative misconduct." *Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 425 (9th Cir. 2014). At this stage, Randall's allegations suggesting that UNOS knew the policy had no basis in science but continued using race-based adjustments to eGFR is sufficient to meet this standard. One particularly significant allegation is that as early as 2011, a peer-reviewed article was published questioning the practice, and UNOS did not change the practice for over a decade after that.[10] *See id.* ¶ 39.

The Title VI claim requires a showing of either: (1) direct discrimination by the defendant, (2) "deliberately indifferent to known acts of discrimination," or (3) acts of discrimination that result from the defendant's policies. *See United States v. Cnty. of Maricopa, Arizona*, 889 F.3d 648, 652 (9th Cir. 2018). Randall has also met this standard, stating a claim at minimum for acts of discrimination caused by UNOS's policies.

UNOS's argues that the other causes of action, for the California Unfair Competition Law ("UCL") and breach of fiduciary duty, also fail because there were no discriminatory acts. These arguments fail for the same reasons.

The Court holds that Randall has adequately pleaded discriminatory conduct by UNOS.

### D. Randall has adequately pleaded that UNOS is a business subject to the Unruh Act and UCL (second and fourth causes of action).

UNOS argues that because it is a nonprofit entity, it is not subject to the Unruh Act or UCL. This argument fails at this stage.

---

[9] UNOS argues this article would at most give UNOS constructive rather than actual knowledge. *See* UNOS Mot. at 12 n.7. But at this stage, the Court must draw all inferences in favor of Randall. Drawing all such inferences, it is plausible that this article gave UNOS actual knowledge that there was no scientific basis for the use of race-based adjustments in eGFR. It is a question of fact whether UNOS actually had such knowledge.

[10] UNOS argues this article would at most give UNOS constructive rather than actual knowledge. *See* UNOS Mot. at 12 n.7. But at this stage, the Court must draw all inferences in favor of Randall. Drawing all such inferences, it is plausible that this article gave UNOS actual knowledge that there was no scientific basis for the use of race-based adjustments in eGFR. It is a question of fact whether UNOS actually had such knowledge.

1   The Unruh Act is directed as "entities operating as private businesses." *Brennon B. v.*

2   *Superior Ct.*, 513 P.3d 971, 981 (Cal. 2022). It applies to "all business establishments of every kind

3   whatsoever." Cal. Civ. Code § 51(b). This is interpreted "in the broadest sense reasonably possible."

4   *Burks v. Poppy Const. Co.*, 370 P.2d 313, 316 (Cal. 1962). California courts have held that certain

5   nonprofit organizations, including homeowners associations that "perform[] all the customary

6   business functions," such as "obtaining insurance, collecting assessments, and enforcing rules" are

7   subject to the Unruh Act. *See Brennon B.*, 513 P.3d at 981. Similarly, nonprofit recreational clubs

8   that are "functionally similar to a commercial business" are subject to the Unruh Act. *See id.* at 981–

9   82. However, public schools are not subject to the Unruh Act. *See id.* at 982. The inquiry focuses on

10  whether the nonprofit entity has attributes such as "performing business functions, protecting

11  economic value, operating as the functional equivalent of a commercial enterprise, etc." *See id.* A

12  nonprofit organization that engages in some business-like commercial transactions might still only

13  be subject to the Unruh Act for those transactions, and not for its "core functions" that are distinct

14  from those transactions. *See Curran v. Mount Diablo Council of the Boy Scouts*, 952 P.2d 218, 238

15  (Cal. 1998). The Supreme Court of California held that the Boy Scouts are not subject to the Unruh

16  Act when making "membership policies or decisions," the Boy Scout would still be subject to the

17  Unruh Act to the extent that the Boy Scouts engage in "actual business transactions with

18  nonmembers." *Id.* The membership policies are exempt from the Unruh Act because "business

19  transactions are distinct from the Scouts' core functions and do not demonstrate that the organization

20  has become a commercial purveyor." *See id.*

21  Here, Randall alleges that UNOS holds a federal contract, under which it receives $7,000,000

22  per year.[11] FAC ¶ 27. At this stage, this allegation is sufficient to show that UNOS operates as a

23  business under the meaning of the Unruh Act. *See Burks*, 370 P.2d at 316 (business should be

24  interpreted in "in the broadest sense reasonably possible."). It is highly plausible that nonprofits that

25  receive significant federal funding perform certain business functions. For example, it is reasonable

26

27  _____

28  [11] Randall also asserts in his Opposition to the UNOS Motion that he paid fees to UNOS. *See* Opp'n to UNOS
    at 24. This is not alleged in the Complaint, so the Court will not consider it.

