**LEWIS BRISBOIS BISGAARD & SMITH LLP**
Jon P. Kardassakis, SB# 90602
Jon.Kardassakis@lewisbrisbois.com
633 West 5th Street, Suite 4000
Los Angeles, CA 90071
Telephone: (213) 250-1800
Facsimile: (213) 250-7900

Attorneys for Defendant,
CEDARS-SINAI MEDICAL CENTER

**WINSTON & STRAWN LLP**
Daniel M. Blouin (admitted pro hac vice)
dblouin@winston.com
Thomas G. Weber (admitted pro hac vice)
tgweber@winston.com
Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
Telephone: (312) 558-5600
Facsimile: (312) 558-5700

Shawn R. Obi (SBN: 288088)
sobi@winston.com
Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543
Telephone: (213) 615-1700
Facsimile: (213) 615-1750

Attorneys for Defendant,
UNITED NETWORK FOR ORGAN SHARING

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ANTHONY RANDALL,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED NETWORK FOR ORGAN SHARING and CEDARS-SINAI MEDICAL CENTER,<br><br>Defendants. | Case No. 2:23-CV-02576-MEMF<br><br>Hon. Maame Ewusi-Mensah Frimpong<br><br>**DEFENDANTS CEDARS-SINAI MEDICAL CENTER AND UNITED NETWORK FOR ORGAN SHARING'S JOINT NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO EXCLUDE OPINIONS OF DAVID CUTLER**<br><br>DATE: June 5, 2025<br>TIME: 10:00 AM<br>CTRM: 8B |

TO THE COURT AND ALL ATTORNEYS OF RECORD:

Please take notice that on June 5, 2025 at 10:00 a.m., or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Judge Maame Ewusi-Mensah Frimpong, Courtroom 8B – 8th Floor, United States Courthouse, 350 W. First Street, Los Angeles, CA 90012, Defendants Cedars-Sinai Medical Center ("Cedars") and United Network for Organ Sharing ("UNOS") will, and hereby do, move for an order excluding the opinions of Plaintiff's expert witness David Cutler pursuant to Federal Rules of Evidence 702, 402, and 403. Cedars and UNOS seek the exclusion of all opinions proffered by Cutler.

This Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the pleadings on file in this action, and such other matters as may be properly presented to the Court at the time of hearing.

This Motion is made following the conference of counsel of record pursuant to Local Rule 7-3.

Dated: February 14, 2025

WINSTON & STRAWN LLP

By: /s/ *Daniel M. Blouin*

Shawn R. Obi (SBN: 288088)
sobi@winston.com
Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543
Telephone: (213) 615-1700
Facsimile: (213) 615-1750

Daniel M. Blouin (Admitted *pro hac vice*)
dblouin@winston.com
Thomas G. Weber (Admitted *pro hac vice*)
tgweber@winston.com
Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
Telephone: (312) 558-5600
Facsimile: (312) 558-5700

*Attorneys for Defendant UNOS*

LEWIS BRISBOIS BISGAARD & SMITH

By: /s/ *Jon P. Kardassakis*

Jon P. Kardassakis, SB# 90602
Jon.Kardassakis@lewisbrisbois.com
633 West 5th Street, Suite 4000
Los Angeles, CA 90071
Telephone: (213) 250-1800
Facsimile: (213) 250-7900

*Attorneys for Defendant Cedars-Sinai Medical Center*

# TABLE OF CONTENTS


**Page**

MEMORANDUM OF POINTS AND AUTHORITIES .......... 1

I. Introduction .......... 1

II. Statement Of The Case .......... 3

A. Summary of Randall's Allegations .......... 3

B. Kidney Function Tests .......... 3

C. Organ Transplantation Process .......... 4

1. Overview .......... 4

2. Patient evaluation / transplant registration process .......... 4

3. "Wait Time" accrual process .......... 4

4. Match runs .......... 6

D. Cutler's Methodology .......... 6

III. Legal Standard .......... 8

IV. Argument .......... 10

A. Cutler's Methodology Is Not Scientifically Valid or Reliable. .......... 10

B. Cutler Fails to Properly Apply His Methodology to the Facts of This Case. .......... 12

1. Cutler's methodology is premised on factually inaccurate assumptions that invalidate his approach and lead to incorrect and unreliable conclusions. .......... 12

2. Cutler fails to include in his analysis the significant "downstream effects" of people who received kidneys in the actual world who would not receive kidneys in Cutler simulated but-for world. .......... 13

C. Cutler's Opinions Will Not Assist the Trier of Fact. .......... 14

V. Conclusion .......... 19

## Table of Authorities

**Page(s)**

**Cases**

*City of Pomona v. SQM N. Am. Corp.*,
750 F.3d 1036 (9th Cir. 2014) .......... 10

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) .......... 17, 18

*Daubert v. Merrell Dow Pharms., Inc.*,
43 F.3d 1311 (9th Cir. 1995) .......... 11

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) .......... *passim*

*Dukes v. Wal-mart Stores, Inc.*,
603 F.3d 571 (9th Cir. 2010), *rev'd on other grounds by* 564 U.S. 338 (2011) .......... 9

*Easton v. Asplundh Tree Experts, Co.*,
No. C16-1694RSM, 2017 WL 4005833 (W.D. Wash. Sept. 12, 2017) .......... 14

