O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY RANDALL,<br><br>               Plaintiffs,<br><br>        v.<br><br>UNITED NETWORK FOR ORGAN SHARING and CEDARS SINAI MEDICAL CENTER.<br><br>              Defendants. | Case No.:  2:23-cv-2576-MEMF-MAA<br><br>**ORDER GRANTING PLAINTIFF'S MOTION TO RETROCTIVELY EXTEND THE DEADLINE FOR THE FILING OF PLAINTIFF'S OPPOSITION [DKT. NO. 145] AND DENYING DEFENDANTS' MOTION TO EXCLUDE OPINIONS OF DAVID CUTLER [DKT. NO. 105]** |

Before the Court is Defendants Cedars-Sinai Medical Center and United Network for Organ Sharing's Motion to Exclude Opinions of David Cutler. Dkt. No. 105. Plaintiff has also submitted a Motion to Retroactively Extend the Deadline for the Filing of Plaintiff's Opposition to Defendants' *Daubert* Motion. Dkt. No. 145. For the reasons below, Plaintiff's Motion is GRANTED, and Defendants' Motion is DENIED.

/ / /

/ / /

/ / /

1

I.    **Background**

  A.  **Factual Background**[1]

Plaintiff Anthony Randall ("Randall") is an individual residing in Los Angeles, California. Dkt. No. 53 ¶ 20 ("2AC"). Randall is Black. *Id.* ¶ 17. As of the time of the filing of his complaint, he was on the waiting list for a kidney transplant. *Id.*

Defendant United Network for Organ Sharing ("UNOS") is a private nonprofit organization that manages the national organ transplant waiting list. *Id.* ¶¶ 27, 28. This organ transplant waiting list contains listings for people awaiting a kidney transplant. *Id.* ¶ 28. UNOS establishes and implements policy concerning how donor kidneys will be awarded to patients with kidney disease. *Id.* By virtue of its work managing the national waiting list, UNOS coordinates with transplant hospitals that refer patients seeking placement on the list. *Id.* ¶ 29. Defendant Cedars-Sinai Medical Center ("Cedars-Sinai") is one of those hospitals. *Id.* ¶ 14. Cedars-Sinai is a California nonprofit corporation with its principal place of business in Los Angeles, California. *See id.* ¶ 22.

Randall's 2AC states claims for (1) a violation of Title VI of the Civil Rights Act of 1964; (2) violations of the Unruh Civil Rights Act, Cal Civ. Code § 51; (3) breach of fiduciary duty; and (4) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq. *See generally* 2AC.

Randall has designated Professor David Cutler as an expert witness and docketed Cutler's expert report. *See generally* Dkt. No. 79-39 ("Cutler Report"). Randall retained Cutler to evaluate the following questions:

> (1) Do you find to a reasonable degree of professional and scientific certainty in the field of health economics that there is a well-accepted methodology to determine how class members' wait times, and thus changes to be offered acceptable kidneys, were impacted by Defendants' use of the race-based coefficient? (2) If yes, what are the methodologies and what is the impact?

---

[1] Unless otherwise indicated, the following factual background is derived from the Second Amended Complaint. Dkt. No. 52 ("2AC").

*Id.* ¶ 8. In response, Cutler concluded that a "straightforward statistical method" existed to determine how much class members' wait times were impacted by Defendants' use of the race coefficient, and thus how much any individual class member's chances of being offered a kidney were prejudiced. *Id.* ¶ 8. Cutler then applied that statistical method, implementing four metrics intended to inform the extent to which class members were harmed. *Id.* Though, of these four metrics, none dispositively resolves whether a person has been materially harmed by use of a racially biased calculation, Cutler nonetheless concludes that "the use of a racially-biased calculation materially harmed Black individuals who were listed at transplant centers in California." *Id.*

### B. Procedural History

Defendants filed the instant Motion to Exclude Opinions of David Cutler on February 14, 2025. Dkt. No. 105 ("Motion"). Randall filed an untimely Opposition on April 29, 2025. Dkt. No. 140 ("Opp."). Defendants filed their Reply on May 6, 2025. Dkt. No. 141.

