**O**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY RANDALL,<br>          Plaintiff,<br><br>                    v.<br><br><br>UNITED NETWORK FOR ORGAN<br>SHARING and CEDARS-SINAI MEDICAL<br>CENTER,<br>          Defendants. | Case No.: 2:23-cv-02576-MEMF-MAA<br><br>**ORDER GRANTING IN PART<br>DEFENDANT'S MOTION FOR SUMMARY<br>JUDGMENT [DKT. NO. 148]**<br><br>**UNDER SEAL** |

Before the Court is the Motion for Summary Judgment filed by Defendants Cedars-Sinai and United Network for Organ Sharing. Dkt. No. 148. For the reasons stated herein, the Motion is GRANTED IN PART.

/ / /

/ / /

1

I.    **Background**

A.  **Factual Background**

Plaintiff Anthony Randall ("Randall") is an individual residing in Los Angeles, California. Dkt. No. 53 ¶ 20 ("2AC"). Randall is Black. *Id.* ¶ 17. As of the time of the filing of his complaint, he was on the waiting list for a kidney transplant. *Id.*

Defendant United Network for Organ Sharing ("UNOS") is a private nonprofit organization that manages the national organ transplant waiting list, pursuant to a federal contract. *Id.* ¶¶ 27, 28. UNOS manages a kidney transplant waiting list, and establishes and implements policy concerning how donor kidneys will be awarded to patients with kidney disease. *Id.* ¶ 28. By virtue of its work managing the national waiting list, UNOS coordinates with transplant hospitals that refer patients seeking placement on the list. *Id.* ¶ 29.

Defendant Cedars-Sinai Medical Center ("Cedars-Sinai") is one of those hospitals. *Id.* ¶ 14. Cedars-Sinai is a California nonprofit corporation with its principal place of business in Los Angeles, California. *See id.* ¶ 22.

B.  **Procedural Background**

Randall filed his first Complaint on April 5, 2023. Dkt. No. 1. Defendants filed two Motions to Dismiss. Dkt. No. 23 (Cedars-Sinai MTD); Dkt. No. 25 (UNOS MTD).

This Court partially granted the motions. *See* Dkt. No. 50 ("MTD Order"). It dismissed Randall's requests for injunctive relief, as well as his claims of breach of fiduciary duty against UNOS and violations of the Unfair Competition Law against both defendants. *Id.* at 23-24. Those dismissals were with leave to amend. *Id.* But this Court denied the Motions to Dismiss on the matter of Cedars-Sinai's breach of fiduciary duty. *Id.* at 20-23. It found that Randall had "adequately pleaded the existence of and breach of a fiduciary relationship." *Id.* at 22. In doing so, it found that Randall had sufficiently established several possible bases on which he may successfully prove a claim—alleging that Cedars-Sinai and its doctors or other employees did not act in Randall's best

interests. *Id.* It noted that his pleadings were sufficient to establish a theory that Cedars-Sinai employees erred by failing to "prompt[ly] adjust[] [] Randall's wait time," "advocating for Randall to have his wait time adjusted to that he could move further up the priority list," and/or "inform[ing] Randall that his wait time score was affected by a now-debunked scientific theory." *Id.* at 22-23.

On March 29, 2024, Randall filed the operative Second Amended Complaint ("2AC"). Relevant to this Court's MTD Order, Randall's 2AC abandoned Randall's claim for breach of fiduciary duty against UNOS. 2AC ¶¶ 98-103. But it maintained Randall's Unfair Competition Law allegations, *Id.* ¶ 105, amending the claim only to allege that "Plaintiff paid to Defendants a significant registration fee, required to join UNOS's national kidney waitlist." *Id.* ¶ 109.

On May 15, 2025, UNOS and Cedars-Sinai (collectively, "Defendants") filed the instant Motion for Summary Judgment which the parties filed as a joint memorandum pursuant to this Court's Civil Standing Order. Dkt. No. 148 ("MPA"). The parties filed separate statements of facts in support of the Motion. Dkt. No. 148-1 ("DSUF"); Dkt. No. 148-2 ("PSUF"). Randall also filed objections to Defendants' evidence. Dkt. No. 148-3.

This Court held a hearing on this Motion on Thursday, November 6, 2025, after which it took the Motion under submission.

## II.      Applicable Law

### A.      Motions for Summary Judgment

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). "A moving party without the ultimate burden of persuasion at trial—usually, but not always, a defendant—has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). To carry its burden of production, the moving party must either: (1) produce evidence negating an essential element of the nonmoving party's claim or defense; or (2) show that there is an absence of evidence to support the nonmoving party's case. *Id.*

Where a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial. *Id.* at 1102–03. In such cases, the nonmoving party may defeat the motion for summary judgment without producing anything. *Id.* at 1103. However, if a moving party carries its burden of production, the burden shifts to the nonmoving party to produce evidence showing a genuine dispute of material fact for trial. *Anderson*, 477 U.S. at 248–49. Under these circumstances, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is no genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks omitted). If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the motion for summary judgment shall be granted. *Id.* at 322 ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co.*, 690 F.2d 1235,

1238 (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for

the dispute. See *id.* "If a party fails to properly support an assertion of fact or fails to properly

address another party's assertion of fact . . . the court may . . . consider the fact undisputed." Fed. R.

Civ. P. 56(e)(2). The Court need not "comb the record" looking for other evidence; it is only

required to consider evidence set forth in the moving and opposing papers and the portions of the

record cited therein. *Id.* 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir.

2001). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be

insufficient; there must be evidence on which the jury could reasonably find for [the opposing

party]." *Anderson*, 477 U.S. at 252. To carry its ultimate burden of persuasion on the motion, the

moving party must demonstrate that there is no genuine issue of material fact for trial. *Nissan Fire*,

210 F.3d at 1102; *Celotex Corp.*, 477 U.S. at 322-23.

### B.  Article III Standing

In order to have Article III standing, a plaintiff must show: "(1) it has suffered an 'injury in

fact' that is (a) concrete and particularized and actual or imminent, not conjectural or hypothetical;

(2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as

opposed to merely speculative, that the injury will be redressed by a favorable decision." *Calif. Sea

Urchin Comm'n v. Bean*, 883 F.3d 1173, 1180 (9th Cir. 2018). Moreover, though "rulings on

standing often turn on a plaintiff's stake in initially filing suit, Article III demands that an 'actual

controversy' persist throughout all stages of litigation." *Virginia House of Delegates v. Bethune-

Hill*, 587 U.S. 658, 662 (2019).

The causation analysis under standing doctrine requires that the plaintiff's injury be fairly

traceable to the defendant's alleged misconduct. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560

(1992). "The line of causation between the defendant's action and the plaintiff's harm must be more

than attenuated." *Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 867 (9th Cir. 2012),

*cert. denied*, 569 U.S. 1000 (2013). But the mere fact that a causal chain has several links does not

defeat standing, so long as the links are "not hypothetical or tenuous." *Id*. When a causal chain, however, "involves numerous third parties whose independent decisions collectively have a significant effect on plaintiffs' injuries, . . . the causal chain is too weak to support standing." *Id.*

"Standing is a question of law for the district court to decide." *In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 747 (9th Cir. 2012). "[W]hen standing is challenged on summary judgment," the Court cannot grant the motion unless the movant shows there is no genuine dispute as to any material fact. *Id.* (citing *Lujan*, 504 U.S. at 561). "To defeat a motion for summary judgment premised on an alleged lack of standing, plaintiffs 'need not establish that they in fact have standing, but only that there is a genuine question of material fact as to the standing elements.'" *Martin v. City of Boise*, 920 F.3d 584, 607 (9th Cir. 2019) (quoting *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 947 (9th Cir. 2002)), *abrogated on other grounds*, *City of Grants Pass v. Oregon*, 603 U.S. 520 (2024).

The Supreme Court has interpreted Article III's injury-in-fact requirement as applied to plaintiffs alleging discrimination, noting that "[d]iscrimination itself . . . can cause serious non-economic injuries to those persons who are denied equal treatment solely because of their membership in a disfavored group." *Heckler v. Mathews*, 465 U.S. 728, 739-40 (1984). Moreover, "state law can create interests that support standing in federal courts." *Cantrell v. City of Long Beach*, 241 F.3d 674, 684 (9th Cir. 2001).

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

### III.    Findings of Fact[1]

#### A.    Organ Transplant Procedures

The Organ Procurement Transplantation Network ("OPTN") is an entity that implements policies in relation to transplantation issues. DSUF ¶ 20. UNOS is a private nonprofit. *Id.* ¶ 21. Since 1986, it has worked alongside OPTN under contract with the Department of Health and Human Services. *Id.* In its capacity as the OPTN contractor, UNOS administers the national kidney transplant waitlist, which matches donor organs to transplant candidates. *Id.* ¶ 22.

