**WATSTEIN TEREPKA LLP**
Matthew L. Venezia (State Bar No. 313812)
mvenezia@wtlaw.com
George Laiolo (State Bar No. 329850)
glaiolo@wtlaw.com
Daniel Contreras (State Bar No. 329632)
dcontreras@wtlaw.com
515 South Flower Street, 19th Floor
Los Angeles, CA 90071
Telephone: (213) 753-1337
Facsimile:  (404) 537-1650

Corine White
cwhite@wtlaw.com
75 14th Street NE, Suite 2600
Atlanta, GA 30309
Telephone: (404) 897-0620
Facsimile: (404) 537-1650

**KELLER ROHRBACK L.L.P.**
David J. Ko (*pro hac vice*)
dko@kellerrohrback.com
Daniel P. Mensher (*pro hac vice*)
dmensher@kellerrohrback.com
1201 Third Avenue, Suite 3400
Seattle, Washington 98101
Telephone: (206) 623-1900
Facsimile: (206) 623-3384

Attorneys for Plaintiff
ANTHONY RANDALL

**LEWIS BRISBOIS BISGAARD & SMITH LLP**
Jon P. Kardassakis, SB# 90602
Jon.Kardassakis@lewisbrisbois.com
Eleonora Antonyan, SB# 338379
Eleonora.Antonyan@lewisbrisbois.com
633 West 5th Street, Suite 4000
Los Angeles, California 90071
Telephone: 213.250.1800
Facsimile: 213.250.7900

Attorneys for Defendant,
CEDARS-SINAI MEDICAL CENTER

**WINSTON TAYLOR LLP**
Daniel M. Blouin (admitted *pro hac vice*)
dan.blouin@winstontaylor.com
Thomas G. Weber (admitted *pro hac vice*)
thomas.weber@winstontaylor.com
Winston Taylor LLP
300 N LaSalle Dr, Ste, 4400
Chicago, IL 60654
Telephone: (312) 558-5600
Facsimile: (312) 558-5700

Shawn R. Obi (SBN: 288088)
shawn.obi@winstontaylor.com
Winston Taylor LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543
Telephone: (213) 615-1700
Facsimile: (213) 615-1750

Attorneys for Defendant,
UNITED NETWORK FOR ORGAN SHARING

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ANTHONY RANDALL,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED NETWORK FOR ORGAN SHARING and CEDARS-SINAI MEDICAL CENTER,<br><br>Defendants. | Case No. 2:23-CV-02576-MEMF<br><br>Hon. Maame Ewusi-Mensah Frimpong<br><br>**DEFENDANTS CEDARS-SINAI MEDICAL CENTER AND UNITED NETWORK FOR ORGAN SHARING'S JOINT MOTION FOR SUMMARY JUDGMENT REGARDING STANDING FOR CLASS MEMBERS**<br><br>Date:      October 8, 2026<br>Time:      10:00 a.m.<br>Crtrm.:    8B |

DEFENDANTS CEDARS-SINAI MEDICAL CENTER AND UNITED NETWORK FOR ORGAN SHARING'S
JOINT MOTION FOR SUMMARY JUDGMENT REGARDING STANDING FOR CLASS MEMBERS

**DEFENDANTS' NOTICE OF MOTION AND MOTION**

**TO ALL PARTIES AND TO THEIR COUNSEL OF RECORD**

**PLEASE TAKE NOTICE THAT** on October 8, 2026, at 10:00 a.m., in the courtroom of the Honorable Maame Ewusi-Mensah Frimpong, in the United States Courthouse 8B 350 West First Street, Los Angeles, CA, 90012, pursuant to the Court's rules, Defendants Cedars-Sinai Medical Center ("Cedars") and United Network for Organ Sharing ("UNOS") (together, "Defendants") will and hereby do move this Court for an order granting Defendants' Joint Motion for Summary Judgment Regarding Standing for Class Members (the "Motion"). Defendants move for summary judgment on the basis that the class members lack Article III standing. This Motion is based on the below points and authorities, the declarations concurrently filed in support, Defendants' joint statement of uncontroverted facts and conclusions of law concurrently filed in support, all of the pleadings, files, and records in this proceeding, all other matters of which the Court may take judicial notice, and any argument or evidence that may be presented to or considered by the Court prior to its ruling.

This Motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on June 10, 2026.

Dated: August 5, 2026

JON KARDASSAKIS
ELEONORA ANTONYAN
LEWIS BRISBOIS BISGAARD & SMITH LLP

By: _/s/ Jon Kardassakis_
JON KARDASSAKIS
Attorneys for Defendant,
CEDARS-SINAI MEDICAL CENTER

i

DEFENDANTS CEDARS-SINAI MEDICAL CENTER AND UNITED NETWORK FOR ORGAN SHARING'S
JOINT MOTION FOR SUMMARY JUDGMENT REGARDING STANDING FOR CLASS MEMBERS

Dated: August 5, 2026

DANIEL M. BLOUIN
SHAWN R. OBI
WINSTON TAYLOR LLP


By:    /s/ Daniel M. Blouin
DANIEL M. BLOUIN
Attorneys for Defendant, UNITED NETWORK
FOR ORGAN SHARING

DEFENDANTS CEDARS-SINAI MEDICAL CENTER AND UNITED NETWORK FOR ORGAN SHARING'S
JOINT MOTION FOR SUMMARY JUDGMENT REGARDING STANDING FOR CLASS MEMBERS

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ............................................................................................................. 1

    A. Defendants' Introduction .......................................................................................... 1
    B. Plaintiff's Introduction ............................................................................................. 2
    C. Defendants' Reply .................................................................................................... 4

II. PLAINTIFF'S FACTUAL BACKGROUND ................................................................. 6

    A. The race-based coefficient constitutes disparate treatment based on race, supported only by offensive racial stereotype. ......................................................................... 6
    B. Defendants maintained a policy and practice of using the race-based coefficient to create a race-based admissions standard for the national kidney transplant waitlist. 8
    C. Every class member, by definition, encountered Defendants' use of the race-based coefficient. .......................................................................................................... 10
    D. While not required for Article III standing, Professor Cutler's model shows Defendants' use of the race-based coefficient deprived class members of kidney offers. ..................................................................................................................... 11
    E. Patients with zero offers still suffered harm. ........................................................ 12

III. DEFENDANTS' REPLY TO "PLAINTIFF'S FACTUAL BACKGROUND" ................ 13

IV. ARGUMENT NO. 1 ....................................................................................................... 15

    A. Defendants' Argument ............................................................................................ 15
        1. Every Class Member Must Demonstrate Article III Standing. ................... 15
            (a) The Supreme Court Has Made Clear That All Class Members Must Have Article III Standing. .................................................... 15
                (i) TransUnion v. Ramirez ...................................................... 15
                (ii) Article III requires a concrete injury even in the context of a statutory violation. ............................................................. 18
                (iii) Being forced to compete on an uneven playing field does not constitute a concrete and actual injury. ............................... 19
        2. Class Members Must Demonstrate Evidence of Standing at Summary Judgment. .................................................................................................... 20
    B. Plaintiff's Response ................................................................................................ 20
        1. Racial discrimination continues to cause concrete harm, even after TransUnion. ............................................................................................... 20
    C. Defendants' Reply .................................................................................................. 24

V. ARGUMENT NO. 2 ....................................................................................................... 26

    A. Defendant's Argument ............................................................................................ 26
        1. Class Members Do Not Have Sufficient Evidence to Establish Article III Standing. .................................................................................................... 26
            (a) Dr. Cutler Does Not Provide Sufficient Evidence That Class Members Incurred Actual Injury. .................................................. 26
            (b) Cutler's use of "probabilities" is a not a legally sufficient basis to establish class member injury. ............................................... 27
            (c) Cutler does not establish the requisite causal link between

Defendants' actions and class members' harm. ............................ 27

B.    Plaintiff's Response..................................................................... 28

1.    Plaintiff presents more than sufficient evidence of class member harm..... 28

(a)    Losing a kidney offer well exceeds what is required to show concrete harm. ...................................................................... 28

2.    Plaintiff presents evidence proving traceability. ......................................... 30

C.    Defendants' Reply......................................................................... 31

VI.    ARGUMENT NO. 3 .......................................................................... 33

A.    Defendant's Argument .................................................................. 33

1.    Record Evidence Proves Class Members Did Not Incur Actual Injury as a Result of Defendants' Actions. ...................................................... 33

(a)    Cutler affirmatively establishes that a significant percentage of class members were not harmed. ........................................... 34

(b)    Independent of Cutler's analysis addressed above, record evidence highlights that class members did not incur actual injury as a result of Defendants' actions................................................... 35

B.    Plaintiff's Response..................................................................... 42

1.    Cutler's model quantifies harm in the form of missed kidney offers; it does not negate other forms of harm. ...................................... 42

2.    Record evidence does not disprove Article III standing. ............................ 42

C.    Defendants' Reply......................................................................... 45

D.    Defendants' Argument: Delayed Registration and/or Delayed Accrual of Wait time Credit Does Not Constitute Concrete Injury. ........................................... 46

E.    Plaintiff's Response..................................................................... 47

F.    Defendants' Reply......................................................................... 47

G.    Defendants' Argument: Making It Harder for Patients to Reach the 20 mL/min Threshold Is Not Concrete Injury................................................................. 48

H.    Plaintiff's Response..................................................................... 51

1.    Students for Fair Admissions ................................................. 51

2.    Monterey Mechanical and Chattopadhyay.................................. 52

I.    Defendants' Reply......................................................................... 54

J.    Defendants' Argument: The OPTN Wait Time Modification Policy Further Undercuts Plaintiff's Contention that Class Members Were Harmed. ................... 55

K.    Plaintiff's Response..................................................................... 55

L.    Defendants' Reply......................................................................... 56

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Angelucci v. Century Supper Club*,
41 Cal. 4th 160 (2007)...................................................................................................2, 18

*Barr v. Am. Ass'n of Political Consultants, Inc.*,
591 U.S. 610 (2020) ............................................................................. 22, 51, 53, 54

*Bras v. Cal. Pub. Utils. Comm'n*,
59 F.3d 869 (9th Cir. 1995)..................................................................................52, 54

*Brown v. Board of Education*,
347 U.S. 483 (1954) ....................................................................................*passim*

*Cent. Delta Water Agency v. United States*,
306 F.3d 938 (9th Cir. 2002)................................................................................ 20

*Chattopadhyah v BBVA USA*,
2021 WL 4958850 (9th Cir. Oct. 26, 2021) ......................................... 50, 53, 54

*Evenchik v. Avis Rent a Car System, LLC*,
2013 WL 12415798 (S.D. Cal. Sept. 27, 2013) ......................................................... 47

*Missouri ex rel. Gaines v. Canada*,
305 U.S. 337 (1938) .............................................................................................. 51

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ...........................................................................................23, 25

*Healy v Milliman, Inc.*,
164 F.4th 701 (9th Cir. 2026)...................................................................*passim*

*Heckler v. Mathews*,
465 U.S. 728 (1984) .............................................................................................*passim*

*Jones v. Kehrlein*,
49 Cal. App. 646 (1920)....................................................................................3, 5

*Koire v. Metro Car Wash*,
40 Cal. 3d 24 (1985)...........................................................................................47

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ...........................................................................................27, 48

*McLaurin v. Oklahoma State Regents for Higher Ed.*,
339 U.S. 637 (1950) .............................................................................................51

DEFENDANTS CEDARS-SINAI MEDICAL CENTER AND UNITED NETWORK FOR ORGAN SHARING'S
JOINT MOTION FOR SUMMARY JUDGMENT REGARDING STANDING FOR CLASS MEMBERS

*Molski v. M.J. Cable, Inc.*,
  481 F.3d 724 (9th Cir. 2007) ................................................................................................ 47

*Monterey Mech. Co. v Wilson*,
  125 F.3d 702 (9th Cir. 1997) ................................................................................. 50, 52, 54

*Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*,
  508 U.S. 656 (1993) ....................................................................................................*passim*

*Opiotennione v. Facebook, Inc.*,
  2020 WL 5877667 (N.D. Cal. Oct. 2, 2020) ..................................................................... 2, 18

*Pharm. Rsch. & Manufacturers of Am. v. Dep't of Health & Hum. Servs.*,
  656 F. Supp. 3d 137 (D.D.C. 2023) ................................................................................ 27, 29

*Popa v. Microsoft Corp.*,
  153 F.4th 784 (9th Cir. 2025) ......................................................................................*passim*

*Preston v. Heckler*,
  734 F.2d 1359 (9th Cir. 1984) ......................................................................................... 29, 32

*Revive Investing LLC v. Armistice Cap. Master Fund, Ltd.*,
  2023 WL 5333768 (D. Colo. Aug. 18, 2023) ........................................................................ 5

*S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co.*,
  690 F.2d 1235 (9th Cir. 1982) .............................................................................................. 20

*Shrimpers & Fishermen of RGV v. Texas Comm'n on Env't Quality*,
  968 F.3d 419 (5th Cir. 2020) ................................................................................. 27, 29, 32, 33

*Soule v. Connecticut Ass'n of Schools, Inc.*,
  90 F.4th 34 (2d Cir. 2023) (en banc) ................................................................... 21, 24, 51

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ....................................................................................................*passim*

*Sprint Commc'ns Co. v. APCC Servs., Inc.*,
  554 U.S. 269 (2008) ............................................................................................................. 55

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*,
  600 U.S. 181 (2023) ....................................................................................................*passim*

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ........................................................................................ 27, 29, 32, 49

*Suttles v. Hollywood Turf Club*,
  45 Cal. App. 2d 283 (1941) ............................................................................................... 3, 5

*TransUnion v. Ramirez*,
  594 U.S. 413 (2021) ....................................................................................................*passim*

DEFENDANTS CEDARS-SINAI MEDICAL CENTER AND UNITED NETWORK FOR ORGAN SHARING'S
JOINT MOTION FOR SUMMARY JUDGMENT REGARDING STANDING FOR CLASS MEMBERS

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) ................................................................................................ 1

*Van v. LLR, Inc.*,
    962 F.3d 1160 (9th Cir. 2020) ............................................................................. 55

*White v. Square, Inc.*,
    891 F.3d 1174 (9th Cir. 2018) ............................................................. 20, 22, 53, 54

*Winter v. Resurgent Cap. Servs. L.P.*,
    2023 WL 3431215 (D.N.J. May 12, 2023) ........................................................... 5

**Statutes**

42 U.S.C. § 3604(d) ................................................................................................ 25

Americans With Disabilities Act ............................................................................ 47

Civil Rights Act of 1964 Title VI .................................................................... 5, 53

Fair Credit Reporting Act ................................................................................ 15, 48

Unruh Civil Rights Act ................................................................................... *passim*

**Other Authorities**

CACI No. 3060 ....................................................................................................... 53

Fed. R. Civ. P. 26(a) .............................................................................................. 43

Fed. R. Civ. P. 37(c)(1) ......................................................................................... 43

Fed. R. Evid. 901 ................................................................................................... 43

Fed. R. Evid. 1002 ................................................................................................. 43

KDIGO, *Transplant Candidate* (Apr. 13, 2026), [https://perma.cc/QPX9-5XLJ] ...................... 38

Lara C. Pullen, *Discarding Kidneys: Can We Do Better?*, 19 Am. J.
    Transplantation 3215, 3215-16 (2019), [https://perma.cc/58FK-LYZB] .............................. 32

U.S. Const. amend. XIV, § 1 ......................................................................... 5, 52, 53

U.S. Const. art. III ........................................................................................ *passim*

## I.   INTRODUCTION

### A.   Defendants' Introduction

Consistent with the Court's order dated March 25, 2026 (Dkt. 253), Defendants move for summary judgment on the grounds that class members do not have Article III standing.  Notably, members of the certified classes have not yet been fully identified.  Nevertheless, as discussed below, there is no record evidence demonstrating that any class member suffered concrete injury traceable to the conduct of either of these two Defendants.  Accordingly, Defendants are entitled to summary judgment as to all class members.

Alternatively, although it is Plaintiff's burden to prove the existence of Article III standing—which he has failed to do—Defendants nevertheless provide evidence affirmatively showing the lack of Article III standing for a large percentage of class members.  At a minimum, Defendants are entitled to summary judgment as to the specifically identified class members.

The Supreme Court has made clear that "every class member must have Article III standing in order to recover individual damages. 'Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not.'"  *TransUnion v. Ramirez*, 594 U.S. 413, 431 (2021) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016)).  As the party invoking federal jurisdiction, Plaintiff bears the burden of demonstrating standing.  *Id.* at 430–31.

This Court previously rejected Plaintiff's argument that neither he nor class members need to show actual harm.  The Court held that "proof of a violation of the Unruh Act still requires a causal link between the alleged violation and some 'injury, damage, loss, or harm' suffered." (SUMF ¶ 2, Dkt. 244, 23:17–19.)  "Alleging a violation of the Unruh Act requires a showing that 'a [defendant's] conduct was a substantial factor in causing [the plaintiff's] harm." (SUMF ¶ 3, Dkt. 244, 23:11–13.)  The court held that "Cutler's methodology cannot be used—on its own—to allocate any harm experienced to any particular Defendant." (SUMF ¶ 4, Dkt. 241:12, n.5.)  The court recognized Cutler's expert opinions do not "even attempt to reflect individual harms done by Cedars-Sinai and/or UNOS; instead, the methodology merely appears to compare the actual world against one in which Black patients are not subject to a race-conscious coefficient from anyone, not just Defendants." (SUMF ¶ 5, Dkt. 241:12, n.5.)