to infer that UNOS likely has insurance, likely attempts to collect revenue that is greater than its expenses, and overall seeks to protect its value as an enterprise. Discovery may show otherwise, but at this stage, drawing inferences in Randall's favor, the Court cannot hold that UNOS is exempt from the act.[12]

At the hearing, UNOS argued that this case is similar to *Curran*, and like the Boy Scouts, UNOS should not be subject to the Unruh Act for all of its activities just because it performs some business-like functions. *See Curran*, 952 P.2d at 238 (despite engaging in commercial transactions, the Boy Scouts are not subject to the Unruh Act for its "core functions," particularly "membership policies or decisions"). But this case is significantly distinguishable from *Curran*. In *Curran*, the plaintiff challenged the Boy Scout's membership policies, and argued that commercial transactions distinct from the membership policies should bring the membership policies within the scope of the Unruh Act. *See id.* Here, Randall's challenge focuses on the commercial activity in question. UNOS has a federal contract and receives significant money for its management of the organ transplant waiting list. Randall's suit seeks to hold UNOS liable under the Unruh Act for that very same activity—the management of the organ transplant list. The logical nexus between the commercial activity and the challenged activity is a significant distinction from *Curran*. While it might be the case that certain activities of UNOS are outside the scope of the Unruh Act (to be clear, the Court is not holding that this is so), there is no doubt that the activity that Randall challenges here is sufficiently related to the ways in which UNOS acts as a business that the challenged activity is within the Unruh Act.

The UCL somewhat similarly applies to "business act[s] or practice[s]." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527, 539 (Cal. 1999). Its coverage is "sweeping, embracing anything that can properly be called a business practice." *Id.* For similar reasons to those

---

[12] The Court notes that at least one other federal District Court took a similar approach to this question in a nonbinding decision—holding that whether a nonprofit is subject to the Unruh Act is a question of fact not suitable for decision on a Motion to Dismiss. *See Stevens v. Optimum Health Inst.*, No. 09CV2565 WQH (RBB), 2010 WL 1838252, *5 (S.D. Cal. May 5, 2010).

described above, the Court holds that Randall has pleaded that UNOS's alleged conduct—directing a organ donor waiting list and being paid millions of dollars to do so—is a business practice.

Neither of these claims will be dismissed on the grounds that UNOS is a nonprofit entity.

### E.  The UCL claim fails because Randall has no standing for any equitable relief (fourth cause of action).

UNOS notes that the UCL only allows equitable remedies, and thus argues that based on UNOS's argument that Randall lacks standing to pursue an injunction, his UCL claim must fail.

The Court finds that the UCL claim does indeed fail for this reason. Relief under the UCL "is limited to injunctive relief and restitution." *Massachusetts Mut. Life Ins. Co. v. Superior Ct.*, 97 Cal. App. 4th 1282, 1288 (2002). As described above, the Court finds that Randall may not pursue his claims for an injunction because he has received a kidney. Randall argues that he may seek restitution for money paid to UNOS. *See* Opp'n to UNOS at 24. But he did not allege that he paid any money to UNOS, so this fails. *See* FAC.

The UCL claim must be dismissed for lack of an available remedy. This dismissal will be with leave to amend, as further allegations might show standing for an injunction, or might show some basis for restitution. *See Manzarek*, 519 F.3d at 1031.

### F.  Randall's claim for breach of fiduciary duty is dismissed as to UNOS (third cause of action).

UNOS moves to dismiss the breach of fiduciary duty claim on the grounds that Randall has not pleaded the existence of a fiduciary relationship giving rise to such a duty. Randall concedes this argument, and states that he "does not currently intend to pursue a breach of fiduciary duty claim against UNOS" and "does not oppose the Motion as to that one cause of action, insofar as it relates to UNOS."[13] Opp'n to UNOS at 4 n.2. This claim will therefore be dismissed. This dismissal will be with leave to amend, as further allegations might state a claim. *See Manzarek*, 519 F.3d at 1031.

---

[13] The Court notes that some degree of motion practice could have been avoided if Randall had agreed to amend his complaint and drop this claim during the meet and confer process prior to the filing of UNOS's Motion. Going forward, the parties should make all possible efforts to meet and confer in good faith and seek to compromise on all possible issues in advance of filing motions. *See* L.R. 7-3.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CEDARS-SINAI'S MOTION TO DISMISS (ECF NO. 23)

### I.       Applicable Law

Cedars-Sinai brings its Motion pursuant to Rule 12(b)(6). The applicable law for this Motion is discussed in detail above, and the Court will not reiterate it here. The standards that govern UNOS's Motion also govern Rule 12(b)(6) as to Cedar's-Sinai's Motion.