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) .......... 8, 9

*In re Google Play Store Antitrust Litig.*,
No. 21-md-02981-JD, 2023 WL 5532128 (N.D. Cal. Aug. 28, 2023) .......... 9

*Grodzitsky v. Amer. Honda Motor Co.*,
957 F.3d 979 (9th Cir. 2020) .......... 8

*Klein v. Meta Platforms, Inc.*,
No. 20-CV-08570-JD, 2025 WL 295361 (N.D. Cal. Jan. 24, 2025) .......... 10

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) .......... 9

*Marshall v. Northrop Grunman Corp.*,
No. 16-CV-06794-AB-JCX, 2019 WL 6354371 (C.D. Cal. Oct. 16, 2019) .......... 12

*Michaels v. Taco Bell Corp.*,
No. CIV. 10-1051-AC, 2012 WL 4507953 (D. Or. Sept. 27, 2012) .................. 12

*Obrey v. Johnson*,
400 F.3d 691 (9th Cir. 2005) .................................................. 12, 14

*OCG Energy, LLC v. Shen*,
No. 8:22-CV-01568-FWS-DFM, 2024 WL 694912 (C.D. Cal. Feb. 12, 2024) .................................................. 10, 11

*Ollier v. Sweetwater Union High Sch. Dist.*,
768 F.3d 843 (9th Cir. 2014) .................................................. 10

*Otto v. Lemahieu*,
No. 4:19-cv-00054-YGR, 2021 WL 1615311 (N.D. Cal. Apr. 26, 2021) .................................................. 8

*Oula Zakaria v. Gerber Prods. Co.*,
2017 U.S. Dist. LEXIS 221124 (C.D. Cal. Aug. 9, 2017) .................. 8, 18

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
725 F.3d 244 (D.C. Cir. 2013) .................................................. 9

*Reflex Media, Inc. v. SuccessfulMatch.com*,
No. 20-CV-06393-JD, 2024 WL 4903267 (N.D. Cal. Nov. 26, 2024) .............. 10

*Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*,
161 F.3d 77 (1st Cir. 1998) .................................................. 10

*Sali v. Corona Reg'l Med. Ctr.*,
909 F.3d 996 (9th Cir. 2018) .................................................. 8

*Sanderson v. Int'l Flavors & Fragrances, Inc.*,
950 F. Supp. 981 (C.D. Cal. 1996) .................................................. 11

*Testone v. Barlean's Organic Oils, LLC*,
2021 U.S. Dist. LEXIS 185896 (S.D. Cal. Sep. 28, 2021) .................. 18

*United States v. E. Mun. Water Dist.*,
No. CV 04-8182 CBM(RNBX), 2008 WL 4755425 (C.D. Cal. Apr. 8, 2008) .................................................. 14

*United States v. Gwaltney*,
790 F.2d 1378 (9th Cir. 1986) .................................................. 14

*United States v. Sandoval-Mendoza*,
472 F.3d 645 (9th Cir. 2006) .......... 11

*Wanke Cascade Dist., Ltd. v. Forbo Flooring, Inc.*,
No. 3:13-CV-768-AC, 2017 WL 2403046 (D. Or. May 4, 2017) .......... 11

*Welch v. UNOS, et al.*,
Case No. 3:24-cv-00422 (M.D. Tenn.), Dkt. 113-17 .......... 14

*Wood v. Sw. Airlines Co.*,
No. 2:14-CV-01421-KJM-CKD, 2016 WL 696599 (E.D. Cal. Feb. 22, 2016) .......... 11

*Woodall v. Walt Disney Co.*,
No. CV 20-3772-CBM-(EX), 2024 WL 5337320 (C.D. Cal. Nov. 4, 2024) .......... 12

**Statutes**

42 U.S.C. § 274(b)(2) .......... 4

California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* .......... 3

California's Unruh Civil Rights Act, Cal. Civil Code § 51 *et seq.* .......... *passim*

Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d .......... 3

**Other Authorities**

Fed. R. Civ. P. 23 .......... 9, 18

Fed. R. Civ. P. 23(b)(3) .......... 18

Fed. R. Evid. 402 .......... 1, 3, 10

Fed. R. Evid. 403 .......... 1, 3, 10

Fed. R. Evid. 702 .......... *passim*

Fed. R. Evid. 702(a) .......... 14

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

This motion is brought under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–93 (1993) ("*Daubert*"), to exclude the opinions of Plaintiff Anthony Randall's expert Professor David Cutler ("Cutler"). Cutler's methodology is not scientifically valid or reliable. Additionally, his model does not fit the theory of liability alleged in the Second Amended Complaint ("SAC"). This motion is also based on Federal Rule of Evidence 402, because "[i]rrelevant evidence is not admissible" and Cutler's opinions are not relevant to the claims alleged in the SAC that Plaintiff seeks to certify for class treatment. Alternatively, this motion is made pursuant to Federal Rule of Evidence 403 because, if Cutler's opinions have any relevance, the probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Plaintiff seeks class certification of claims alleging that each Defendant violated California's Unruh Civil Rights Act, Cal. Civil Code § 51 et seq. This case is premised on Plaintiff's assertion that "patients do not begin accruing wait time on the national kidney waitlist until their eGFR score reaches 20 ml/min." (Dkt. 53 (hereinafter "SAC") ¶ 36). Randall contends that "the race-based coefficient was applied to artificially inflate the Black patients' eGFR scores above 20 ml/min, preventing them from qualifying to accrue wait time." (*Id.*). Randall concludes that, but for the use of the race-conscious coefficient, he would have begun to accrue wait time earlier, increasing his chances to receive a donor kidney. (*Id.* ¶ 55).