On May 15, 2025, Randall filed a Motion to Retroactively Extend the Deadline for the Filing of Plaintiff's Opposition to Defendants' *Daubert* Motion. Dkt. No. 145 ("Ext. Motion"). On May 22, 2025, Defendants submitted their Opposition. Dkt ("Ext. Opp."). No. 154.

This Court held oral argument on the Motions on December 11, 2025.

### RANDALL'S MOTION TO RETROACTIVELY EXTEND THE DEADLINE FOR THE FILING OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' *DAUBERT* MOTION [DKT. NO. 145]

Before this Court can address the merits of Defendants' *Daubert* Motion, it must resolve the matter of Randall's untimely opposition. For the reasons below, this Court will not retroactively extend the deadline, but it will exercise its discretion to consider the untimely opposition in ruling on the *Daubert* Motion.

Trial courts have discretion to consider untimely filed papers. Under this District's Local Civil Rules, "The Court may decline to consider any memorandum or other document not filed

within the deadline set by order or local rule." L.R. 7-12. Moreover, "[t]he failure to file any required document, or the failure to file it within the deadline, may be deemed consent to the granting or denial of the motion." *Id.* This Court's deadlines are governed by its Civil Standing Order. The Court instructed the parties in this matter to familiarize themselves with the Standing Order upon the commencement of this case. Dkt. No. 9. Per the Standing Order, motions must be filed no later than forty-two days prior to the motion's hearing date; oppositions must be filed no later than fourteen days after the filing of the motion; and replies must be filed no later than seven days after the opposition. Civil Standing Order § XIII(B).

Courts sometimes consider applications for consideration of untimely filed documents under the excusable neglect framework. *See, e.g.*, *Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253, 1261 (9th Cir. 2010); Fed. R. Civ. P. 60(b). To determine whether a party's failure to meet a deadline constitutes excusable neglect, courts apply a four-factor test: (1) the danger of prejudice to the opposing party; (2) the length of the delay and its potential impact on the proceedings; (3) the reason for the delay; and (4) whether the movant acted in good faith. *Id.* (citing *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)).

Here, Randall's Opposition to Defendants' Motion was due on February 28, 2025—fourteen days after the Motion was filed. Civil Standing Order § VIII(B). Instead, Randall filed an Opposition two months late, on April 29, 2025. *See generally* Opp. Because Randall filed the Opposition in April instead of February, his Opposition was able to make use of the April 11, 2025, Supplemental Report of Professor David M. Cutler. *See* Declaration of Matthew L. Venezia, Dkt. No. 140-1 ("Venezia Decl. I"), Ex. J ("Supplemental Report").

For the reasons below, this Court will consider the merits of Randall's Opposition and will not therefore grant Defendants' *Daubert* Motion as unopposed.

Applying the *Pioneer* factors, Randall's untimely filing of the Opposition constitutes excusable neglect. As to the first factor, Defendants argue that they are prejudiced by the fact that

Randall "unfairly benefitted" from the ability to file its motion two months late, but Defendants had the same amount of time to prepare their Reply than they would have if Randall had filed his opposition at the time that it was due. So, though Defendants note that Randall likely benefitted from taking the additional time, it does not necessarily follow that Defendants suffered prejudice as a result. Further, any risk of prejudice is mitigated by the fact that this Court has now continued the hearing on the Motion from June 5, 2025, to December 11, 2025—meaning that Defendants have had a full six months to consider the arguments made in the Opposition prior to oral argument, and that they had several opportunities to respond to the Opposition (and its use of the Supplemental Report). So the Opposition's untimely filing was not substantially unfairly prejudicial, which weighs in favor of considering the Opposition.

The second *Pioneer* factor—the length and impact of the delay—weighs in favor of considering the Opposition. To be sure, the delay in filing the Opposition was significant: Randall took two months beyond what this Court's Standing Order permitted. However, this factor specifically guides this Court to consider the delay's "potential impact on the proceedings." *Pioneer*, 507 U.S. at 395. And this Court finds that the impact on these proceedings has been negligible. This is particularly true because this Court set oral argument over six months after the Motion was fully briefed, and Defendants have had an opportunity to set forth their arguments related to the Opposition's untimeliness. *See* Ext. Opp.