Part of determining whether a patient is a good candidate for a kidney transplant is performing tests that measure their kidney's performance. *Id.* ¶ 7. There are several ways to do this. *Id.* ¶ 1. Two of the tests used are the MDRD equation and the CKD-EPI equation. *Id.* ¶ 1, 7. Both equations measure a patient's estimated glomerular filtration rate ("eGFR"). *Id.*; PSUF ¶ 30. Both equations use serum creatinine, age, race, and sex to arrive at an eGFR. DSUF ¶ 2. eGFR is measured in terms of milliliters per minute ("mL/min"). *Id.* ¶¶ 44, 79-80.

During the relevant time period for this case, the majority of transplant hospitals and laboratories used the MDRD and CKD-EPI equations to determine patients' kidney performance. *Id.* ¶ 12. In other words, most transplant hospitals included a race-based coefficient in kidney testing. *Id.*

_____

[1] The facts set forth below are taken from the parties' respective Statements of Uncontroverted Facts. *See generally* PSUF; DSUF. To the extent that any statements of fact are omitted, the Court concludes they are not material to the disposition of this Motion. To the extent that any of the facts set below were allegedly disputed, the Court concludes that no actual dispute exists or that the adopted language resolves the dispute.

In making these Findings of Fact, the Court considered the parties' objections to the Statements of Uncontroverted Facts. *See* PSUF; Dkt. No. 148-3. But the Ninth Circuit has recognized that "a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56." *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003) (quoting *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001)). In other words, when evidence is not presented in admissible form at summary judgment but could be later presented in an admissible form at trial, a court may still consider the evidence for the purposes of summary judgment. *Id.* at 1037; see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment."). For these reasons, to the extent the Court relies upon evidence to which the parties object, the objections are OVERRULED. To the extent the Court does not, the objections are DENIED.

As a general matter, transplant hospitals could preemptively list patients on the kidney waitlist once the patient showed a result of 20 mL/min, allowing them to accrue time and qualify for a kidney. PSUF ¶ 79. Time accrued on the waitlist is one of several factors used to determine when a patient qualifies for transplant. *Id.* ¶¶ 75, 79.

The use of race in both formulas stems from a "race-based coefficient" first developed in 1999, following research that suggested that calculations to determine Black patients' eGFR should be increased by 21%. PSUF ¶ 30. Following this, the majority of the nephrology community adopted the MDRD test, which employed the race-based coefficient. *Id.* ¶ 34. In 2009, the CKD-EPI test was developed, which similarly used a race-based coefficient—increasing Black patients' calculated eGFR scores by 16%. *Id.* ¶ 36.

Many transplant centers employed the MDRD and CKD-EPI equations to calculate eGFR. *Id.* ¶ 39. But the equations' use of race in calculating eGFR received some criticism. *Id.* In 2022, the OPTN Board of Directors approved a policy that prohibited OPTN members, including transplant hospitals, from using race-conscious considerations when calculating a patient's eGFR. DSUF ¶¶ 27-28. In consideration that then-current patients had been evaluated under a race-conscious framework, the OPTN Board of Directors approved a policy—effective January 2023—addressing modification of wait times for certain Black patients. *Id.* ¶¶ 29-30. Through this policy, Black patients who had initially been screened using a race-conscious methodology could receive credit for additional wait time, dating back to the earliest day that they had an eGFR result that was over 20 mL/min. *Id.* ¶¶ 31, 46.

### B. Anthony Randall's medical care

In approximately 2014, Randall became a patient of Dr. Kaplan, a general practitioner at Kaiser. DSOF ¶ 48. Dr. Kaplan referred Randall to a Kaiser nephrologist, Dr. Sims, who ordered blood tests to evaluate Randall's kidney function. *Id.* ¶ 49. When Kaiser performed a blood test on Randall on May 8, 2017, the result was an eGFR score of 21. *Id.* ¶ 50. Had this test been performed

without the race-conscious coefficient, Randall's eGFR score would have been approximately 17 mL/min. PSUF ¶ 27, 88. When Kaiser administered another test on January 18, 2018, the result was an eGFR score of 18. DSUF ¶ 51. Kaiser administered a third test on February 5, 2018, yielding the same result. *Id.* ¶ 52.

Following these test results, on June 18, 2018, a Kaiser nephrologist authorized Randall for a pre-kidney transplant evaluation at Cedars-Sinai. DSUF ¶ 53. Cedars-Sinai operates a large hospital in Los Angeles, which includes a transplant center. PSUF ¶ 23. It is a member of the OPTN, and it has agreed to abide by OPTN's membership requirements. *Id.* ¶ 24. Cedars-Sinai first became aware of Randall on June 20, 2018. DSUF ¶ 54. Kaiser's Nephrology/Kidney Transplant Department sent a packet referring Randall to Cedars-Sinai via fax. *Id.* Randall was listed on the kidney transplant waitlist on his registration date of January 10, 2019. *Id.* ¶ 71. But, before being offered a kidney from the waitlist, he obtained a kidney from a private donation made from a friend. *Id.* ¶ 75. On May 16, 2023, Cedars-Sinai successfully completed transplant surgery for Randall. *Id.* ¶ 81.

## IV.    Discussion

Defendants move for summary judgment on the following bases: As to all of Randall's claims, they argue that he lacks standing. On the Title VI claim, they argue that UNOS is not subject to the law because it does not receive federal financial assistance, UNOS's conduct was not intentional, and Randall cannot prove causation. On the Unruh claim, they argue that Randall cannot establish that Defendants discriminated against him—or that Defendants' acts caused Randall harm. On the breach of fiduciary duty claim, they argue Cedars-Sinai owed Randall no fiduciary duty, did not breach such a duty, and that Cedars-Sinai's actions did not cause Randall's harm. And on the Unfair Competition Law claim, Defendants argue Randall lacks standing and that Defendants did not violate any laws. The Court considers each argument in turn, and for the reasons discussed below, summary judgment is granted in part.

### A.    Randall Has Article III Standing.

As a threshold matter, Defendants argue that Randall does not have Article III standing to pursue any of his claims in this action. MPA at 36. Defendants argue that Randall has not offered "evidence to demonstrate he has suffered concrete injury *traceable to the conduct of these two Defendants*." *Id.* at 38. In other words, they challenge Randall's ability to prove injury-in-fact and causation. In opposition, Randall argues that, when a case involves the context of racial classifications, "being forced to compete on an uneven playing field is an injury in fact sufficient to confer Article III standing." *Id.* at 40. In reply, Defendants argue that "the race-conscious coefficient is not a racial classification," because not all Black patients are burdened by use of the race-conscious coefficient. *Id.* at 44.

Both parties cite legal authority that does not fully resolve this dispute. Plaintiff cites *Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656 (1993), for the proposition that competing on an uneven playing field suffices to show injury in fact. MPA at 40. But that case is easily distinguished—the Court limited its holding to "equal protection case[s]," and noted that "*the government* [had] erect[ed]a barrier that ma[de] it more difficult for members of one group to obtain a benefit than it [was] for members of another group." *City of Jacksonville*, 508 U.S. at 657 (emphasis added). And Defendants' arguments—that the race-based coefficient is not a racial classification at all, because not all Black patients are impacted—are also insufficient. Defendants cite *Students for Fair Admissions v. Harvard*, 600 U.S. 181 (2023), for the proposition that racial classifications occur only when a policy applies to all individuals subject to the policy. MPA at 44-45. But the *SFFA* Court did not find that the universities' policies led *every* student of a given racial group to face advantage or disadvantage. *See SFFA*, 600 U.S. at 195 (describing university policies where "race is a determinative tip for a *significant percentage* of all admitted African American and Hispanic

applicants" (emphasis added and internal quotation marks omitted)). So *SFFA* does not require proof that every member of a given group was injured for a classification to be race-based.

The Ninth Circuit has recognized that the injury-in-fact analysis can differ for discrimination-related claims even when they do not involve race. *See, e.g.*, *White v. Square, Inc.*, 891 F.3d 1174, 1176 (9th Cir. 2018) (plaintiff had Article III standing to challenge "discriminatory policy against bankruptcy attorneys" after being prevented from accessing Defendant's services). So, in any event, this Court need not decide whether the Defendants' use of the race-based coefficient qualifies as a "racial classification" in order to determine whether Randall has standing.

To defeat a motion for summary judgment challenging standing, Randall need only establish a genuine dispute of material fact as to whether he has standing. *Martin*, 920 F.3d at 607. Because he has presented facts that could lead a reasonable factfinder to believe that Randall was "denied equal treatment solely because of [his] membership in a disfavored group," he has met that threshold. *White*, 891 F.3d at 1177.