Plaintiff contends that he and all members of the certified classes were harmed when they purportedly were forced to compete for donated kidneys on an uneven playing field because they are Black.  The law, however, does not support Plaintiff's position. Article III requires that the injury sustained by class members must be "real, and not abstract."  *TransUnion*, 594 U.S. at 423. Additionally, concrete injury must have been "likely caused by the defendant." *Id.*  Competition, especially successful competition, is not harm.

The Supreme Court expressly rejected the proposition that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.  Article III standing requires a concrete injury even in the context of a statutory violation. This standard applies to Unruh Act claims pending in this court. *Opiotennione v. Facebook, Inc.*, 2020 WL 5877667, at *4 (N.D. Cal. Oct. 2, 2020) ("[W]hile the Unruh Act renders arbitrary sex discrimination by businesses . . . per se injurious, it still requires allegations of injury." (quoting *Angelucci v. Century Supper Club*, 41 Cal. 4th 160, 174 (2007))).

Class members lack evidence demonstrating concrete actual injury traceable to Cedars or UNOS.

### B.    Plaintiff's Introduction

Defendants seek to revive *Plessy v. Ferguson*'s shameful argument that disparate treatment based on race is not inherently harmful. They are not so bold as to quote *Plessy*, but they are so bold as to argue "making it harder for Black patients to reach the 20 mL/min threshold is not concrete actual injury." Motion at 21. This is remarkable—Defendants admit the race-based coefficient made it harder for Black patients to qualify for the kidney waitlist but argue the law does not recognize this as an actionable harm.

Defendants cite *TransUnion LLC v. Ramirez* for the proposition that when determining whether harm is concrete, the Court should consider whether the harm "has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." 594 U.S. 413, 424 (2021). To say that courts do not recognize discrimination as a traditional form of harm, Defendants must ignore more than 100 years of law. Even before the Supreme Court overturned

2

*Plessy*—indeed, even before the end of institutional Jim Crow segregation—California's courts had identified racial discrimination as inherently harmful under the Unruh Act. *See, e.g.*, *Jones v. Kehrlein*, 49 Cal. App. 646, 651 (1920) (segregated seating policy found "illegal and void"); *Suttles v. Hollywood Turf Club*, 45 Cal. App. 2d 283, 287 (1941) (policy banning Black citizens from entering a club house was "clearly a violation of the statute"). In the 70 years since the Supreme Court repudiated *Plessy* with *Brown v. Board of Education*, 347 U.S. 483, 495 (1954), the Court has confirmed, time and again, the obvious proposition that race discrimination is harmful in and of itself. *See Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984) ("Discrimination itself . . . can cause serious non-economic injuries to those persons who are denied equal treatment solely because of their membership in a disfavored group."); *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 214 (2023) ("*SFFA*") ("racial discrimination is invidious in all contexts") (cleaned up).

Defendants' support for undoing this key principle is that a case about errors in credit reports somehow overturned decades of landmark discrimination decisions. That borders on frivolous, but this case does not rise and fall with the intrinsic harms caused by racial discrimination. Defendants ignore evidence proving the race-based coefficient caused serious clinical consequences for Black patients.

UNOS's former president, doctor Matthew Cooper, testified the date of the first score that would have qualified Black patients to accrue wait time but for the race adjustment is the "best objective measurement" of the delay caused by the race-based coefficient. Plaintiff's Statement of Additional Facts ("PAF") No. 22 (Cooper Depo. at 72:14–24). Every class member suffered this delay because the California Class and Cedars Class include only Black patients with such scores. This is not just intrinsic or stigmatic harm, or an uneven playing field, which would be sufficient for standing; it is quantifiable delay in qualifying to accrue wait time for the kidney waitlist because of race.

Moreover, for a large percentage of the class members, Professor David Cutler's model demonstrates that but for the race-based coefficient, they would have received additional kidney

DEFENDANTS CEDARS-SINAI MEDICAL CENTER AND UNITED NETWORK FOR ORGAN SHARING'S JOINT MOTION FOR SUMMARY JUDGMENT REGARDING STANDING FOR CLASS MEMBERS

offers. Not only were these class members' accruals of wait time delayed, but that delay is also directly tied to losing out on kidney offers. Harm could not be more concrete.

Nor is there any question this harm is traceable to Defendants. UNOS manages the kidney waitlist nationwide, necessarily including patients at every California transplant hospital. UNOS is the entity that conducted site visits to confirm California transplant hospitals used "Black values" for Black patients and knowingly used race-impacted wait time data when awarding kidney offers. And, as to the Cedars Class, every member of that class encountered Cedars's race-based admissions policies because that class includes only Black patients that were ultimately registered on the kidney waitlist by Cedars.

The Motion should be denied.

**C.** **Defendants' Reply**

"[U]nder Article III, an injury in law is not an injury in fact." *TransUnion*, 594 U.S. at 427. A key legal issue for the Court is what is required to demonstrate that every class member "suffered an injury in fact that is concrete, particularized, and actual or imminent." *Id*. at 423.

Plaintiff argues, "the use of the race-based coefficient made Black patients compete on an uneven playing field. That is itself cognizable harm" and "[p]atients with zero [kidney] offers still suffered harm." *See infra*, § II.E. That is incorrect. *TransUnion* holds: "Central to assessing concreteness is whether the asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts—such as physical harm, monetary harm, or various intangible harms including (as relevant here) reputational harm." *TransUnion*, 594 U.S. at 417. Competing on an uneven playing field or making it harder to reach an eGFR of 20— with no ***actual impact*** on the patient or the patient's ability to obtain a kidney—is not "harm." Competition that does not cause injury is not "harm traditionally recognized in common law." *Successfully competing* has never been recognized as actual concrete injury. Receiving a kidney notwithstanding it having been "harder" to reach 20 mL/min, is not actual, concrete injury. There is no common law analogue for statutory damages plaintiff seeks under the Unruh Act. This is a question of law for the Court. This is not a factual dispute.

DEFENDANTS CEDARS-SINAI MEDICAL CENTER AND UNITED NETWORK FOR ORGAN SHARING'S JOINT MOTION FOR SUMMARY JUDGMENT REGARDING STANDING FOR CLASS MEMBERS

Plaintiff cites pre-*TransUnion* cases and asks the Court to ignore that *TransUnion* changed the law. *Healy v Milliman, Inc.*, 164 F.4th 701, 708 (9th Cir. 2026) ("[N]early all of the cases Healy cites predate *TransUnion* and therefore have since been abrogated"); *Popa v. Microsoft Corp.*, 153 F.4th 784, 788 (9th Cir. 2025) ("The Supreme Court has, in recent years, made the concrete injury' requirement 'even more definite'").[1]  Article III standing was not discussed in *Brown v. Board of Education*, 347 U.S. 483, 495 (1954) (decided 67 years before *TransUnion*), where students suffered actual concrete harm because they were denied admission. *Heckler v. Mathews*, 465 U.S. 728, 738 (1984) (decided 37 years before *TransUnion*), involved social security benefits, plaintiff had standing because "as a nondependent man, he receives fewer benefits than he would if he were a similarly situated woman."  Plaintiff quotes *Heckler* that discrimination "can cause serious non-economic injuries to those persons who are denied equal treatment."  That discrimination **can** cause harm—i.e., there is a risk of harm, is not enough. *TransUnion*, 594 U.S. at 417.  Article III standing exists only where risk ripens into actual, concrete harm, which must be established for every class member. *Id.*  The sole standing case Plaintiff cites decided after *TransUnion* is *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.* ("*SFFA*"), 600 U.S. 181, 214 (2023). An organization filed suit against Harvard and the University of North Carolina ("UNC") arguing their race-based admissions programs violated Title VI of the Civil Rights Act of 1964 and the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 197.  UNC argued SFFA lacked standing because it was not a "genuine" membership organization. *Id.*  No one disputed, however, that the students represented by SFFA suffered concrete injuries when denied admission. *Jones v. Kehrlein*, 49 Cal. App. 646, 651 (1920), and *Suttles v. Hollywood Turf Club*, 45 Cal. App. 2d 283, 287 (1941), were filed in state court, where there is no requirement that plaintiff establish Article III standing.

Even assuming each class member has presented evidence of "actual harm"—which they have not—each class member also must present evidence that their injury "was likely caused by the

---

[1] *See also Winter v. Resurgent Cap. Servs. L.P.*, 2023 WL 3431215, at *3 (D.N.J. May 12, 2023) ("[T]he legal landscape for Article III standing changed after *TransUnion* . . ., where the Supreme Court determined that plaintiffs must show more than a statutory violation to establish Article III standing."); *Revive Investing LLC v. Armistice Cap. Master Fund, Ltd.*, 2023 WL 5333768, at *4 (D. Colo. Aug. 18, 2023) ("In the aftermath of *TransUnion*, the legal landscape of standing has shifted. Before *TransUnion*, courts routinely held that Congress, by statute, can create rights that would not otherwise exist and that infringement of those rights is a sufficient injury to permit standing to sue in federal court.").

DEFENDANTS CEDARS-SINAI MEDICAL CENTER AND UNITED NETWORK FOR ORGAN SHARING'S JOINT MOTION FOR SUMMARY JUDGMENT REGARDING STANDING FOR CLASS MEMBERS

defendant." *TransUnion*, 594 U.S. at 423.  Actual concrete harm does not satisfy the requirement for standing unless the harm is traceable to the defendants. *Id.*  Plaintiff fails to present any evidence linking class members' purported injury to Defendants' actions.

Plaintiff's citation to Dr. Cooper's testimony completely misses the mark.  At no point in his expert report or deposition testimony did Dr. Cooper link the existence of class members' "straddling scores" to Cedars' or UNOS's actions.  And other than Plaintiff's speculation regarding the purported delayed referral for Randall, Plaintiff offers no evidence regarding any purported delayed referral for any Class Member.  Plaintiff does not identify the referring physician for any class member, let alone provide evidence that any of the unidentified referring physicians delayed any class member's referral to a transplant hospital because of a Cedars or UNOS policy.

Plaintiff's reliance on Dr. Cutler is equally misplaced.  First, Cutler admits his model does not establish whether any class member, let alone all class members, would have received a transplanted kidney any sooner in his "but for" world.  (SUMF ¶¶ 7–10, Dkt. 79-39.)  Relatedly, Cutler "cannot say for certain that a particular Black patient would receive a kidney."  (SUMF ¶ 8.)  Delay in wait-time accrual is not actual harm if it does not change a kidney offer.  And, in any event, Cutler does not establish the causal link between any purported injury *traceable to Cedars or UNOS*.  (SUMF ¶ 11, Dkt. 241:12, n.5.)  Plaintiff provides no other evidence to establish a causal link.[2]

## II.    PLAINTIFF'S FACTUAL BACKGROUND[3]

### A.    The race-based coefficient constitutes disparate treatment based on race, supported only by offensive racial stereotype.

The Court made these factual findings when ruling on Defendants' summary judgment motion as to Mr. Randall:

> The use of race in both formulas stems from a "race-based coefficient" first developed in 1999, following research that suggested that calculations to determine Black patients' eGFR should be increased by 21%. Following this, the majority of the nephrology community adopted the MDRD test, which employed the race-

---

[2] At minimum, Plaintiff's contention that he has established standing for only a "large percentage of the class members," *supra* at § I.B, concedes that the Motion must be granted as to at least some Class Members. Plaintiff bears the burden of establishing standing for every Class Member, *TransUnion*, 594 U.S. at 430–31, not merely a subset of the Class.

[3] Defendants' opening summary judgment briefing does not contain a factual background section. Plaintiff submits this section to give appropriate context to his arguments in opposition to Defendants' motion.

DEFENDANTS CEDARS-SINAI MEDICAL CENTER AND UNITED NETWORK FOR ORGAN SHARING'S JOINT MOTION FOR SUMMARY JUDGMENT REGARDING STANDING FOR CLASS MEMBERS

based coefficient. In 2009, the CKD-EPI test was developed, which similarly used a race-based coefficient—increasing Black patients' calculated eGFR scores by 16%.

ECF No. 244 at 8 (internal citations omitted); *see also* PAF No. 4.

The Court thus already determined the race-based coefficient is definitionally discriminatory, and the evidence further shows it was based on the racial stereotype that "black persons have greater muscle mass than white persons[.]" PAF No. 1.

Neither the MDRD nor the CKD-EPI accurately assesses kidney function, and recent scholarship suggests both tests perform better without the race-based coefficient. PAF No. 5. That the race-based coefficient discriminatorily treated Black patients worse without any scientific backing was readily apparent dating back to its creation in 1999. PAF No. 6. Dr. Herbert Y. Lin, a Harvard nephrology professor and Massachusetts General Hospital nephrologist, summarized:

It is fair to say that I now have the benefit of hindsight; nonetheless, if I were the reviewer of this paper in 1999, I would have rejected the paper based on the sloppy justification for the use of a race-based coefficient. As noted above, I would have been highly troubled by the apparent implication of ugly, centuries-old stereotypes about Black people, with no serious science being offered in support of their hypothesis that Black persons have larger muscles.

*Id*. But the original authors neglected to interrogate the assumptions underlying the MDRD. Two coauthors admitted they never even read the studies supporting the proposition that Black people have greater muscle mass than White people. PAF No. 2. Worse, one of those coauthors confirmed the team behind the test did nothing to confirm that hypothesis. *Id*. Despite its reliance on junk science, the nephrology community embraced the MDRD test and the 21% race-based coefficient as the standard for estimating GFR scores. PAF No. 3.

Moreover, Dr. Andrew Sharp, professor of genetics and genomic sciences at the Icahn School of Medicine at Mount Sinai, explained that the authors of the race-based coefficient failed to grapple with then-current understandings that race is neither biologically relevant nor a medically useful tool. PAF No. 7 ("[I]t is my opinion that at the time of the creation of [the MDRD and CKD-EPI], established and considerable scientific research cast doubt on the usefulness of race as a

DEFENDANTS CEDARS-SINAI MEDICAL CENTER AND UNITED NETWORK FOR ORGAN SHARING'S JOINT MOTION FOR SUMMARY JUDGMENT REGARDING STANDING FOR CLASS MEMBERS

biological variable."). In summary, there was never any scientific justification for Defendants' disparate treatment of Black patients via the race-based coefficient.[4]

      **B.**      **Defendants maintained a policy and practice of using the race-based coefficient to create a race-based admissions standard for the national kidney transplant waitlist.**

UNOS policy required transplant hospitals using the MDRD or CKD-EPI to enter the race-adjusted GFR scores (the "Black value") into UNet for Black patients. UNOS conducts a site visit to each transplant hospital every three years where UNOS examines medical records and confirms that the reported GFR scores match the patient's race. PAF No. 9 (citing ECF No. 149-84 (Smith Depo. at 15:19–16:1) ("[A] site visit is where UNOS personnel will visit transplant hospitals to do an evaluation . . . to determine if the medical record data that is contained in the patient's individual medical file has been accurately keyed into the UNet system[.]")). One UNOS employee stated one of the purposes of monitoring transplant hospitals was to make sure they were using the race-based coefficient for Black patients:

**From:** Nicole Benjamin <Nicole.Benjamin@unos.org>
**Sent:** Tuesday, April 7, 2020 12:02 PM
**To:** Kiana Stewart <Kiana.Stewart@unos.org>; Leah Slife <Leah.Slife@unos.org>
**Cc:** Tina Rhoades <Tina.Rhoades@unos.org>
**Subject:** RE: eGFR and race

I don't think there is a biracial box. I can't get into help documentation right now, but I think its just the 2 options. If they document that the candidate is AA then they need to use the AA value. We don't have guidance on if a biracial candidate should be listed as AA or non-AA. That would be a question for the KI committee. Does that make sense?

---

**From:** Kiana Stewart <Kiana.Stewart@unos.org>
**Sent:** Tuesday, April 7, 2020 11:42 AM
**To:** Nicole Benjamin <Nicole.Benjamin@unos.org>; Leah Slife <Leah.Slife@unos.org>
**Cc:** Tina Rhoades <Tina.Rhoades@unos.org>
**Subject:** RE: eGFR and race

Hi Nicole,
Thanks for the response. So when you look at the chart to see if they are or aren't African American does that mean that as long as that box isn't checked (because they checked the biracial box instead) than they aren't expected to use the eGFR value associated with African Americans?

---

[4] As early as 2012, The College of American Pathologists described the use of race as a "drawback," in part because of "limited guidance on what to report for mixed-race populations or when to consider an individual as African American or not." PAF No. 8 (2012 Estimated Glomerular Filtration Rate (eGFR) and Renal Function article excerpt).

8

DEFENDANTS CEDARS-SINAI MEDICAL CENTER AND UNITED NETWORK FOR ORGAN SHARING'S JOINT MOTION FOR SUMMARY JUDGMENT REGARDING STANDING FOR CLASS MEMBERS

*Id*. (citing ECF No. 149-87 (Poff Depo Ex. 92) (further stating "If they document that the candidate is AA then they need to use the AA value.")). On at least one occasion, UNOS cited a transplant hospital because the reported GFR score did not match the patient's race. PAF No. 10.