### II.       Discussion

For the reasons discussed below, the Court finds that Randall has stated a claim against Cedar-Sinai for violations of the Unruh Act (second cause of action) and breach of fiduciary duty (third cause of action), but not for UCL violations (fourth cause of action).

#### A.  The statute of limitations does not bar Randall's claims against Cedars-Sinai.

Cedars-Sinai argues that the statute of limitations bars Randall's state law claims (the only claims brought against Cedars-Sinai). As discussed above, a plausible inference from Randall's allegations is that he did not learn of the violation until March 2023, and that the time for the statute of limitations did not begin accruing until that time.[14] *See Aryeh*, 292 P.3d at 875 ("discovery rule," in California "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action."). He filed suit in April 2023. Thus, his state law claims are timely. The claims will not be dismissed on this basis.

#### B.  Randall plausibly alleged a fiduciary relationship with Cedars-Sinai (third cause of action).

Cedars-Sinai argues that Randall has not alleged a fiduciary relationship with Cedars-Sinai. This argument fails.

A claim for breach of fiduciary duty requires, among other elements, the existence of a fiduciary relationship giving rise to a fiduciary duty. *See Pierce v. Lyman*, 1 Cal. App. 4th 1093,

---

[14] Although Cedars-Sinai points to Randall's allegations about the length of time that the race-based coefficient has been used, the length of time it has been criticized, and the fact that one doctor has attempted to explain the policy to her Black patients, CS Mot. at 6, at no point does Randall allege that *he* was ever informed of the impact of the application of the race-based coefficient to Black patients in general or his own eGFR testing.

1   1101 (1991). A fiduciary relationship "can arise when confidence is reposed by persons in the

2   integrity of others." *Id.*

3       California courts have on several occasions addressed what, if any, fiduciary relationship a

4   hospital has with its patients. No court has ever addressed the issue of whether a hospital has a

5   fiduciary duty to ensure that it does not subject its patients to racial discrimination, or to promptly

6   rectify the issue when it discovers that it has engaged in such discrimination. In *Moore v. Regents of*

7   *Univ. of California*, the Supreme Court of California considered whether it is permissible for a

8   doctor to perform a legitimate medical procedure for a patient's benefit that was also motivated by a

9   desire to use the patient's bodily materials for research and monetary gain. The court held that the

10  treating physician had some degree of a fiduciary duty to patients, but that this duty was only to

11  "disclose all facts material to the patient's decision." *Moore v. Regents of Univ. of California*, 793

12  P.2d 479, 483, 485 n.10 (1990). The court further held that the hospital and other administrators did

13  not "[stand] in a fiduciary relationship with [the plaintiff]," as they were not his treating physician.

14  *See id.* at 486. The court left open the possibility that these defendants could be liable "on the basis

15  of a recognized theory of secondary liability, such as respondeat superior." *Id.* In *Weinberg v.*

16  *Cedars-Sinai Med. Ctr.*, a California court of appeal held, in considering a situation where a hospital

17  is aware of issues with a physician's performance but allows the physician to continue treating

18  patients, that the hospital owes "a duty of a fiduciary nature to its patients and the public to deliver

19  safe and competent medical services." *Weinberg v. Cedars-Sinai Med. Ctr.*, 119 Cal. App. 4th 1098,

20  1109 (2004). This decision considered a statute which requites hospitals to participate in the peer

21  review process, but to "give great weight to the actions of peer review bodies." *See* Cal. Bus. & Prof.

22  Code § 809.05. Another California Court of Appeal held that a hospital does not have fiduciary

23  duties to its staff members and wrote in dicta that a hospital's "fiduciary responsibility is to the

24  *public*." *O'Byrne v. Santa Monica-UCLA Med. Ctr.*, 94 Cal. App. 4th 797, 811 (2001). Finally,

25  another California Court of Appeal wrote that "[h]ospital governing body members have fiduciary

26  duties as directors and under certain circumstances have exposure to personal liability," while

27  holding that a decision to fire a physician made by a hospital governing body against the

28  recommendation of the medical staff was not a denial of fair procedure. *Hongsathavij v. Queen of*

*Angels/Hollywood Presbyterian Med. Ctr.*, 62 Cal. App. 4th 1123, 1143 (1998). None of these cases is directly instructive.