Randall has designated Cutler as an expert witness. As detailed in his Report (Dkt. 79-39 ¶ 8), Cutler opines that "[t]here is a straightforward statistical method one can use to determine how much class members wait times were impacted by Defendants use of the race-biased coefficient, and thus how much any particular class

member's chances of being offered an acceptable kidney were prejudiced." Cutler's opinions should be excluded under Rule 702 for several reasons.

Cutler's methodology is not scientifically valid or reliable. It has never been tested, subjected to peer review, or otherwise accepted in the scientific community.

Cutler fails to properly apply his methodology to the facts of this case. His opinions are premised on factual assumptions that are demonstrably false. Cutler's methodology also fails to consider that altering the sequence of patients on match runs in his but-for world can, and will, significantly alter the sequence of patients on every match run thereafter. A single adjustment creates a cascading effect throughout the whole match run system. As a result, it is impossible to isolate the effects of any single change to a match run. Cutler has admitted that this is a significant limitation of his proffered methodology.

Cutler's opinions are not helpful because he does not propose a concrete approach to determine which class members have been injured, let alone by how much. Cutler's methodology also is not helpful because he fails to focus his analysis on Defendants' conduct. Instead, his approach purports to consider a but-for world in which no one used a race-based coefficient in calculating eGFR scores.

Randall seeks damages from UNOS and Cedars because he alleges each of them discriminated against him on the basis of race by using race-based algorithms to calculate eGFR scores that treat Black patients differently than all other patients. Adjudicating that claim against Cedars requires determining whether Cedars violated the Unruh Act. Adjudicating that claim against UNOS requires determining whether UNOS violated the Unruh Act. Plaintiff does not allege, nor could he allege, that Cedars can be held liable for the acts of anyone other than Cedars itself, or that UNOS could be held liable for the acts of anyone other than UNOS itself. But Cutler readily admits his model does not segregate harm caused by Cedars, as distinct from harm caused UNOS or anyone else; his model does not segregate harm caused by UNOS as distinct from harm caused by Cedars or anyone else; and his model does not

segregate out harm caused exclusively by other non-parties (e.g., referring physicians or medical providers) who generated and relied on race-based algorithms that allegedly resulted in delays in referring those patients to Cedars which, in turn, allegedly resulted in delay in those patients being offered kidneys.

For each of these reasons, Cutler's opinions and testimony should be excluded under Rules 702, 402, and 403.

## II. STATEMENT OF THE CASE

### A. Summary of Randall's Allegations

The SAC asserts four causes of action: (1) violation of Title VI of the Civil Rights Act of 1964; (2) violation of the Unruh Civil Rights Act; (3) breach of fiduciary duty; and (4) violation of California's Unfair Competition Law. Each claim is premised on Randall's assertion that, but for use of the race-conscious coefficient, he would have begun to accrue wait time earlier, increasing his chances to receive a donor kidney. (SAC ¶ 55). Randall's pending motion for class certification seeks only class certification of the Unruh Act claim.

### B. Kidney Function Tests

Healthcare providers can determine an individual's kidney function in one of several ways, including use of an estimated glomerular filtration rate test ("eGFR"). A race-conscious coefficient was included in eGFR equations, along with coefficients that accounted for age and sex, because study investigators determined from the data and statistics before them that, at any given age or sex, serum creatinine levels for individuals identified as Black had higher measured GFR than those not identified as Black. (Dkt. 104-46 ¶¶ 22–23; Dkt. 104-44 § VI.1).

Over time, concerns were raised regarding the use of race in connection with healthcare generally, and kidney function testing specifically. (Dkt. 104-46 ¶¶ 25–26). A race-free CKD-EPI equation was published, and laboratories began to incorporate that equation in late 2021 and 2022. (*Id.* ¶ 27).

### C. Organ Transplantation Process

#### 1. Overview

UNOS administers the national kidney transplant waitlist, matching deceased donor organs to transplant candidates. *See* 42 U.S.C. § 274(b)(2). To provide this service, UNOS uses a software application known as UNet, through which, each time a deceased donor organ becomes available, an algorithm generates a ranked list of potential candidate matches from the national transplant waitlist ("Match Runs"). (Dkt. 104-17).

#### 2. Patient evaluation/transplant registration process

Evaluating candidates for transplantation involves input and direction from multiple specialties and healthcare professionals who consider a variety of factors. (*See* Dkt. 104-46 ¶ 8; Dkt. 104-19). The list and weighting of factors taken into consideration varies from hospital to hospital. Having an eGFR score of 20 or less does not qualify a patient to be registered on the national kidney transplant list. (Dkt. 104-20).