The third *Pioneer* factor—the reason for the delay—weighs in favor of considering the Opposition. As the Court noted in *Pioneer*, "Congress plainly contemplated that the courts would be permitted, where appropriate, to accept late filings caused by inadvertence, mistake, or carelessness." 507 U.S. at 388. And here, it appears that the untimely Opposition was caused by a careless, but sincere, inadvertent mistake. Randall has explained that the cause of the error was a confusion between this Court's Standing Order and the District's Local Rules; the two conflict, and counsel for Randall followed the Local Rules. Declaration of George B.A. Laiolo, Dkt. No. 145-2

("Laiolo Decl."), ¶ 5. It appears that Randall's counsel had misread the Standing Order to suggest that the operative filing schedule only applied to motions for summary judgment, based on a preceding sentence. *Id.* ¶¶ 3-4. The parties rely on *Pincay v. Andrews*, 389 F.3d 853 (9th Cir. 2004), for opposite conclusions; Defendants rely on the Court's statement there that "a lawyer's failure to read an applicable rule is one of the least compelling excuses that can be offered." *Id.* at 859. But here, Randall's counsel *does* appear to have read the relevant rule—they merely misinterpreted its applicability. Moreover, "the decision whether to grant or deny an extension of time" is not subject to any rigid rule,[2] because "the district court is in a better position . . . to evaluate factors such as whether the lawyer had otherwise been diligent, the propensity of the other side to capitalize on petty mistakes, the quality of representation of the lawyers . . . , and the likelihood of injustice." *Id.* Here, relevant to this Court's conclusion is the fact that Randall's counsel has otherwise been diligent: This is the first time this Court has received a filing from Randall's counsel in violation of its deadlines, and it is satisfied that the error was uncharacteristic and is unlikely to recur.

And the fourth *Pioneer* factor—whether the movant acted in good faith—weighs in favor of considering the Opposition. Defendants do not appear to dispute that Randall's counsel acted in good faith, instead suggesting that this Court should resolve this factor in their favor because Randall did not act promptly to redress the missed deadline. *See* Ext. Opp. at 7-8. In support, Defendants direct this Court to cases where courts found good faith where the late filer promptly acknowledged its error. *Id.* at 8. Though prompt acknowledgement of the party's error can certainly evince good faith, however, it is not the only way to show good faith. *See Pincay*, 389 F.3d at 861 (Berzon, J., concurring) ("The good faith consideration goes to the absence of tactical or strategic

---

[2] For similar reasons, the parties' citations to cases where a substantial delay was held to be excusable neglect, *see* Ext. Motion at 8-9, or cases where a brief delay was not excused, *see* Ext. Opp. at 7-8, do not resolve the matter. Courts routinely resist setting a bright-line rule that delay is per se unacceptable past a certain length of delay.

motives . . . . "). This Court is satisfied that Randall's counsel sincerely believed they were complying with this Court's rules until after they had filed the Opposition. *See* Laiolo Decl. ¶ 6; Declaration of Matthew L. Venezia, Dkt. No. 145-1 ("Venezia Decl. II"), ¶ 3. Further, Randall's counsel alleges that, prior to filing the Opposition, over the course of conversations with counsel for Defendants regarding the *Daubert* Motion, Randall's counsel communicated—and Defendants' counsel did not dispute—that Randall would be filing his motion early (that is, ahead of the Local Rules' default schedule). Ext. Motion at 3-4. Taken together, it appears to this Court that the error was sincere and not intended to achieve a strategic advantage.

In conclusion, the *Pioneer* factors weigh in favor of consideration of the Opposition, and this Court will do so. For that reason, Plaintiff's Motion is GRANTED.

## DEFENDANTS' MOTION TO EXCLUDE OPINIONS OF DAVID CUTLER [DKT. NO. 105]

### II.   Applicable Law

#### A. Federal Rules of Evidence 401 and 402

Federal Rule of Evidence 402 explicitly prohibits the inclusion of "irrelevant" evidence. Fed. R. Evid. 402. The Rule dictates that "[r]elevant evidence is admissible unless any of the following provides other: the United States Constitution; a federal statute; these rules; or other rules prescribed by the Supreme Court. Irrelevant evidence is not admissible." Fed. R. Evid. 402.