The harm Randall claims is Defendants' "failure to properly calculate wait time," which Randall argues has harmed him and putative class members "because their chances to receive a donor kidney have been lessened." 2AC ¶ 107. He alleges that his kidney disease has worsened significantly, resulting in "significant economic harm in the form of lost wages and medical expenses, particularly ongoing dialysis costs." *Id.* ¶ 62. Defendants do not dispute that this constitutes injury-in-fact sufficient for Article III standing. Instead, Defendants' central contention is that Randall's harm cannot be connected to their own actions. *See* MPA at 36-37 (arguing that Randall's theory of standing "fails to appreciate that Article III standing requires not only concrete injury but also 'that the injury was likely *caused by the defendant*'" (quoting *TransUnion v. Ramirez*, 594 U.S. 413, 423 (1992)).

But there are genuine disputes of material fact as to whether Defendants, as Randall argues, employed a "policy and practice of using race-adjusted scores for Black patients like Mr. Randall

[that] made it harder for [those patients] to reach the 20 mL/min threshold required to accrue wait time, thus creating an uneven playing field." MPA at 40. Defendants do not dispute that, until UNOS changed its policy, UNOS's affiliate hospitals could conduct and accept eGFR calculations that incorporated the race coefficient. *See* DSUF ¶ 12. But the parties have presented conflicting evidence, for example, regarding the nature of UNOS's site visits. Defendants argue that these visits merely check the accuracy of hospitals' data entry. *See* Dkt. No. 149-164 at 4-5, 7-8; *see also* Dkt. No. 149-87 at 4 (UNOS employee stating that, "from a monitoring perspective, we are looking in the chart for documentation that they are or aren't African American and then looking for the correlating value"). But Randall argues that UNOS knowingly accepted, and thereby perpetuated, transplant hospitals' use of a race-conscious methodology that resulted in some patients' scores not reaching the 20 mL/min threshold solely on the basis of their race. *See* Dkt. No. 149-104 at 4-5 ("Q: [I]f the transplant program's practice was for instance, the MDRD, then the site inspectors would make sure that for black patients the adjusted black score was being entered into UNet, would they not? A: Correct."); *see also* Dkt. Nos. 149-87, -88 (alleging UNOS cited at least one hospital for apparent mismatches between patients' races and eGFR scores). Defendants' characterizations of UNOS's site visits as intended to confirm the accuracy of data entry is not something that Randall appears to dispute—but the parties disagree as to the extent of Defendants' active participation in the implementation and enforcement of the race-based coefficient.

Drawing reasonable inferences in Randall's favor, as this Court must at this stage, he has offered evidence to support the idea that the harm that Randall faced—specifically, the delay in listing him as eligible for an organ donation—can be traced through a cause-and-effect link to Defendants' actions. In effect, Randall argues that Defendants' practice of permitting the use of race-conscious methodologies led to the harmful delay in Black patients, including himself, being deemed eligible for kidney transplants. He argues that UNOS's practice was to permit transplant hospitals to accept scores calculated with the race coefficient, and that Cedars-Sinai was among the

transplant hospitals that did so. Because Randall produces sufficient evidence to substantiate this argument, Defendants' summary judgment motion on the basis of standing must be and is denied.

At summary judgment, it is not this Court's function to "weigh the evidence and determine the truth of the matter." *Anderson*, 477 U.S. at 249. Instead, finding only that reasonable disputes as to material facts exist, and that a reasonable factfinder could find that Randall has standing, the Motion as to this basis is denied.

### B.    Randall's Title VI Claim Against UNOS

Defendants next move for summary judgment on Randall's claim of a violation of Title VI of the Civil Rights Act of 1964 against UNOS. MPA at 48. Under Title VI, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 42 U.S.C. § 2000(d). Defendants argue that UNOS does not receive financial assistance, as it must in order to be included within the ambit of Title VI; that Randall cannot establish the requisite element of intentionality; and that Randall cannot establish "but-for causation" between UNOS's actions and Randall's harm. *Id.* at 48-56. Because this Court finds that UNOS does not receive federal financial assistance as defined in Title VI jurisprudence, this Court grants summary judgment in favor of the Defendants on this claim and does not reach their remaining arguments.

Title VI requires courts to distinguish between recipients of "[p]ayments that include a subsidy" and recipients of "purely compensatory payments" in determining whether a defendant can be liable under the statute: the former are subject to Title VI, but the latter are not. *Jacobson v. Delta Airlines*, 742 F.2d 1202, 1209 (9th Cir. 1984). This is consistent with Title VI's "clear" intent that "that statute was not intended to apply to government procurement contracts." *Id.* In determining whether a program is subject to the Title VI paradigm, courts therefore focus "not on

market value but on the intention of the government . . . whether the government intended to provide assistance or merely to compensate." *Id.* at 1210.

Randall characterizes the $6.5 million per year that UNOS receives as "federal funding." MPA at 57.[2] He notes that, in *Moreno v. Consolidated Rail Corp.*, 99 F.3d 782 (1996), the Sixth Circuit concluded that—though the government had not explicitly expressed it intended to subsidize the railroads—the relevant funding program was, in purpose and effect, a subsidy. *Id.* at 788. But the *Moreno* Court faced materially different facts. In *Moreno*, the Court found that the relevant program appeared to be government assistance because the railroad would own the improvements that it was paid to undertake, and (absent the government program) the railroad itself would have to pay for the improvements itself. *Id.* at 787-88. Here, Randall does not allege that UNOS would bear the full cost of maintaining the transplant network and waitlist absent government funding—nor that UNOS, in addition to being paid to implement a program, benefits through the creation of an enduring resource that it owns outright.

Defendants have demonstrated—and Randall has failed to meaningfully dispute—that the funding that UNOS receives is characteristic of a quid pro quo contract with the government: UNOS is paid for the service it provides in managing the organ waitlist. MPA at 49. Defendants offer the contract itself, which explicitly defines its purpose as follows: "to support the operations and continual improvement of the OPTN." Dkt. No. 149-21 at 72. Under the explicit terms of the contract, UNOS must develop and improve a national electronic organ matching function, ensuring consistency with OPTN regulations and policies. *Id.* UNOS must do so by performing certain enumerated functions as a contractor—including matching organs to individuals on the national

---

[2] At times, Randall appears not to dispute the contractor relationship between UNOS and the federal government. It concedes that UNOS is a "private, nonprofit corporation" that "has served as the OPTN contractor under federal contract with HHS since 1986." DSUF ¶ 21.

waiting list; supporting, establishing and enforcing OPTN membership criteria; and developing

policies to allocate donated organs. *Id.* at 73.

The functions UNOS provides are a government service for which the government pays—nothing more. The OPTN partnership, first delineated in the 1984 National Organ Transplant Act, requires OPTN to maintain national systems and list of donors, a twenty-four-hour telephone service to facilitate matching organs, and the publication of studies and data concerning organ procurement. 42 U.S.C. § 274. Congress, through passing the Act, established the OPTN itself to provide a national solution for organ matching. *Id.* In turn, when UNOS began serving as the OPTN contractor under federal contract with HHS, it contracted with the government to offer a service that Congress wished OPTN to provide. In entering into the contract with UNOS, the government is not effectively subsidizing costs it would otherwise bear itself as with the railroad in *Moreno*. Nor is the government providing funding to pay for a resource that UNOS will own outright, as with the railroad in *Moreno*.

UNOS clearly benefits economically from this arrangement, but this does not necessarily give rise to Title VI liability. "[E]ntities that only benefit economically [as government contractors] from federal assistance are not" themselves recipients of "federal financial assistance." *Sharer v. Oregon*, 581 F.3d 1176, 1181 (9th Cir. 2009).

Randall argues that this Court should move beyond the language of the contract to the legislative intent behind the funding of OPTN; according to Randall, the legislative history demonstrates a clear intent to assist the work of OPTN, and to treat OPTN and UNOS as one and the same insofar as UNOS's work in administering the organ waitlist. MPA at 56. In support, Randall cites several floor statements from members of Congress expressing support for increasing the amount of funding given to the OPTN. *Id*. But these statements merely express support for the funding of OPTN as consistent with the public interest; they do not convey a hope to provide assistance to UNOS. Though the floor statements repeatedly discuss the aim of supporting *OPTN*,

they only mention UNOS as an entity "which contracts with" OPTN. 154 Cong. Rec. H8668-01,

2008 WL 4329712, at *H8669 (statement of Rep. Costa); *see also* Organ Procurement and

Transplantation Network, 42 CFR § 121.3(c)(3) (1998) (HHS final rule noting that the OPTN's

"contracting organization" may establish independent corporate procedures from those of OPTN).