UNOS also knew that transplant hospitals used the race-based coefficient because, again, for decades, the federal government entrusted UNOS with policymaking and oversight authority over organ allocation. PAF No. 11 (citing Jacobs Report, Ex. 5 (To the Senate Finance Committee, UNOS explained, "We develop, implement, and monitor equitable organ allocation policies")). UNOS executives and board members are transplant professionals that used or knew of the race-based coefficient from their own medical practices. PAF No. 12 (Former UNOS president: "In accordance with accepted standards of care, as well as recommendations of the American Society of Nephrology, the National Kidney Foundation, and key opinion leaders in the field of transplant nephrology, I, along with the kidney transplant programs that I led, consistently utilized the MDRD eGFR calculator[.]"); former UNOS board member: "Q: Do you remember how you first became aware that a race-based coefficient existed in regard to measuring eGFR for kidney scores generally? A. I've known about that for a long time.").

Contemporaneous documents further show that on July 10, 2019, unprompted, UNOS policy staff emailed an article questioning the use of the coefficient. PAF No. 13. Nothing was done to address the race-based coefficient then, but there was some discussion around it. PAF No. 14 (Internal UNOS email stated "This was discussed by research and PCR back in July. The conversation sort of fizzled out after a bit[.]"). That discussion fizzled out in the policy department of UNOS's Roger Brown—the same Roger Brown who testified that he cares more about pets than equitable access to healthcare for Black patients, and who admitted he was not personally interested in providing Black persons equitable access to transplants. PAF No. 15.

Knowing that—consistent with UNOS requirements—transplant hospitals entered race-adjusted GFR scores into UNet, UNOS knowingly used the race-adjusted data in UNet to generate match runs. PAF No. 16 (UNOS employee provided declaration stating the following: "My investigation indicates that more than 19,500 kidney transplant match runs were generated in 2023

DEFENDANTS CEDARS-SINAI MEDICAL CENTER AND UNITED NETWORK FOR ORGAN SHARING'S JOINT MOTION FOR SUMMARY JUDGMENT REGARDING STANDING FOR CLASS MEMBERS

alone. . . . Extrapolating those numbers over a multi-year period would increase the numbers significantly.").

As to Cedars, Dr. Irene Kim, the Director of Cedars' Comprehensive Transplant Center, admitted in August 2021 that Cedars used the race-based coefficient. PAF No. 17 (Document attached to Dr. Kim's email states, "**At Cedars-Sinai, we are still using the black race coefficient**, although we are changing this policy for entry due to my initiative.") (emphasis added). Dr. Kim testified Cedars' policy of using the race-based coefficient did not change until July 2022, when formally banned by UNOS. PAF No. 18. Cedars' Quality Manager testified consistently: "Q: While you have served and been employed at Cedars-Sinai, has Cedars-Sinai used the race-based coefficient when calculating Black patients' eGFR scores? A. Yes." *Id*. Dr. Kim later confirmed that Cedars used eGFR scores to determine whether a patient qualifies for the kidney transplant waitlist. PAF No. 26 ("Well, from our viewpoint, as a transplant center, we are just seeing that this GFR is a qualifying GFR for kidney transplant listing. . . . That's all we care about."). Cedars's kidney transplant manager, Margaret Farrell, declared "[u]ntil July 2022, it was Cedars-Sinai's practice when registering Black patients on the national kidney waitlist, that if their medical records reflected an eGFR score and an eGFR AA score, Cedars-Sinai would enter the eGFR AA score into UNET." PAF No. 29. Besides Dr. Kim's and Ms. Farrell's testimony, Cedars's kidney transplant selection criteria authorized consideration of the MDRD, which, for Black patients, definitionally included a race-based coefficient. PAF No. 30. Indeed, review of a sample of Cedars's Black patients reveals abundant use of the race-based coefficient for Black patients. PAF No. 31.

**C.    Every class member, by definition, encountered Defendants' use of the race-based coefficient.**

On March 25, 2026, the Court certified two classes:

**California Class:** Black kidney disease patients registered on the national kidney transplant waitlist at California transplant hospitals, from 2000 to the present, that received or would have qualified for a wait time adjustment because a lab test shows that with a race-inclusive calculation, the candidate's eGFR was over 20 mL/min, but with a race-neutral calculation it would have been 20 mL/min or less, given that the patients received a delay in their accrual of wait time, attributable to the race-conscious coefficient. Excluded from this class is any person filing an individual personal injury or wrongful death action.

DEFENDANTS CEDARS-SINAI MEDICAL CENTER AND UNITED NETWORK FOR ORGAN SHARING'S
JOINT MOTION FOR SUMMARY JUDGMENT REGARDING STANDING FOR CLASS MEMBERS

**Cedars Class:** Black kidney disease patients registered on the national kidney transplant waitlist at Cedars-Sinai Medical Center, from 2000 to the present, that received or would have qualified for a wait time adjustment because a lab test shows that with a race-inclusive calculation, the candidate's eGFR was over 20 mL/min, but with a race neutral calculation it would have been 20 mL/min or less, given that the patients received a delay in their accrual of wait time, attributable to the race-conscious coefficient. Excluded from this class is any person filing an individual personal injury or wrongful death action.

ECF No. 253 at 20.

To be a member of either class, one must be a Black kidney disease patient whose eGFR score was adjusted in a manner that rendered the patient ineligible for the kidney waitlist because of race. As to the California Class, UNOS required use of the race-based coefficient for every transplant hospital in California that uses an equation that includes the coefficient. PAF No. 9. And, as to the Cedars Class, every class member was subject to Cedars' race-based admissions policy because they applied to be added to the kidney waitlist through Cedars. *See supra*, Section II(B). In this way, every class member is similarly situated to Mr. Randall, who this Court held provided sufficient evidence of traceability to survive summary judgment. ECF No. 244, 12–13 ("[Plaintiff] argues that UNOS's practice was to permit transplant hospitals to accept scores calculated with the race coefficient, and that Cedars-Sinai was among the transplant hospitals that did so. Because Randall produces sufficient evidence to substantiate this argument, Defendants' summary judgment motion on the basis of standing must be and is denied.").

**D.**     **While not required for Article III standing, Professor Cutler's model shows Defendants' use of the race-based coefficient deprived class members of kidney offers.**

Cutler created a model to measure the *frequency* in which the race-based coefficient harmed Black patients. To do this, Cutler created a but-for world where UNOS's new race-neutral policy was in place from the time the race-based coefficient was created. PAF No. 21 (Cutler Report §§ III–IV). Cutler retroactively implemented wait time adjustments for Black patients receiving or qualifying for adjustments, and re-ran match runs to determine what would have happened if eGFR scores were measured in a race-neutral manner from the beginning. *Id*.

Cutler then analyzed the data using four metrics, each intended to capture match runs where

11

class members would have a realistic chance of being offered a kidney: (1) the number of times a class member moved into the top 7 or top 50 of the match rank distribution; (2) the number of times the class member would have been placed on the match list at a higher rank than a person who received a donor kidney; (3) the number of times a class member would have placed high enough to be offered a kidney with certainty; and (4) the expected number of kidney offers a person would have received. ECF No. 149-51 ¶ 8. The results were staggering.

- For all California transplant hospitals, the average class member would move into the top 7 of the rankings 2.7 times and the top 50 a total of 16.3 times. For Cedars patients, the average class member would move into the top 7 of the rankings 1.3 times and the top 50 a total of 13.7 times.

- For all California transplant hospitals, the average class member would move above the person in the match run that actually received the kidney 75 times. For Cedars patients this average is 57 times.

- For all California transplant hospitals, 30% of the average class members would move high enough in a match run that it is certain they would be offered a kidney. For Cedars patients this number is 38%.

- For all California transplant hospitals, the average class member would be offered a total of 71 kidneys. For Cedars patients this number is 54 kidneys.

*Id*. (Cutler Report Exs. 7 & 8).

Cutler's model reveals not only substantial clinical consequences for Black kidney disease patients, but that the harm is frequently reoccurring, with class members missing out on kidney offers over and over again. As demonstrated in Exhibit 8 of Cutler's Report, 888 identified class members were deprived of an estimated 63,048 kidney offers (multiplying 888 individuals by 71 average anticipated kidney offers). *Id*. (Cutler Report Ex. 8.) This amounts to approximately 70% of the California class.

### E.    Patients with zero offers still suffered harm.

As a general matter, the use of the race-based coefficient made Black patients compete on an uneven playing field. That itself is cognizable harm. As Cutler states, "[o]ther than the fact that the wait time adjustment differs across individuals, the individuals here are all treated identically, and suffer the same type of injury, even if in different magnitudes." *Id*. (Cutler Report ¶ 25). UNOS's ex-president and expert witness for UNOS in this case, Dr. Matthew Cooper, agrees:

Q. So having one qualifying score, to use your words, was a measurable and

12

objective metric that could be used. Is that fair?

A. That's correct. That was the, again, the change in the policy that we could expect transplant centers could do the work to be able to have data that could be entered into the change form and then could be evaluated by the UNOS monitors that we spoke about earlier.

Q. And that metric was used as a best approximation for the extent to which black patients were impacted by the race-based coefficient. Would you agree with that?

A. Again, it was the best -- it still is *the best objective measurement, which is ultimately how we assign prioritization on a deceased donor waitlist is a GFR, whether measured or estimated*.

PAF No. 22 (emphasis added).

UNOS admissions further reveal the harmful nature of the race-based coefficient. A March 29, 2021 UNOS committee workgroup dubbed Reassess Race in Estimated Glomerular Filtration Rate (eGFR) Calculation stated "[t]here are a number of consequences to utilizing race coefficients in eGFR equations, including: . . . racial disparities involved in preemptive wait-listing and deceased donor kidney transplant." PAF No. 23. Chair of that UNOS committee and Cedars expert witness, Dr. Irene Kim, explained that in 2021 "there were concerns that because these equations are based on race, which is a social construct, that preemptive listing time could be impacted." PAF No. 24. And a June 28, 2022 UNOS press release stated "in organ transplantation, [the race-based coefficient] may have negatively affected the timing of transplant listing or the date at which candidates qualify to begin waiting time for a transplant." PAF No. 25. These admissions, made long before this litigation began and in direct contradiction to UNOS's and Cedars's arguments, demonstrate that encountering the race-based coefficient made it more difficult for Black patients to begin accruing wait time.

The Court should accept Dr. Cooper's own statement and find that encountering the race-based coefficient is the "best objective measurement" of harm, even if those patients would not have received a kidney offer in Dr. Cutler's model.

## III. DEFENDANTS' REPLY TO "PLAINTIFF'S FACTUAL BACKGROUND"

Plaintiff argues Cutler's model identifies 888 class members who were deprived of kidney

13

offers.[5]  Cutler applied his methodology to 1,109 Black patients and of those 1,109, Cutler concedes **222 did not match in any match runs**.  (SUMF ¶ 16, Dkt. 79-39 ¶ 60.)  Cutler's report shows **an additional 103 class members who would not have been offered any kidneys**. (SUMF ¶ 18).  With at least these 325 patients who would have received zero kidney offers, Plaintiff argues "Patients with zero offers still suffered harm."  This is an issue of law, not a dispute of fact.  Competing on an uneven playing field is abstract and does not constitute actual, concrete harm.

As to the other 785 Class Members (the 888 considered by Cutler minus the 103 whom his model shows would have received no offers), Cutler's "but for" world does not take into account the *undisputed fact* that "Delay in registration and delay in accrual of wait time occurs for reasons completely unrelated to GFR scores, including BMI, substance use, active infections, cancer history, patient non-compliance with testing requirements, and failure to complete required medical evaluations."  (SMUF ¶ 40.)  Cutler's opinion that 785 Class members would have received one or more offers **does not trace the alleged harm to the Defendants**. (Dkt. 241:12, n 5.)

Dr. Kim's testimony that Cedars was "still using the race coefficient" for *some* patients is not evidence Cedars used the race-based coefficient for *all* Cedars Class members.  Plaintiff offers no evidence to demonstrate for which class members Cedars used the race-based coefficient.  Plaintiff argues, "To be a member of either class, one must be a Black kidney disease patient whose eGFR score was adjusted in a manner than rendered the patient ineligible for the kidney waitlist because of race."  *See supra*, § II.C.  Plaintiff argues, "as to the Cedars Class, every class member was subject to Cedars' race-based admissions policy because they applied to be added to the kidney waitlist through Cedars." *See supra*, § II.C. Plaintiff's argument is inconsistent with the undisputed evidence.  Kidney transplant candidates start accruing wait-time credit on "The date the candidate began regularly administered dialysis . . . ."  (Dkt. 104-5:83, Waiting Time § 8.4.A(3).)  "Most patients are listed for transplantation using the dialysis pathway, in other words after starting dialysis; at this point, GFR is not relevant for transplant determinations.  If a patient is listed for transplantation using the dialysis pathway, OPTN policy in 2018 dictated that waiting time starts to

---

[5] Plaintiff asserts 888 class members is "approximately 70%" of the class.  The math doesn't work.  Plaintiff represents "the certified classes include thousands."  *See infra*, § VI.B.2. 888 is not 70% of thousands.

DEFENDANTS CEDARS-SINAI MEDICAL CENTER AND UNITED NETWORK FOR ORGAN SHARING'S JOINT MOTION FOR SUMMARY JUDGMENT REGARDING STANDING FOR CLASS MEMBERS

accrue on the day the person initiated dialysis . . . ." (Dkt. 104-56, at 7–8 ¶ 13.)  There was no entry of a GFR score for a patient who had started dialysis and no basis for Plaintiff's argument that to be a member of the Cedars Class, the patient must have been subject to a race-based admission policy by Cedars.  Unlike Randall, dialysis patients were not.

## IV.  ARGUMENT NO. 1

### A.  Defendants' Argument

#### 1.  Every Class Member Must Demonstrate Article III Standing.

##### (a)  The Supreme Court Has Made Clear That All Class Members Must Have Article III Standing.

###### (i)  *TransUnion v. Ramirez*

In *TransUnion* the Supreme Court held that class members do not have Article III standing unless they suffered a concrete harm–a mere risk of harm is not sufficient.  *TransUnion*, 594 U.S. at 417.  In *TransUnion,* a class of 8,185 individuals sued a credit reporting agency alleging violation of the Fair Credit Reporting Act ("FCRA").  Plaintiffs claimed TransUnion failed to use reasonable procedures to ensure the accuracy of their credit files.  *Id.*  For 1,853 class members, TransUnion provided misleading credit reports to third-party businesses that mistakenly identified them as being on a terrorist watch list.  The Court concluded that the referenced 1,853 class members demonstrated concrete reputational harm and had Article III standing.  The credit files of the other 6,332 class members were not provided to third-party businesses.  *Id.* at 433.  The Court concluded that these class members had not demonstrated concrete harm and lacked Article III standing.  *Id.* at 439.  In two other claims, all class members complained of formatting defects in mailings sent to them by TransUnion.  But class members other than Ramirez had not demonstrated formatting errors caused them concrete harm.  The Court held the class members, other than Ramirez, did not have standing to pursue those two claims.  *Id.* at 441–42.

The Supreme Court's review came after the Ninth Circuit ruled all 8,185 class members had standing to pursue all three claims and approved a class damages award of about $40 million. *Id.* at 418. The Court reversed because only 1,853 class members had standing to pursue the first claim and only Ramirez had standing to pursue the two formatting claims.  *Id.* at 442.  In doing so, the

15

Supreme Court reaffirmed that proving a statutory violation alone and/or a risk of harm was insufficient to establish the concrete injury needed for Article III jurisdiction. *Id.* at 429–30.

To establish standing, a litigant "must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* at 423. The Court focused on the "requirement that plaintiff's injury in fact must be 'concrete'—that is, 'real, and not abstract.'" *Id.* at 424.

The Court explained that "history and tradition offer a meaningful guide to the types of cases that Article III empowers federal courts to consider." *Id.* The obvious harms that qualify as concrete injury "are traditional tangible harms, such as physical harms and monetary harms. If a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III." *Id.* at 425. "Various intangible harms can also be concrete. Chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts. Those include, for example, reputational harms, disclosure of private information, and intrusion upon seclusion." *Id.*

Significantly, the Court held in *TransUnion* that not all intangible harms meet this requirement. *TransUnion* teaches, "courts should assess whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." *Id.* at 424. Here, the statutory violation at issue would not satisfy Article III under *TransUnion*. Using or allowing referring physicians to select a kidney test method that undisputedly met the medical standard of care for decades does not have a close historical or common-law analogue.

"Article III standing requires a concrete injury even in the context of a statutory violation." *Id.* at 426 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)). The Court emphasized, "under Article III, an injury in law is not an injury in fact. Only those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court." *Id.* at 427.

The Court held the class members whose reports were disseminated by TransUnion to third-parties suffered reputational harm because the reports included misleading information that they

16

were on alerts falsely labeling them as terrorists.  *Id.* at 431–33.  Their reputational harm was concrete injury.  The other class members—whose reports were not disseminated—did not suffer concrete injury even though their reports contained the same misleading alerts.  Because their credit reports were not sent to third-parties, they suffered no concrete harm.  *Id.* at 435.

Plaintiffs argued they had standing because of a *risk* of future harm–that there was a *material risk* the information would be disseminated in the future to third parties and thereby cause harm.  *Id.* The Court rejected plaintiff's argument, stating "mere risk of future harm, standing alone, cannot qualify as a concrete harm-at least unless the exposure to the risk of future harm itself causes a separate concrete harm." *Id.* at 436.  The Court offered an example to illustrate the point: a woman driving home is exposed to another driver who is recklessly swerving across lanes.  *Id.*  The recklessly swerving driver creates a significant risk of harm.  If the woman makes it home safely, there was no concrete harm.  If the reckless driver crashed into her, the situation would be different. For the 6,332 class members, the Court held the *risk* that the reports would cause future harm was too speculative to convey standing.  *Id.* at 437–38.