Here, among other allegations, Randall alleges that Cedars-Sinai breached its fiduciary duty by failing to promptly correct Randall's wait time calculation after UNOS announced a change in policy that forbade the use of race-adjusted eGFR scores. *See* FAC ¶ 104; *see also* FAC ¶ 44–45 (in June 2022, UNOS announced the policy change forbidding race-adjusted eGFR), 57 (as of December 2022, Cedar-Sinai had taken no action to correct Randall's wait time that was calculated based on previous race-adjusted eGFR scores).

The Court finds that Randall has adequately pleaded the existence of and breach of a fiduciary relationship. Randall alleges that he trusted that Cedars-Sinai and the Cedars-Sinai doctors he interacted with were acting in his best interests. *See Pierce*, 1 Cal. App. 4th at 1101 ("A fiduciary or confidential relationship can arise when confidence is reposed by persons in the integrity of others."). According to Randall, Cedars-Sinai and its doctors "voluntarily accept[ed] or assum[ed] to accept [Randall's] confidence." *See id.* Having done so, he asserts they could "not act so as to take advantage of [Randall's] interest without that [his] knowledge or consent." *See id.* At the very least, it is clear from *Moore* that—taking Randall's allegations as true, as this Court must at this stage— whatever physician Randall interacted with had a fiduciary duty to inform Randall of "all facts material to [Randall's] decision." *Moore*, 793 P.2d at  at 485 n.10 (1990). Similarly, Randall has also properly alleged that he placed some degree of trust in whoever at Cedars-Sinai oversaw the kidney transplant wait list, and it is plausible that those individuals owed a fiduciary duty to Randall.

Randall has properly alleged that Cedars-Sinai and its doctors or other employees did not act in Randall's best interests—taking his allegations as true, acting in his best interests would have required a prompt adjustment of Randall's wait time, and advocating for Randall to have his wait time adjusted so that he could move further up the priority list. According to the complaint, Cedars-Sinai and its employees instead allowed Randall to remain where he was on the list, to the inevitable benefit of other patients. Also according to the complaint, Cedars-Sinai and its doctors did not inform Randall that his wait time score was affected by a now-debunked scientific theory that UNOS had instructed Cedar-Sinai not to use going forward. *See Moore*, 793 P.2d at 485 n.10 ("a physician

must disclose all facts material to the patient's decision"). Randall has thus properly alleged that if Cedars-Sinai had informed Randall of the full facts, and informed him that Cedars-Sinai would not do anything to rectify Randall's wait time calculation, he might have chosen not to continue treatment at Cedars-Sinai.

Randall has therefore adequately pleaded that the doctors he interacted with at Cedar-Sinai owed him a fiduciary duty, and that Cedars-Sinai may be held liable under a theory of respondeat superior for a breach of that duty by failing to inform him of the facts and by taking advantage of his trust by prioritizing other patients over him. *Moore* does not foreclose such a claim. *See id.* at 487. Another plausible inference is that other employees at Cedars-Sinai who oversaw the kidney transplant waiting list owed Randall a fiduciary duty, and that Cedars-Sinai might be liable for those employees' breach of that duty.

More facts are needed to determine whether a claim will actually lie against Cedars-Sinai on these theories. But at this stage, drawing all inferences in favor of Randall, Randall has alleged that Cedars-Sinai may be liable for a breach of fiduciary duty that one of its doctors or other employees owed to Randall. This claim will not be dismissed at this stage.

### C. Randall's UCL claim fails for lack of an available remedy (fourth cause of action).

As discussed above as to UNOS, relief under the UCL "is limited to injunctive relief and restitution." *Massachusetts Mut.*, 97 Cal. App. 4th at, 1288. The Court found that Randall may not pursue his claims for an injunction because he has received a kidney. He seeks no other remedies that are available under the UCL.

Accordingly, the UCL claim must be dismissed. This dismissal will be with leave to amend, as further allegations might state a claim. *See Manzarek*, 519 F.3d at 1031.

### CONCLUSION

For the reasons stated herein, the Court GRANTS in part both Motions:

1. Randall's prayers for injunctive relief are dismissed as to UNOS and Cedars-Sinai. This dismissal is with leave to amend.

2. Randall's claim for breach of fiduciary duty (third cause of action) is dismissed as to UNOS only. This dismissal is with leave to amend.

1

3. Randall's claim for violations of the UCL (fourth cause of action) is dismissed as to

2

UNOS and Cedars-Sinai. This dismissal is with leave to amend.

3

4. The Motions are otherwise DENIED.

4

5

IT IS SO ORDERED.

6

7

Dated: March 11, 2023

_____

8

MAAME EWUSI-MENSAH FRIMPONG

9

United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28