When healthcare professionals make the clinical judgment that a patient meets the transplant hospital's criteria for transplantation, a hospital staff member registers the patient with the Organ Procurement Transplantation Network ("OPTN"). (Dkt. 104-44 § VI.3). The staff member enters data into UNet, including whether the patient: (1) has a measured or estimated creatinine clearance level of 20 mL/min. or less; (2) has a measured or estimated GFR of 20 mL/min. or less; or (3) has begun regularly administered dialysis. (Dkt. 104-51 ¶ 3). If the staff member marks "Yes" for categories (1) or (2), they also must provide a numerical value for the test result and the corresponding test date. Such data, however, does not reflect the test used to calculate the result, nor does it reflect whether a race-conscious coefficient was used in determining the result. (*Id.*).

#### 3. "Wait Time" accrual process

A patient cannot accrue wait time on the national kidney transplant waitlist

administered by UNOS until the patient meets the transplant registration requirements established by the hospital. Once registered, regardless of race, a patient's wait time historically began to accrue in accordance with the rules set forth in Section 8.4 of the OPTN Kidney Allocation Policy. (Dkt. 104-6 at UNOS_0013565 (policy effective December 5, 2018); *see also* Dkt. 104-22 § 8.3 (policy effective December 11, 2024)). Section 8.4A, which applies to candidates registered at age 18 years or older, provides that the candidate's wait time begins to accrue after registration and on the earliest of the following: "(1) The candidate's registration date with a measured or estimated creatinine clearance [CrCl] or glomerular filtration rate (GFR) less than or equal to 20 mL/min. (2) The date after registration that a candidate's measured or estimated creatinine clearance or GFR becomes less than or equal to 20 mL/min. (3) The date that the candidate began regularly administered dialysis as an End Stage Renal Disease (ESRD) patient in a hospital based, independent non-hospital based, or home setting." (Dkt. 104-6 at UNOS_0013565; *see also* Dkt. 104-22 § 8.3A). Once wait time begins to accrue, candidates, regardless of race, receive 1/365 kidney allocation points for each day on the waitlist. (Dkt. 104-6 at UNOS_0013564; *see also* Dkt. 104-22 § 8.2).

On December 5, 2022, the OPTN Board of Directors approved a policy addressing modification of wait times for certain Black patients (the "Wait Time Modification Policy"). The Wait Time Modification Policy became effective on January 5, 2023. (Dkt. 104-12; Dkt. 104-13 at UNOS_0004510–0004511). Under the Wait Time Modification Policy, Black transplant candidates became entitled to additional wait time dating back to the earliest day they had an eGFR result that was over 20 mL/min with a race-conscious coefficient that would have been 20 mL/min or less without a race-conscious coefficient. (*Id.*). Black patients received modified wait times independent of whether the race-conscious coefficient had any effect on the transplant hospital's decision to register the patient on the transplant list, let alone when to do so. (Dkt. 104-44 § VI.6). Stated differently, that a Black patient received

a modified wait time in no way establishes a causal relationship between use of the race-conscious coefficient and the date on which the patient met the transplant hospital's criteria for registration on the national kidney transplant list. (*Id.*).

**4. Match runs**

When a donor kidney becomes available, an Organ Procurement Organization ("OPO") performs a Match Run in UNet to identify potential recipients of that kidney. (Dkt. 104-51 ¶ 4). The Match Run includes all candidates who are designated as "active" on the waitlist and who otherwise are medically compatible with the donated kidney. (*Id.* ¶ 5).

Within each Match Run, donated kidneys are ranked by criteria established by the OPTN. (*Id.* ¶ 6). Each kidney is assigned a kidney donor profile index ("KDPI"). Kidneys are grouped according to KDPI. (*Id.*). Taking these and other factors into consideration, classification groups are created. (*Id.*). Transplant candidates are classified into one of 43 classifications based on a variety of factors. (*Id.* ¶ 7). As a general matter, kidneys are offered to candidates sequentially by classification group and then by rank order within a classification group. (*Id.*). The rank order within which kidneys are offered to candidates is far from absolute. Exceptions can and do occur. (*Id.*). For example, the authorized representative of a donor can designate that the donated organ be given to a particular individual or category of recipient (e.g., Veteran). In such situations, the rank order on a match run becomes irrelevant. (*Id.*).

**D. Cutler's Methodology**

Cutler offers four metrics he contends "may" reflect a causal relationship between Defendants' use of the race-conscious coefficient and alleged harm to class members, specifically:

- **Metric 1 – "Top 7" or "Top 50"**: The number of times the individual moved into the upper tier of the match rank distribution, defined as being in the top 7 of the distribution (where approximately 50% of kidneys are allocated) or the

top 50 of the distribution (where approximately 75% of the kidneys are allocated).

- **Metric 2 – Movement ahead of person who received the kidney**: The number of times that class members would have been placed on the match list with a higher rank than a person who actually received one of the donor kidneys.
- **Metric 3** – "**Certain offers**": The number of times the person would have placed high enough to be offered a kidney with certainty, and, among that set, the number of times the person indicated provisional acceptance of a kidney (first- (or second-) ranked person from Metric 2).
- **Metric 4 – "Expected offers" based on movement ahead of person who received the kidney weighted by the chance of being offered kidney**: The expected number of kidney offers the person would have received (same offers as Metric 2).