Federal Rule of Evidence 401 prescribes what evidence qualifies as relevant. Fed. R. Evid. 401. It provides that evidence is relevant if: "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." *Id.* 401(a)–(b); *see also Crawford v. City of Bakersfield*, 944 F.3d 1070, 1077 (9th Cir. 2019) ("Deciding whether a fact is of consequence in determining the action generally requires considering the substantive issues the case presents." (internal quotation marks omitted)). Courts

have recognized that Rule 401's "basic standard of relevance . . . is a liberal one." *Crawford*, 944 F.3d at 1077.

### B.  Federal Rule of Evidence 403

Federal Rule of Evidence 403 dictates that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. District courts have broad discretion in assessing admissibility under Rule 403. *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 US 379, 384 (2008) (finding "wide discretion" necessary because Rule 403 "requires an on–the–spot balancing of probative value and prejudice, potentially to exclude . . . evidence that already has been found to be factually relevant") (internal quotes omitted); *see also Hardeman v. Monsanto Co.*, 997 F.3d 941, 967 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 2834 (2022) ("A district court's Rule 403 determination is subject to great deference, because the considerations arising under Rule 403 are susceptible only to case–by–case determinations, requiring examination of the surrounding facts, circumstances, and issues.").

### C.  Rule 702

Under Rule 702 of the Federal Rules of Evidence, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if the witness's proponent demonstrates, by a preponderance of the evidence, that:

> (1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the expert's opinion reflects a reliable application of the relevant principles and methods to the facts of the case.

Fed. R. Evid. 702.

In 2023, Rule 702 was amended. The amendments "clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Evid. 702 advisory committee's note to 2023 amendment.

Qualification of an expert witness must be established by a preponderance of the evidence. *Daubert v. Merrell Dow Pharm., Inc.* ("*Daubert I*"), 509 U.S. 579, 592 n.10 (1993). As a result, before admitting expert testimony, courts must make a "preliminary assessment" of: (1) whether the expert is qualified to present the opinion offered; (2) "whether the reasoning or methodology underlying the testimony is scientifically valid" (i.e., reliable); and (3) "whether that reasoning or methodology can properly be applied to the facts in issue" (i.e., relevant). *Daubert I*, 509 U.S. at 592–93. "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013).

In evaluating reliability, the district court may consider factors such as: (1) whether the method has been tested; (2) whether the method "has been subjected to peer review and publication"; (3) "the known or potential rate of error"; (4) whether there are "standards controlling the technique's operation"; and (5) the general acceptance of the method within the relevant community." *Daubert I*, 509 U.S. 579, 592–95. However, these factors are nonexclusive, and "the trial court has discretion to decide how to test an expert's reliability . . . based on the particular circumstances of the particular case." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) ("The court must assess the expert's reasoning or methodology, using as appropriate criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance.").

Moreover, under Federal Rule of Evidence 703, an expert may base an opinion on facts or data that they've "been made aware of or personally observed" or those that experts in their field would "reasonably rely on" in forming an opinion on the subject. Fed. R. Evid. 703. Additionally, the court should "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

Ultimately, however, the test "is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert v. Merrell Dow Pharms., Inc.* (*Daubert II*), 43 F.3d 1311,

1318 (9th Cir. 1995). Moreover, "[a]n expert's specialized knowledge and experience can serve as the requisite 'facts or data' on which they render an opinion." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024–25 (9th Cir. 2022) (concluding that an expert's "extensive, relevant experience" with the medical process about which he offered an opinion "qualified him to make such a judgment and provided a sufficient foundation for his testimony").

The court is "a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d 558, 568 (9th Cir. 2010) (quoting *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006)). Accordingly, "[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Alaska Rent-A-Car, Inc.*, 738 F.3d at 969–70. If the proposed testimony meets the thresholds of relevance and reliability, its proponent is "entitled to have the jury decide upon [its] credibility, rather than the judge." *Sandoval-Mendoza*, 472 F.3d at 656.

### D.  Discussion

Defendants move to exclude the expert opinions of Dr. David Cutler under Rules 401, 403, and 702. For the reasons below, the Motion is DENIED on Rule 702(c) and (d) grounds.