So the legislative history fails to demonstrate that Congress intended to assist UNOS, which would

be required to find that UNOS received federal financial assistance.[3]

Randall also argues that at least some of UNOS's revenue is fairly characterized as a grant.

He notes that UNOS has, in contexts like tax filings and audited financial statements, characterized

the federal revenue it receives as "grants," MPA at 57, and that "even UNOS did not view its HRSA

contract as a procurement contract," *id.* at 58. But UNOS's characterization of the funds in

unrelated contexts is not dispositive as to whether the funds are "federal financial assistance;" what

is dispositive is the government's intent in providing the funds.[4] *Jacobson*, 742 F.2d at 1210.

Finally, Randall also notes that UNOS received "federal financial assistance" in the form of

a Paycheck Protection Program loan (a "PPP loan"), and suggests that this brings UNOS within the

ambit of Title VI. MPA at 57 n.14. Defendants do not dispute that UNOS received "federal

financial assistance in the form of a PPP loan, which UNOS was not required to repay." PSOF ¶ 99.

The Ninth Circuit has yet to determine whether an entity's receipt of a forgiven PPP loan qualifies it

as a recipient of "federal financial assistance," and other courts that have faced this question are

divided. *See E.H. ex rel. Herrera v. Valley Christian Acad.*, 616 F. Supp. 3d 1040, 1049 (C.D. Cal.

2022) (collecting cases). But Randall's suggestion that UNOS's receipt of a PPP loan suffices to

_____

[3] Furthermore, the Ninth Circuit has cautioned against construing the floor statements of individual legislators as reflecting the views of the entire body. *Kenna v. U.S. Dist. Ct. for Central Dist. of Cal.*, 435 F.3d 1011, 1015 (9th Cir. 2006).

[4] In addition, Randall provides this Court with no basis to conclude that the definition of "grant" in tax filings is to be imported to Title VI.

constitute "federal financial assistance" was not pleaded in the 2AC. "[A]dding a new theory of liability at the summary judgment stage would prejudice the defendant": The parties have not fully developed the factual and legal record on this basis. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000). For that reason, this Court need not reach the issue.[5]

In short, UNOS is paid to provide a service to the federal government; it only benefits from "federal financial assistance" insofar as it benefits economically from being a party to the contract. Because of this, this Court finds that there are no genuine disputes of material fact as to that UNOS is a government contractor, but does not—under the Title VI paradigm as the Ninth Circuit has interpreted it—receive federal financial assistance. As the applicability of Title VI to UNOS is a threshold question, this Court does not evaluate the other bases that Defendants offer in support of their motion. The Court therefore GRANTS Defendants' Motion regarding Randall's Title VI claim against UNOS.

### C. Randall's Unruh Act Claim Against UNOS and Cedars-Sinai.

Defendants next move for summary judgment on Randall's claim of an alleged violation of the Unruh Civil Rights Act. Cal. Civ. Code § 51. The Unruh Act states that "all persons within the jurisdiction of the state are free and equal, no matter what their sex, race color . . . are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." *Id.* Courts interpret the Unruh Act "liberally 'with a view to effectuating its purposes.'" *Smith v. BP Lubricants USA Inc.*, 278 Cal. Rptr. 3d 587, 600 (Cal. Ct. App. 2021) (quoting *Koire v. Metro Car Wash*, 707 P.2d 195, 197 (Cal. 1985); *see also Isbister v. Boys' Club of Santa Cruz*, 707 P.2d 212, 214 (Cal. 1985) ("The Act is this state's bulwark against

---

[5] It also appears that the PPP loan was received well after the key conduct in this case, thereby excluding liability for the majority of Randall's claim. In other words, even if this Court accepted Randall's argument and found that UNOS's acceptance of a PPP loan rendered it a program receiving federal financial assistance, it would do little to support most of Randall's claims' factual basis.

arbitrary discrimination in places of public accommodation . . . The Legislature's desire to banish

such practices . . . has led this court to interpret the Act's coverage in the broadest sense reasonably

possible." (internal quotation marks omitted)).

Defendants seek summary judgment on the ground that Randall cannot establish that Cedars-

Sinai or UNOS intended to discriminate against him or engaged in arbitrary discrimination. They

also argue that Randall cannot establish but-for causation relating his harm to any discrimination

caused by Defendants. This Court addresses the arguments in turn.

      i.   Genuine disputes of material fact exist as to whether Defendants engaged in
arbitrary or intentional discrimination.

At issue is whether Defendants are entitled to summary judgment as to whether they

engaged in arbitrary or intentional discrimination. For the reasons below, this Court finds that they

are not.

The Unruh Act authorizes a damages action against any person who intentionally

discriminates in violation of the Act. *Munson v. Del Taco, Inc.*, 208 P.3d 623, 630 (Cal. 2009). To

establish a violation of the Unruh Act in the context of racial discrimination, the dispositive

question is whether "the plaintiff faced unequal treatment on account of his or her race that

members of other races did not experience." *Smith*, 278 Cal. Rptr. 3d at 600. Thus, an Unruh Act

plaintiff must point to an affirmative discriminatory act on the part of the defendant to establish

liability.

Randall points to the Defendants' alleged use of the race coefficient in wait time

calculations as the affirmative discriminatory act which gives rise to their liability. According to

Randall, UNOS policy induced transplant hospitals like Cedars-Sinai to delay referring Black

patients who would, but for the race coefficient, have qualified to accrue wait time on the waitlist

earlier than they were placed.[6] Defendants assert that not only did they not use the race-conscious coefficient to evaluate him, but they had no knowledge that it was used with respect to his evaluation at all. The Court finds that there are genuine disputes of fact as to the use of the race-conscious coefficient and the extent to which the Defendants knew of, and contributed to, its use with respect to Randall.

As an initial matter, the evidence is disputed as to whether UNOS and Cedars-Sinai knew whether the race coefficient had been applied to Randall. Defendants cite record evidence tending to indicate that they were not aware, at the time of Randall's registration on the waitlist, what test method Kaiser had used to calculate Randall's eGFR scores. MPA at 69. In opposition, Randall counters that "the record is replete with evidence that both UNOS and Cedars knew Mr. Randall's score was adjusted using the race-based coefficient at the time he was registered on the kidney waitlist." *Id.* at 72. As for UNOS, Randall references its practice of performing site visits at its affiliate hospitals to ensure that data was being entered correctly; as a corollary, this would involve determining whether the hospitals were using the race-conscious coefficient as applied to their Black patients.[7] *Id.* He also cites medical records of Randall's, produced by Cedars-Sinai, that

---

[6] Defendants object to this Court's consideration of "allegations that Cedars or UNOS discouraged Kaiser from making an earlier referral" through their consideration of eGFR scores calculated with the race coefficient. MPA at 87. They characterize Randall's delayed-referral argument as improper due to a lack of notice in the 2AC. *Id.* But Defendants were fairly made aware that Randall would argue that he received a delayed referral. Randall's 2AC, dated March 2024, claims that "because of the race-based coefficient, many Black patients never began to accrue wait time because of a qualifying eGFR score, but were instead delayed." 2AC ¶ 10. Though this Court understands this allegation implies the delayed accrual of wait time while on the waitlist—not delayed referral to the waitlist—it finds Defendants were fairly on notice that Randall's claims would support a delayed-referral theory. After all, it is rational that, if Black patients have to wait longer before beginning to accrue time on the waitlist, a natural consequence would be that they would not be referred until later. There is no point in referring a patient to a waitlist earlier if they cannot accrue time until later. Moreover, in any event, it appears Defendants were well aware of Randall's theory during discovery, and were able to conduct fact and expert discovery to that effect. *See* MPA at 89-91.

[7] Defendants appear to argue that they were not aware of all of these medical records until after litigation began. *See* PSUF ¶ 108 (noting that the medical records were created by Kaiser, and that "evidence does not support an argument that Cedars-Sinai knew in January 2019 or before what method Kaiser had used"). But, to the extent the parties disagree as to Defendants' awareness that Randall's wait time was a byproduct of race-conscious calculations, it is an issue of fact for the jury to resolve.

indicate that he is Black and that his score had been calculated with the race-conscious formula. *Id.* at 72-73. At minimum, Randall argues, UNOS had reason to know that its transplant hospitals were likely to be using calculations that incorporated the race coefficient, a practice that it sanctioned until it changed its policy. *Id.* at 73-74. In light of this, the Defendants have failed to establish that it is undisputed that they had no knowledge of whether the race coefficient had been used.