The Court noted there was no evidence the 6,332 class members even knew of the misleading alerts.  "It is difficult to see how a risk of future harm could supply the basis for a plaintiff's standing when the plaintiff did not even know that there was a risk of future harm." *Id.* at 438.

Plaintiffs argued "the credit reports of many of those 6,332 class members were likely also sent to third parties[.]" *Id.* at 438.  The *possibility* those reports were sent to third parties was not sufficient.  The Court noted, "plaintiffs had the burden to prove at trial their reports were actually sent to third-party businesses. The inferences on which the argument rests are too weak to demonstrate that the reports of any particular number of the 6,332 class members were sent to third-party businesses." *Id.* at 439.

As to the formatting error claims, the Court held plaintiffs had not demonstrated the format of TransUnion's mailings caused them a harm that had a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts.  *Id.* at 440.  The result: "No concrete harm, no standing." *Id*. at 442.  The Court also suggested the lower court should examine whether class certification was properly granted, stating: "On remand, the Ninth Circuit may

17

consider in the first instance whether class certification is appropriate in light of our conclusion about standing." *Id.* at 442.

As discussed below, the evidence in this case does not support a conclusion that class members incurred a concrete injury attributable to Defendants' actions.  To the contrary, the evidence establishes a lack of concrete injury to class members.

**(ii)     Article III requires a concrete injury even in the context of a statutory violation.**

In *TransUnion*, the Supreme Court "rejected the proposition that 'a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.'"  594 U.S. at 426 (quoting *Spokeo*, 578 U.S. at 341).  "Article III standing requires a concrete injury even in the context of a statutory violation." *Id.*   "Congress's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III[.]" *Id.*; *see also Opiotennione*, 2020 WL 5877667, at *4 ("[W]hile the Unruh Act renders arbitrary sex discrimination by businesses . . . per se injurious, it still requires allegations of injury." (quoting *Angelucci*, 41 Cal. 4th at 174)).   *TransUnion* provides clear instruction that Plaintiff's injury must be "real, and not abstract."  *Id*. at 424 (quoting *Spokeo*, 578 U.S. at 340).

The Ninth Circuit expressly acknowledges that in recent years the Supreme Court has made the "concrete injury" requirement even more definite. *Popa v. Microsoft Corp.*, 153 F.4th 784, 788 (9th Cir. 2025).   In *Popa*, the Ninth Circuit recognized not all intangible harm meets this requirement.  The Ninth Circuit explained, "we need to acknowledge . . . that *TransUnion* requires a court to assess whether an individual plaintiff has suffered a harm that has traditionally been actionable in our nation's legal system." *Id.* at 791.  In *Popa*, plaintiffs alleged statutory violations arising from the use of "session-replay technology" that invaded their privacy. *Id.* at 791 n.5.  The Ninth Circuit affirmed the district court's order dismissing for lack of jurisdiction because the alleged invasion of privacy did not have a close relationship to the common law invasion of privacy torts of intrusion upon seclusion or public disclosure of private facts. *Id.* at 794–95.

18

DEFENDANTS CEDARS-SINAI MEDICAL CENTER AND UNITED NETWORK FOR ORGAN SHARING'S JOINT MOTION FOR SUMMARY JUDGMENT REGARDING STANDING FOR CLASS MEMBERS

Here, Plaintiff alleges violation of the Unruh Act. He complains that the Defendants should not have used, or allowed referring physicians to use, methods to estimate GFR that were recommended by the National Kidney Foundation and widely accepted as the medical standard of care because they treated Black patients differently than non-Black patients. He does not allege medical malpractice or negligence. The statutory violation he alleges is not "a harm that has traditionally been actionable in our nation's legal system." *Id.* at 791. It does not bear a "close relationship" to any common law tort. Accordingly, Plaintiff fails to show that class members' claims meet the requirements of *TransUnion* and *Popa.*

> ### (iii) Being forced to compete on an uneven playing field does not constitute a concrete and actual injury.

Plaintiff contends that "in the context of racial classifications, the Supreme Court has held that being forced to compete on an uneven playing field is an injury in fact sufficient to confer Article III standing[.]" (Dkt. 148 at 40 (citing *Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993)).) The *City of Jacksonville* case predates *TransUnion* and *Spokeo*. Accordingly, Plaintiff's reliance on *City of Jacksonville* misses the mark because although competing on an uneven playing field may present a *risk* of harm, after *TransUnion*, 594 U.S. at 436, "mere risk of future harm, standing alone, cannot qualify as a concrete harm . . . ." As to class members here, risk that a patient may be harmed by delayed registration or delayed wait time accrual is analogous to the woman the Supreme Court describes in *TransUnion* who was at risk while driving home when exposed to a reckless driver swerving across lanes. When she made it home safely, there was no concrete and actual injury. *See id.* at 436–38. Similarly, absent evidence that a patient did not receive a donated kidney due to Defendants' use of a race-conscious coefficient—and no such evidence exists—competing on an uneven playing field alone is not concrete and actual injury.

This Court's citation to *Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984), for the proposition that "[d]iscrimination itself . . . can cause serious non-economic injuries" is misplaced. (MSJ Order, Dkt. 244 at 6.) *Heckler* predates *TransUnion* and *Spokeo*. And *Heckler* did not hold discrimination without economic or non-economic injury caused by a defendant's conduct satisfies

19

the requirements of Article III.[6] *TransUnion* makes clear concrete injury caused by the defendant is required: "No concrete harm, no standing." *TransUnion*, 594 U.S. at 442.  Discrimination without concrete actual injury is not sufficient after *TransUnion*.

### 2. Class Members Must Demonstrate Evidence of Standing at Summary Judgment.

In *Healy v. Milliman*, 164 F.4th 701, 708 (9th Cir. 2026), the Ninth Circuit ruled that *TransUnion* "compels unnamed class members to demonstrate evidence of standing . . . after class certification but prior to trial at summary judgment."  The unnamed class members at least must demonstrate "a genuine issue of material fact as to the standing elements." *Id.* at 708 (quoting *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 947 (9th Cir. 2002)).  "A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. Rather there must be specific, admissible evidence identifying the basis for the dispute." (Dkt. 244 at 4–5 (citing *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co.*, 690 F.2d 1235, 1238 (9th Cir. 1982)).)  Plaintiff fails to meet his burden of presenting any such evidence in this case.

### B. Plaintiff's Response

At the summary judgment stage, members of a certified class must present evidence sufficient to show there is a triable issue of fact on Article III standing. *Healy*, 164 F.4th at 708. Here, there is more than enough evidence of concrete harm traceable to the Defendants that a reasonable juror could find every class member has standing.

### 1. Racial discrimination continues to cause concrete harm, even after *TransUnion*.

Defendants' argument that *TransUnion*, a case about errors in credit reports, implicitly overturned 70 years of Supreme Court doctrine acknowledging racial discrimination as inherently harmful is a non-starter. *TransUnion* held the existence of a statutory cause of action does not automatically create Article III standing, and that in conducting the standing analysis, courts should

---

[6] *White v. Square, Inc.*, 891 F.3d 1174 (9th Cir. 2018), also pre-*TransUnion* and did not consider "whether an individual plaintiff has suffered a harm that has traditionally been actionable in our nation's legal system" as is now required under *TransUnion* and *Popa*.  (*See* MSJ Order, Dkt. 244 at 11.)

20

DEFENDANTS CEDARS-SINAI MEDICAL CENTER AND UNITED NETWORK FOR ORGAN SHARING'S JOINT MOTION FOR SUMMARY JUDGMENT REGARDING STANDING FOR CLASS MEMBERS

consider "whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." 594 U.S. at 424. "That inquiry asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." *Id. TransUnion* specifically "identified 'discriminatory treatment' as an example of a 'concrete, *de facto*, injur[y].'" *Soule v. Connecticut Ass'n of Schools, Inc.*, 90 F.4th 34, 46 (2d Cir. 2023) (en banc) (quoting *TransUnion*, 594 U.S. at 425–26).

Defendants ignore *TransUnion*'s express acknowledgment of discrimination as an example of concrete harm, and further ignore generations of federal and state precedent before *TransUnion* holding the same. This was not always the law. In *Plessy v. Ferguson*, the Supreme Court shamefully ruled that disparate treatment based on race is only harmful "because the colored race chooses to put that construction upon it." 163 U.S. at 551. The case held laws permitting or requiring racial separation "in places where [different races] are liable to be brought into contact do not necessarily imply the inferiority of either race to the other, and have been . . . recognized as within [state police powers]." *Id.* at 544.

But the law changed. *Brown* overturned *Plessy* more than 70 years ago, and the Supreme Court emphasized that, in fact, disparate treatment for Black citizens "generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone." 347 U.S. at 494.

Building on the foundation of *Brown*, in *Heckler*, considering sex-based discrimination, the Supreme Court explained, "Discrimination itself . . . can cause serious non-economic injuries to those persons who are denied equal treatment solely because of their membership in a disfavored group." 465 U.S. at 739–40. In *City of Jacksonville*, the Supreme Court revisited race-based discrimination, again in the equal protection context, and held:

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.

21

508 U.S. 656, 666 (1993).[7] Most recently, and without discussion of *TransUnion*, in *SFFA*, the Supreme Court held a group had organizational Article III standing to challenge the use of race in college admissions. 600 U.S. 181, 199–200 (2023).

The Court previously held that because Mr. Randall "presented facts that could lead a reasonable factfinder to believe that Randall was 'denied equal treatment solely because of [his] membership in a disfavored group,'" he established Article III standing sufficient to defeat summary judgment. ECF No. 244 at 11 (quoting *White v. Square, Inc.*, 891 F.3d 1174, 1176 (9th Cir. 2018)). *White* explained "discrimination itself . . . can cause serious non-economic injuries to those persons who are denied equal treatment solely because of their membership in a disfavored group[.]" 891 F.3d at 1177 (quoting *Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984)). This is the correct standard for members of the California Class and Cedars Class who need only provide evidence upon which a reasonable factfinder could find they suffered discrimination because of their race.

Here, the California Class and Cedars Class allege that use of the race-based coefficient, which increased their kidney function score above the eligibility cutoff for the kidney waitlist because of their Black race, violated the Unruh Civil Rights Act. The concrete harm is threefold. First, every class member, by definition, was subject to disparate treatment because of race. Again, it is in the algorithm that Black patients' kidney function scores are increased by 21% (MDRD) or 16% (CKD-EPI). Second, this adjustment made it harder for Black patients to reach the 20 mL/min threshold to qualify to accrue wait time; therefore, they were forced to compete on an uneven playing field. Third, for the large majority of class members, their harm is even more than uneven competition—Cutler's model shows the race-based coefficient deprived them of real kidney offers.

---

[7] In this case's prior summary judgment ruling, the Court distinguished *City of Jacksonville* on the grounds that "*the government*," rather than a private party, "had erected a barrier that made it more difficult for members of one group to obtain a benefit than it was for members of another group." ECF No. 244 at 10 (cleaned up, emphasis in original). But whether the government or a private party discriminates, the Supreme Court and Ninth Circuit recognize that discrimination as harmful for the purposes of the *TransUnion* historical-analogue analysis. *See Barr v. Am. Ass'n of Political Consultants, Inc.*, 591 U.S. 610, 634–35 (2020) ("the Court has squarely held that a plaintiff who suffers unequal treatment has standing to challenge a discriminatory exception that favors others"); *White v. Square, Inc.*, 891 F.3d 1174, 1176–77 (9th Cir. 2018) (standing for discrimination claim against Square corporation because "discrimination itself . . . can cause serious non-economic injuries to those persons who are denied unequal treatment solely because of their membership in a disfavored group").

DEFENDANTS CEDARS-SINAI MEDICAL CENTER AND UNITED NETWORK FOR ORGAN SHARING'S JOINT MOTION FOR SUMMARY JUDGMENT REGARDING STANDING FOR CLASS MEMBERS

Defendants attempt to distinguish *City of Jacksonville* and *Heckler* by arguing class members only suffer a risk of future harm, held insufficient in *TransUnion*. But there is not simply a risk the class members will be subject to racial discrimination in the future: **all class members' kidney function scores were adjusted because of their race in a way that left them ineligible to accrue wait time on the kidney waitlist.** The crux of Defendants' argument is that the only concrete harm class members can suffer in this context is actually missing out on a kidney transplant, but this ignores stigmatic harm recognized in *Heckler*, ignores uneven-playing-field harm recognized in *City of Jacksonville* and again in *Students for Fair Admissions*, and ignores the concrete value of being offered a potentially lifesaving kidney, and being allowed the chance for your doctor to determine whether to accept the kidney on your behalf. Indeed, discrimination's pedigree as an actionable harm is as traditional as any *TransUnion* catalogued. *See also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373–74 (1982) (holding Black citizen given false apartment-availability information because of her race suffered concrete harm even though she never intended to rent and lost no apartment, discriminatory treatment itself causing injury).

For Defendants to prevail, the Court must accept their argument that Black patients they subjected to a meritless race-based algorithm suffer no more harm than someone who sees a rogue driver on the road. In the section above, they argue the following:

> "risk that a patient may be harmed by delayed registration or delayed wait time accrual is analogous to the woman the Supreme Court describes in *TransUnion* who was at risk while driving home when exposed to a reckless driver swerving across lanes. When she made it home safely, there was no concrete and actual injury."

*See supra*. Defendants did not simply swerve at class members and pull the wheel back from the brink; they mangled class members' kidney-function scores because they were Black. This is race discrimination and binding appellate law recognizes the harm it causes.

In summary, Defendants' argument invites this Court to return to the days of *Plessy* when the Supreme Court did not view racial discrimination as inherently harmful. The Court is bound by more recent doctrine starting with *Brown* and continuing even after *TransUnion* in *Students for Fair Admissions*. And even if the Court were not bound, that Defendants would request such a result to

DEFENDANTS CEDARS-SINAI MEDICAL CENTER AND UNITED NETWORK FOR ORGAN SHARING'S JOINT MOTION FOR SUMMARY JUDGMENT REGARDING STANDING FOR CLASS MEMBERS

dodge liability demonstrates the reason for this lawsuit: to seek justice for direct discrimination on the basis of race.

### C.    Defendants' Reply

The cases Plaintiff cites do not support Plaintiff's argument that being subject to disparate treatment, making it harder to reach 20, and/or competing on an uneven playing field are actual concrete injury.  In *TransUnion*, 8,185 individuals sued because there was inaccurate information in their credit files.  The 6,332 individuals whose inaccurate alerts remained only in TransUnion's internal files lacked standing because the misinformation was never published and did not otherwise cause concrete harm.  Plaintiff has not shown that an uneven playing field or delay in reaching 20, without more, translates to concrete injury for Class Members.  It does not.

*Brown* does not discuss Article III standing nor does it support Plaintiff's argument that a student who was subject to disparate treatment or competed on an uneven playing field but was nonetheless admitted to the school of his or her choice, would have standing. In *Soule v. Conn. Ass'n of Schools*, 90 F.4th 34, 43 (2nd Cir. 2023), plaintiffs unsuccessfully competed and finished behind transgender athletes. "[I]n the 2019 state open indoor 55m final, Plaintiff Mitchell finished in 3rd place behind [transgender] Miller and Yearwood. For each Plaintiff, the complaint identifies at least one race in which she allegedly competed against and lost to one or both intervenors." The injury was not that they competed. The injury was that they competed *and lost*: "plaintiffs are discriminated against *and that discriminatory treatment results in the denial of certain benefit*[.]" *Id.* at 46 (emphasis added). Denial of the benefit (unsuccessful competition) is an injury; competition is not.

*Heckler* recognized discrimination "can cause serious non-economic injuries to those persons who are denied equal treatment." It did not hold risk of harm was sufficient. *Heckler* required plaintiff to show he "personally has suffered some actual or threatened injury." 465 U.S. at 738. *TransUnion* requires showing discrimination caused actual injury. Plaintiff's argument that it is sufficient to show discrimination "can cause harm" to some persons–i.e., there is a risk of harm, is inconsistent with *TransUnion*, 594 U.S. at 417.  *City of Jacksonville* and *Heckler* were both decided before *TransUnion*.

DEFENDANTS CEDARS-SINAI MEDICAL CENTER AND UNITED NETWORK FOR ORGAN SHARING'S JOINT MOTION FOR SUMMARY JUDGMENT REGARDING STANDING FOR CLASS MEMBERS

Plaintiff's argument that "all class members' kidney function scores were adjusted because of their race" is unsupported and wrong. Class members who received the same kidney offers with or without an adjustment (*i.e.*, won the race) did not suffer actual, concrete injury. Adjustment of GFR score before referral or registration is not *traceable to Cedars or UNOS* absent evidence that the physician knew of and delayed referral because of Cedars or UNOS policies. Plaintiff offers no such evidence. Speculation is not sufficient.