Cutler runs ten simulations for each Match Run in which he imputes wait time adjustments for Black patients. His methodology is premised on the assumption that the but-for world is one in which Randall and proposed class members would have been placed on the waitlist and would have started accruing wait time when a candidate's eGFR was over 20 mL/min, but with a race-neutral calculation it would have been 20 mL/min or less. Cutler asserts that his methodology "is a straightforward way to simulate the distribution of likely outcomes for kidney transplantation had a racially-biased calculation of eGFR not been used." (Dkt. 79-39 ¶ 74). Cutler adds further that his approach is based on methodologies that are "consistent with models used in the literature." (*Id.*). Cutler, however, fails to identify any simulation models in the literature that use the methodology he uses in this case, or any literature that supports the metrics he uses in this case.

## III. LEGAL STANDARD

The *Daubert* standard must be applied at the class certification stage to determine if the proffered expert testimony is reliable. *See Ellis v. Costco Wholesale Corp*., 657 F.3d 970, 982 (9th Cir. 2011). "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 at 592–93. Under the Federal Rules of Evidence, expert opinion is only allowed if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case. Fed. R. Evid. 702.

"In determining the reliability of a proffered expert, courts 'scrutinize not only the principles and methods used by the expert, but also whether those principles and methods have been properly applied to the facts of the case.'" *Oula Zakaria v. Gerber Prods. Co*., 2017 U.S. Dist. LEXIS 221124, at *17-18 (C.D. Cal. Aug. 9, 2017) (citing Fed. R. Evid. 702 advisory committee's note to 2000 amendment).

"[I]n evaluating challenged expert testimony in support of [or in opposition to] class certification, a district court should evaluate admissibility under the standard set forth in *Daubert*. . . ." *Grodzitsky v. Amer. Honda Motor Co.*, 957 F.3d 979, 984 (9th Cir. 2020) (quoting *Sali v. Corona Reg'l Med. Ctr*., 909 F.3d 996, 1006 (9th Cir. 2018)). "At class certification, 'the relevant inquiry is a tailored *Daubert* analysis which scrutinizes the reliability of the expert testimony in light of the criteria for class certification and the current state of the evidence.'" *Otto v. Lemahieu*, No. 4:19-cv-00054-YGR, 2021 WL 1615311, at *1 (N.D. Cal. Apr. 26, 2021) (citation omitted). The Court does not make an ultimate determination of the admissibility of an expert's

opinions for purposes of a dispositive motion or trial. *See Dukes v. Wal-mart Stores, Inc.*, 603 F.3d 571, 602 n.22 (9th Cir. 2010), *rev'd on other grounds by* 564 U.S. 338 (2011).

> *Daubert* does not require a court to admit or to exclude evidence based on its persuasiveness; rather it requires a court to admit or exclude evidence based on its scientific reliability and relevance. Thus, an expert's "inference or assertion must be derived by the scientific method" to be admissible. A trial court has broad latitude not only in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability.

*Ellis*, 657 F.3d at 982 (first quoting *Daubert*, 509 U.S. at 589–90; and then quoting *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152 (1999)). Even at the class certification stage, "[u]nder *Daubert*, the trial court must act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards by making a preliminary determination that the expert's testimony is reliable." *Id.* (citing *Kumho Tire*, 526 U.S. at 145, 147–49).

The inability of a damages model to withstand scrutiny at class certification is not merely a merits issue, but bears directly on the plaintiff's ability to satisfy Rule 23 requirements. *See, e.g.*, *In re Rail Freight Fuel Surcharge Antitrust Litig*., 725 F.3d 244, 252–53 (D.C. Cir. 2013) ("Common questions of fact cannot predominate where there exists no reliable means of proving class-wide injury in fact."). The proponent of the expert testimony has the burden of establishing by a preponderance of the evidence that the proposed testimony satisfies those standards. *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendment; *Daubert*, 509 U.S. at 592 n.10.

"At all stages, Rule 702 . . . tasks a district court judge with 'ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *In re Google Play Store Antitrust Litig*., No. 21-md-02981-JD, 2023 WL 5532128, at *5 (N.D. Cal. Aug. 28, 2023) (citation omitted). In performing this

analysis, "the Court looks at whether the reasoning and methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Klein v. Meta Platforms, Inc.*, No. 20-CV-08570-JD, 2025 WL 295361, at *3 (N.D. Cal. Jan. 24, 2025) (*quoting Reflex Media, Inc. v. SuccessfulMatch.com,* No. 20-CV-06393-JD, 2024 WL 4903267, at *2 (N.D. Cal. Nov. 26, 2024)).

"An expert's opinions are 'inherently unreliable' if they do not rest on a sufficient factual foundation and are 'speculative.'" *Id.* (quoting *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861 (9th Cir. 2014)). "[W]hile methodology remains the central focus of a *Daubert* inquiry," this Court "may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable." *Id.* (quoting *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998)).

Federal Rule of Evidence 402 limits evidence to relevant evidence and provides, in pertinent part, that "[i]rrelevant evidence is not admissible."