> **a.  Under Rule 402, Randall has sufficiently shown that Cutler's opinions are relevant and will help the trier of fact.**

As a preliminary matter, the Court addresses Defendants' argument that the Court should exclude the evidence under Rule 402 as irrelevant. Motion at 1. They note that "[i]rrelevant evidence is not admissible," and that Cutler's opinions are not relevant to the claims alleged in the 2AC. *Id.*

Evidence is relevant if it tends to make a fact of consequence more or less probable. Fed. R. Evid. 401. As such, "[t]he relevancy bar is low." *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014). Given this, Cutler's opinions have clear relevance: Cutler's conclusions, particularly to the extent that they suggest that use of a race-neutral methodology could have resulted in an earlier kidney match for Randall and other similarly situated members of the putative class, bear directly on Randall's claims.

In Opposition, Defendants suggest that the evidence would be irrelevant to the trier of fact because "Cutler fails to identify a single definitive measure the trier of fact should use to identify specific violations of the Unruh Act." Motion at 14. They also reraise the argument that Cutler's model cannot distinguish a harm caused by Defendants, as opposed to a third-party actor. *Id.* at 15. But, even taking those arguments as true, they would not point to the evidence being irrelevant. To the extent that Defendants' arguments would go to diminish the relevance of Cutler's opinions, that is a matter of the weight of the evidence, not its threshold admissibility.

For that reason, this Court finds that Cutler's proposed expert opinion is relevant, but addresses the relevant arguments under the 702 framework below.[3]

### b. Under Rule 702(c), Randall has sufficiently shown that Cutler's methodology is scientifically reliable.

At issue is whether Randall has demonstrated, by a preponderance of the evidence, that Cutler's methodology is reliable. *See* Fed. R. Evid. 702(c). This Court finds that Randall has generally done so, with one limitation discussed below.

To evaluate reliability under Rule 702(c), trial courts "assess the expert's reasoning or methodology, using as appropriate criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014). These factors are nonexclusive; "the trial court has discretion to decide how to test an expert's reliability . . . based on the particular circumstances of the particular case." *Id.* (quoting *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010)).

---

[3] The Court notes that, as an alternative basis for exclusion of Cutler's opinions, Defendants raise a Rule 403 challenge to Cutler's opinion testimony. Motion at 1. Defendants offer no support or explanation for this argument other than a conclusory statement that, "if Cutler's opinions have any relevance, the probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Id. This Court does not find that any possible prejudicial effect deriving from Cutler's opinions would substantially outweigh the probative value they offer. And Defendants do not offer any explanation of why Cutler's opinions would risk unfair prejudice or another basis for a Rule 403 objection. To that end, this Court rejects Defendants' Rule 403 argument. But, to the extent that Defendants' concerns about unfair prejudice overlap with their substantive 702 arguments, this Court addresses them when discussing the Rule 702 arguments.

Applying these factors, this Court is satisfied that Cutler's opinions generally meet the reliability threshold. Randall has offered, and Defendants do not seem to meaningfully dispute, that Cutler's use of simulation modeling and partial equilibrium analyses[4] have appeared in peer-reviewed literature and amassed acceptance amongst peer-reviewed economics articles and researchers in the medical industry. *See* Opp. at 5 (listing sources). Instead, Defendants argue that Cutler's methodology is unreliable because it has "never been tested by anyone" or "admitted into evidence." Motion at 11. But the standard that Defendants suggest—that studies adopting a similar methodology to Cutler's in the same field as Cutler do not support Randall's argument because they do not "address the impact of the race-based coefficient on an offer and/or acceptance of a kidney transplant" or "apply Cutler's unique modeling" as constructed for this case—appears to reach beyond what Rule 702 requires. Reply at 4. This Court need not find that someone in Cutler's position has used this specific combination of models to resolve an identical factual question to Cutler to find that Cutler's opinions are reliable. Based on Randall's arguments, and Cutler's representations as to the acceptance of his methods and their presence in peer-reviewed publications, this Court is satisfied that Cutler's testimony meets the reliability threshold of Rule 702(c).[5]

---

[4] Defendants also argue that evidence that "simulation modeling" is reliable is overbroad. After all, "[a]cceptance of simulation modeling in general does not validate Cutler's particular simulation methodology in this case." Reply at 3-4. But Randall has offered evidence supporting the reliability of partial equilibrium analyses, which appears to this Court to describe the relevant methodology more precisely than merely describing it as a simulation model.