Defendants also argue that their knowledge of the use of the race coefficient is immaterial, because by the time Randall was listed on the waitlist, his eGFR qualified him regardless of his race. But this fails to contend with Randall's argument—that the time he was placed on the list was influenced, at least in part, by the Defendants' policies and practices regarding use of the race coefficient. Defendants' arguments that Randall had a qualifying eGFR at the time of being placed on the list, and that they did not explicitly dictate when he should be placed on the list, are unavailing. Randall has adduced sufficient evidence for a jury to find that they implicitly did. Defendants themselves admit that, during the relevant period, the "majority of transplant hospitals and laboratories used the MDRD and CKD-EPI eGFR equations," DSUF ¶ 12, and that both of those equations rely on race in calculating eGFR, *id.* ¶ 2. And Randall offers evidence that UNOS representatives conducting site visits at transplant hospitals—including Cedars-Sinai—would know and did know whether transplant hospitals were using race-based eGFR tests. *See, e.g.*, Dkt. No. 149-104 at 4-5.

Finally, the Defendants argue that the race coefficient was historically an acceptable measure of kidney function. *See* DSUF at ¶¶ 1, 3-7. Defendants argue that, for many years, the MDRD and CKD-EPI equations "were the best estimates of kidney function" commercially available and that the inclusion of race led to higher "model accuracy." *See id.* at ¶¶ 5, 7.[8] Randall,

in opposition, suggests that the inclusion of race was erroneous from the start, and premised on the

authors' "hypothesis that Black individuals had greater muscle mass." *Id.* Randall cites expert

evidence that "[t]he MDRD and CKD-EPI equations were not supported by defensible science of

the level generally accepted in peer-reviewed medical journals, but instead relied on racial

stereotype, untested hypotheses, and insufficient underlying date"—and, countering Defendants'

argument, that "use of the race-based coefficient makes the MDRD and CKD-EPI *less* accurate."

Dkt. No. 149-58 at ¶ 14. There is, therefore, a genuine dispute of material fact as to whether the race

coefficient was acceptable, even prior to recent revelations about its use.

Given this, a reasonable factfinder could find that, as Randall argues, UNOS's "[u]se of the

race-based coefficient constitutes intentional, arbitrary discrimination." MPA at 74. Randall has

offered some evidence of the race coefficient's arbitrariness as applied to patients, citing the

"difficult in assessing who is 'Black' and the genetic reality that Black people are not a biological

monolith." *Id.* The post-discovery record, for example, demonstrates substantial uncertainty about

how to list biracial patients consistent with UNOS policy. Dkt. No. 149-87 at 4 (UNOS affiliate

asking UNOS for guidance on whether the race coefficient would apply to a biracial patient); *id.* at

3 (UNOS employee noting that the affiliate's question "tends to come up a few times a year," but

that there was no "guidance on if a biracial candidate should be listed as AA or non-AA"). Put

another way, the lack of a uniform policy that was consistently applied to patients with multiracial

backgrounds constitutes an arbitrary use of a policy that, by its own terms, calculated eGFR values

--------

The parties also seem to disagree regarding whether actually calculating GFR, as opposed to estimating it, would have been a suitable alternative. One practitioner noted that "doing a 24Hr clearance through intensive," meaning a calculation of GFR that does not rely on an equation to arrive at an estimated GFR, might be the best way of giving [patients] an ac[c]urate answer." Dkt. No. 149-99 at 5-6. It is also undisputed that twenty-four-hour urine tests measure GFR in a race-neutral manner and have been widely available since prior to the creation of either the MDRD or CKd-EPI tests. PSUF ¶ 42. Moreover, to the extent that Defendants argue that other forms of GFR calculation were not viable during the relevant time period, they undercut this argument: See, for example, Cedars-Sinai's policy of "expressly authoriz[ing] use of four independent methods to determine GFR, and only one of the four used a race-conscious coefficient." MPA at 78. If Cedars-Sinai had four viable race-neutral methods through which a patient's GFR could be calculated, it follows that race-conscious methods were not the only option.

differently for Black and non-Black patients. Because a reasonable view of the evidence supports

Plaintiffs' theory of the case, UNOS is not entitled to summary judgment on this basis.

Similarly, a reasonable factfinder could find that Cedars-Sinai's "[u]se of the race-based

coefficient constitutes intentional, arbitrary discrimination." MPA at 74. Randall has offered

evidence that, at the time that Cedars-Sinai accepted him as a patient, its policy required the

determination of GFR through one of several accepted tests—including the MDRD formula. Dkt.

No. 149-99 at 7-10; Dkt. No. 149-126 at 5 (Cedars-Sinai policy noting that preemptive listing was

available for patients with a "GFR less than 20," calculated with methods including the MDRD

formula).[9] That policy, which effectively sanctions the use of race coefficients when referring

patients to Cedars-Sinai, can reasonably be seen as arbitrary on this record: There appear to have

been other accepted race-neutral ways to estimate GFR. Dkt. No. 149-99 at 34-36 (discussing the

"cystatin C equation," and noting that at least one other hospital ended the use of the race

coefficient in eGFR calculations in 2017); *see also* PSUF ¶ 42 (discussing a widely available

method to calculate GFR with urine samples). Moreover, Randall has offered evidence that, "[u]ntil

July 2022, it was Cedar[s]-Sinai's practice when registering Black patients on the national kidney

waitlist, that if their medical records reflected an eGFR score and an eGFR [African American]

score, Cedars-Sinai would enter the eGFR [African American] score into UNET." Dkt. No. 149-97.

Of course, the parties may disagree about the extent to which these practices were discriminatory,

evidence-based, or consistent with standard practice. But whether Cedars-Sinai's sanctioning of the

---

[9] Defendants argue, in support of summary judgment on the matter of discrimination, that Cedars-Sinai had a policy that "expressly authorized use of four independent methods to determine GFR, and only one of the four used a race-conscious coefficient." MPA at 78. This decision leaves the question of whether Defendants' use (and their approval of other actors' use) of race coefficients constitutes discrimination as a question for the jury. But, as a matter of law, this Court is not persuaded that the adoption of alternative nondiscriminatory avenues bars liability for a party's use of a discriminatory criterion.

race-conscious policy constitutes actionable discrimination under Unruh is a question with substantial evidence in favor and against. For that reason, this question is best left to the jury.

In conclusion, as a reasonable factfinder could evaluate each of Defendants' knowledge and approaches to use of the race coefficient and determine that they constituted discrimination under the meaning of the Unruh Act, Defendants are not entitled to summary judgment.

> ii. Genuine disputes of material fact exist as to whether Randall can prove Defendants' discriminatory actions caused him harm.

Defendants next challenge Randall's claim on the basis that he cannot prove that the harm he suffered was caused "but for" the Defendants' acts. MPA at 68. Randall argues, in opposition, that he is not required to prove but-for causation of damages—and, even if he were, he can demonstrate that Defendants' actions were a but-for cause of harm that Randall suffered.

Alleging a violation of the Unruh Act requires a showing that "[a defendant's] conduct was a substantial factor in causing [the plaintiff's] harm." *Thurston v. Omni Hotels Mgmt. Corp.*, 284 Cal. Rptr. 3d 341, 345 n.5 (Cal. Ct. App. 2021); Cal. Civ. Jury Instr. § 3060 (same). Randall notes that "there is no requirement that a plaintiff suing under Unruh has suffered actual damages." MPA at 76. This is true, in the sense that the Unruh Act includes no requirement that a claimant seek a compensatory award for financial losses suffered. But proof of a violation of the Unruh Act still requires a causal link between the alleged violation and some "injury, damage, loss, or harm" suffered. *Thurston*, 284 Cal. Rptr. 3d at 345 n.5. So this Court must determine whether a reasonable jury could find the requisite causal link between Defendants' alleged discriminatory conduct and a harm that Randall suffered.

This Court must determine whether Defendants are entitled to summary judgment as a matter of law on causation, applying the substantial factor test. Defendants argue that Randall has not established, and cannot establish, but-for causation linking Defendants' use of the race coefficient

and Randall's harm. MPA at 54. Because this Court finds that outstanding factual disputes exist such that a reasonable jury could find in Randall's favor, it denies summary judgment on this basis.

As for UNOS, Randall has offered evidence that UNOS's practice of accepting eGFR calculations shaped by the race coefficient were a "substantial factor" in the harm that Randall suffered. *Thurston*, 284 Cal. Rptr. 3d at 345 n.5. Defendants argue that their conduct was not a cause of Randall's delay in receiving a kidney transplant, noting that a 20 mL/min eGFR is only one of several factors considered in a patient's waitlist placement—and does not, by itself, guarantee that Randall would have received a transplant.[10] But Randall's expert evidence on this matter is instructive: Professor David Cutler's report offers a methodological simulation that determines that, were it not for the race-conscious coefficient, Randall would have likely been offered several kidney transplants before he eventually received one through a private donation. *See* Dkt. No. 149-51 ("Cutler Report") at ¶¶ 54-58. Were it not for the fact that UNOS's policy, at this time, accepted transplant hospitals' use of race-conscious methodology for estimating GFR—despite available alternatives—Randall has offered evidence to show that he would have been qualified to accrue time sooner. The fact that he was not actually listed until he qualified to start accruing wait time does not defeat his claim: Hospitals had no reason to list patients that would not be accruing time until their eGFR levels dropped below the 20 mL/min threshold. Because a reasonable jury could find that UNOS's actions and policy were substantial factors in causing Randall undue delay in his qualification for a kidney from the waitlist, UNOS is not entitled to summary judgment on this basis.