Plaintiff's reliance on *SFFA* is misplaced. *SFFA* did not consider or recognize playing field harm. *Havens*, 455 U.S. 363, 373–74, another pre-*TransUnion* case, held that § 804(d) "establishes an enforceable right to truthful information concerning the availability of housing . . . . A tester who has been the object of a misrepresentation made unlawful under § 804(d) has suffered injury in precisely the form the statute was intended to guard against, and therefore has standing . . . ." *Id.* at 373–74. Importantly, however, plaintiff Coleman had standing not because he competed but because he was falsely told no apartments were available when they were. *Id*. Plaintiff HOME had standing because it "had to devote significant resources to identify and counteract the defendant's [*sic*] racially discriminatory steering practices" and "the consequent drain on the organization's resources – constitutes far more than simply a setback to the organization's abstract social interests." *Id.* at 379. In contrast, plaintiff Willis lacked standing because he was truthfully told apartments were available. *Id*. It was not sufficient for Willis to allege he was deprived of the "important social, professional, business and economic, political and aesthetic benefits of interracial associations that arising from living in integrated communities free from discriminatory housing practices." *Id*. at 369. "[B]ecause Willis does not allege that he was a victim of a discriminatory misrepresentation, he has not pleaded a cause of action under § 804(d)." *Id.* at 375. *Havens* does not support Plaintiff's assertion that merely being forced to participate on an uneven playing field is sufficient—it is not. In *Spokeo*, 578 U.S. at 341, the Supreme Court "rejected the proposition that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *TransUnion*, *Healy*, and *Spokeo* establish: (i) alleged statutory violations do not satisfy the injury-in-fact requirement; (ii) Plaintiff must establish an actual, concrete injury for every class member; and (iii) arguments of unequal

25

treatment or unequal playing field are abstract and insufficient. Application of this well-established legal framework establishes that the Class Members here lack Article III standing.

## V.    ARGUMENT NO. 2

### A.    Defendant's Argument

#### 1.    Class Members Do Not Have Sufficient Evidence to Establish Article III Standing

Plaintiff contends that being forced to compete on an uneven playing field, in and of itself, is a sufficient basis to establish concrete injury for all class members.  Plaintiff's position is inconsistent with *TransUnion* and *Popa* and otherwise unsupportable as discussed *supra*.

Alternatively, Plaintiff contends that his expert, Dr. Cutler, provides evidence of harm to all class members.  Plaintiff is wrong.  First, this Court expressly held that Cutler's methodology does not provide a sufficient basis to link class members harm and Defendants' actions.  Second, assuming the Court were to consider his stated opinions, Dr. Cutler's results establish that a significant percentage of class members did not incur any actual injury.  The evidence establishes class members were not injured by Defendants' purported use of a race-conscious coefficient.

#### (a)    Dr. Cutler Does Not Provide Sufficient Evidence That Class Members Incurred Actual Injury.

Dr. Cutler purports to offer a "statistical method . . . to determine how much class member wait times were impacted by Defendants use of the race-biased coefficient, and thus how much any particular class member's chances of being offered an acceptable kidney were prejudiced." (SUMF ¶ 6, Dkt.79-39, p. 4 ¶ 8.)  Importantly, however, Cutler admits he does not even attempt to establish whether any class member, let alone all class members would have received a kidney transplant any sooner in his "but for" world.  (SUMF ¶¶ 7–10, Dkt. 79-39.)  Instead, Cutler merely provides probabilities that purportedly show some, but not all class members may have received additional "offers" if no one in the world used a race-conscious coefficient.  (SUMF ¶ 7, Dkt. 79-39, p. 27, ¶ 62 n.27.)  But receipt of an offer is not equivalent to acceptance of an offer or receipt of a transplant. Additionally, as the Court previously ruled, Cutler does not provide sufficient evidence of class member harm attributable to Defendants' actions.  (SUMF ¶ 13, Dkt. 241 at 12, n.5.)

26

**(b)        Cutler's use of "probabilities" is a not a legally sufficient basis to establish class member injury.**

Cutler concedes that he "cannot say for certain that a particular Black individual would receive a kidney, or even that the kidney would be given to a Black person. We can only determine probabilities." (SUMF ¶ 8, Dkt. 79-39, p. 11 ¶ 24.)  Cutler's analysis, which is based exclusively on statistical probabilities, is legally insufficient to establish actual concrete harm for members of the certified classes. *See Pharm. Rsch. & Manufacturers of Am. v. Dep't of Health & Hum. Servs.*, 656 F. Supp. 3d 137, 149 (D.D.C. 2023) ("[A] particular injury cannot rest on 'a statistical probability' that some unknown members will suffer a concrete injury."); *Shrimpers & Fishermen of RGV v. Texas Comm'n on Env't Quality*, 968 F.3d 419, 424 (5th Cir. 2020) ("We do not recognize the concept of 'probabilistic standing' based on a non-particularized 'increased risk'. . . ."); *Summers v. Earth Island Inst.*, 555 U.S. 488, 497–98 (2009) (rejecting environmental organizations' argument that they had suffered a concrete injury because there was a "statistical probability" that at least some of their hundreds of thousands of members nationwide were threatened with concrete harm from Forest Service regulations).

**(c)        Cutler does not establish the requisite causal link between Defendants' actions and class members' harm.**

Article III standing does not exist unless "the plaintiff's injury [is] fairly traceable to the defendant's alleged misconduct." (Order, Dkt. 244 at 5 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).)  As this Court correctly noted, Cutler does not even attempt to link any purported concrete injury to either Defendants' actions.

Defendants are correct that Cutler's methodology cannot be used—on its own—to allocate any harm experienced to any particular Defendant. Defendants correctly assert that Cutler's model alone cannot "segregate a violation or harm" caused by Defendants—individually or jointly—as opposed to that caused by a third party. Motion at 15. It does not appear to this Court that Randall disputes this. This Court does find that, upon review of the Cutler Report, it does not appear as though Cutler's expert opinions even attempt to reflect individual harms done by Cedars-Sinai and/or UNOS; instead, the methodology merely appears to compare the actual world against one in which Black patients are not subject to a race-conscious coefficient from

27

anyone, not just Defendants.

(SUMF ¶¶ 4–5, Dkt. 241 at 12, n.5.)

For these reasons Cutler does not provide a sufficient evidentiary basis to establish Article III standing for any member of the certified classes.  Plaintiff provides no other evidence to support class member standing.  Defendants are entitled to summary judgment as to all members of the certified class and subclass.

**B.     Plaintiff's Response**

**1.     Plaintiff presents more than sufficient evidence of class member harm.**

Contrary to Defendants' argument, every class member suffered harm. Definitionally, membership in the California Class and/or Cedars Class depends on having a race-adjusted eGFR score that otherwise would have met the 20 mL/min threshold necessary to accrue wait time. Moreover, the classes are limited to patients registered on the kidney waitlist, which UNOS oversees. And the Cedars Class includes only patients registered by Cedars that would have encountered its race-based admissions policy. ECF No. 253 at 20; *see also supra*, Section II(C).

Defendants intentionally overstate the role of Cutler's expert testimony to focus on what was beyond his analysis. Plaintiff readily admits that (1) Cutler models kidney offers, not acceptances, and (2) Cutler's model does not attempt to determine who used the race-based coefficient. Nonetheless, Cutler's model shows actionable harm in the form of lost kidney offers, and separate record evidence traces class members' harm to Defendants.

**(a)     Losing a kidney offer well exceeds what is required to show concrete harm.**

Defendants make the distinction that "receipt of an offer is not equivalent to acceptance of an offer or receipt of a transplant." *See, supra*, Section IV(A)(1)(a). Plaintiff never argued that it was, and Defendants suggest here that to establish Article III standing, class members are required to prove they were deprived of a particular kidney and transplant surgery. This argument is made without citation and is shown incorrect above. Certainly, if exposure to disparate treatment or an uneven playing field constitutes concrete harm, the deprivation of an actual benefit—the offer of a kidney—is another form of concrete harm. *Cf. Ne. Fla. Chapter of Associated Gen. Contractors of*

28

*Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993) ("And in the context of a challenge to a set-aside program, the 'injury in fact' is the inability to compete on an equal footing in the bidding process, not the loss of a contract."); *Preston v. Heckler*, 734 F.2d 1359, 1365 (9th Cir. 1984) ("We have held previously that, when challenged agency conduct allegedly renders a person unable to fairly compete for some benefit, that person has suffered a sufficient 'injury in fact' and has standing under the APA").

Defendants invoke organizational-standing cases unsuccessfully brought by various interest groups to cast Cutler's analysis as probabilistic speculation. *See supra* (citing *Pharm. Rsch. & Manufacturers of Am. v. Dep't of Health & Hum. Servs.*, 656 F. Supp. 3d 137, 149 (D.D.C. 2023); *Shrimpers & Fishermen of RGV v. Texas Comm'n on Env't Quality*, 968 F.3d 419, 424 (5th Cir. 2020); *Summers v. Earth Island Inst.*, 555 U.S. 488, 497–98 (2009)). For instance, in *Summers*, the Supreme Court rejected standing because it was not "probable . . . that some (unidentified [Sierra Club]) members have planned to visit (unidentified) small parcels affected by the Forest Service's procedures and will suffer (unidentified) concrete harm as a result." 555 U.S. at 497–98. Defendants' citation to *Shrimpers & Fishermen* reads, "We do not recognize the concept of 'probabilistic standing' based on a non-particularized 'increased risk'. . . ." *Supra* (citing 968 F.3d 419, 424 (5th Cir. 2020)). Their ellipses are telling; the full rule says, "[w]e do not recognize the concept of 'probabilistic standing' based on a non-particularized 'increased risk'—**that is, an increased risk that equally affects the general public**." *Id.* (emphasis added).

The class members' harm, and Cutler's testimony thereabout, is on completely different footing. Unlike a Sierra Club member who *might* like to visit *some* federal parcel *some time*, the race-based coefficient delayed every class member's referral to a California hospital or Cedars, specifically. There is no dispute that the race-based coefficient applied to every class member because they were Black, and would not have applied to them had they been White. Cutler does not venture to answer whether the class members suffered harm (that much is obvious); instead, he uses *UNOS's own research* to rigorously model a world where the race-based coefficient never existed. *See* ECF No. 140 at 9 (citing Cutler Report ¶ 16–17 (ECF No. 149-51)). Unlike in the probabilistic standing cases Defendants cite, Cutler offers a "straightforward statistical model one can use to

29

determine how much class members wait times were impacted by Defendants' use of the race-based coefficient, and thus how much any particular class member's chances of being offered an acceptable kidney were prejudiced." ECF No. 149-51 ¶ 8. Far from longshot, speculative harm, Cutler provides more than the showing required—differential treatment based on race—he categorizes harm based on when the race-based coefficient impacted class members' kidney match runs. *See id.*

### 2.    Plaintiff presents evidence proving traceability.

Cutler does not need to provide evidence tracing class members' harm to Defendants because Defendants provide that evidence themselves. The evidence shows Defendants maintained a policy and practice of relying on race-adjusted kidney-function scores from waitlist admission to kidney allocation. As set out in Section II.B, *supra*, UNOS:

- required transplant hospitals using the MDRD or CKD-EPI to enter the race-adjusted GFR scores (the "Black value") into UNet for Black patients, and monitored them to ensure compliance. PAF No. 9 (citing ECF No. 149-84 (Smith Depo. at 15:19–16:1); *Id*. (citing ECF No. 149-87 (Poff Depo Ex. 92) (further stating "If they document that the candidate is AA then they need to use the AA value.")).

- composed of transplant and nephrology professionals, oversaw kidney allocation policy for the entire United States, with its former president and board members admitting they knew of the race-based coefficient and regularly applied it. PAF Nos. 11–12.

- knowingly used race-adjusted GFR scores in UNet, its kidney allocation algorithm. PAF No. 16.

Cedars:

- doctor Irene Kim admitted that Cedars was "still using the black race coefficient" until UNOS formally banned it in July of 2022. PAF Nos. 17–18;

- doctor Irene Kim admitted Cedars uses eGFR scores—including those based on the "black race coefficient"—to determine whether a patient qualifies for the kidney transplant waitlist. PAF No. 26;

30

- transcript manager, Margaret Farrell, testified "[u]ntil July 2022, it was Cedars-Sinai's practice when registering Black patients on the national kidney waitlist, that if their medical records reflected an eGFR score and an eGFR AA score, Cedars-Sinai would enter the eGFR AA score into UNET." PAF No. 29;

- enforced transplant selection criteria that authorized consideration of the MDRD, which, for Black patients, definitionally included a race-based coefficient. PAF No. 30. Around the time Plaintiff was admitted onto the waitlist, approximately 94% of nationwide laboratories were using the race-based coefficient. PAF No. 32.

This Court already found genuine disputes of material fact on traceability based on both Defendants' policies of using or allowing for the use of the race-based coefficient. ECF No. 244 at 11–13. Specifically, the Court held as follows:

> In effect, Randall argues that Defendants' practices of permitting the use of race-conscious methodologies led to the harmful delay in Black patients, including himself, being deemed eligible for kidney transplants. He argues that UNOS's practice was to permit transplant hospitals to accept scores calculated with the race coefficient, and that Cedars-Sinai was among the transplant hospitals that did so. **Because Randall produces sufficient evidence to substantiate this argument, Defendants' summary judgment motion on the basis of standing must be and is denied**.

*Id.* at 12–13 (emphasis added).

Cutler was not necessary for the Court to deny Defendants' first motion on traceability. The same result should follow here because none of the evidence has changed.

### C.    <u>Defendants' Reply</u>

The class definitions eviscerate Plaintiff's argument that "the Cedars Class includes only patients registered by Cedars that would have encountered its race-based admissions policy." *See supra*, § V.B.1.  It is undisputed that most patients are listed for transplantation using the dialysis pathway; GFR is not needed or relevant. (Dkt. 104-56, pp. 7–8 ¶ 13.) The California and Cedars Class definitions include Black patients who were "registered on the national kidney transplant waitlist" without regard to whether the registration was on the basis of a GFR score or the dialysis pathway. The definition requires that the patient "received or would have qualified for a wait time adjustment because a lab test shows" a straddling score attributable to the wait-time adjustment.

31

Eligibility for a wait-time adjustment was *not* limited to patients who were listed on the basis of GFR. (Dkt. 104-56, pp. 9–10 ¶ 17c.) A straddling test score from any physician qualified. The class definition includes patients who were not affected by *Defendants' use* of a GFR score and who did not encounter an alleged "race-based admissions policy" *by Defendants*.

Plaintiff admits Cutler's model counts estimated kidney *offers* without regard to the quality of the kidney or whether it would have been accepted. "Transplant centers are 'throwing away' thousands of kidneys annually." *See* Lara C. Pullen, *Discarding Kidneys: Can We Do Better?*, 19 Am. J. Transplantation 3215, 3215–16 (2019), [https://perma.cc/58FK-LYZB]. Class Members did not suffer actual concrete injury by not being offered kidneys they or their surgeons would have declined.

Plaintiff asks this Court to apply the wrong legal standard. *City of Jacksonville* was decided before *TransUnion* held "mere risk of future harm, standing alone, cannot qualify as a concrete harm . . . ." *TransUnion*, 594 U.S. at 436. *Heckler*, 734 F.2d 1359, another pre-*TransUnion* case, provides no support for Plaintiff's argument that a class member who has *successfully competed* for a kidney suffered actual and concrete harm. In relying on almost exclusively pre-*TransUnion* cases—Plaintiff ignores *Healy*, 164 F.4th 701, 708 ("nearly all of the cases [plaintiff] Healy cites predate *TransUnion* and therefore have since been abrogated"), and *Popa*, 153 F.4th 784, 788 (the Supreme Court has in recent years made the concrete injury requirement "even more definite.").

Plaintiff misses the point concerning Cutler's reliance on "probabilities" when it comes to standing. The cases Defendants cite relating to statistical probabilities, such as *Shrimpers & Fishermen*, 968 F.3d at 424, and *Summers*, 555 U.S. at 497–98, turn on the question of "particularized" injury. *Spokeo*, 578 U.S. at 339, teaches that a particularized injury is one that "affect[s] the plaintiff in a personal and individual way." The language Plaintiff quotes from *Shrimpers & Fishermen*—about particularity and risk to the "general public" 968 F.3d at 424—is but one expression of the particularized injury inquiry. *See supra*, § V.B.1.a. The opposition admits "Cutler does not venture to answer whether the class members suffered harm" *id.*, and Cutler concedes he "can only determine probabilities." (SUMF ¶ 8.) In an attempt to validate Cutler's probabilities methodology, the opposition asserts "the race-based coefficient delayed every class

32

DEFENDANTS CEDARS-SINAI MEDICAL CENTER AND UNITED NETWORK FOR ORGAN SHARING'S
JOINT MOTION FOR SUMMARY JUDGMENT REGARDING STANDING FOR CLASS MEMBERS

member's referral to a California hospital or Cedars." *Id.* Cutler's analysis leads to no such conclusion and that assertion, devoid of any record citation, is simply false. Cutler's statistical model is based on this false premise—he assumes all "class members wait times were impacted by Defendants' use of the race-based coefficient[.]" *Id.* Cutler lacks a foundation to demonstrate any specific class member suffered a personal injury in an individual manner arising *from Defendants' conduct*. The Court previously recognized this flaw; noting Cutler's methodology compares the "actual world against one in which Black patients are not subject to a race-conscious coefficient from anyone, not just Defendants" and therefore Cutler's opinions do not "even attempt to reflect **individual harms** done by Cedars-Sinai and/or UNOS[.]" (SUMF ¶ 5, Dkt. 241:12, n.5 (emphasis added)); (*see also* SUMF ¶ 10, Dkt. 79-39, at 11 ¶ 24 (Plaintiff identifies as undisputed: "Cutler does not establish whether any class member . . . would have received a transplanted kidney any sooner in his "but-for" world.").)