Federal Rule of Evidence 403 provides for excluding even relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

## IV. ARGUMENT

### A. Cutler's Methodology Is Not Scientifically Valid or Reliable.

"In evaluating the reliability of scientific expert opinion testimony, the court 'assess[es] the expert's reasoning or methodology, using as appropriate criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance." *OCG Energy, LLC v. Shen*, No. 8:22-CV-01568-FWS-DFM, 2024 WL 694912, at *2 (C.D. Cal. Feb. 12, 2024) (quoting *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014)). "Factors the court may consider include '(1) whether the scientific theory or technique can be (and has been)

tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) whether there is a known or potential error rate, and (4) whether the theory or technique is generally accepted in the relevant scientific community.'" *Id.* (quoting *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654–55 (9th Cir. 2006)).

"[T]he party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology"; the expert's "bald assurance of validity is not enough." *Wood v. Sw. Airlines Co.*, No. 2:14-CV-01421-KJM-CKD, 2016 WL 696599, at *2, *4 (E.D. Cal. Feb. 22, 2016) (citations omitted) (The proffered expert must "point to a[] learned treatise, policy statement of a professional association, or a published article supporting his argument for the reliability of" his methodology.).

Here, Cutler's methodology has never been tested by anyone, including Cutler himself. (*See* Blouin Decl. Ex. 1 at 31:2–12, 123:22–124:7). Plaintiff is unable to cite to any case where Cutler's method has been accepted and admitted into evidence. Plaintiff asks this Court to be the first. That is a path the Court should decline to take.

Cutler acknowledges that each of his four proffered "metrics" have limitations. (*See id.* at 132:5–11, 133:21–23; *see also id.* 24:8–17). He also admits that his methodology has not been peer-reviewed or otherwise approved by anyone in the scientific community. (*See id.* at 82:11–24). Cutler's methodology is litigation-driven and devoid of any objective validation. As such, it should be rejected. *See, e.g.*, *Wanke Cascade Dist., Ltd. v. Forbo Flooring, Inc.*, No. 3:13-CV-768-AC, 2017 WL 2403046, at *19 (D. Or. May 4, 2017) (excluding opinions where expert "offers no industry standard against which the court here and the jury at trial can evaluate the validity of the opinions he offers"); *Sanderson v. Int'l Flavors & Fragrances, Inc.*, 950 F. Supp. 981, 993–94 (C.D. Cal. 1996) (noting the "dangers of relying on litigation-related research" (citing *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995))).

Cutler has provided no basis to claim that his simulation methodology, as he

designed it, is generally accepted within the relevant scientific community. The Federal Judicial Center identifies, as two among four *Daubert* criteria, that an expert's "methods should preferably be published in a peer-reviewed journal" and "should be generally accepted within the relevant scientific community." Federal Judicial Center, Reference Manual on Scientific Evidence (3d ed. 2011), at 53. Cutler's simulation methodology, by contrast, is novel and unreliable. Any claim by Cutler that his simulation methodology in this case is peer-reviewed or generally accepted within the scientific community lacks factual support.

**B. Cutler Fails to Properly Apply His Methodology to the Facts of This Case.**

To survive a Rule 702 challenge, Cutler's opinions must be "sufficiently tied to the facts of the case such that [they] will aid the trier of fact in resolving a factual dispute and [are], therefore, reliable." *Marshall v. Northrop Grunman Corp.*, No. 16-CV-06794-AB-JCX, 2019 WL 6354371, at *1 (C.D. Cal. Oct. 16, 2019). Exclusion under Rule 702 is appropriate where there are "serious questions about the validity of the data [Cutler] used and assumptions he made, and [where] he failed to consider material information in conducting his testing and analysis—information that either was available to him or could have been obtained by him." *Michaels v. Taco Bell Corp.*, No. CIV. 10-1051-AC, 2012 WL 4507953, at *10 (D. Or. Sept. 27, 2012); *see also Woodall v. Walt Disney Co.*, No. CV 20-3772-CBM-(EX), 2024 WL 5337320, at *1 (C.D. Cal. Nov. 4, 2024) ("Evidence should be excluded as unreliable if it 'suffer[s] from serious methodological flaws.'" (*quoting Obrey v. Johnson*, 400 F.3d 691, 696 (9th Cir. 2005))).

**1. Cutler's methodology is premised on factually inaccurate assumptions that invalidate his approach and lead to incorrect and unreliable conclusions.**

Cutler fails to model the but-for world in a way that aligns with the facts of the case. His methodology provides no reliable basis to evaluate any potential harm to

Randall or members of the proposed class.

Cutler's methodology relies on the premise that a patient qualifies to be registered on the national kidney transplant list and otherwise begins to accrue wait time as soon as he or she has an eGFR score of 20 mL/min or less. The evidence in this case establishes otherwise. Specifically, as addressed *supra* Part II.C.2, evaluating candidates for transplantation involves input and direction from multiple specialties and healthcare professionals who consider a variety of factors. (Dkt. 104-46 ¶ 8; Dkt. 104-19). Having an eGFR score of 20 or less does not qualify a patient to be registered on the national kidney transplant list. (Dkt. 104-20). Cutler's methodology and analysis fail for the additional reason that, contrary to his assumption, kidneys are not always allocated in the sequential order reflected on match runs. (Dkt. 104-51 ¶ 7).