[5] But Defendants are correct that Cutler's methodology cannot be used—on its own—to allocate any harm experienced to any particular Defendant. Defendants correctly assert that Cutler's model alone cannot "segregate a violation or harm" caused by Defendants—individually or jointly—as opposed to that caused by a third party. Motion at 15. It does not appear to this Court that Randall disputes this. This Court does find that, upon review of the Cutler Report, it does not appear as though Cutler's expert opinions even attempt to reflect individual harms done by Cedars-Sinai and/or UNOS; instead, the methodology merely appears to compare the actual world against one in which Black patients are not subject to a race-conscious coefficient from anyone, not just Defendants. *See* Cutler Report ¶ 19 (noting that analysis methodology re-ranks the organ match calculations "as if the race-based calculation had not been used"). But the connection from this counterfactual to a showing of Defendants' specific wrongdoing appears tenuous, particularly as to Cedars-Sinai. Put another way, as not everyone listed received any treatment otherwise interacted with Cedars-Sinai, it appears that Cedars-Sinai could only be responsible for a fraction of the aggregate alleged harm that the Cutler Report states ensued for Black patients. This is particularly concerning as it suggests a possible mismatch between Randall's requests for Cutler and his proposed testimony. *Compare id.* ¶ 7 ("Do you find . . . that there is a well-accepted methodology to determine how class members' wait times . . . , were impacted by *Defendants' use* of the race-based coefficient?" (emphasis added)) *and* Dkt. No. 105-2 ("Cutler Dep.") at 172:14-23 ("I did not reach any conclusions about the harm cause by Cedars-Sinai."); *id.* at 170:28-171:4

### c. Under Rule 702(d), Randall has sufficiently shown that Cutler's methodology was applied reliably to the facts of this case.

Next, this Court considers whether Cutler's methodology was applied reliably to the facts of this case. For the reasons below, it finds that Rule 702(d)'s requirements have been met.

Rule 702(d) requires that "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(d). In 2023, Rule 702(d) was "amended to emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology*." In re Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin & Metformin) Prods. Liab. Litig.*, 93 F.4th 339, 345 n.4 (6th Cir. 2024).[6] The proponent of the evidence bears the burden of showing its admissibility by a preponderance of the evidence. Fed. R. Evid. 702.

In support of exclusion of Cutler's opinions on Rule 702(d) grounds, Defendants argue that "Cutler's methodology is premised on factually inaccurate assumptions that invalidate his approach and lead to incorrect and unreliable conclusions."[7] Motion at 12. The sole premise that Defendants attack on this basis is "the premise that a patient qualifies to be registered on the national kidney list

---

("Q: . . . You understood your task to be to try to figure out what harm was caused to Mr. Randall and other potential class members, either by UNOS or the transplant center that listed them, correct? You understood that to be your task? A: That's correct, and not to differentiate between what was the harm caused by UNOS and what was the harm caused by the transplant center.").

Taken together, then, it does not appear that Cutler has attempted to allocate what amount of the harm faced by class members is attributable to each Defendants' actions. This is not a basis for granting the Motion; for the reasons stated above, Randall has met his burden of demonstrating the reliability of Cutler's opinions for their stated purposes.

[6] Defendants argue that the 2023 amendment renders some of Randall's use of pre-2023 case law "improper[]." Reply at 1. This Court notes that the 2023 amendment clarifies that "[n]othing in the amendment imposes any new, specific procedures." Fed. R. Evid. 702 advisory committee's note to 2023 amendment. Instead, the new amendment merely emphasizes what was previously true: An expert's opinion "must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." *Id.* So this Court does not read the 2023 amendment to prevent reliance on pre-2023 case law.