And as for Cedars-Sinai, Randall argues that, when he was evaluated for transplant, "Cedars used the race-based coefficient to estimate his GFR scores, and used a race-adjusted score from

_____

[10] Defendants incorporate their arguments disputing causation for the Title VI claim—which, as discussed above, this Court resolves on different grounds—into the Unruh causation analysis. MPA at 77 n.25. But, unlike Title VI claims, but-for causation is not the standard that California law applies for these claims. *Thurston*, 284 Cal. Rptr. 3d at 345 n.5.

September 2018 to register Mr. Randall on the waitlist in January 2019, more than a year and a half after he would have qualified but-for being Black." MPA at 41. The parties dispute the conclusion, but Randall has offered evidence showing that Cedars-Sinai accepted eGFR calculations that incorporated race, despite alternate methods of screening being available. *See, e.g.*, Dkt. No. 149-159 ¶ 62 ("[T]ransplant programs have always had other race-neutral options to measure kidney function."); *id.* ¶ 58 ("[F]or patients whose eGFR scores straddled 20 mL/min . . . I would have used one of the race-neutral tests available to clinicians[.]"). Whether permitting hospitals like Kaiser to submit race-conscious scores constitutes discrimination is a question that this Court leaves for trial. But there is a clear plausible causal link between Cedars-Sinai's actions and Randall's harm: Had Cedars-Sinai not accepted eGFR calculations that incorporated the use of the race coefficient, hospitals like Kaiser would have to use either race-blind MDKD and CKD-EPI calculations—in effect, applying the formula in the same way regardless of the patient's race. Randall plausibly would have crossed the 20 mL/min threshold earlier,[11] been referred earlier,[12] started accruing time earlier,[13] and received a kidney match earlier.[14] Certainly, under this view, other actors—such as Kaiser—also took actions that contributed to Randall's harm. But a defendant need not be the sole cause of a plaintiff's harm to clear the "substantial factor" threshold required for Unruh Act claims.

---

[11] *See* Dkt. No. 147-10 at 2 (Randall's May 2017 medical records, reflecting that the stated eGFR of 21 "ha[d] been multiplied by 1.21 if 'Black' race is reported," when 21 divided by 1.21 is approximately 17.3).

[12] *See* Dkt. No. 149-118 ¶¶ 5-9 & fig. 1 (noting that Randall was referred only after reaching the 20 mL/min threshold, which starts the calculation of waiting time under OPTN Policy 8.3.A); Dkt. No. 149-94 at 5 ("Q. . . . If you got a referral of a patient with 23 milliliters a minute and they weren't on dialysis yet, you couldn't register them on the wailist; correct? A. Correct.").

[13] *Id.*; see also *id.* ("Q. So hospitals wouldn't refer patients to the Transplant Center until the time they understood they were eligible to join the wait list; right? A. Correct.").

[14] *See* Dkt. No. 149-51 ¶¶ 7, 54-58 (Randall's expert, in determining whether "class members' wait times . . . were impacted by Defendants' use of the race-based coefficient," finding that Randall would likely have been offered several kidneys but for the use of the coefficient).

Because sufficient factual dispute exists for a reasonable factfinder to find in Randall's favor on this basis, Cedars-Sinai is not entitled to summary judgment.

### D.    Randall's Breach of Fiduciary Duty Claim against Cedars-Sinai.

Under California law, "[t]he elements of a cause of action for breach of fiduciary duty are the existence of a fiduciary relationship, breach of fiduciary duty, and damages." *Oasis W. Realty, LLC v. Goldman*, 250 P.3d 1115, 1121 (Cal. 2011).

Defendants move for summary judgment on Randall's breach of fiduciary duty claim against Cedars-Sinai. They argue that the claim must fail because Randall cannot establish that a fiduciary duty existed between him and Cedars-Sinai; there is no evidence that a physician employed by Cedars-Sinai had material information that was not disclosed to Randall; Cedars-Sinai provided Randall with the requisite standard of care; and Randall cannot establish but-for causation. MPA at 93-97. For the reasons below, this Court finds a triable issue of fact on this basis.

i.    <u>Genuine disputes of material fact exist as to whether Cedars-Sinai owed Randall a fiduciary duty.</u>

"A fiduciary or confidential relationship can arise when confidence is reposed by persons in the integrity of others." *Pierce v. Lyman*, 3 Cal. Rptr. 2d 236, 240 (Cal. Ct. App. 1991). When the latter "voluntarily accepts or assumes to accept the confidence, he or she may not act so as to take advantage of the other's interest without that person's knowledge." *Id.* Moreover, "the existence of a fiduciary relation is a question of fact." *In re Daisy Systems Corp.*, 97 F.3d 1171, 1178 (9th Cir. 1996); *see also Hasso v. Hapke*, 173 Cal. Rptr. 3d 356, 392 (Cal. Ct. App. 2014). Thus, a fiduciary relationship exists "turn[s] in part on whether [Randall] reposed confidences in [Cedars-Sinai]." *Id.*

At issue is whether Cedars-Sinai owed Randall a fiduciary duty. This Court has already outlined the basis upon which Cedars-Sinai might owe Randall a fiduciary duty. *See generally* MTD

Order.[15] There, the Court identified three ways in which Randall had properly pleaded—and therefore might eventually show—that Cedars-Sinai owed him a fiduciary duty: that Cedars-Sinai employees erred by (1) failing to "prompt[ly] adjust[] [] Randall's wait time," (2) "advocating for Randall to have his wait time adjusted so that he could move further up the priority list," and/or (3) "inform[ing] Randall that his wait time score was affected by a now-debunked scientific theory."[16] *Id.* at 22-23.

Because this Court finds that a reasonable factfinder could find in Randall's favor on these theories, it denies summary judgment on this basis.

On the first theory, Randall has offered evidence that Cedars-Sinai employees owed him a prompt adjustment on his wait time. The parties agree that "[n]o Cedars doctor or employee ever told Mr. Randall that the race-based coefficient" was impacting his standing on the waitlist, *Id.* ¶ 95; Randall alleges that, had he known, he would immediately have requested race-neutral treatment, and failing that, that he would have sought treatment elsewhere or more immediate legal action. *Id.* ¶ 96.[17] As a general matter, the parties do not dispute that "Randall placed his trust in the doctors and staff at Cedars to ensure he would receive fair consideration for a donor kidney, and to

---

[15] Much of the Defendants' arguments appear to be an attempt to reargue matters already determined by this Court. *See* MTD Order. Similarly, Defendants assert that the theory of vicarious liability was not properly pleaded in the 2AC, which is a curious position to take, given that this Court has already explicitly found that it was. *Id.* at 23 ("Randall has alleged that Cedars-Sinai may be liable for a breach of fiduciary duty that one of its doctors or other employees owed to Randall."). The Court will therefore not reiterate its analysis as to how fiduciary duty was properly pleaded. Instead, it moves on to address whether there are genuine issues of material fact preventing summary judgment on the theories the Court previously identified.

[16] At the hearing, Cedars-Sinai argued that this Court should not read *Lyman*'s requirements as to breach of fiduciary duty absent the context of *Moore*. But this Court, in explaining the MTD Order and outlining the viable theories that Randall could pursue, has already considered *Moore* and found that it does not foreclose Randall's claims. MTD Order at 23. Cedars-Sinai does not sufficiently explain why this Court should depart from that determination.