That race-based GFR scores were used for some Class Members by some physicians does not demonstrate any particular Class Member, much less all, were denied kidney offers traceable to the conduct of Cedars or UNOS. An issue of fact as to whether Kaiser delayed referring Randall, does not demonstrate any other Class Members' doctor knew of or delayed referral because of Cedars or UNOS policy. Unlike Randall, no GFR scores were entered for the majority of Class Members who were registered when they commenced regular dialysis and no GFR score was required. (Dkt. 104-56, pp. 7–8 ¶ 13.)

## VI. ARGUMENT NO. 3

### A. Defendant's Argument

#### 1. Record Evidence Proves Class Members Did Not Incur Actual Injury as a Result of Defendants' Actions.

Putting aside that it is Plaintiff's burden to establish actual injury, Defendants direct the Court to record evidence that affirmatively shows a significant percentage of class members were not injured as a result of Defendants' actions.

DEFENDANTS CEDARS-SINAI MEDICAL CENTER AND UNITED NETWORK FOR ORGAN SHARING'S JOINT MOTION FOR SUMMARY JUDGMENT REGARDING STANDING FOR CLASS MEMBERS

**(a)    Cutler affirmatively establishes that a significant percentage of class members were not harmed.**

Dr. Cutler has presented a methodology he contends shows "how much any particular class member's chances of being offered an acceptable kidney were prejudiced" by use of the race-based coefficient.  (SUMF ¶ 14, Dkt. 79-39, p. 4 ¶ 8.)  Cutler assumes in his simulated "but-for" world that Black patients should have been registered on the transplant list when they first had an eGFR score that would have been 20 ml/min or less had the race-based coefficient not been used (a "Straddling Score").  (SUMF ¶ 9, Dkt. 79-39, p. 7 ¶ 13.)  With that as his working premise, Cutler re-ranks people in match runs and counts how many times in his simulated world people fall into four metrics he devised for this litigation.  (SUMF ¶ 12, Dkt. 79-39, pp. 4–5 ¶ 8.)  Cutler admits that falling into one or more of his metrics does not establish a Black individual would have received a kidney transplant any sooner.  (SUMF ¶ 10, Dkt. 79-39, p. 11, ¶ 24.)  Instead, Cutler contends that falling into one of his metrics merely indicates, at most, that a Black individual may have received an offer for a donated kidney.  (SUMF ¶ 7, Dkt. 79-39, p. 27, ¶ 62 n.27).  An offer for a donated kidney does not necessarily mean that the offer would be accepted, and does not mean that even if accepted, the transplant would necessarily occur.  Cutler's methodology is fatally flawed in many ways, most notably his foundational assumption that having an eGFR score of 20 or less entitles a patient to be immediately registered on the transplant list and begin accruing wait time.  Record evidence unequivocally establishes that Cutler is wrong.  *See infra*, Section II.B.2.  Even if the Court were to accept Cutler's methodology, Cutler identifies a substantial number of specific class members who were not injured.

Cutler applied his methodology to 1,109 Black individuals registered on the kidney transplant waitlist in California who had received a wait time adjustment pursuant to the OPTN policy that became effective on January 5, 2023.  (SUMF ¶ 15, Dkt. 79-39, p. 26 ¶ 60.)  Of the 1,109 individuals who received wait time modifications, 222 did not match in any match runs.[8]  (SUMF ¶

---

[8] A list specifically identifying these 222 class members is set forth as Ex. A of the Blouin Declaration, filed simultaneously herewith. The list is generated using Appendix Exhibit 5 to Cutler's report.

DEFENDANTS CEDARS-SINAI MEDICAL CENTER AND UNITED NETWORK FOR ORGAN SHARING'S JOINT MOTION FOR SUMMARY JUDGMENT REGARDING STANDING FOR CLASS MEMBERS

16, Dkt. 79-39 ¶ 60; Blouin Decl. Ex. A.)  Because they were not in any match runs there is no evidentiary basis to conclude that these 222 individuals would have fared any better in any match run but for use of the race-based coefficient.  (SUMF ¶ 17; Blouin Decl. Ex. A.)  Given the complete lack of evidence that they incurred actual injury, Defendants are entitled to summary judgment for the 222 class members identified in Ex. A of the Blouin Declaration.

Cutler identifies an additional 103 class members who did not incur actual injury.[9]  (SUMF ¶ 18, Blouin Decl. Ex. B.)  Cutler's analysis identifies 103 class members who were not harmed, regardless of which of his four metrics is used, i.e., these 103 class members had zero projected kidney offers for each of Cutler's metrics.  Given the complete lack of evidence that they incurred actual injury, Defendants are entitled to summary judgment for the 103 class members identified in Ex. B of the Blouin Declaration.

Next, as Cutler admits, each of his four metrics have limitations.  (SUMF ¶ 19, Dkt. 79-39 ¶¶ 15, 45.)  Although Defendants strongly contend that none of the metrics provide sufficient evidence of actual injury, let alone injury caused by Defendants' actions, of the four, Cutler's Metric 3 is the only one that purports to reflect the number of times the class member would have placed high enough on the match run to be offered a kidney "with certainty" had the race-based coefficient not been used.  (SUMF ¶ 20, Dkt. 79-39, pp. 5, 23 ¶¶ 8, 52.)  According to Cutler's Metric 3 analysis, 808[10] class members would not have been offered a kidney "with certainty."  Defendants are entitled to summary judgment for each of the 808 class members identified in Ex. C of the Blouin Declaration.  (SUMF ¶ 21, Blouin Decl. Ex. C.)

**(b)     Independent of Cutler's analysis addressed above, record evidence highlights that class members did not incur actual injury as a result of Defendants' actions.**

Contrary to Plaintiff's assertion, the evidence shows that class members do not qualify for

---

[9] A list specifically identifying these 103 class members is set forth as Ex. B of the Blouin Declaration, filed simultaneously herewith. The list is generated using Appendix Exhibit 5 to Cutler's report.

[10] The 808 class members without a "certain" offer include the 222 and 103 class members referenced in the preceding paragraphs. The list of 808 class members is generated using Appendix Exhibit 5 to Cutler's report.

35

registration on the transplant list and begin to accrue wait time merely because they have an eGFR score of 20 or less.  Cutler's reliance on the date class members first had a Straddling Score misses the mark.  The fallacy of Plaintiff's position is illustrated by the graphs of exemplar class members.  (SUMF ¶ 30, Blouin Decl. ¶¶ 6–11, Exs. D–I.)  In each of the depicted cases the patient had an eGFR score with a race-based coefficient of 20 or less before they had a Straddling Score.  If Plaintiff's assertion were correct, each of these class members would have been registered and would have begun to accrue wait time even before they had a Straddling Score, which clearly is not the case.

**Patient 1631281** had an eGFR score of 18 (with a race-based coefficient) on March 21, 2011, but the transplant hospital did not register the patient on the transplant list for more than 10 years, specifically November 7, 2021.  (*See* Blouin Decl. Ex. D, at CSMC 010855; Blouin Decl. Ex. E, at CSMC 006032.)



**Patient 1637555** had an eGFR score of 14 (with a race-based coefficient) on October 20, 2014, but the transplant hospital did not register the patient on the transplant list for more than 7 years, specifically December 10, 2021.   (*See* Blouin Decl. Ex. F, at CSMC 011278-11279; Blouin Decl. Ex. G, at CSMC 006036.)

36
DEFENDANTS CEDARS-SINAI MEDICAL CENTER AND UNITED NETWORK FOR ORGAN SHARING'S JOINT MOTION FOR SUMMARY JUDGMENT REGARDING STANDING FOR CLASS MEMBERS



**Patient 1566689** had an eGFR score of 20 (with a race-based coefficient) on January 12, 2018, but the transplant hospital did not register the patient on the transplant list until November 23, 2020.  (*See* Blouin Decl. Ex. H, at CSMC 010272-10273; Blouin Decl. Ex. I, at CSMC 006011.)



Defendants can provide numerous additional examples where patients were not registered until long after their eGFR score (with a race-based coefficient) was 20 or less.  (*See, e.g.*, Patient 1530503 [Dkt.104-31 & 104-32]; Patient 1776159 [Dkt.104-33 & 104-34]; Patient 1716517 [Dkt.104-35 & 104-36]; Patient 1574367 [Dkt.104-37 & 104-38 at UNOS_0568326]; Patient 1788680 [Dkt. 104-42 at ECF p. 35]; Patient 1574367 [Dkt. 104-42 at ECF p. 36]; Blouin Decl. ¶¶ 12–15 (Patients 1255638, 1662895, 1684727, 1701672).)  This evidence torpedoes the premise of Plaintiff's case that he and all members of the class would have been registered on the transplant list earlier and correspondingly would have accrued additional wait time absent use of the race-based coefficient.

DEFENDANTS CEDARS-SINAI MEDICAL CENTER AND UNITED NETWORK FOR ORGAN SHARING'S JOINT MOTION FOR SUMMARY JUDGMENT REGARDING STANDING FOR CLASS MEMBERS

The medical records of class members clearly show there are myriad reasons why a transplant hospital may not register an individual on the transplant list for an extended period even though they had one or more eGFR scores of 20 or less. "The selection of a candidate for kidney transplantation is a complex, individualized process, weighing the survival and quality of life benefit of transplantation versus the risk of complication and death from transplant surgery and treatment with immunosuppressive medications for the life of the transplant kidney." (SUMF ¶ 22, Dkt. 104-21.) "[N]ot all patients are suitable candidates for transplantation, and suitability is often determined by the perceived risks of transplantation relative to the risks of not receiving a transplant. Estimation of risk is therefore a key part of the transplant candidate evaluation." (SUMF ¶ 23, KDIGO, *Transplant Candidate* (Apr. 13, 2026), [https://perma.cc/QPX9-5XLJ].)

Delay in registration and delay in accrual of wait time occurs for reasons completely unrelated to GFR scores. The evidence regarding the following exemplar class members proves this point.

**Patient 1592512** had an eGFR score of 16 as early as June 8, 2018. (SUMF ¶ 31, Farrell Decl. ¶ 8, Ex. 3.) Notwithstanding this fact he was not evaluated for possible transplant until July 29, 2020. (SUMF ¶ 31, Farrell Decl. ¶ 8, Ex. 2.) Completely independent of his test score, this patient's candidacy and corresponding transplant assessment necessarily took into consideration his past medical history that included a stroke, prostate cancer and a colonoscopy in September 2016 that showed tubular adenoma. *Id.* His assessment in 2020 required a cardiac stress test, urology clearance regarding his history of prostate cancer, and consideration for repeat colonoscopy in light of the findings of tubular adenomas. (SUMF ¶ 32, Farrell Decl. ¶ 8, Exs. 2–5.) He started dialysis in October 2020. (SUMF ¶ 32, Farrell Decl. ¶ 8, Ex. 4.) Given the complexity of his medical condition, even starting dialysis was not enough to justify the transplant hospital registering him on the transplant list. Only after additional tests were conducted did the medical team determine that he was an acceptable transplant candidate. He was registered on the transplant list on April 22, 2021. (SUMF ¶ 32, Farrell Decl. ¶ 8, Ex. 5.) These facts establish that merely having an eGFR score of less than 20 in 2018 was not enough to justify registration on the transplant list.

38

**Patient 1548142** is another good example of an individual who was not registered on the waitlist for years notwithstanding an eGFR score of 20 or less. Contrary to Cutler's conclusion that **Patient 1548142** *would* have been expected to receive 215 kidney offers but for use of race-based equations, (Dkt. 79-39, p. 72), the evidence shows that delay in the patient's registration was completely unrelated to his eGFR score. The patient started dialysis on April 28, 2017. (SUMF ¶ 35, Farrell Decl. ¶¶ 12–13, Ex. 8 & 9.) He was referred to Cedars for evaluation in 2017. Cedars Kidney Transplant Selection Policy provided, "Patients with a chronic history of nicotine use with documented medical complications from such use may be asked to abstain from smoking and may also be required to submit to random nicotine screens." (SUMF ¶ 26, Dkt. 104-50 at 4–5.) **Patient 1548142** cancelled his appointment stating he wanted "to be physically ready" for evaluation and stated he would quit smoking. (SUMF ¶ 35, Farrell Decl. ¶ 12, Ex. 8.) He was re-referred almost two years later on August 22, 2019, stating "he quit smoking and is ready to proceed with the kidney transplant option." (SUMF ¶ 36, Farrell Decl. ¶ 13, Ex. 9.)[11] Even then, "Pt expressed ambivalence regarding transplantation." (SUMF ¶ 36, Farrell Decl. ¶ 14, Ex. 10.) Following additional work, he was registered for transplant August 20, 2020, and received retroactive wait time credit to July 5, 2009 based on a race-based GFR of 21. (SUMF ¶ 37, Farrell Decl. ¶ 14, Ex. 12.)

**Patient 1789614** provides another example of a situation in which any arguable "delay" in an individual's registration date was caused by factors unrelated to eGFR scores. In 2018 Cedars' Kidney Transplant Selection Policy provided that "Patients with a BMI > 38 at time of referral will not be evaluated for transplant. Patients with a BMI of >35 but <40 may be asked to lose weight or be referred to bariatric surgery . . . ." (SUMF ¶ 43, Farrell Decl. ¶¶ 2, 9, Ex. 1; Dkt. 104-50, p. 4.) **Patient 1789614** was seen in Cedars' evaluation clinic on 12/22/2021. (SUMF ¶ 33, Farrell Decl. ¶ 10.) The patient was not accepted as a transplant patient because the patient's BMI was too high. (SUMF ¶ 33, Farrell Decl. ¶ 10, Ex. 19.)[12] The patient lost weight, was evaluated a second time on

---

[11] Relatedly, Cedars' Kidney Transplant Selection Policy, (SUMF ¶ 24, Dkt. 104-50 at 1; Dkt. 149-179, at 1), expressly provides that one of many transplantation considerations is whether the patient can reasonably be expected to adhere to a long-term disciplined medical regimen following transplantation. *Id.* If not, the patient is not accepted for transplant. GFR is not a factor.

[12] The patient's medical records detail, "This RN met with patient and reviewed after being seen by Dr. Todo and Dr. (footnote continued)

39

12/5/2023, was accepted for transplant after losing weight[13] and was registered for transplant on January 12, 2024. (SUMF 33, Farrell Decl. ¶ 10, Ex. 20.)  This patient had a race-based GFR of 21 that would have been 19 without considering race. (SUMF ¶ 34, Farrell Decl. ¶ 10, Ex. 7.)  But it was the patient's BMI that made the patient not suitable for transplant before the weight loss. (SUMF ¶ 34, Farrell Decl. ¶ 10, Ex. 19.)

There are myriad additional factors totally unrelated to eGFR scores that preclude patients, at least initially, from being registered on the transplant list. For example, pursuant to Cedars 2018 Kidney Transplant Selection Policy, a breast cancer patient would not be accepted for transplant at that time but could later be considered, accepted and added to the national kidney transplant waitlist after 2 to 5 years.   (SUMF ¶ 44, Dkt. 104-50, at 3.)  Whether the patient's GFR score was 20 or below would not be a factor until 2 to 5 years after the cancer cleared. Likewise, patients with a history of bladder, lung, prostrate or skin cancer would not be accepted for transplant unless and until recommendation of specialists in those disciplines.   (SUMF ¶ 45, Dkt. 104-50, at 3–4.) Independent of GFR score, "Active, uncontrolled infections are contraindications for transplant." (SUMF ¶ 27, Dkt. 104-50, at 3.)  If treatment resolves the infection, a patient may later be accepted and registered. Other exclusions included chronic liver or lung disease, uncorrected heart disease or severe peripheral vascular disease but such patients "will be referred to the appropriate subspecialty physicians" and, if appropriate, might later be added to the transplant list in connection with combined organ transplant. (Dkt. 104-50, at 6.)

Record evidence proves that registration for some patients was delayed because they were not diligent in undergoing required tests.  For example, **Patient 1573124** was seen at Santa Barbara Cottage Hospital (SBCH) on October 18, 2018.  The SBCH records indicate the patient visited Lompoc Emergency Department on October 12, 2018, and was told "that she needed to be

---

Sethi, pt was found unsuitable to BMI >41. Pt verbalized understanding and was given a weight loss goal of 20 lbs weight loss." (SUMF ¶ 46, Farrell Decl. ¶ 10, Ex. 6.)

[13] This situation highlights that a patient not accepted for transplant at one time for one of many reasons may be registered on the transplant list later once the prior disqualifying condition is no longer applicable.  It also should be noted that the Kidney Transplant Selection Guidelines changed over time which provides even more variability from patient to patient, depending on the applicable guidelines would not be the same for all class members dating back to 2000. Compare, variations of the policy in effect in different years. (Dkt. 149-179 pp. 11–31; Dkt. 104-20.)

40

transferred to SBCH for dialysis and higher level of care, but she refused and left the ED AMA"—against medical advice.   (SUMF ¶ 38, Dkt. 104-5, p. 80 ¶ 8.4; Farrell Decl. ¶ 15, Ex. 13.)  The patient resumed dialysis on October 18, 2018. (SUMF ¶ 38, Farrell Decl. ¶ 15.)  Having started dialysis, there was no need to demonstrate a GFR of 20 or below to be eligible to accrue wait time credit. The patient was not registered for reasons unrelated to GFR.  On 1/2/2019, SBCH sent a referral packet to Cedars for **Patient 1573124**.  (SUMF ¶ 47, Farrell Decl. ¶ 15, Ex. 13.)  The patient was seen at Cedars on January 15, 2020, for pre-kidney transplant evaluation. (SUMF ¶ 47, Farrell Decl. ¶ 16, Ex. 14.)  The patient had a prior kidney transplant in 2004 that failed in 2018.  *Id.* Evaluation was delayed because the patient did not undergo tests needed for the evaluation.[14]  There was no delay caused by an eGFR score.  If the patient was an acceptable transplant candidate, having resumed dialysis on October 18, 2018, she would have accrued wait time credit as of that date. (SUMF ¶ 38, Dkt. 104-5, p. 80 ¶ 8.4.)