**2. Cutler fails to include in his analysis the significant "downstream effects" of people who received kidneys in the actual world who would not receive kidneys in Cutler simulated but-for world.**

Cutler's methodology fails to consider that altering the sequence of patients on match runs in his but-for world can, and almost certainly will, significantly alter the sequence of patients on every match run thereafter. His own simulation results reveal that thousands of kidney transplant recipients, who received kidneys in real life, would not receive kidneys in Cutler's simulated but-for world. Consequently, a single simulated change to who receives the kidney in the but-for world creates a cascading effect throughout future match runs. As a result, it is impossible to isolate the effects of any single change to a match run because Cutler does not know which individuals would be included in the match run. Cutler's failure to address this undeniable fact renders his methodology unreliable. Moreover, Dr. Cutler offers no reliable basis to justify his decision to ignore the significant "downstream effects" in in his simulation model.

Cutler previously acknowledged this significant limitation of his methodology in a report he filed in a virtually identical case, *Welch v. UNOS, et al.*, Case No. 3:24-cv-00422 (M.D. Tenn.), Dkt. 113-17. In his expert report in *Welch*, Cutler admitted: "An additional limitation of this methodology is that changing the allocation list for one match run will have downstream effects on who is entered in the match run [for] all future match runs." *Id.* ¶ 16.

Although Cutler deleted this admission from his report in the *Randall* case, his failure to consider the downstream effect is equally problematic for his analysis in this case. Specifically, Cutler's failure to consider the inevitable "downstream" effects introduces statistical error into his model.

Succinctly stated, Cutler's proffered approach suffers from serious methodological flaws that render his opinions and associated testimony unreliable. As a result, his opinions and associated testimony should be excluded. *Obrey*, 400 F.3d at 696.

**C. Cutler's Opinions Will Not Assist the Trier of Fact.**

Expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a); *accord United States v. E. Mun. Water Dist.*, No. CV 04-8182 CBM(RNBX), 2008 WL 4755425, at *1 (C.D. Cal. Apr. 8, 2008). "In the Ninth Circuit, '[t]he general test regarding the admissibility of expert testimony is whether the jury can receive "appreciable help" from such testimony.'" *Easton v. Asplundh Tree Experts, Co.*, No. C16-1694RSM, 2017 WL 4005833, at *3 (W.D. Wash. Sept. 12, 2017) (quoting *United States v. Gwaltney*, 790 F.2d 1378, 1381 (9th Cir. 1986)).

One problem is that Cutler fails to identify a single definitive measure the trier of fact should use to identify specific violations of the Unruh Act. Instead, Cutler testified that "[e]ach individual can choose which metric they think is important." (Blouin Decl. Ex. 1 at 62:23–64:3). Cutler also admitted he could not identify a specific Match Run for which Randall would have received a transplanted kidney but

for Defendants' use of the race-conscious coefficient. (*See id.* at 52:9–14). When pressed, Cutler was unwilling to opine whether there was even a 50% chance that Randall would have received a kidney in any of his simulations. (*See id.* at 59:19–60:12, 60:21–61:3). Instead, Cutler merely provides data that shows how many times Randall would fall into one of his four "metrics" Cutler developed for his use in this case. Such information, however, has no real-world implications and, accordingly, would not be helpful to the trier of fact.

A separate disqualifying problem is Cutler's model's inability to segregate a violation or harm caused by Cedars, as distinct from UNOS or any third party; an inability to segregate a violation or harm caused by UNOS, as distinct from Cedars or any third party; and an inability to segregate violations or harm caused exclusively by third parties (e.g., referring physicians who used race-based algorithms that Randall complains about) where the third party's use of those algorithms resulted in alleged delay in referring patients to Cedars or other transplant centers and that, in turn, resulted in delay in registration for donor kidneys. Cutler admits his method is exclusively designed to figure out whether harm was caused to Black patients because they were not offered kidneys—without any focus on who is responsible for the harm:

> Q. You're trying to figure out whether harm was caused to Black patients by them not being offered kidneys, correct?
>
> A. That's correct, yes.

(*Id.* at 170:6–9). Cutler understood his task to be to try to figure out what harm was caused to Randall or class members and not to differentiate between what harm was caused by Cedars or by UNOS or by a transplant center (or anyone else):

> Q. Understood. I'm just trying to understand. You understood your task to be to try to figure out what harm was caused to Mr. Randall and other potential class members, either by UNOS or the transplant center that listed them, correct? You understood that to be your task?
>
> A. That's correct, and **not to differentiate between what was the harm**

**caused by UNOS and what was the harm caused by the transplant center**.

(*Id.* at 170:20–71:4 (emphasis added)).

Although the trier of fact will be tasked with determining whether Cedars violated the Unruh Act and caused harm, Cutler admits there is nothing in his report that allows a differentiation between a violation by Cedars as distinct from a violation by UNOS as distinct from a violation exclusively by some other non-party—determining who caused the delay is not what he did:

Q. So if a trier of fact was trying to determine what harm was caused specifically by Cedars-Sinai, there's nothing in your report that would allow that differentiation, correct?

MR. VENEZIA: Vague, ambiguous, calls for a legal conclusion.

A. I have not been asked to say anything about what should Cedars-Sinai have done differently or what should UNOS have done differently. I'm just calculating the harm that resulted from what was the actuality of what was done.