[7] Defendants also contend that Cutler's analysis fails to grapple with the "significant 'downstream effects' of people who received kidneys in the actual world who would not receive kidneys in Cutler's simulated but-for world." Motion at 13. Defendants reason that a partial equilibrium analysis risks modeling one simulated change to who receives the kidney in the but-for world, and it could "create[] a cascading effect throughout future match runs." *Id.* Defendants offer no evidence for this proposition, either in the form of case authority or evidence from this record. Given that absence of proof, this Court understands Defendants' criticism as a criticism of the model that does not defeat its reliability or reliable application. To that end, the matter can be appropriately addressed through effective cross-examination.

and otherwise begins to accrue wait time *as soon as* he or she has an eGFR score of 20 mL/min or less." *Id.* at 13 (emphasis added). Because Defendants assert that "[t]he evidence in this case establishes otherwise," they submit that a methodology that relies upon this fact is necessarily unreliable. *Id.* It does appear that Defendants have submitted some evidence that the 20 mL/min threshold did not govern every patient's eligibility for transplant. *See id.* at 4 (referencing Defendants' holistic, multifactor policy). Randall disputes that evidence. Opp. at 19.

At the hearing, Defendants argued that Randall has not actually shown that this fact is in dispute—that is, that 20 mL/min is actually the threshold at which a patient qualifies to be registered on the national kidney transplant list and otherwise begins to accrue wait time. They addressed Randall's record citations (*see* Opp. at 19; Reply at 5–6) to argue that none of them suggest that 20 mL/min is a dispositive threshold. It is true that several of Randall's citations on this point do not discuss the 20 mL/min threshold at all. *See, e.g.*, Venezia Decl. I, Ex. C ("Smith Dep."), at 15:19– 16:1 (discussing the witness's work history and college attendance); Venezia Decl. I, Ex. D ("Kim Dep."), at 69:18–70:8 (discussing the timing of the OPTN policy's adoption). Others support the 20 mL/min threshold, but only as applied to the time-adjustment policy—not to listing in the first place. *See, e.g.*, Venezia Decl. I, Ex. E ("Cooper Dep."), at 67:9–18 ("Q. So would it be fair for me to say, then, that . . . black patients accrue wait time starting from the first time they have a score that would be 20 milliliters a minute or less if calculated in a race-neutral fashion? A. As – as the policy is currently written, that's correct."). Still other citations offer additional context. *See, e.g.*, Dkt. No. 79-20 at 1–3 (noting that, "[p]er UNOS regulation, GFR must be 20 or below to be eligible for deceased donor transplantation," but indicating other routes—like "rapidly progressive renal disease"—that could qualify a patient for listing).

On this last piece of evidence, Defendants argue that it supports their own position: "eGFR is just one of many factors considered when evaluating candidates for registration." Reply at 6.

It does appear to this Court that Randall has failed to establish that the 20 mL/min threshold is dispositive. But this is of no moment, as it appears that even if not dispositive, if it is significant at all—and Randall has presented evidence that it is—this would be a useful assumption for Cutler to

use in his model. The fact that his model does not attempt to—and therefore cannot—account for other factors does not make his conclusions unreliable.

This Court's role is to "determine the scientific validity of an expert's principles and methodology, not to determine whether their hypothesis is correct, or to evaluate whether it is corroborated by other evidence on the record." *Elosu*, 26 F.4th at 1026. "That is for the litigants to argue, and for the jury to decide." *Id.*

So, to the extent that the parties dispute the significance of the 20 mL/min threshold, Defendants can cross-examine the witness on the reliance on what they see as a disputed or false assertion. An expert need not align with every aspect of Defendants' interpretation of the evidentiary record to meet the Rule 702(c) threshold. To that end, the fact that Cutler's assumptions rely upon disputed facts is a matter best resolved through cross-examination, not exclusion altogether.

For that reason, this Court DENIES Defendants' Motion; Cutler's testimony will not be excluded.

### III.    Conclusion

For the foregoing reasons, the Court hereby ORDERS as follows:

1. Plaintiffs' Motion, Dkt. No. 145, is GRANTED IN PART. The Court has considered Plaintiffs' Opposition to the *Daubert* motion on the merits.

2. Defendants' Motion, Dkt. No. 105, is DENIED. To be clear, though, Cutler may not testify as to a quantification or other assessment of the harm caused by each (or both) of Defendants, as opposed to third-party actors.


IT IS SO ORDERED.


Dated: February 12, 2026.

_____

MAAME EWUSI-MENSAH FRIMPONG

United States District Judge