[17] Defendants dispute this, alleging Randall's testimony contradicts itself. *Id.* They suggest that Randall "contradicts his own testimony" by alleging that he was "desperate to receive a kidney transplant" while also noting that, had he known about the race-based coefficient's impact on his treatment, he would have sought race-neutral treatment earlier or gone elsewhere. *Id.* But this Court sees no reason to think that both statements cannot coexist. In fact, as Randall alleges that the race-conscious treatment delayed his treatment at Cedars-Sinai, his strong wish for a prompt kidney transplant is perfectly consistent with the idea that he would have sought remedial measures earlier.

keep him apprised of important aspects in his medical care." PSUF ¶ 92. Moreover, Cedars-Sinai

employees appear to have been the sole intermediaries between Randall and the transplant waitlist;

neither party suggests he had other routes for information, and Randall therefore has shown that he

relied on Cedars-Sinai employees. *Id.* ¶ 93. More specifically, that reliance arguably extended to

adjusting Randall's wait time. OPTN approved its wait time modification policy for Black patients

on January 5, 2023. DSUF ¶ 30. Cedars-Sinai first attempted to reach out to Randall "requesting his

assistance in looking for data to support a wait time adjustment" in May 2023. *Id.* ¶ 79. But that was

the month in which Randall's transplant surgery, using his friend's kidney and not one from the

waitlist, was completed. *Id.* ¶ 81. Based on these facts, it is not clear that Randall had the

knowledge or ability to petition for a wait time adjustment earlier. Instead, given his trust and

relationship with Cedars-Sinai employees, a reasonable factfinder could determine that Cedars-Sinai

owed Randall a more prompt adjustment. In sum, because a reasonable factfinder could find that

Randall placed his confidence on Cedars-Sinai's employees to promptly adjust his wait time, he has

created a genuine issue of material fact on this issue.

On the second theory, for similar reasons, Randall has offered evidence that Cedars-Sinai

employees should have advocated for Randall to have his wait time adjusted so that he could move

further up the priority list. As with above, Randall has offered evidence of the trust and reliance in

his relationship with Cedars-Sinai and its employees. And, as with above, the parties agree that four

months passed between OPTN's enactment of its wait time adjustment policy and Cedars-Sinai's

first attempt to discuss with Randall a wait time adjustment. Taken together, as a reasonable

factfinder would have sufficient evidence to find that Cedars-Sinai employees owed Randall a

prompt adjustment of his waitlist status, he has created a genuine issue of material fact on this issue.

On the third theory, Randall has offered evidence that Cedars-Sinai employees should have

informed him that his wait time was affected by the race-conscious coefficient. Again, the parties

agree that "[n]o Cedars doctor or employee ever told Mr. Randall that the race-based coefficient"

was impacting his standing on the waitlist. *Id.* ¶ 95. Defendants do not dispute the trust or reliance that Randall had in his doctors at Cedars-Sinai. To that end, a reasonable juror could certainly decide that the race-conscious treatment as a methodology for organ waitlist time calculation was something that Randall was entitled to expect from his medical team.

In support of summary judgment, Defendants argue that "Randall does not identify in the SAC any physician who purportedly was a Cedars employee." MPA at 80. This is relevant because "[t]he distinction between an employee and an independent contractor is a significant one: With some exceptions, an employer is vicariously liable for the negligent acts of its employees, but not of its independent contractors." *Bowman v. Wyatt*, 111 Cal. Rptr. 3d 787, 795 (Cal. Ct. App. 2010). At summary judgment, however, the nonmoving party is entitled to the benefit of reasonable inferences from evidence on the record. *Barnes v. Arden Mayfair, Inc.*, 759 F.2d 676, 680 (9th Cir. 1985). It is true that the parties' respective Statements of Facts do not offer dispositive proof on these doctors' relationships to Cedars-Sinai. But Randall has offered sufficient evidence for a reasonable factfinder to conclude that the relevant physicians and administrators were Cedars-Sinai employees.

Regarding his physicians, Randall has established that he met with doctors while at Cedars-Sinai—Dr. Brennan and Dr. Huang—to discuss his transplant candidacy. PSUF ¶ 94. Randall has established that his treating physicians met him at a Cedars-Sinai hospital, *id.*, and are listed on the Cedars-Sinai website, *id.* ¶111. And as for administrators, he offers some evidence that "Dr. Kim acts on behalf of Cedars as the Director of its Comprehensive Transplant Center." PSUF ¶ 110. As of August 2021, Kim appears to have used an email domain ending in @cshs.org—consistent with Cedars-Sinai's own website. *See generally* About Cedars-Sinai, careers.cshs.org/about-cedars-sinai (last visited Nov. 3, 2025); *see also* Dkt. No. 149-93 (email from Kim); Dkt. No. 149-94 (authenticating the email). At deposition, Kim also answered questions about "[her] time at Cedars." *See, e.g.*, Dkt. No. 149-99 at 12-13. In sum, based on the discovery record, Randall has

raised sufficient facts for a reasonable jury to find that Cedars-Sinai's physicians and administrators were employees of Cedars-Sinai.

In conclusion, Randall is entitled to proceed on his theory of vicarious liability for duties owed by Cedars-Sinai. Defendants are therefore not entitled to summary judgment.

> ii.    <u>Genuine disputes of material fact exist as to whether Cedars-Sinai breached a fiduciary duty.</u>

Defendants next argue that, if this Court were to find that Cedars-Sinai owed Randall a fiduciary duty, it should also find that Defendants did not breach such a duty.

As discussed above, in its MTD Order, this Court determined that Randall had sufficiently pleaded three theories of fiduciary duty imputable to Cedars-Sinai. Randall has properly alleged that Cedars-Sinai employees had the duty to (1) "prompt[ly] adjust[] [] Randall's wait time," (2) "advocat[e] for Randall to have his wait time adjusted so that he could move further up the priority list," and/or (3) "inform[] Randall that his wait time score was affected by a now-debunked scientific theory." MTD Order at 22-23. Because Randall has created triable issues of fact on whether those three duties were breached, Cedars-Sinai is not entitled to summary judgment.

On the first theory, Randall has established that a four-month gap took place between the enactment of the OPTN time adjustment policy and Cedars-Sinai's first effort to reach out to him to discuss a wait time adjustment in his case. PSUF ¶¶ 30, 75. And Randall has offered evidence in support the theory that Cedars-Sinai could have known that his wait time was in need of adjustment; Randall has offered deposition evidence where Kim confirms awareness that Cedars-Sinai accepted "race-based coefficients" in its wait time calculations.[18] Dkt. No. 149-94 at 10-11. If a jury found

---

[18] Defendants argue that it was Kaiser who used the race-conscious methodology, and that Randall improperly seeks to hold Cedars-Sinai and UNOS liable for Kaiser's actions. MPA at 1. They further note that "Randall does not even have evidence that the doctors knew about the race-conscious coefficient." *Id.* at 8. But as a legal matter, there is no requirement that breaches of fiduciary duty be committed knowingly. *See Knight v. Aqui*, 966 F. Supp. 2d 989, 996

that, as Randall pleaded, Cedars-Sinai employees breached a fiduciary duty by not adjusting his

wait time more promptly, a jury could also find that Cedars-Sinai erred by waiting four months

before it first attempted to apply its adjustment policy to Randall. In support of the Motion,

Defendants note that Cedars-Sinai "did, in fact, write to patients potentially impacted by the policy .

. . requesting [patients'] assistance in looking for data to support a wait time adjustment." MPA at

81.

On the second theory, for similar reasons, Randall has created a triable issue of fact. There is

no indication that, prior to the May 2023 letter from Cedars-Sinai, any member of his medical

treatment team at Cedars-Sinai inquired into the methodology that had been used to calculate his

wait time, advocated for a race-neutral calculation that would result in an earlier qualification for

transplant, or otherwise supported the use of a race-neutral methodology as applied to Randall.

Given that a reasonable factfinder could find that Cedars-Sinai employees had a duty to advocate

for Randall, then, they could also find that Cedars-Sinai breached that duty.

On the third theory, it is undisputed that Cedars-Sinai did not inform that Randall's wait

time was being adversely impacted by the race-conscious coefficient. PSUF ¶ 95. Defendants, of

course, dispute the degree to which the race-conscious coefficient was based on legitimate science.

DSUF ¶¶ 3-8. But even if the science backing the race-conscious coefficient was wholly reliable—a

determination of fact that this Court need not make here—a reasonable juror could find that Cedars-

Sinai erred by not telling Randall that its accepted method of calculation was incorporating analysis

of his race to his detriment. This is because Randall has established that not all hospitals used the

race-conscious coefficient. *See* PSUF ¶¶ 39, 63. So, even if the race-conscious coefficient was

(N.D. Cal. 2013) (collecting cases treating negligence claims as "functionally the same" as professional negligence claims). Cedars-Sinai could have ensured that no patients were listed using a race-conscious coefficient by doing what OPTN did in July 2022—that is, prohibiting its staff "from using race-conscious considerations when calculating a patient's eGFR." DSUF ¶¶ 27-28. Moreover, Cedars-Sinai always had the power to ascertain that the race-conscious methodology was not impacting Randall—as evidenced by its 2023 letter to him seeking to adjust his wait time.

scientifically sound, it was still a methodology that worked to Randall's detriment. Under a race-neutral framework, a reasonable factfinder could determine that Randall would have received a kidney sooner. *See* Cutler Report ¶ 56 (suggesting that, but for the use of the race-conscious coefficient, Randall would have been offered approximately three kidneys before his transplant). Thus, as Cedars-Sinai did not inform Randall of the race-conscious coefficient's impact on his transplant wait time, Randall has created a triable issue of fact on whether Cedars-Sinai employees breached their duty.