There is no evidence that Kaiser, SBCH (or any other referring physician for other class members) delayed referral because of patient eGFR scores. Relatedly, there is no evidence to create a genuine dispute of fact that Cedars will only accept for evaluation for possible kidney transplantation patients who have a GFR of 20 or less.  (SUMF ¶ 28.)  To the contrary, Cedars-Sinai can list—and historically has listed—patients pre-emptively for kidney transplant even if the patient does not have an eGFR score of 20 ml/min or less.  (SUMF ¶ 28, Dkt. 149-179 at 6 ¶ 18.)

In short, class members who were not added to the transplant list when they had a Straddling Score for reasons independent of GFR score, but who subsequently were registered did not suffer concrete harm as required for Article III standing.  "No concrete harm, no standing."  *TransUnion*, 594 U.S. at 442.

---

[14] On March 25, 2020, Patient 1573124 stated she had "not completed any exams and stated due to Covid 19 everything is closed. Pt stated she will reach out once she is able to get some tests scheduled."  (SUMF ¶ 48, Farrell Decl. ¶ 17, Ex. 15.)  On June 22, 2020, the Patient reported "still has not completed any exams."  When the exams were later completed, Patient 1573124 was accepted and listed for deceased-donor organ transplant.  (SUMF ¶ 49, Farrell Decl. ¶ 19, Ex. 17.)

DEFENDANTS CEDARS-SINAI MEDICAL CENTER AND UNITED NETWORK FOR ORGAN SHARING'S JOINT MOTION FOR SUMMARY JUDGMENT REGARDING STANDING FOR CLASS MEMBERS

**B.**      <u>Plaintiff's Response</u>

**1.**      **Cutler's model quantifies harm in the form of missed kidney offers; it does not negate other forms of harm.**

As explained above, Cutler's model was intended to isolate instances in which class members were deprived of kidney offers and found 888 identified class members were deprived of an estimated 63,048 kidney offers. *See supra*, § II(D). In addition to competing on an uneven playing field, Cutler's model shows these class members were deprived of the benefit for which they were competing—kidney offers—tens of thousands of times.

This does *not* mean, however, that patients absent from match runs or missing specifically identified offers in Cutler's model were not forced to compete on an uneven playing field. *See, supra*, § II(E). Moreover, Cutler notes that his model is "purposely conservative" in that it does not account for kidneys that came available before class members were in fact added to the kidney waitlist. ECF No. 149-51 (Cutler Report) ¶ 15. Every class member missed out on being on the kidney waitlist between the time they would have qualified but for the race-based coefficient, and the time they were actually added. *See, supra*, § II(E). Defendants' insistence that Cutler identify kidney offers lost "with certainty" flips the summary judgment standard on its head. *Healy* held the district court erred because it demanded evidence that "necessarily" establishes class-wide injury where plaintiffs need only enough evidence that a rational trier of fact "could" reasonably infer it. 164 F.4th at 710.[15]

**2.**      **Record evidence does not disprove Article III standing.**

Defendants present cherry-picked medical records attempting to show that for 16 class members—where the certified classes include thousands—it was not the race-based coefficient, but something else, that delayed their registration on the kidney waitlist. Setting aside that, again, simply being subjected to disparate treatment or an uneven playing field because of your race is sufficient for Article III standing, this is the same process that UNOS's ex-president criticized as "not

---

[15] That Cutler refers to one metric as "certain offers" does not mean that his other metrics are speculative. A certain offer is simply defined as a scenario where "they are high enough on the match list that not all kidneys are certain to be taken by people ranking above them." PAF No. 21 (Cutler Report) ¶ 69. The other metrics, like expected kidney offers for example, also show instances where class members were deprived of kidney offers. *Id.* ¶ 71.

DEFENDANTS CEDARS-SINAI MEDICAL CENTER AND UNITED NETWORK FOR ORGAN SHARING'S
JOINT MOTION FOR SUMMARY JUDGMENT REGARDING STANDING FOR CLASS MEMBERS

objective" when explaining why UNOS decided to use the date of the first straddling score as the measure of harm when performing wait time adjustments. PAF No. 22.

The "not objective" concern is magnified here for several reasons. First, the medical records attached to the Farrell Declaration were produced for the first time on June 5, 2026, approximately seventeen months after discovery closed. ECF No. 49. Moreover, those records were not identified in Cedars's initial disclosures. PAF No. 27. Indeed, during discovery, Cedars objected to Plaintiff's discovery of patients' medical records on the grounds that the information was private. PAF No. 28. Cedars now attempts to sandbag Plaintiff with the very same evidence it objected to producing before, but the evidence should be excluded.[16] Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."). There is no justification offered here, and the failure is not harmless where Plaintiff had no opportunity to seek additional records to understand the context concerning this handful of class members.

Second, even if not excluded, the evidence is inadmissible. Cedars provides redacted medical records obscuring the names, and in some instances, apparently the races, of the discussed patients. *See, e.g.*, Farrell Decl. Ex. 14 at CSMC_021614:

> **HPI:**      is a        female who presents to our clinic today for pre-kidney transplant evaluation. She has ESRD attributed to HTN. She underwent DDKT in 2004 at CSMC. The kidney failed in 2018 and she resumed dialysis 10/2018.

*See also* Farrell Decl. Exs. 9–17. The Farrell Declaration makes representations as to which class members the records are connected, *id.* ¶¶ 8, 10, 12–19, but there is no way to test that representation, particularly given the late production of these documents. This violates Rules 901 and 1002 and the evidence is thus inadmissible. Fed. R. Evid. 901 ("the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is"); 1002 ("An

---

[16] Plaintiff submits evidentiary objections simultaneously with this brief.

43

original writing . . . is required in order to prove its content"). A party may not redact identifying information from evidence and then simply offer a declarant to explain what the document is.

**Patient Nos. 1631281, 1637555, 1566689, 1530503, 1776159, 1716517, 1574367, 1788680, 1255638, 1662895, 1684727, and 1701672**. UNOS argues these 12 class members could not have been harmed by the race-based coefficient because their race-adjusted score was 20 or below, but for some time period thereafter, they were not registered on the kidney waitlist. UNOS provides no medical records such that the Court could evaluate any intervening cause for these class members' delay. What is in the record, however, is that each class member's eGFR score was adjusted because of their race in a manner that prevented them from qualifying for the kidney waitlist. Defendants suggest some intervening cause must exist but fail to provide any proof.

**Patient 1592512.** Cedars points to three medical conditions suffered by this patient between 2016 and 2020, but this patient would have qualified to accrue wait time if he was not Black in May 2014, and Cedars offers no explanation why the patient should not have been registered at that time. Farrell Decl. ¶ 8. Moreover, two of the three conditions Cedars points to arose after this patient had a race-neutral qualifying score, meaning the delay caused by the race-based coefficient led to this patient encountering two additional health complications that further prolonged his accrual of wait time. *Id*.

**Patient 1789614.** Cedars argues this patient was ineligible to join the waitlist because his BMI was too high, but this patient qualified for wait time but for being Black in August 2020, sixteen months before the record showing his BMI was too high. *Id*. ¶ 10. Cedars puts nothing in the record concerning this patient's BMI at the time he qualified. Even if this patient's BMI was prohibitive at the time he received a race-neutral qualifying score, this patient lost out on sixteen months of time to lose weight to become eligible because of Cedars's and UNOS's policies.

**Patient 1548142.** Cedars argues this patient voluntarily chose not to be registered in November 2017 because he wanted to quit smoking first, but had he been White, this patient would have qualified to accrue wait time in July 2009. *Id*. ¶¶ 12–14. There is nothing in the record confirming whether this patient smoked, or had any other contraindication to transplant, at that time. Again, even if this patient smoked in 2009, eligibility for placement on the waitlist prompted this

44

patient to quit smoking. This means that the race-based coefficient cost this patient eight years of time to quit smoking.

**Patient 1573124.** Cedars argues this patient caused her own delay by failing to follow up for years after an emergency room visit in October 2018 related to kidney failure, but this patient qualified for the kidney waitlist but for being Black in January 2017. *Id*. ¶¶ 15–19. Had she been registered at that time, it is possible she would have had a transplant prior to the October 2018 incident, and at minimum, a reasonable jury could reject the inference that because this patient failed to follow up after an incident in 2018, she would have failed to go through the necessary steps to get on the kidney waitlist if she had been told she qualified in January 2017.

In sum, each of these class members has Article III standing such that they should survive summary judgment, and Defendants fail to substantiate with admissible evidence that something other than the race-based coefficient delayed waitlist registration for any of these class members. Even if this were not the case and Defendants were granted summary judgment on any of these 16 class members, the remainder of the California Class and Cedars Class would proceed to trial.

### C.    **Defendants' Reply**

The parties disagree regarding the significance of the Court's addition to the Class definitions of the words "given that the patients received a delay in their accrual of wait time, attributable to the race-conscious coefficient." Plaintiff contends every patient with a straddling score who obtained a wait-time modification is a Class Member even where the GFR score was not reason for delay. Defendants disagree and contend these words narrow the class definitions. Plaintiff does not even attempt to show that for each class member delay in referral or listing *is attributable to the race-based coefficient*. Although not their burden to do so, Defendants present evidence establishing that many class members delay in referral or registration was caused by reasons wholly unrelated to their eGFR scores.

Plaintiff represents that "the certified classes include thousands," *see supra*, § VI.B.2, and argues Cutler's model, which claims 888 Class members missed kidney offers, somehow provides evidence of concrete injury for "thousands." Evidence for 888 does not demonstrate standing for "thousands." Cutler admits 103 of the 888 would not have received any offers. Missing offers of

45

kidneys of poor quality the patient would have declined is not actual, concrete harm. 809 were not "certain" to receive any offers. (SUMF ¶ 21, Blouin Decl. Ex. C.)

Plaintiff's references to "the time they would have qualified" confuses OPTN's rule for when a patient *who has not started dialysis* is eligible to start accruing wait-time credit with the fact that the patient must first be accepted by a transplant hospital as an appropriate candidate for transplant. Having a GFR of 20 or less does not result in patients automatically being accepted for transplant or added to the waitlist. One example: Cutler's model projects that the patient with Wait List ID number 1548142 would have received 215 offers. (Dkt. 79-39, p. 72 of 92). **Patient 1548142**'s registration was delayed not because of his GFR score but because he cancelled his appointment to be evaluated stating he would first quit smoking. (SMUF ¶ 35, Farrell Decl. ℙ 12, Ex. 8).[17]  No patients are registered without a transplant center first determining suitability for transplant. Plaintiff lacks evidence that all Class members were harmed by delayed registration *traceable to these defendants*. Nothing here "flips *Healy* on its head." "[P]laintiffs bear the burden of demonstrating that they have standing." *TransUnion*, 594 U.S. at 430–31; *Healy*, 164 F.4th at 708.

**D.     Defendants' Argument: Delayed Registration and/or Delayed Accrual of Wait time Credit Does Not Constitute Concrete Injury.**

Delay in registration and/or delayed accrual of wait time credit theoretically may create a *risk* of injury for class members.  But, as discussed above, *TransUnion* holds that risk of injury is not an actual concrete injury sufficient to establish standing.  Thus, class members here cannot establish concrete actual harm attributable to Defendants' actions.

Plaintiff has presented no evidence that any, let alone all class members incurred increased medical costs or lost wages attributable to Defendants' actions.  To the extent Randall is considered typical of the class, it is worth noting that, contrary to the allegations in his complaint, Randall admitted in deposition that he did *not* personally incur any medical expenses–all such expenses were fully covered by his health care insurer.  (SUMF ¶ 41, Randall Dep. 158:14–161:3.)  Similarly,

---

[17] Plaintiff's evidentiary objections lack merit. Patient records were timely produced before the July 1, 2026 deadline to complete class discovery. (Dkt. 261). Cedars agreed to produce the witness for deposition. Kardassakis Decl. ℙℙ 5-10. Plaintiff served a notice of deposition but cancelled the deposition. *Id.*

DEFENDANTS CEDARS-SINAI MEDICAL CENTER AND UNITED NETWORK FOR ORGAN SHARING'S JOINT MOTION FOR SUMMARY JUDGMENT REGARDING STANDING FOR CLASS MEMBERS

Plaintiff has no evidence that he or class members lost wages as a result of any alleged delay in their registration date or wait time accrual date.  Absent *evidence* that specific class members incurred medical expenses and/or lost wages traceable to the Defendants' conduct, they do not have Article III standing.

### E.    Plaintiff's Response

Plaintiff explained above why disparate treatment and an uneven playing field, which result in delayed registration and accrual of wait time, are concrete harm sufficient to establish Article III standing. *See, supra*, § IV.B. Plaintiff further explained how missed kidney offers constitute additional instances of concrete harm. *Id.* § IV.B. Lack of evidence regarding lost wages or medical expenses is unremarkable—the class members seek only Unruh Civil Rights Act statutory damages, for which there is no actual damages requirement. *Evenchik v. Avis Rent a Car System, LLC*, 2013 WL 12415798, at *3 (S.D. Cal. Sept. 27, 2013) ("Section 52 provides for minimum statutory damages . . . regardless of the plaintiff's actual damages.") (quoting *Koire v. Metro Car Wash*, 40 Cal. 3d 24, 33 (1985)); *see also Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 731 (9th Cir. 2007) (frequently cited for same proposition in ADA cases).

The Court should not mistake the lack of such evidence in the record for harmlessness. Documents identifying class members were due the same day as this opposition and Plaintiff thus had no opportunity to obtain evidence of medical bills or lost wages as to specific class members. ECF No. 261 at 3. Nonetheless, it is very much in the record that the race-based coefficient made it harder for Black kidney patients to obtain lifesaving transplants, and many such patients waited additional years on dialysis, or died before receiving a transplant. ECF No. 49-108 at 2 (UNOS press release stating "[s]o many African Americans have been affected by the use of race-inclusive calculations, and have become very ill or have died waiting for the opportunity to list for a kidney transplant.").

### F.    Defendants' Reply

The risk of injury is not actual concrete harm. Harm not traceable to UNOS or Cedars does not meet Plaintiff's burden.

47

**G.** **Defendants' Argument: Making It Harder for Patients to Reach the 20 mL/min Threshold Is Not Concrete Injury**

This Court's Order on the prior summary judgment motion ruled "there are genuine disputes of material fact as to whether Defendants, as Randall argues, employed a 'policy and practice of using race-adjusted scores for Black patients like Mr. Randall [that] made it harder for [those patients] to reach the 20 mL/min threshold required to accrue wait time, thus creating an uneven playing field.'" (Dkt. 244 at 12.)  For the same reasons discussed above, making it harder for Black patients to reach the 20 mL/min threshold is not concrete actual injury.  It is not harm that "has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts—such as physical harm, monetary harm . . . ." *TransUnion*, 594 U.S. at 417.  Here, Plaintiff does not plead a claim for medical malpractice or negligence—nor could he since it is undisputed that using the race-conscious formulas met the standard of care.

*TransUnion* cited and built on *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016).  If a person visited Spokeo's website and input a person's name, phone number, or email address, Spokeo provided information about that person.  Robins alleged information that Spokeo generated in a profile about him was incorrect.  *Id.* at 334.  Robins learned of this and filed suit for himself and others alleging violation of the Fair Credit Reporting Act, 15 USC § 1681 *et seq*.  The District Court dismissed the complaint for lack of standing.  The Ninth Circuit reversed noting "first, that Robins alleged that 'Spokeo violated his statutory rights, not just the statutory rights of other people,' and second, that 'Robins's personal interests in the handling of his credit information are individualized rather than collective.'" *Id.* at 333–34. "Based on these two observations, the Ninth Circuit held that Robins had adequately alleged injury in fact, a requirement for standing under Article III of the Constitution." *Id.* at 334.  The Supreme Court reversed the Ninth Circuit, explaining "the injury-in-fact requirement requires a plaintiff to allege an injury that is both 'concrete and particularized.' The Ninth Circuit's analysis focused on the second characteristic (particularity), but it overlooked the first (concreteness)." *Id.*  The Court held, "[t]o establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (quoting *Lujan v. Defs. of Wildlife*,

48

504 U.S. 555, 560 (1992)).  The Court explained, "[p]articularization is necessary to establish injury in fact, but it is not sufficient. An injury in fact must also be 'concrete.'" *Id.* "A 'concrete' injury must be '*de facto*'; that is, it must actually exist. When we have used the adjective 'concrete,' we have meant to convey the usual meaning of the term — 'real,' and not 'abstract.'" *Id.* at 340 (citation modified).  The Court recognized that intangible injuries could be concrete, but it was "instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.* at 341.

The Court held, "Robins could not, for example, allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Id.* (citing *Summers*, 555 U.S. at 496 ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation . . . is insufficient to create Article III standing[.]")).  The Court then held that,

> Robins cannot satisfy the demands of Article III by alleging a bare procedural violation. A violation of one of the FCRA's procedural requirements may result in no harm. For example, even if a consumer reporting agency fails to provide the required notice to a user of the agency's consumer information, that information regardless may be entirely accurate. In addition, not all inaccuracies cause harm or present any material risk of harm. An example that comes readily to mind is an incorrect zip code. It is difficult to imagine how the dissemination of an incorrect zip code, without more, could work any concrete harm.