Q. Yes, but that doesn't really answer my question. If a trier of fact wanted to determine what harm, if any, was caused by Cedars-Sinai, specifically, is there something in your report that would allow that differentiation to determine who, if anyone, was harmed as a result of conduct by Cedars-Sinai?

MR. VENEZIA: Vague, ambiguous, calls for a legal conclusion.

A. **I did not reach any conclusions about the harm caused by Cedars-Sinai.** I'm hesitating because I don't know whether there's some fact in this which is relevant for someone, you know, that the lawyers may choose to use in some way, but I did not draw any conclusion about that.

(*Id.* at 171:5–72:6 (emphasis added)). It is quite clear that nothing Cutler did is specific to helping a trier of fact determine whether harm was caused *by Cedars*:

Q. . . . Is it correct that nothing in your study addresses the issue of whether harm was caused to Mr. Randall by specifically Cedars- Sinai, correct?
MR. VENEZIA: Calls for a legal conclusion.
A. I was not asked to say whether Cedars-Sinai was at fault, so nothing here is I've drawn—I've made no conclusions about who is at fault for specific things.

(*Id.* at 172:14–23).

The crux of the problem is that Cutler creates a "but-for" world where the race-based coefficient was not used by anyone in the world. His model is not able to attribute delayed or lost opportunity for a donor kidney to Cedars or to UNOS, and he is not able to differentiate whether the alleged violation that caused a delay was in fact exclusively that of a non-party:

Q. Nor are you able to say it necessarily was Cedars-Sinai or UNOS for that matter, correct?
MR. VENEZIA: Asked and answered, vague and ambiguous.
A. If there were some other party that were involved in this and that other party was the one that said we should use this or not use that or whatever, then that other party would be—would be—**nothing says it's only these two parties**.
Q. So your study really says you believe Mr. Randall or other Black patients were harmed by the use of the race-based coefficient by somebody in the world, not necessarily by these two defendants?
A. I calculated the harms to Mr. Randall and to the other members of the class, **because the race-based coefficient was used**.

(*Id.* at 172:24–73:15 (emphasis added)).

As the Supreme Court explained in *Comcast*, a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory. If the model does not even attempt to do that, it cannot

possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3). *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). "[A]t the class-certification stage (as at trial), any model supporting a 'plaintiff's damages case must be consistent with its liability case, . . . [a]nd for purposes of Rule 23, courts must conduct a 'rigorous analysis' to determine whether that is so." *Id*. (citations omitted); *accord Testone v. Barlean's Organic Oils, LLC*, 2021 U.S. Dist. LEXIS 185896, at *44 (S.D. Cal. Sep. 28, 2021); *Oula Zakaria*, 2017 U.S. Dist. LEXIS 221124, at *40.

The SAC does not allege any theory that would authorize imposing vicarious liability on Cedars for the conduct of anyone other than Cedars itself. The SAC does not allege any theory that would authorize imposing vicarious liability on UNOS for the conduct of anyone other than UNOS itself. The SAC most certainly does not allege any theory that would authorize imposing vicarious liability on Cedars or UNOS for harm caused to Randall or any putative class member because a non-party referring physician delayed referring Randall or others to transplant centers because that non-party used a race-based algorithm that discriminated against Black patients. Cutler's model fails the *Comcast* test because his model does not measure only those damages attributable to the theory of liability alleged in the SAC.

This fundamental problem requires exclusion of Cutler's report, opinions and testimony.

## V. CONCLUSION

For the foregoing reasons, the Court should exclude the opinions and testimony of David Cutler.

Dated: February 14, 2025

WINSTON & STRAWN LLP

By: /s/ *Daniel M. Blouin*

Shawn R. Obi (SBN: 288088)
sobi@winston.com
Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543
Telephone: (213) 615-1700
Facsimile: (213) 615-1750

Daniel M. Blouin (Admitted *pro hac vice*)
dblouin@winston.com
Thomas G. Weber (Admitted *pro hac vice*)
tgweber@winston.com
Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
Telephone: (312) 558-5600
Facsimile: (312) 558-5700

*Attorneys for Defendant UNOS*

LEWIS BRISBOIS BISGAARD & SMITH

By: /s/ *Jon P. Kardassakis*

Jon P. Kardassakis, SB# 90602
Jon.Kardassakis@lewisbrisbois.com
633 West 5th Street, Suite 4000
Los Angeles, California 90071
Telephone: (213) 250-1800
Facsimile: (213) 250-7900

*Attorneys for Defendant Cedars-Sinai Medical Center*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendant United Network for Organ Sharing, certifies that this brief contains 5,787 words, which:

__x__ complies with the word limit of L.R. 11-6.1.

____ complies with the word limit set by court order dated ________.

Dated: February 14, 2025 By: /s/ *Daniel M. Blouin*

Daniel M. Blouin

## CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2025, I filed the foregoing document entitled **DEFENDANTS CEDARS-SINAI MEDICAL CENTER AND UNITED NETWORK FOR ORGAN SHARING'S JOINT NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO EXCLUDE OPINIONS OF DAVID CUTLER** with the clerk of court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record in this action.

By: /s/ *Daniel M. Blouin*

Daniel M. Blouin