In sum, Randall has offered sufficient evidence to substantiate his theories of vicarious liability; a reasonable factfinder, having determined that Randall was owed all three duties described in the MTD Order, could also find that Cedars-Sinai breached those duties. For that reason, on the matter of breach, Defendants' Motion is denied.

> iii. Genuine disputes of material fact exist as to whether Cedars-Sinai's breach of fiduciary duty through Kim's actions proximately caused harm to Randall.

Defendants' third argument on summary judgment on the breach of fiduciary duty claim is that Randall must, and cannot, establish causation between Cedars-Sinai's breach and the harm that he suffered.

California courts describe the relevant standard on causation as "damage *proximately caused by the breach.*" *Gutierrez v. Girardi*, 125 Cal. Rptr. 3d 210, 215 (Cal. Ct. App. 2011) (emphasis added). "Proximate cause involves two elements." *PPG Industries, Inc. v. Transamerica Ins. Co.*, 975 P.2d 652, 655 page number (Cal. 1999). The first is cause in fact—whether an act was "a necessary antecedent of an event." *Id.* "[T]he second element focuses on public policy considerations." *Ferguson v. Lieff, Cabraser, Heimann & Bernstein*, 69 P.3d 965, 969 (Cal. 2003). This component instructs courts to consider "'the various considerations of policy that limit an actor's responsibility for the consequences of his conduct.'" *Id.* (quoting *Mosley v. Arden Farms*

*Co.*, 157 P.2d 372 (Traynor, J., concurring)). This Court evaluates whether Randall has created a genuine dispute of material fact on the matter of causation under that paradigm.

First, a reasonable factfinder could conclude that Cedars-Sinai employees' actions were a necessary antecedent of Randall's harm. This Court has also already found a triable issue of fact on the matter of whether Randall's treating physicians owed and breached a fiduciary duty.

Randall has also created a genuine issue of material fact regarding the roles individual actors played in causing him harm. Randall, for example, has offered evidence that Kim was the "Director of Cedars' Comprehensive Transplant Center," MPA at 5. And he has offered evidence that supports that Kim exercised some amount of control over the policy at Cedars-Sinai to "us[e] the black race coefficient." Dkt. No. 197-93 at 7. In fact, she expresses that Cedars-Sinai's initiative to "chang[e] this policy" was one she spearheaded. *Id.* These statements, interpreted in Randall's favor, could suggest that Kim permitted the policy of using race-conscious coefficients to screen Black patients to be in effect while Randall was awaiting a transplant.

Both Cedars-Sinai physicians and administrators arguably took actions with causal links to Randall's harm. This is because, as Randall puts it:

> No Cedars doctor or employee ever told Mr. Randall that the race-based coefficient was used to calculate his kidney function score, nor was he told it was Cedars policy to use a race-adjusted value for waitlist registration purposes. Had Mr. Randall been so informed, he would have immediately requested race-neutral treatment from Cedars. If that request were denied, Mr. Randall would have sought race-neutral treatment at another transplant center, and if unavailable . . . , would have pursued legal action earlier.

PSUF at ¶¶ 95-96 (citing Dkt. No. 149-157 at ¶¶ 5-8). As a reasonable factfinder could credit Randall's own deposition, in which he conveys his "desperat[ion]" to receive a transplant, it could find that Randall would have pursued different treatment had he been fully informed.

Moreover, a reasonable factfinder could decide that policy considerations weigh in favor of finding liability for Cedars-Sinai through its employees' failure to fully inform a hospital patient. Defendants do not raise arguments or legal authorities that would suggest otherwise. Moreover,

California law has long recognized "the medical patient's protectible interest in autonomous decisionmaking." *Arato v. Avedon*, 858 P.2d 598, 605 (Cal. 1993). In keeping with that interest, this Court's MTD Order determined that Randall had sufficiently pleaded, and may eventually prevail, in arguing that he was underinformed and that his medical team insufficiently advocated for him, leading to an undue delay as he waited to receive a transplant.

In sum, finding grounds for a reasonable factfinder to find in Randall's favor on the matter of causation, this Court DENIES summary judgment on this basis.

### E. Defendants' Motion for Summary Judgment on Randall's Unfair Competition Law Claim Against UNOS and Cedars-Sinai.

Defendants next move for summary judgment on Randall's claim of a violation of the Unfair Competition Law against both UNOS and Cedars-Sinai. MPA at 85-86. They argue that Randall lacks standing under this state law and that, even if he did not, he would have no available remedy.

Relief under the UCL "is limited to injunctive relief and restitution." *Mass. Mut. Life. Ins. Co. v. Super. Ct.*, 97 Cal. App. 4th 1282, 1288 (Cal. Ct. App. 2002). This Court has already ruled that Randall may not pursue a claim for injunctive relief. *See* Dkt. No. 50 at 9 (noting that Randall has already received a kidney, so his request for injunctive relief is moot). In filing the 2AC, Randall added an allegation that he "paid to Defendants a significant registration fee, required to join UNOS's national kidney waitlist." 2AC at ¶ 109. But Randall agrees that, contrary to his allegations in the 2AC, "he paid no registration fee to either Cedars or UNOS." DSUF ¶ 66. To that end, Randall "does not contest dismissal of his UCL claim on the grounds that there is no current available remedy." MPA ¶ 85-86.

Because Plaintiff appears to be abandoning this claim, and in any event, there is no dispute of material fact such that a reasonable factfinder could find in favor of Plaintiff, this Court GRANTS Defendants' Motion as to this claim.

### F. Randall's Request for Punitive Damages

Finally, the parties dispute whether Randall may seek punitive damages. Defendants argued that Randall could not seek punitive damages under Title VI as a matter of law; Randall, in opposition, clarified that he sought no such damages on that claim. MPA at 86. Because of this, and because this Court has already explained why summary judgment as to that claim is granted, this Court focuses only on whether Randall may seek punitive damages as to his breach of fiduciary duty claim.

As Defendants note, punitive damages under California law are available "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff." Cal. Civ. Code § 3294(a). In the MPA, Defendants' opening argues that "Randall offers no evidence that meets those requirements." MPA at 86. Randall, in opposition, only clarified that he sought punitive damages under the breach of fiduciary duty claim, not his Title VI claim—and, importantly, offered no argument in response to Defendants' statement that no record evidence the statutory requirements for punitive damages.

Randall's decision not to contest Defendants' argument that no evidence on the record supports his punitive damages request weighs in favor of treating the Motion on this basis as unopposed. Moreover, this Court is independently unaware of what record evidence Randall would cite in support of punitive damages. Randall does not direct this Court to any in the MPA, nor do the PSUF's proposed conclusions of law incorporate mentions to punitive damages. Indeed, it does not appear as though Randall's PSUF argues that oppression, fraud, or malice exist on this recod.

For those reasons, Defendants' request for summary judgment as to punitive damages is granted.

## **CONCLUSION**

2    For the foregoing reasons, the Court hereby ORDERS that Defendants' Motion for

3    Summary Judgment is

4    1.   DENIED as to all of Randall's claims on the basis of a lack of Article III standing;

5    2.   GRANTED as to Randall's Title VI claim against UNOS;

6    3.   DENIED as to Randall's Unruh Act claim against Defendants;

7    4.   DENIED as to Randall's breach of fiduciary duty claim against Cedars-Sinai:

8    5.   GRANTED as to Randall's Unfair Competition Law claim against Defendants;

9    6.   GRANTED as to Randall's request for punitive damages under the breach of fiduciary duty

10       claim.

11    The parties shall meet and confer regarding what portions (if any) of this Order need be

12    sealed, and shall file a joint statement describing as such within fourteen (14) days of this Order.

13    The Joint Statement shall include all details required for a motion to seal under the local rules (e.g.,

14    the parties must justify why the information they seek to seal warrants sealing, and must file a

15    declaration in support). The Joint Statement shall also include as an attachment a version of this

16    Order with proposed redacted language highlighted in yellow, pursuant to Local Rule 79.5.2.2. That

17    attachment may be filed under seal. The parties shall also email to chambers a PDF with redactions

18    in black for the Court to file in the event that the redactions are approved. This Order shall be

19    conditionally sealed in its entirety in the interim.

20

21    IT IS SO ORDERED.

22    Date: February 12, 2026

                                                      _____

23                                                    Maame Ewusi-Mensah Frimpong

24                                                    United States District Judge

25

26