*Id.* at 342.  For similar reasons any arguable delay in registration on the transplant list is insufficient to establish Article III standing.

In denying the Defendants' earlier motion for summary judgment, this Court disagreed with Defendants' argument that the race-based coefficient is not a racial classification, noting that in *Students for Fair Admissions v. Harvard*, 600 U.S. 181 (2023), and ruled that "race is a determinative tip for a *significant percentage* of all admitted African American and Hispanic applicants." (Order, Dkt. 244, at 10.) That race was determinative to admissions decisions meant

there was concrete harm, not competition on an uneven playing field that did not change the result. That does not change the rule from *TransUnion* and *Spokeo*—that in a suit like this, where class members are seeking damages, all class members must demonstrate concrete harm. Competing on an uneven playing field, delayed registration or reduced wait time credit may create a risk of harm, but they are not themselves concrete actual harm suffered by all class members.

In his opposition to Defendants' earlier summary judgment motion, Plaintiff cited a 1997 Ninth Circuit decision, *Monterey Mech. Co. v Wilson*, 125 F.3d 702, 708 (9th Cir. 1997). *Monterey Mech.* is pre-*TransUnion*. In any event, in *Monterey* there was concrete harm because plaintiff submitted the low bid for a construction project but was disqualified because the company did not comply with a state statute that required contractors to subcontract percentages of the work to minority, women and disabled veteran owned subcontractors or demonstrate good faith efforts to do so. The court concluded the contractor suffered concrete harm because it was disqualified from a $21 million job where it was the low bidder. The facts in this case are not analogous.[18] There is no evidence any class member failed to receive a donated kidney any sooner as a result of Defendants' actions.

The test after *TransUnion* is whether an alleged intangible harm has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts. 594 U.S. at 417 (citing *Spokeo*, 578 U.S. at 340–41). Making it harder for patients to reach the 20 mL/min threshold is not sufficient. Assuming for sake of analysis that violation of the Unruh Act is deemed an intangible harm, the situation presented here is not a harm that has traditionally been actionable in our nation's legal system, nor does it bear a close relationship to any common law tort. This is the same reason why the Ninth Circuit affirmed dismissal of the claim in *Popa*, 153 F.4th at 788. The invasion of privacy alleged in *Popa* was based on a statutory violation that did not bear a "close relationship" to any common law tort.

---

[18] Plaintiff also cited *Chattopadhyah v BBVA USA*, 2021 WL 4958850, at *1 (9th Cir. Oct. 26, 2021). This Memorandum decision was NOT FOR PUBLICATION. It does not cite or discuss *TransUnion*. To the extent there is any conflict, *TransUnion* controls. In any event, this unpublished opinion found plaintiffs were harmed because defendant offered them contracts on discriminatory terms because of their citizenship.

50

DEFENDANTS CEDARS-SINAI MEDICAL CENTER AND UNITED NETWORK FOR ORGAN SHARING'S JOINT MOTION FOR SUMMARY JUDGMENT REGARDING STANDING FOR CLASS MEMBERS

**H.      Plaintiff's Response**

Defendants primarily repeat their earlier *TransUnion* argument, which is incorrect, if not frivolous. *See, supra*, § VI.G. In summary, *TransUnion* acknowledged discrimination as an example of concrete harm, and racial discrimination has been consistently recognized in American courts as causing concrete harm since *Brown* overruled *Plessy* more than 70 years ago. *TransUnion*, 594 U.S. at 425–26; *Soule*, 90 F.4th at 46; *City of Jacksonville*, 508 U.S. at 665–67; *Heckler*, 465 U.S. at 739–40; *Barr*, 591 U.S. at 634–35; *SFFA*, 600 U.S. at 203. The only thing added in this section is an attempt to distinguish cases recognizing discrimination as harmful. That attempt fails:

**1.      *Students for Fair Admissions***

*SFFA* reiterates forcefully the lesson *Brown* taught: Racial discrimination causes injury because it is inherently harmful. This is true, stresses *SFFA*, for "even racial distinctions that were argued to have no palpable effect." *SFFA*, 600 U.S. at 203.

> After *Plessy*, "American courts . . . labored with the doctrine of separate but equal for over half a century." *Brown v. Board of Education*, 347 U.S. 483, 491 (1954). Some cases in this period attempted to curtail the perniciousness of the doctrine by emphasizing that it required States to provide Black students educational opportunities equal to—even if formally separate from—those enjoyed by White students. *See, e.g.*, *Missouri ex rel. Gaines v. Canada*, 305 U.S. 337, 349–50 (1938) ("The admissibility of laws separating the races in the enjoyment of privileges afforded by the States rests wholly upon the equality of privileges which the laws give to the separated groups . . . "). But the inherent folly of that approach—of trying to derive equality from inequality—soon became apparent. As the Court subsequently recognized, **even racial distinctions that were argued to have no palpable effect** worked to subordinate the afflicted students. *See, e.g.*, *McLaurin v. Oklahoma State Regents for Higher Ed.*, 339 U.S. 637, 640–42 (1950) ("It is said that the separations imposed by the State in this case are in form merely nominal . . . But they signify that the State . . . sets [petitioner] apart from other students.") . . . In [*Brown*], we overturned *Plessy* for good and set firmly on the path of invalidating all *de jure* racial discrimination by the States and the Federal Government . . . The school district maintained that . . . segregation was lawful because the schools provided to Black students and White students were of roughly the same quality. But we held such segregation impermissible "even *though* the physical facilities and other 'tangible' factors may be equal." . . . The mere act of separating "children . . . because of their race . . . generated a feeling of inferiority."

*Id.* at 203–04 (cleaned up, emphasis added).

Defendants' argument here, if accepted, would resurrect the doctrine of separate but equal. Their heading reads, "making it harder for patients to reach the 20 mL/min threshold is not concrete injury," but the true meaning of that heading is astounding. In light of the evidence, it should say,

DEFENDANTS CEDARS-SINAI MEDICAL CENTER AND UNITED NETWORK FOR ORGAN SHARING'S
JOINT MOTION FOR SUMMARY JUDGMENT REGARDING STANDING FOR CLASS MEMBERS

"A race-based test applied only to Black patients that made it more difficult for them to qualify to accrue wait time is not concrete injury." Not qualifying to accrue wait time toward a donor kidney is concrete harm because, as Defendants admit, wait time is a significant factor in determining eligibility for a donor kidney. PAF No. 19. This is a racial distinction **with a palpable effect**— delaying Black patients' accrual of wait time because of their race.

More class members in this case suffered tangible harm than the "significant percentage" of disadvantaged Harvard applicants subjected to Harvard's discriminatory admissions policy. *See* ECF No. 244 at 10–11 (citing *SFFA*, 600 U.S. at 195). By definition, *all* class members "received a delay in their accrual of wait time attributable to the race-conscious coefficient." Any Black patients who suffered no delay are simply not in the classes at all.

### 2.     *Monterey Mechanical and Chattopadhyay*

Defendants misread *Monterey Mechanical*, which conclusively establishes that competing for a benefit on an unequal playing field based on race confers Article III standing. In *Monterey Mechanical*, the Ninth Circuit confirmed that "**plaintiffs [do] not have to prove that they would lose any bids or identifiable contracts in order to sustain actual injury.**" *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 707 (9th Cir. 1997) (citing *Bras v. Cal. Pub. Utils. Comm'n*, 59 F.3d 869, 873 (9th Cir. 1995)). Instead, to establish standing, bidders "need only show that they are forced to compete on an unequal basis." *Id.* at 707. Every class member here was forced to compete on an unequal basis; solely because of their Black race, Defendants' policies delayed their accrual of wait time.

The Supreme Court upheld this principle in *Northeastern Florida Contractors v. City of Jacksonville*, where it found that "[b]eing forced to compete on an unequal playing basis because of their race (or sex) is an injury under the Equal Protection Clause." *Monterey Mechanical Co. v. Wilson*, 125 F.3d 702, 707 (9th Cir. 1997) (describing the holding of *City of Jacksonville*, 508 U.S. at 665–67). In the Court's Order on Summary Judgment (ECF No. 244), the Court distinguished *City of Jacksonville* on the grounds that it was limited to equal protection cases where the government—not a private party—was responsible for the discrimination. *See* ECF No. 244 at 10 ("the Court limited its holding to 'equal protection case[s],' and noted that '*the government* [had

52

erect[ed] a barrier that ma[de] it more difficult for members of one group to obtain a benefit than it [was] for members of another group.'" (emphasis added by this Court)). But Title VI and the Unruh Act prohibit race discrimination by private parties with *even clearer* force than the Equal Protection Clause. *See SFFA*, 600 U.S. at 309–10 (holding that Title VI, unlike the Equal Protection Clause, does not direct courts to apply different levels of scrutiny to racial classifications; rather, Title VI makes it unlawful to *ever* racially discriminate (Gorsuch, J., concurring)); CACI No. 3060 (form jury instructions for Unruh claim requiring no levels of scrutiny—just simple proof that plaintiff's race was a substantial reason for defendants' harmful "distinction that denied full and equal accommodations/advantages/facilities/privileges/services").

Defendants also attempt to distinguish yet another appellate case that rejects their standing argument. They claim *Chattopadhyay* "found plaintiffs were harmed because defendant offered them contracts on discriminatory terms because of their citizenship." *See supra* n.12. Their reading of the facts and the holding is wrong. In *Chattopadhyay*, both U.S. citizens and plaintiff non-citizens applied for (and, if they qualified, would have received) the same benefit—entitlement to a checking account. *Chattopadhyay v. BBVA USA*, 2021 WL 4958850, at *1 (9th Cir. Oct. 26, 2021). But only the non-citizens had to apply for the checking account in person. *Id.* The Ninth Circuit reversed the dismissal for lack of standing, holding "**discrimination itself . . . can cause serious non-economic injuries to those persons who are denied equal treatment solely because of their membership in a disfavored group.**" *Id.* (citing *White v. Square, Inc.*, 891 F.3d 1174, 1177 (9th Cir. 2018)) (emphasis added); *see also Barr v. Am. Ass'n of Political Consultants, Inc.*, 591 U.S. 610, 634 (2020) ("[A] plaintiff who suffers unequal treatment has standing to challenge a discriminatory exception that favors others."). The Ninth Circuit reversed despite "[t]he fact that [p]laintiffs would have ultimately obtained the same checking account given to U.S. citizens" because the in-person requirement was imposed on a protected group. *Id.* In other words, loss of equal treatment *alone* satisfied Article III. Loss of a checking account was not the harm at issue, discrimination was. *Chattopadhyay* post-dates *TransUnion* by four months and the Ninth Circuit found no tension in applying *White* and *Heckler* after *TransUnion*.

DEFENDANTS CEDARS-SINAI MEDICAL CENTER AND UNITED NETWORK FOR ORGAN SHARING'S JOINT MOTION FOR SUMMARY JUDGMENT REGARDING STANDING FOR CLASS MEMBERS

The argument that the class has not shown harm thus collapses because Defendants' definition of harm is simply wrong. They state, "[t]here is no evidence any class member failed to receive a donated kidney any sooner as a result of Defendants' actions." As demonstrated by every Ninth Circuit and Supreme Court authority cited above, loss of the ultimate benefit (a kidney transplant) is not the harm at issue. Loss of *equal competition* for that benefit *because of race* is what the law prohibits. Even if there were other reasons White patrons got on a restaurant's waiting list earlier than Black patrons, and even if some Black patrons ultimately got a seat, a policy that made signing up to wait 16–21% more difficult for Black patrons is still illegal. Defendants cannot dispute that every class member "received a delay in their accrual of wait time attributable to the race-conscious coefficient." This delay—as well as lesser consideration because of race—is tangible harm under the law.

### I.     Defendants' Reply

Except for *SFFA*, Plaintiff cites only pre-*TransUnion* cases and pretends *TransUnion* did not make the test for concrete injury more difficult. *Healy*, 164 F.4th at 708; *Popa*, 153 F.4th at 788. *Healy* recognized reliance on pre-*TransUnion* precedent would be erroneous as "nearly all of the cases Healy cites predate *TransUnion* and therefore have since been abrogated." 164 F.4th at 708.

Plaintiff cites cases where discrimination caused actual harm but tries to characterize the cases as holding discrimination alone, without actual injury, is sufficient. Standing existed in those cases because there **was** actual harm, not because of competition on an uneven playing field. *Brown*, 347 U.S. at 495 (pre-*TransUnion,* did not discuss Article III standing, student denied admission); *Monterey Mech.*, 125 F.3d at 707 (pre-*TransUnion*, low bidder denied contract); *Bras*, 59 F.3d at 873 (pre-*TransUnion*, denied employment); *City of Jacksonville*, 508 U.S. at 666 (pre-*TransUnion*, denied opportunity to compete for contracts); *Chattopadhyay*, 2021 WL 4958850, at *1 (pre-*TransUnion*, offered contract on less favorable terms); *White*, 891 F.3d at 1177 (pre-*TransUnion*, denied service); *Barr* (pre-*TransUnion*, denied free speech). The post-*TransUnion* case plaintiff cites is *SFFA* where the students were *denied admission*. Here, Plaintiff presents no evidence that Class Members suffered actual concrete harm.

DEFENDANTS CEDARS-SINAI MEDICAL CENTER AND UNITED NETWORK FOR ORGAN SHARING'S JOINT MOTION FOR SUMMARY JUDGMENT REGARDING STANDING FOR CLASS MEMBERS

**J.** **Defendants' Argument: The OPTN Wait Time Modification Policy Further Undercuts Plaintiff's Contention that Class Members Were Harmed.**

The OPTN adopted a Wait Time Modification Policy that became effective on January 5, 2023.  Under this policy, Black patients whose transplant hospitals submitted documentation to the OPTN received additional accrued wait time dating back to when they first had a Straddling Score. (Dkt. 104-12, at 3 § 3.7.D.ii.)  A candidate was eligible for additional accrued wait time whether or not the identified Straddling eGFR score had in fact caused a delay in registration.  See, for example, **Patients 1548142** and **1789614**, discussed above.

If Plaintiff argues that some class members would have been offered a kidney before the wait time modification credit was granted, the burden is on Plaintiff to offer evidence to demonstrate specifically which patients would have received and accepted an earlier offer and that such earlier offer would have resulted in a transplant. Plaintiff has no such evidence. Even Cutler would not support an argument that all class members would have received a kidney offer before being granted the wait time credit and certainly not that such earlier offer would necessarily have been accepted. And any such argument based on patient-specific facts would fracture the class.

In summary, Plaintiff lacks evidence to demonstrate a genuine issue of fact that class members incurred concrete injury traceable to Cedars and/or UNOS. Accordingly, Defendants are entitled to summary judgment against all class members for lack of Article III standing.

**K.** **Plaintiff's Response**

This argument is a retread of Defendants' earlier claims that to show actionable discrimination class members must prove they would have been transplanted earlier but for the race-based coefficient. *See supra*, § VI.J (Defendants argue Plaintiff must "demonstrate specifically which patients would have received and accepted an earlier offer and that such earlier offer would have resulted in a transplant."). This is incorrect, as even being subjected to disparate treatment or an uneven playing field is sufficient for Article III standing. *See, supra*, §§ IV.B, V.B.

The Supreme Court ruled losing "a dollar or two" is good enough for standing. *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 289 (2008). The Ninth Circuit held standing remains even when those missing dollars find their way back to the wallet. *See Van v. LLR, Inc.*,

55

962 F.3d 1160, 1164 (9th Cir. 2020) (temporary loss of money, if later refunded, is still an injury in fact). Missing kidneys is no less harmful than missing dollars. Especially if you miss them on the basis of race.

> **L.    Defendants' Reply**

Despite having the burden, Plaintiff offers no evidence any Class member lost "a dollar or two" or that any Class member was, in fact, delayed in receiving a kidney that would have been accepted. That deficiency is dispositive.

Dated: August 5, 2026     JON KARDASSAKIS
            ELEONORA ANTONYAN
            LEWIS BRISBOIS BISGAARD & SMITH LLP

            By: _/s/ Jon Kardassakis_
              JON KARDASSAKIS
              Attorneys for Defendant,
              CEDARS-SINAI MEDICAL CENTER

Dated: August 5, 2026     DANIEL M. BLOUIN
            SHAWN R. OBI
            WINSTON TAYLOR LLP

            By: _/s/ Daniel M. Blouin_
              DANIEL M. BLOUIN
              Attorneys for Defendant, UNITED NETWORK
              FOR ORGAN SHARING

DEFENDANTS CEDARS-SINAI MEDICAL CENTER AND UNITED NETWORK FOR ORGAN SHARING'S
JOINT MOTION FOR SUMMARY JUDGMENT REGARDING STANDING FOR CLASS MEMBERS

Dated: August 5, 2026

WATSTEIN TEREPKA LLP
Matthew L. Venezia
George Laiolo
Daniel Contreras
Corine White

KELLER ROHRBACK L.L.P.
David J. Ko
Daniel P. Mensher


_s/Matthew L. Venezia_
By:  Matthew L. Venezia
Attorneys for Plaintiff Anthony Randall

DEFENDANTS CEDARS-SINAI MEDICAL CENTER AND UNITED NETWORK FOR ORGAN SHARING'S
JOINT MOTION FOR SUMMARY JUDGMENT REGARDING STANDING FOR CLASS MEMBERS